# EXHIBIT A

to The Flecks' Motion for Class Certification and Appointment of Class Representative and Class Counsel

Civil Action No. 21-CV-01073-CMA-GPG
United States District Court for the District of Colorado



March 24, 2022

Mr. Richard B. Podoll
Podoll & Podoll, P.C.
5619 DTC Pkwy
Suite 1100
Greenwood Village, CO 80111

  RE: Aaron Fleck Revocable Trust et. al. v. First Western Trust Bank et. at District of Colorado Case No. 21-CV-01073

Dear Rich:

Outlined below is my expert perspective in the above referenced case.

I. **Case Background**

In 2017, Aaron Fleck secured a bridge loan of $6 million from First Western Trust Bank (FWTB) for a new primary residence, while preparing to sell his then-current residence. In May 2018, Aaron Fleck agreed to allow FWTB to manage two Revocable Trusts, one for Aaron and the other for his wife Barbara.

On January 22, 2018, Aaron and Barbara Fleck entered into an investment-management agreement with First Western Trust Bank (FWTB) for the management of two Revocable Trusts. Each was in the amount of $4 million.

At the same time, the Flecks entered a relationship with FWTB, an Investment Policy Statement (IPS) that was signed by both the Flecks and FWTB. Given that both of the Flecks were in their 90s, the intent and goal of these Trusts were to provide a level of income and conservative growth to provide long-term income (1) for the Flecks jointly; (2) for the surviving spouse upon Aaron's or Barbara's death; and (3) for their six grandchildren upon passing of either Aaron or Barbara. In establishing the accounts, the level of income to be generated from the $8 million was between $300,000 to $500,000, with an overall return to be in the 5.0% to 6.0% range. The IPS outlined an understanding of the Flecks' investment needs and objectives.

II. **Tax Harvesting**

One of the objectives in the IPS, outlined on Page 3, was the need to minimize potential tax liabilities—otherwise known as tax harvesting—which all parties agreed to when they signed the IPS.

Tax harvesting involves selling securities at a loss to offset a capital gains tax liability. Tax harvesting is a basic strategy used by Investment Advisors in regards to tax planning. The process

is used at yearend, with a complete overview of a client's tax implications for the year. A harvesting strategy can be used to offset current capital gains or future gains. This strategy can help improve the investment performance of a portfolio over the course of time.

Between January 2018 and December 2018, Aaron and Barbara Fleck sustained major short-term capital losses due to mismanagement by FWTB. The Flecks had some major long-term capital gains on other personal transactions. On December 2, 2018, Aaron Fleck had instructed FWTB to harvest the losses from the two trust accounts to help offset the capital gains on the other gains he was holding.

In January 2019, after proactively inquiring on the tax-harvesting request by Aaron Fleck, FWTB acknowledged that they had not followed Aaron's specific request, resulting in a major tax liability for the Flecks. In fact, the bank made two offers to offset this mishandling with a credit of ongoing management fees, ranging from $90,000 to $166,000.

In January 2019, FWTB admitted that they were at fault and liable for not taking the losses for the tax year of 2018 for both Aaron and Barbara Fleck. Due to the bank's lack of oversight, gross negligence, and mismanagement in the handling of the Flecks' trusts, capital losses had occurred, and so did the opportunity for the Flecks to use those losses when filing their 2018 taxes. Both of these failures caused considerable financial harm to Aaron and Barbara Fleck.

### III. The Failure to Have a Policy or Procedure Regarding Tax Loss Harvesting Harmed All Members of the Putative Class

As indicated in the IPS, an essential component of managing fiduciary accounts is to minimize potential tax liabilities. In my experience, it is below the industry standard for a fiduciary account manager not to have a policy and procedure for all fiduciary accounts under administration on an annual basis. In 2018, FWTB had had no policy or procedure in place to harvest tax losses on an annual basis. There is no evidence that FWTB had policies and procedures in place to harvest tax losses in prior years. (*See* Sawyer Depo, 149:17-149:21).

The Bank failed to meet the industry standard as a fiduciary and that failure caused damage to the class members. The Plaintiffs here are typical of the other putative class members who had fiduciary accounts managed by FWTB. Generally, harvesting tax losses on an annual basis confers a benefit on account holders even if the loss isn't taken in the current tax year; the loss may be carried forward and used in future years. Also contrary to Mr. Sawyer's deposition testimony, there is no significant risk of loss of appreciation due to the 30-day buyback rule. If a fund is sold to harvest a loss, a similar fund could be simultaneously purchased to eliminate the risk of missing out on a market upswing.

Finally, a class action is a superior way to pursue the damages resulting from the failure to assess and harvest losses. The potential damages to individual account beneficiaries would necessarily vary with the potential losses that should have been harvested. Nonetheless, the damage to each putative class member is the result of the same conduct. As in most class action cases, the damages suffered by individual class members may not be as significant as the Flecks and may not provide class members with incentive to pursue a claim individually.

## IV. Investment Management of Funds:

The lack of a tailored approach and investment strategy, given the ages of the clients, and the nature of the funds to meet the Flecks' personal needs and those of their beneficiaries, especially given that the accounts were established and designated as trusts. The time horizon provided by the Flecks does not match that of the management of the trusts, which also reflects just how little attention to detail was applied in the clients' interests.

It was apparent that FWTB's investment agreements did more in protecting FWTB and allowing the practice of double dipping, through the use of proprietary funds that benefited the firm over the needs of its clients. Since no apparent investment strategy was followed, the only strategy for the bank appears to it being generously compensated in management fees, mutual-funds-management fees, other undisclosed transaction fees, and possibly additional undisclosed sales-incentive fees.

The high level of transactions in each account can only lead one to believe there was systematic, willful, and intentional self-dealing taking place here, rather than having done the right thing as a fiduciary, i.e., managing accounts to meet the needs of the clients first and foremost. I am also extremely confused by the complete portfolio changeover that took place in 2019. The complete changeover from funds, ETFs, and other alternative investments to a compilation of individual securities for a good portion of the portfolio just did not make sense nor did it provide confidence that there was a clear path in the investment process or as a strategy.

My final finding of FWTB's gross negligence was in the misconception in how it marketed its client services vs. the Flecks' actual client experience. FWTB prides itself as a fiduciary in the management of client funds on many levels—as a wealth advisor, private bank, trustee, etc. Taken from its own promotional materials, one can read the following: "At First Western Trust, our trust and wealth-management teams are held to a fiduciary standard, which means that we are committed to ensuring that your wishes are carried out and that your loved ones are taken care of to the best of our ability." There is not one aspect in the management of the Fleck's relationship or management of their personal trust funds that meets the high standard that FWTB professes to maintain. It is clear to me that a combination and willful intentional. misconduct and gross negligence led to significant capital losses to the Flecks.

The investment management of the two Fleck trust accounts did not match the outlined Investment Policy Statement (IPS) that was duly signed by both Aaron and Barbara Fleck and FWTB. Not only was there no coherent approach to the management of their investment accounts, but there were times the bank riddled their accounts with bank proprietary funds in which the bank double dipped in management fees through both direct and indirect management fees. As a result, the Flecks sustained serious and unnecessary losses.

## V. Know Your Client (KYC)

As a result of the Dodd Frank Wall Street Reform and Consumer protection Act of 2010, banks have been required to become more stringent in obtaining client background information to help prevent financial fraud and money laundering. In response to the Dodd Frank requirements, and given tougher standards by bank regulators, financial institutions used this opportunity to

gather greater information about their clients, including a holistic understanding and more in-depth knowledge of their clients and their financial needs.

Since FWTB served the Flecks both with lending and investment-management services, the bank should have had a greater in-depth understanding of the Flecks and their family financial needs—including tax liabilities.

As I reviewed the FWTB's internal notes, there were many concerns on the state of Aaron Fleck's mind, thinking, memory, age, and the bank services being provided by FWTB. That being the case, and the needs to know their client, FWTB should have received consent by Aaron to reach out directly to Barbara Fleck, their attorneys, and their CPA to verify the Flecks' circumstances, and to make sure they were best serving the Flecks, especially if Aaron was considering FWTB as a possible co-trustee of their estate.

Given the shallow depth of FWTB's investment and relationship-management team, the internal communication within the bank was more centered around the bank's exposure and how to best rectify the Flecks' threat of a lawsuit, rather than getting to the root cause of the Fleck's issue in harvesting taxes, lack in investment returns, and the bank's inability to understand the Flecks' needs.

Given the ages of the Flecks, the KYCs should have captured more details over all the needs of Aaron & Barbara Fleck, and beneficiaries. There should have been more information asked and provided around tax planning, estate planning and long-term goals in the management of the funds. As Aaron Fleck became more frustrated, the need for the bank to have more in-depth conversations should have been in person and with the full team. The lack of an initial quarterly meeting with the Flecks was irresponsible, especially given their age. A seven-month gap between the client's first review is inexcusable, especially given the market volatility and losses that had been mounting in such a new client relationship.

Given that FWTB had done little work to truly understand the holistic needs of Aaron and Barbara Fleck, multiple issues arose in the management of the Fleck's relationship with the bank. Had the bank truly fulfilled their obligation to know the Flecks as they should have, the issues that arose could have been prevented.

### VI. Conclusions

The issues that I have addressed around the Flecks' relationship with FWTB seem to be ingrained into the style of this bank. I do not believe that these circumstances are just an isolated occurrence, but rather a style and culture embedded into the bank and those that work for FWTB. Shallow relationship management, lack of knowledge about their clients, inability to harvest tax liabilities as a basic responsibility, coupled with past practices of double dipping in product/service fees, can lead one to believe that many customers of the bank have had similar experiences.

Sincerely,

**Joseph R. Rulison**

Please note: The comments provided in this letter are of my own personal perspective, gleaned from over 40 years of experience in the investment-management and banking world. They do not represent the opinion or perspective of three+one or the three+one company, inc.

**Materials Reviewed**

A. Depositions of

   1. John E. Sawyer  03/09/22

   2. Andrew Godfrey 03/07/22

   3. Charles Bantis  03/03/22

B. Account Statements

   1. FLECK_000003-FLECK_000038 A Fleck Revocable Trust 12 1 18 12 31 18.pdf

   2. FLECK_000003-FLECK_000038 A Fleck Revocable Trust 12 1 18 12 31 18_REDACTED.pdf

   3. FLECK_000039-FLECK_000049 A Fleck Revocable Trust Income and Expenses 12 31 18 5 15 19.pdf

   4. FLECK_000039-FLECK_000049 A Fleck Revocable Trust Income and Expenses 12 31 18 5 15 19_REDACTED.pdf

   5. FLECK_000072-FLECK_000090 Barbara Fleck Revocable Trust 12 31 18  5 15 19.pdf

   6. FLECK_000072-FLECK_000090 Barbara Fleck Revocable Trust 12 31 18  5 15 19_REDACTED.pdf

   7. FLECK_000101-FLECK_000170 Fleck Revocable Trust 12 31 18   5 15 19.pdf

   8. FLECK_000101-FLECK_000170 Fleck Revocable Trust 12 31 18   5 15 19_REDACTED.pdf

   9. FLECK_000171-FLECK_000251 Fleck Revocable Trust 4 1 19 41 30 19 Statement.pdf

   10. FLECK_000171-FLECK_000251 Fleck Revocable Trust 4 1 19 41 30 19 Statement_REDACTED.pdf

   11. _0000010.pdf

   12. FWTB_0000024.pdf

   13. FWTB_0000041.pdf

   14. FWTB_0000055.pdf

   15. FWTB_0000068.pdf

16. FWTB_0000082.pdf
17. FWTB_0000085.pdf
18. FWTB_0000098.pdf
19. FWTB_0000103.pdf
20. FWTB_0000112.pdf
21. FWTB_0000130.pdf
22. FWTB_0000140.pdf
23. FWTB_0000155.pdf
24. FWTB_0000170.pdf
25. FWTB_0000184.pdf
26. FWTB_0000193.pdf
27. FWTB_0000207.pdf
28. FWTB_0000226.pdf
29. FWTB_0000240.pdf
30. FWTB_0000254.pdf
31. FWTB_0000268.pdf
32. FWTB_0000271.pdf
33. FWTB_0000285.pdf
34. FWTB_0000290.pdf
35. FWTB_0000300.pdf
36. FWTB_0000319.pdf
37. FWTB_0000330.pdf
38. FWTB_0000346.pdf
39. FWTB_0000362.pdf
40. FWTB_0000611.pdf

41. FWTB_0000624.pdf
42. FWTB_0000642.xlsx
43. FWTB_0000643.xlsx
44. FWTB_0000645.pdf
45. FWTB_0000654.pdf
46. FWTB_0000782.pdf
47. FWTB_0000785.pdf
48. FWTB_0000941.pdf
49. FWTB_0001102.pdf
50. FWTB_0001103.xlsx
51. FWTB_0001105.pdf
52. FWTB_0001114.pdf
53. FWTB_0001819.pdf
54. FWTB_0002658.pdf
55. FWTB_0002664.pdf
56. FWTB_0003963.pdf
57. FWTB_0003970.xlsx
58. FWTB_0005557.pdf
59. FWTB_0005570.xlsx

C. Communications

1. FLECK_000328-FLECK_000330 Letter to Podoll 9.10.2020.pdf
2. FWTB_0000460.pdf
3. FWTB_0000461.pdf
4. FWTB_0000545.pdf
5. FWTB_0000555.pdf

6. FWTB_0000772.pdf

7. FWTB_0000773.pdf

8. FWTB_0000774.pdf

9. FWTB_0000947.pdf

10. FWTB_0001099.pdf

11. FWTB_0001100.pdf

12. FWTB_0001749.pdf

13. FWTB_0002125.pdf

14. FWTB_0002167.pdf

15. FWTB_0002382.pdf

16. FWTB_0002423.pdf

17. FWTB_0002437.pdf

18. FWTB_0002581.pdf

19. FWTB_0002652.pdf

20. FWTB_0002983.pdf

21. FWTB_0003029.pdf

22. FWTB_0003165.pdf

23. FWTB_0003166.pdf

24. FWTB_0007733.pdf

25. FWTB_0007748.pdf

26. FWTB_0007753.pdf

27. FWTB_0007767.pdf

28. FWTB_0007769.pdf

29. FWTB_0007770.pdf

30. FWTB_0007775.pdf

31. FWTB_0007779.pdf

32. FWTB_0007783.pdf

33. FWTB_0007787.pdf

34. FWTB_0007789.pdf

35. FWTB_0007790.pdf

36. FWTB_0007793.pdf

37. FWTB_0007796.pdf

38. FWTB_0007807.pdf

39. FWTB_0007810.pdf

40. FWTB_0007818.pdf

41. FWTB_0007917.pdf

42. FWTB_0007934.pdf

43. FWTB_0007945.pdf

44. FWTB_0007948.pdf

45. FWTB_0007984.pdf

46. FWTB_0007992.pdf

47. FWTB_0008328.pdf

48. FWTB_0008343.pdf

49. FWTB_0008358.pdf

D. Tax Documents

1. FLECK_000252-FLECK_000327 AARONHandBARBARAG.pdf

2. FLECK_000252-FLECK_000327 AARONHandBARBARAG_REDACTED.pdf

3. Fleck_007103.pdf

4. FWTB_0002126.xlsx

5. FWTB_0007440.pdf

6. FWTB_0007468.pdf

E. Trust Documents

1. FLECK_000050-FLECK_000055 A Fleck Trust Investment Svcs Agreement.pdf

2. FLECK_000056-FLECK_000060 A Fleck Trust New Acct Info Form.pdf

3. FLECK_000056-FLECK_000060 A Fleck Trust New Acct Info Form_REDACTED.pdf

4. FLECK_000061-FLECK_000065 B Fleck New Acct Info Form.pdf

5. FLECK_000061-FLECK_000065 B Fleck New Acct Info Form_REDACTED.pdf

6. FLECK_000066-FLECK_000071 B Fleck Trust Investment Svcs Agreement.pdf

7. FLECK_000091-FLECK_000091 Fleck Fee Agreement.pdf

8. FLECK_000092-FLECK_000098 Fleck IPS.pdf.