# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| AARON H. FLECK REVOCABLE TRUST, et al. | ) ) ) | Case No. 21-CV-01073 |
| Plaintiffs, | ) | |
| v. | ) ) | |
| FIRST WESTERN TRUST BANK, et al. | ) ) | |
| Defendants | ) ) ) ) ) ) ) ) ) ) ) ) | |

**EXPERT REBUTTAL REPORT OF JON S. AHERN, CPA**





April 14, 2022

Ex. 11

**ALVAREZ & MARSAL DISPUTES AND INVESTIGATIONS, LLC**

## I.  INTRODUCTION

### Assignment

1.  Alvarez & Marsal Disputes and Investigations, LLC ("A&M") was retained by Bryan, Cave, Leighton, Paisner, LLP to analyze and opine on damages issues related to a dispute between plaintiffs The Aaron H. Fleck Revocable Trust, through its Trustees, Aaron H. Fleck; Barbara G. Fleck, and The Barbara G. Fleck Revocable Trust, through its Trustees, Aaron H. Fleck and Barbara G. Fleck (collectively, the "Trusts"); Aaron Fleck, individually and Barbara Fleck, individually on behalf of themselves and all others similarly situated and defendants First Western Trust Bank ("FWTB" or "First Western"), Charles Bantis, and Andrew Gottfried.  Specifically, I was asked to review and evaluate the report of Joseph R. Rulison dated March 24, 2022 (the "Rulison Report") and to respond to the Rulison Report's damages-related opinions.  My report is only for use in the above-referenced matter.

### Experience and Qualifications

2.  I am a Senior Director in the Denver office of A&M, an independent consulting firm providing services to government agencies, legal counsel, and business entities.  I have a Bachelor of Arts degree in Economics from Colorado College, and I have taken additional accounting and business courses at Metro State College of Denver.  I am a Certified Public Accountant licensed by the State of Colorado and a Chartered Global Management Accountant.

3.  I have 30 years of experience in analyzing accounting, financial and economic issues in the context of commercial disputes and other litigation matters, including business valuation and calculating economic damages.  I have performed detailed financial, accounting, valuation and damages analyses in the financial services and banking industries and a wide variety of other industries, including oil and gas exploration and development, agriculture, cannabis, travel and leisure, employment, media, technology, automotive, real estate, telecommunications, government contracts, manufacturing, insurance, and other industries.

4.  A copy of my current resume is provided in **Appendix A**.  A&M is compensated for my work at a rate of $495 per hour.  A&M's fees are not contingent upon the outcome of this litigation.  A list of my testimony during the past four years is included as **Appendix B**.  My

opinions in this matter are based on an independent and objective analysis of the case facts and my extensive experience in evaluating commercial litigation damages.

5. A&M's work on this matter was performed either directly by me or by other A&M professionals working at my direction and under my direct supervision.

## II. INFORMATION CONSIDERED

6. **Appendix C** contains a list of the documents and information I considered to reach my conclusions and opinions. If additional information is produced in this matter, I will review it and, if appropriate, update the conclusions and opinions expressed in this report.

7. In addition to the analyses and opinions described in this report, I may also be asked to perform additional analysis based on new information provided to me between now and trial. I understand that I may also be asked to testify at trial and prepare charts or other demonstrative exhibits based on the information and analyses included in this report.

## III. BACKGROUND[1]

8. In December 2017, the Flecks secured a bridge loan from FWTB for a new primary residence as they pursued the sale of their then current residence. The Flecks then, based upon their positive experience with FWTB, decided in 2018 to use FWTB to manage two revocable trusts, one for Aaron and one for Barbara.

9. On May 8, 2018, the Flecks executed an Investment Services and Custody Agreement, a Fee Schedule Agreement, and an Investment Policy Statement with FWTB for the management of both trust accounts.

10. The Investment Policy Statement indicated that the $8 million in assets ($4 million for each trust) would be managed using a moderate portfolio allocation with an investment time horizon of 10+ years and a cash flow objective of $500,000 per year.[2]

---

[1] The sources for this section are Plaintiffs' First Amended Complaint, dated May 14, 2021, and any other cited sources.

[2] May 8, 2018 Investment Policy Statement (FWTB_0000437-443).

11.    On May 23, 2018, the $8 million in Trust assets were deposited into the two trust accounts at FWTB.[3]

12.    Plaintiffs allege that, on December 2, 2018, Aaron Fleck instructed FWTB to harvest losses in both Trust accounts to offset gains he had realized on other personal transactions.  Plaintiffs allege that FWTB knew at the time that the Flecks had capital gains related to the sale of their home between $4 million and $5 million.  FWTB did not harvest capital losses in either of the Trust accounts in 2018.

13.    Plaintiffs allege that because FWTB did not harvest losses, the Flecks were unable to use those losses when filing their 2018 tax returns resulting in damages to the Trusts and to the Flecks.

14.    Plaintiffs also allege that FWTB failed to follow a coherent investment strategy and failed to adhere to the investment strategy discussed and agreed to at the outset of FWTB's relationship with the Flecks.

15.    Plaintiffs claim the Flecks' damages include not only damages from the failure to harvest capital losses, but also losses in the investment accounts due to FWTB's breaches of fiduciary duties, and attorney fees incurred in asserting their claims against FWTB.

16.    Plaintiffs in this case also brought forth the action on behalf of all persons who had accounts of portfolios consisting of assets managed by FWTB claiming that common questions of law and fact exist to all members of the proposed class.  Common questions of law and fact that Plaintiffs allege will be shown through evidence include:

- Whether FWTB breached its fiduciary duties to Plaintiff and class members by having no policy to address harvesting of capital losses;

- Whether FWTB knew or should have known that losses would occur in accounts it was managing and that such losses be harvested to offset gains in the same tax year; and

---

[3]  May 2018 Account Statement for each Trust (FWTB_0000300-318, specifically FWTB_0000309; FWTB_0000112-129, specifically FWTB_0000121).

- Whether FWTB acted in a grossly negligent manner and willful manner failing to have any policies or procedures in place to harvest losses occurring in Plaintiffs' and class members' accounts.

## IV.   THE RULISON REPORT

17.   In the Rulison Report, Mr. Rulison reaches three conclusions regarding Claimants' economic damages.  First, the Rulison Report concludes that "[d]ue to the bank's lack of oversight, gross negligence, and mismanagement in the handling of the Fleck's trusts, capital losses had occurred, and so did the opportunity for the Flecks to use those losses when filing their 2018 taxes.  Both of these failures caused considerable financial harm to Aaron and Barbara Fleck."[4]  To reach this conclusion, the Rulison Report does not provide any analyses other than a discussion around the purpose of tax lost harvesting and a timeline of disputed events.

18.   Second, the Rulison Report claims "a class action is a superior way to pursue the damages resulting from the failure to assess and harvest losses"[5], stating FWTB "failed to meet the industry standard as a fiduciary" by not harvesting tax losses and "that failure caused damage to the class members."[6]

19.   Lastly, the Rulison Report claims FWTB's alleged mismanagement of the accounts "led to significant capital losses to the Flecks" and "the Flecks sustained serious and unnecessary losses" related to FWTB's use of proprietary funds in which the bank allegedly "double dipped in management fees through both direct and indirect management fees."[7]

20.   I was retained to review and evaluate Mr. Rulison's conclusions regarding Plaintiffs' and class members' potential economic damages discussed above.

## V.   SUMMARY OF OPINIONS

21.   For the purposes of this report, I understand that my opinions regarding potential damages are only relevant if Plaintiffs and/or class members prevail on their legal claims against

---

[4]   Rulison Report, p. 2.

[5]   Rulison Report, p. 2.

[6]   Rulison Report, p. 2.

[7]   Rulison Report, p. 3.

Defendants and are determined to be entitled to economic damages.  I offer no opinion on liability issues in this matter.

22.   All opinions in this report have been formed to a reasonable degree of professional certainty based on my work performed, education, certifications, and experience.  Having reviewed and evaluated the Rulison Report, the Trusts' financial information, and other source documents, I have reached the following rebuttal opinions regarding Plaintiffs' alleged damages as set forth in Mr. Rulison's reports and in Plaintiffs' legal filings.

**Opinion 1)   Mr. Rulison's damages opinions for the Flecks and proposed class members are unsupported and are not based on an appropriate methodology for evaluating economic damages.**

**Opinion 2)   Mr. Rulison's generalized damages allegations are inconsistent with the facts, which show that the Flecks benefitted from the alleged misconduct and suffered little or no damages.**

**Opinion 3)   Mr. Rulison's opinion that class action is the "superior way" to pursue damages ignores the fact that numerous individualized factors affect whether each putative class member benefitted from or was harmed by the lack of a uniform tax loss harvesting policy and in what amount.  The fact of damages and the amount of damages cannot be measured on a classwide basis.**

23.   I explain the methodologies and bases for the above opinions in the remaining sections of this report.  I understand that opinions presented as expert testimony must be based upon sufficient facts or data and must be the product of reliable principles and methods.  Ultimately, an expert witness must apply the principles and methods reliably to the facts of the case.  My approach in this matter is consistent with these threshold requirements.[8]

## VI.   ANALYSIS & OPINIONS

**Opinion 1)   Mr. Rulison's damages opinions for the Flecks and proposed class members are unsupported and are not based on an appropriate methodology for evaluating economic damages.**

24.   Though Mr. Rulison does not offer any specific damages conclusions or calculations, he makes numerous unsupported statements claiming that FWTB's alleged misconduct has

---

[8]   *See* Federal Rules of Evidence, Rule 702, Testimony by Expert Witnesses.

resulted in significant harm to the Flecks.  For example, Mr. Rulison claims that FWTB's conduct resulted in a "major tax liability for the Flecks."[9]  Mr. Rulison states that FWTB "caused considerable financial harm to the Flecks,"[10] and he further states that FWTB's alleged mismanagement "… led to significant capital losses to the Flecks."[11] Mr. Rulison also states that FWTB's "double-dipping" caused damages to the Flecks, as did the "high level of transactions" in the Trusts.[12]  Overall, Mr. Rulison opines that the Flecks "sustained serious and unnecessary losses" as a result of FWTB's actions.[13]

25. Mr. Rulison also offers unsupported damages opinions regarding potential class damages. For example, Mr. Rulison opines that FWTB's failure to consistently harvest losses "caused damage to the class members" and that "class action is a superior way to pursue the damages" in this matter.[14]

26. A widely-accepted framework for evaluating economic damages is to compare the results of a "but-for" scenario absent alleged misconduct to what has actually happened including the impact of alleged misconduct.  If a potentially harmed party would have been economically better off in the "but-for" scenario compared to the "actual" scenario, then potential damages may exist.  However, if the "but-for" scenario does not differ from what actually happened – or if the "but-for" scenario does not result in a more favorable economic outcome for the plaintiff – then potential damages should be zero.

27. In addition to the fundamental "but-for" versus "actual" comparison described above, damages must also be proven with reasonable certainty: "Most courts have found that damages do not need to be calculated with mathematical precision (to the exact penny), but must not be speculative or remote.  That is, damages should be calculated with reasonable certainty."[15]  Though there is no specific definition of what constitutes reasonable certainty

---

[9]  Rulison Report, p. 2.

[10] Rulison Report, p. 2.

[11] Rulison Report, p. 3.

[12] Rulison Report, p. 3.

[13] Rulison Report, p. 3.

[14] Rulison Report, p. 2.

[15] AIPCA Forensic & Valuation Services Practice Aid.  *Measuring Damages Involving Individuals*.

in proving damages, I understand courts consider numerous factors when assessing reasonable certainty, including: whether the estimate of damages is accurate; whether it is clear that the plaintiff has suffered at least some economic harm; whether plaintiff produced the best available evidence of harm; and other factors.[16]  However, the calculation must be "capable of measurement based upon reliable factors without undue speculation."[17]  Furthermore, when damages are "remote, speculative, hypothetical, and not within the realm of reasonable certainty, they cannot be recovered."[18]

28.   In this case, Plaintiffs allege that FWTB should have harvested the capital losses in the Flecks' Trusts at or near year-end 2018 and that the failure to do so has resulted in economic harm to the Flecks.  Thus, the appropriate "but-for" scenario to evaluate any potential damages to the Flecks is a scenario in which the capital losses in the Flecks' Trust accounts had been harvested in 2018.  The "but-for" scenario, however, also requires an assessment of what FWTB would have done with the proceeds from the harvest sale, including at least the following options: leaving the proceeds in cash; re-buying the same security after 31 days to avoid the "wash sale" rule; buying a similar investment; or buying something completely different that would alter the portfolio's asset allocation.  Measuring the economic impact to the Flecks in this "but-for" scenario and comparing it to the actual economic position of the Flecks – having <u>not</u> harvested the losses in 2018 and instead retaining ownership of the securities that had an unrealized loss as of December 31, 2018 – would potentially result in an appropriate framework for estimating the potential damages, if any.  This same approach would be applicable for any model that could theoretically be constructed for evaluating putative class members' damages, including whether the putative class members have suffered any damages at all.

29.   Mr. Rulison's broad and unsupported damages statements suffer from numerous flaws.  First, they are not specific – in fact they are not quantified at all.  Second, Mr. Rulison's

---

[16]  Fannon, Nancy J. and Dunitz, Jonathan M., *The Comprehensive Guide to Economic Damages*, 5th Ed. Chapter 6, pages 94-95.  See also AICPA Forensic & Valuation Services Practice Aid.  *Attaining Reasonable Certainty in Economic Damages Calculations*.

[17]  *Ashland*, 82 N.Y.2d at 403 as cited in Fannon, Nancy J. and Dunitz, Jonathan M., *The Comprehensive Guide to Economic Damages*, 5th Ed. Chapter 9, page 214.

[18]  *Albert*, 234 F.Supp.2d at 103 as cited in Fannon, Nancy J. and Dunitz, Jonathan M., *The Comprehensive Guide to Economic Damages*, 5th Ed. Chapter 9, page 214.

damages claims are not based on a comprehensive "but-for" versus "actual" comparison. Third, they require significant speculation about individual investors, use of proceeds, and other factors and, thus, Mr. Rulison fails to establish even the fact of damages with reasonable certainty.

**Opinion 2)  Mr. Rulison's generalized damages allegations are inconsistent with the facts, which show that the Flecks benefitted from the alleged misconduct and suffered little or no damages.**

30.    As stated above, Mr. Rulison makes numerous broad and unsupported statements regarding the alleged losses suffered by the Flecks as a result of FWTB's alleged misconduct.  Mr. Rulison claims that FWTB's failure to harvest tax losses at year-end 2018 resulted in a "major tax liability"[19] for the Flecks.  Mr. Rulison further claims that FWTB's mismanagement resulted in significant capital losses, and that FWTB's use of FWTB "proprietary funds" in the Flecks' Trusts caused even further damages.  None of Mr. Rulison's damages claims, however, are anchored in the facts of this case.  When the facts are evaluated within an appropriate damages methodology, it is clear that the Flecks suffered little or no damages, even if they are able to prove liability against FWTB.

**Tax Liability / Benefit from Harvested Losses**

31.    Mr. Rulison claims that Mr. Fleck specifically asked FWTB to harvest capital losses in December 2018 to offset some "major long-term capital gains on other transactions"[20] and that FWTB's failure to do so resulted in a "major tax liability for the Flecks."[21]  Though Mr. Rulison cited the Flecks' 2018 income tax return (which was marked as a "draft") in his list of "materials reviewed," he does not specify the amount of the purported "major tax liability" incurred by the Flecks.

32.    The Flecks' tax liability for 2018 was not at all "major" as claimed by Mr. Rulison.  In the "draft" 2018 tax return considered by Mr. Rulison, the Flecks had total income of $338,511, a net capital gain of $99,458, taxable income of $135,312 and a total tax figure

---

[19] Rulison Report, p. 2.

[20] Rulison Report, p. 2.

[21] Rulison Report, p. 2.

of $7,765.  Having already paid taxes of $11,006, the "draft" 2018 tax return reflected a refund to the Flecks of $3,241.[22]

33.    However, the "draft" tax return does not appear to be the one filed with the Internal Revenue Service.[23]  According to a "tax transcript" from the IRS for the year ending December 31, 2018, the Flecks actually reported total income of $270,367, a lower net capital gain of $31,314, taxable income of $50,173, and a total tax figure of only $774. According to the tax transcript, the Flecks received a 2018 refund for $10,232 of the $11,006 payments they had made.[24]

34.    Even if FWTB had harvested most or all of the over $460,000 in unrealized losses in the Flecks' Trusts at year-end 2018,[25] such an action would have had a negligible impact on the Flecks' 2018 tax liability.  The vast majority of the loss, had it been harvested in December 2018 as claimed by the Flecks, would have been carried over to 2019 or future years.

35.    For 2019, the Flecks reported a net capital gain of $169,645 and total income of $368,365. The Flecks also reported itemized deductions totaling $213,425, resulting in taxable income of $154,940 and a total tax liability of $15,581.[26]  Thus, had FWTB harvested over $460,000 of losses at year-end 2018, some of the carryover could have been used in 2019 to reduce the $15,581 tax liability in 2019.  I understand from FTWB's counsel that the Flecks do not intend to seek damages beyond 2019 and that Plaintiffs have therefore not produced tax returns for either 2020 or 2021.

---

[22]  FLECK_007103 to 007165, at FLECK_007106 and FLECK_007107.

[23]  In deposition, Mr. Fleck testified that he did not have the as-filed (final) version of his tax return for 2018.  March 1, 2022 deposition of Aaron Fleck, pages 49-51.

[24]  FLECK_007522 to 007529.

[25]  In the First Amended Complaint, dated May 14, 2021, Plaintiffs allege that Aaron Fleck gave notice to FWTB on December 2, 2018 to harvest losses in both trust portfolios.  Mr. Rulison does not provide an analysis that indicates a date on which the losses should have been realized.  For purposes of my calculations in this report, I have analyzed the unrealized losses in the portfolio as of December 31, 2018.

[26]  FLECK_000252 to 000327, at 000257-258.

36.   Thus, based on the Flecks' 2018 and 2019 total federal tax liability alone, the harvesting of losses by FWTB in December 2018 could potentially have saved the Flecks up to $16,355 in federal taxes ($744 in 2018, plus $15,581 in 2019).[27]

37.   Based on the "draft" state tax return, the Flecks had a total tax amount for Colorado in 2018 of only $178.[28]  For 2019, the Flecks' Colorado tax liability was $7,133.[29]  Including the Flecks' 2018 state tax liability from the "draft" return and the Flecks' 2019 state tax liability, the Flecks' total potential tax savings for the Flecks (in both federal and state taxes) could have been approximately $23,666, assuming the harvesting of capital losses in the FWTB Trusts could have reduced their tax liabilities to zero in both years.

38.   However, looking only at the potential tax benefit of harvested losses is an incomplete and one-sided view of the Flecks' potential damages.  One must also consider how the proceeds from the "harvest" sale would have been used since, in the "actual" scenario, absent the sale, the Flecks continued to hold the securities that had unrealized losses as of December 31, 2018.

39.   As of December 31, 2018, the Flecks had total unrealized losses of approximately $462,000 between the two trust accounts.[30]  Had FWTB harvested the $462,000 in losses, as the Plaintiffs allege should have occurred, the Flecks would have missed out on market appreciation in the sold securities for at least 30 days.

40.   For example, had the Flecks sold all of the positions related to the $462,000 unrealized loss and remained out of the market for at least 30 days to avoid wash sale rules, they would have forfeited significant appreciation that actually occurred on these positions in January 2019.  By January 31, 2019, the securities that had a combined $462,000 unrealized loss as of December 31, 2018 had appreciated by $316,000.[31]

---

[27] If the Flecks only seek damages for capital loss utilization in 2018, then potential damages would be limited to $774.

[28] FLECK_007159.

[29] FLECK_000314.

[30] **Attachment 1**.

[31] **Attachment 1**.

41. The $316,000 benefit to the Flecks resulting from the market appreciation in January 2019 outweighs the $23,666 in total potential tax savings to the Flecks discussed above. Thus, if the proceeds the Flecks would have realized in harvesting the year-end 2018 tax losses had stayed out of the market even for only the month of January 2019, the Flecks would have lost out on a net benefit from market appreciation that would have more than offset any gain the Flecks could have realized from selling in December 2018. Thus, under this scenario, the Flecks have not suffered any economic damages; rather, the Flecks benefited by over $290,000 compared to the potential capital gains tax savings.

42. Further, had the Flecks decided to stay out of the market for any period longer than just January 2019, they would have also forfeited the gains from further market appreciation. The securities which were at a loss position at year-end 2018 appreciated a further $88,000 from January 31, 2019 to February 28, 2019.[32] Thus, had the proceeds from year-end 2018 tax loss harvesting remained out of the market for both January 2019 and February 2019, the Flecks would have lost out on $404,000 of appreciation, which more than offsets any potential benefit they could have realized at year-end 2018 from harvesting the tax losses.

43. Mr. Rulison states, however, that the proceeds from harvesting the Flecks' tax losses at year-end 2018 would not necessarily have remained out of the market. According to Mr. Rulison, "a similar fund" could have been purchased (so proceeds remained "in the market" and didn't miss out on early 2019 gains). Mr. Rulison's proposed approach, however, is non-specific and speculative. As shown on Attachment 1, as of December 31, 2018 there were over 40 individual securities in the Trust with unrealized losses, and each one of which could have been replaced with numerous "similar" securities. Neither Plaintiffs nor Mr. Rulison have offered any evidence of what alternative investments would have been purchased with the proceeds from the harvest transactions. Mr. Fleck acknowledged in deposition that he did not provide FWTB with any instructions regarding what to do with the proceeds.[33]

---

[32] **Attachment 1**. $403,976 − $316,005 = $87,971.

[33] March 1, 2022 deposition of Aaron Fleck, pages 99-100.

44. Absent specific information about which securities should have been sold and what the replacement investments would have been, the potential economic impact to the Flecks cannot be determined.

45. However, even if one were to assume that FWTB should have used the harvest transaction proceeds to immediately repurchase a "similar" security *and* further assume that the replacement security would have performed exactly the same as the original (sold) security, the Flecks would have had a lower tax basis in the replacement security. A reduced tax basis – again, assuming identical returns between the original security and the "replacement" security – would lead to a <u>higher future tax obligation</u> for the Flecks.  In fact, the higher future tax obligation would be equal to the potential tax savings in the year when the original security's loss was harvested, as shown in the table below.

| | Tax Benefit / (Loss) | Cash Flow | Activity / Transaction | Cash Flow | Tax Benefit / (Loss) |
|---|---|---|---|---|---|
| | **HARVEST Scenario** | | | **NO HARVEST Scenario** | |
| **Year 1** | | $ (10,000) | Initial Purchase | $ (10,000) | |
| | | $ 7,000 | Value at YE | $ 7,000 | |
| | | $ 7,000 | Sale - Harvest of Loss | $ - | |
| | | $ (3,000) | Gain / (Loss) | $ - | |
| | $ 750 | $ 750 | Tax Benefit @ 25% | $ - | $ - |
| **Year 2** | | $ (7,000) | Re-Buy Alternative | $ - | |
| | | $ 12,000 | Value at Sale | $ 12,000 | |
| | | $ 5,000 | Gain / (Loss) | $ 2,000 | |
| | $ (1,250) | $ (1,250) | Tax Benefit (Liability) | $ (500) | $ (500) |
| | **$ (500)** | | **TOTAL TAX PAID** | | **$ (500)** |
| | $ (440) | | *NPV of Tax Paid @ 5%* | | $ (476) |

Table title: **Tax Impact of Harvest and Re-Buy of Alternative Investment** — With Ability to Utilize Harvested Loss in Year of Sale

46. In the table above, harvesting of the $3,000 loss at the end of Year 1 results in a $750 tax savings (assuming full utilization of the loss and a 25% total tax rate).  However, using the sale proceeds of $7,000 to buy a "similar fund" results in a new, lower basis compared to the original fund ($7,000 vs. $10,000).  Assuming both the original fund and the replacement fund subsequently increase in value to $12,000 (which is consistent with Mr. Rulison's assumption that the two funds are "similar") and are sold at that point, the

investor will have a larger taxable gain in the scenario where the earlier loss had been harvested and the proceeds used to purchase a replacement.

47.    In the example above, the investor's gain in the "harvest" scenario would be $5,000, which reflects the replacement security's basis of $7,000.  In the "no harvest" scenario, the investor's gain would be a lower $2,000, which reflects the gain to $12,000 from the original basis of $12,000.  In both scenarios, the investor ends up paying taxes based on the net gain of $2,000.  Thus, the larger gain realized from the replacement security will nominally wipe out the benefit received from the earlier "harvest" transaction.

48.    As a result, all that is left is as potential damages is the "time value of money", which in the example above is only $36 – a small fraction of the original $750 tax benefit from the harvest transaction.

49.    The example above assumes that the taxpayer can effectively use 100% of the harvested tax loss in the year of sale.  If, however, the loss could not have been utilized – but instead could only be carried over to later tax years to offset future capital gains (as is the case for the Flecks in 2018) – then even the "time value of money" element of potential damages would go away, as shown in the revised table below.

### Tax Impact of Harvest and Re-Buy of Alternative Investment
#### Without Ability to Utilize Harvested Loss in Year of Sale

| | HARVEST Scenario | | | | NO HARVEST Scenario | |
|---|---|---|---|---|---|---|
| | Tax Benefit / (Loss) | Cash Flow | | Activity / Transaction | Cash Flow | Tax Benefit / (Loss) |
| **Year 1** | | $ (10,000) | | Initial Purchase | $ (10,000) | |
| | | $ 7,000 | | Value at YE | $ 7,000 | |
| | | $ 7,000 | | Sale - Harvest of Loss | $ - | |
| | | $ (3,000) | | Gain / (Loss) | $ - | |
| | | $ (3,000) | | Carryforward of Loss | $ - | |
| | $ - | $ - | | Tax Benefit @ 25% | $ - | $ - |
| **Year 2** | | $ (7,000) | | Re-Buy Alternative | $ - | |
| | | $ 12,000 | | Value at Sale | $ 12,000 | |
| | | $ 5,000 | | Gain / (Loss) | $ 2,000 | |
| | | $ (3,000) | | Utilization of Carryforward | $ - | |
| | | $ 2,000 | | Net Gain / (Loss) | $ 2,000 | |
| | $ (500) | $ (500) | | Tax Benefit (Liability) | $ (500) | $ (500) |
| | **$ (500)** | | | **TOTAL TAX PAID** | | **$ (500)** |
| | $ (476) | | | *NPV of Tax Paid @ 5%* | | $ (476) |

50. The table above uses the same figures as the earlier example; however, in this scenario, the taxpayer cannot actually use the harvested loss in the year of sale. In this circumstance, the investor would carry forward the unused $3,000 capital loss and have no realized tax benefit in Year 1. As in the first scenario, this example assumes that the $7,000 of proceeds from the harvest transaction are immediately reinvested in a similar security. Then, in a later year (assumed to be "Year 2" in table above), the security is sold for $12,000 – in the "harvest" scenario, this would be sale of the replacement security, and in the "no harvest" scenario, this would be the sale of the original security. In the "harvest" scenario, the taxpayer would have a gain of $5,000 in Year 2 but would also have a carryover loss of $3,000, resulting in a tax liability on a net $2,000 gain. In the "no harvest" scenario, the taxpayer would also have a $2,000 taxable gain in Year 2.

51. In this scenario – which is aligned with the Flecks' inability to actually use the vast majority of 2018 losses they claim FWTB failed to harvest – the taxpayer ends up with same tax payment liability at the same time, and thus zero damages.

52. Overall, the Flecks benefitted from FWTB's decision not to realize additional capital losses in 2018. Even based on the speculative assumption that FWTB would have immediately replaced any sold securities with an alternative that would have performed exactly the same as the original security, potential damages would be limited to the possibility of delaying taxes, not avoiding taxes (i.e., the "time value of money" of paying lower taxes now and higher taxes in the future). Under any scenario, the potential damages would not constitute a "major tax liability for the Flecks"[34] as described by Mr. Rulison.

**Flecks' alleged "capital losses" (from alleged mismanagement)**

53. As mentioned above, the Rulison Report claims FWTB's alleged mismanagement of the accounts "led to significant capital losses to the Flecks."[35] However, Mr. Rulison does not provide an analysis of the Trusts' performance during the 11-12 month period under FWTB's management, nor does he discuss the overall market performance over the same time period.

---

[34] Rulison Report, p. 2.

[35] Rulison Report, p. 3.

54. To determine whether the Flecks' trust accounts underperformed the market – regardless of the reason – I have developed an expectation of account performance over the same time period utilizing the target allocation of the portfolio from the Investment Policy Statement and the total return from common indices for each relevant asset class.  For the alternative asset class, I reviewed the Investment Policy Statement to decide which indices to select for the alternative asset category.  I then calculated a combined annualized return for the alternative asset class by equally weighting the investment types making up the class.[36]  The following table, which is included with additional details as **Attachment 2B** shows my calculation of expected annualized return for the period.

| Expected Portfolio Return Based on Market Indices | | | |
|---|---|---|---|
| **Asset Class** | **Target Allocation** | **Index Return** | **Weighted Index Return** |
| US Large Cap Equities | 13% | 9.76% | 1.27% |
| US Mid Cap Equities | 4% | 3.07% | 0.12% |
| US Small Cap Equities | 6% | -0.14% | -0.01% |
| International Equities | 12% | -2.97% | -0.36% |
| Emerging Markets | 3% | -2.31% | -0.07% |
| High Yield Bonds | 4% | 7.00% | 0.28% |
| Fixed Income | 49% | 5.40% | 2.65% |
| Alternatives | 8% | 2.71% | 0.22% |
| Cash and Equivalents | 1% | 2.26% | 0.02% |
| | **Expected Annualized Return** | | **4.12%** |
| *Sources: Attachments 2B & 2C* | | | |

55. After calculating the expected annualized return, I then calculated the actual annualized return in the Flecks' accounts to determine whether the accounts underperformed the market over the same period.  To calculate the actual returns, I compared the ending value of the Trusts on May 6, 2019 and any fees paid by the Flecks on the date which they were paid to the $8 million beginning value of the trusts on May 23, 2018.  My analysis indicates that the two trusts combined for a 4.44% annualized return, overperforming the annualized market return of the "target allocation" by 0.31%, as shown in the table below and on **Attachment 2A**.

---

[36] **Attachment 2C**.

| Actual Portfolio Return Compared to Expected Return | | | |
|---|---|---|---|
| | Aaron Fleck Trust | Barbara Fleck Trust | Combined |
| Actual Annualized Return | 5.33% | 3.55% | 4.44% |
| Expected Annualized Return | 4.12% | 4.12% | 4.12% |
| **Overperformance (Underperformance)** | 1.20% | -0.57% | **0.31%** |
| *Source: Attachment 2A* | | | |

56.  The positive overall return and the very similar market performance experienced by both Fleck Trusts while under FWTB's management contradict Mr. Rulison's claim that the Flecks suffered "significant capital losses" due to FWTB's mismanagement.[37]  The Trusts' performance relative to market-based benchmarks during the FWTB management period does not support that the Flecks suffered damages from FWTB's alleged mismanagement.

**Flecks' alleged losses from "double-dipping"**

57.  Mr. Rulison also suggests that the Flecks may have suffered damages from FWTB "double dipping" by collecting both management fees on the Trusts and additional asset-based fees on FWTB "proprietary funds."[38]

58.  Even if FWTB did generate additional fees from investing some of the Trusts' capital in FWTB funds, Mr. Rulison has not provided any evidence that such fees resulted in "damages" to the Flecks.  If, instead of investing in FWTB funds, FWTB had instead invested the Trusts' money in other managers' funds, the other fund managers would still have charged fees. Absent any comparison of the fees charged by the various FWTB "proprietary funds" with other similar funds, no qualitative or quantitative damages conclusion is possible.  If, for example, FWTB's "proprietary fund" fees were the same as other alternative funds' fees, the Flecks would not in fact have suffered any adverse impact related to the alleged "double-dipping."

---

[37] Rulison Report, p. 3

[38] Rulison Report, p. 3.

**Opinion 3)   Mr. Rulison's opinion that class action is the "superior way" to pursue damages ignores the fact that numerous individualized factors affect whether each putative class member benefitted from or was harmed by the lack of a uniform tax loss harvesting policy and in what amount.  The fact of damages and the amount of damages cannot be measured on a classwide basis.**

59.   Mr. Rulison opines that "a class action is a superior way to pursue the damages resulting from the failure to assess and harvest losses."[39]  According to Mr. Rulison, the individual investor losses "would necessarily vary with the potential losses that should have been harvested."[40]  Though Mr. Rulison fails to fully explain his reasoning, he appears to suggest that only the size/amount of the un-harvested loss would affect the damages to each investor.

60.   I disagree with Mr. Rulison.  In my opinion, the very question of whether each putative class member was harmed at all or benefitted from FWTB's decision not to harvest tax losses would require an individualized analysis of each investor's circumstances.

61.   While discussing whether the decision to tax loss harvest can be applied to every client, Mr. Fleck stated the following in deposition: "A client is a separate person.  You think of each client separately."[41]  Mr. Fleck further stated that "Circumstances are different in every case.  Every client is different…and the circumstances are different."[42]  Mr. Fleck also testified in deposition that the factors a portfolio manager would need to consider when deciding whether to tax loss harvest are difficult to determine without looking at a client's specific situation:

> Q.  *And what type of factors specific to each client, would affect your decision as of portfolio manager of whether or not to sell a particular stock?*
>
> A.  *God, that's such a general question.  It's difficult to answer a general question without getting facts.  Every client is different.*[43]

62.   The decision whether to harvest a tax loss and the factors that would need to be considered as part of that decision are based on each client's specific situation.  Numerous individualized factors would require client-specific inquiry.  In other words, there is not a

---

[39] Rulison Report, p. 2.

[40] Rulison Report, p. 2.

[41] March 1, 2022 Deposition of Aaron Fleck, page 64.

[42] March 1, 2022 Deposition of Aaron Fleck, page 65.

[43] March 1, 2022 Deposition of Aaron Fleck, page 64.

single model that could be developed to quantify potential class damages, or even whether putative class members have suffered any potential damages at all.

63. One such factor is an investor's ability to utilize harvested losses to offset capital gains. Mr. Fleck stated in deposition that "No person in their right mind would take a loss if you can't use it."[44] Thus, at a minimum, each putative class member would need to be evaluated individually to determine whether any unrealized capital loss, if harvested, could have actually been used – and in what year such losses could have been used. If the loss could never have been used, there would be no damages.

64. Even for those potential class members who could have utilized the harvested loss, the issue of damages is more complex than just the year's potential tax benefit. For example, upon harvesting a loss, an investor has options on what to do with the proceeds realized in the transaction. Some of the possible options include:

- Immediately repurchasing a similar investment that avoid wash sale rules and minimizes "time out of market" (as suggested by Mr. Rulison)

- Waiting 31 days and repurchasing the identical security (to avoid the wash sale rule)

- Staying in cash (thus avoiding risk of further market downturn, but also potentially missing out on any potential upswing, which would have been the case in early 2019)

- Buying something completely different (which would affect the portfolio's investment mix and would lead to potentially different future gains/losses than if the original investment had been maintained).

65. Each of the above possible outcomes (of what to do with proceeds from the loss harvesting transaction) would have very different impacts on analyzing a putative class member's potential damages and would require individualized inquiry that could not be captured in a single model for calculating classwide damages. In assessing the impact of each of the above courses of action, other factors would need to be considered such as the market performance of the specific assets for the relevant time period.

---

[44] March 1, 2022 Deposition of Aaron Fleck, page 76.

66.   Other investor preferences would also affect potential damages for a putative class member. For example, certain investors might prefer not to harvest losses, even if doing so could have resulted in a short-term tax benefit.  Some investors may not want to part with "preferred" investments, or they may want to limit the turnover and volume of activity in their accounts. Mr. Fleck testified in deposition that it was an investor's choice to harvest losses and not all investors may decide to harvest losses, as follows: "I could not take a loss indiscriminately… they had the choice."[45]  Further, Mr. Fleck states "You never ever take a loss or a gain for a client without his permission."[46]  Therefore, any analysis of potential damages for a putative class member would have to consider whether a class member had any investment preferences which would have caused them not to elect not to harvest a loss.

67.   As described in Opinion 1 above, a damages calculation must be "capable of measurement based upon reliable factors without undue speculation."[47]  To avoid undue speculation, it would also be necessary to analyze each investor's financial accounts and tax records to determine the nature of gains and losses experienced in any given year.  Long-term gains and losses are treated differently for tax purposes than short-term gains and losses.  While one investor may have had short-term losses in an account, another might have had long-term losses.  One investor may have used the losses to offset short-term gains, while another might have used the losses to offset long-term gains.  Each situation would result in a different method of estimating potential damages.  Further, any analysis of potential damages could not be limited to one account.  Many investors have multiple accounts with various unrealized and realized gains and losses in each account that would affect not only the potential decision to harvest losses, but the potential adverse impact from not having done so.

68.   A putative class member's tax bracket for the year in which the investor would have utilized the harvested loss to offset capital gains also impacts a class member's potential damages.  An investor's tax bracket, including the capital gains tax rate for the investor, would necessarily impact any calculation of an investor's potential tax savings from a harvested loss.  For some investors, the capital gains tax rate could be 0%; therefore, it is possible that some investors

---

[45] March 1, 2022 Deposition of Aaron Fleck, pages 60 – 61.

[46] March 1, 2022 Deposition of Aaron Fleck, page 95.

[47] *Ashland*, 82 N.Y.2d at 403 as cited in Fannon, Nancy J. and Dunitz, Jonathan M., *The Comprehensive Guide to Economic Damages*, 5th Ed. Chapter 9, page 214.

would not have had any tax savings in a year in which they would have used the harvested loss to offset capital gains.

69. Other factors impacting whether a client would choose to harvest losses and the financial impact of such a transaction include the investor's age, risk tolerance, and the state in which an investor pays tax. By definition, tax loss harvesting is more common in "down" years. The age and risk tolerance of the investor may influence how an investor would choose to respond to a "down" year, including the decision whether to harvest any capital losses. Some investors may decide to limit their exposure to any further losses, but others may see the "down" market as an opportunity to increase their exposure to the market in hopes of a market rebound. Also, an older investor may be less likely to harvest a loss unable to be used in the current year because losses cannot be carried forward beyond the investor's date of death.[48] State tax rates could also significantly affect any estimation of a putative class member's potential damages, and it could also be a factor in an investor's decision whether to harvest losses. For example, an investor filing taxes in higher-tax states such as California would likely have state tax savings significantly higher than those investors filing taxes in lower-tax and zero-tax states.

70. No classwide model or calculation could be proposed or designed that would account for all of the individualized factors identified above. Identifying those investors who may have chosen to harvest capital losses, determining if each putative class member benefited from or was damaged by the alleged misconduct, and estimating each putative class member's potential damages, if any, would require significant individual inquiry.

---

[48] March 24, 2022 Expert Report of Robert Reidy, pages 4-5.

**Analysis of Positions with Unrealized Losses as of December 31, 2018**

ATTACHMENT 1

| | December 31, 2018 | | | | | January 31, 2019 | | | | | | February 28, 2019 | | | | | |
| | Aaron Fleck Trust | | Barbara Fleck Trust | | COMBINED | Aaron Fleck Trust | | Barbara Fleck Trust | | COMBINED | | Aaron Fleck Trust | | Barbara Fleck Trust | | COMBINED | |
| | Shares | Unrealized Gain / (Loss) | Shares | Unrealized Gain / (Loss) | Unrealized Gain / (Loss) | Shares | Unrealized Gain / (Loss) [1] | Shares | Unrealized Gain / (Loss) [1] | Unrealized Gain / (Loss) | Change from 12/31 | Shares [1] | Gain / (Loss) [2] | Shares [1] | Gain / (Loss) [2] | Gain / (Loss) | Change from 12/31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fixed Income:** | | | | | | | | | | | | | | | | | |
| American Century Intermediate-Term Tax-Free Bond Fund Class I | 43,574.877 | $ (1,264.94) | 43,695.472 | $ 23.05 | $ (1,241.89) | 43,677.346 | $ 1,355.70 | 43,798.224 | $ 2,650.94 | $ 4,006.64 | 5,248.53 | 43,777.917 | $ 3,106.82 | 43,899.013 | $ 4,406.90 | $ 7,513.72 | $ 8,755.61 |
| Dodge & Cox Income Fund #147 | 46,270.004 | (10,404.17) | 54,084.001 | (11,456.52) | (21,860.68) | 46,270.004 | (1,150.17) | 54,084.001 | (639.72) | (1,789.89) | 20,070.79 | 46,270.004 | 1,626.03 | 54,084.001 | 2,605.32 | 4,231.35 | 26,092.03 |
| First Western Fixed Income Fund | 84,103.850 | (4,288.71) | 78,845.742 | (2,166.11) | (6,454.81) | 84,346.407 | 772.08 | 79,073.134 | 2,578.28 | 3,350.36 | 9,805.17 | 84,555.740 | 772.08 | 79,269.380 | 2,578.28 | 3,350.36 | 9,805.17 |
| First Western Short Duration High Yield Credit Fund - Inst | 15,942.551 | (7,595.01) | 15,748.942 | (7,502.50) | (15,097.51) | 16,024.517 | (2,947.90) | 15,829.913 | (2,911.83) | (5,859.73) | 9,237.78 | 16,089.006 | (1,499.89) | 15,893.618 | (1,481.40) | (2,981.29) | 12,116.22 |
| **Total Fixed Income:** | | $ (23,552.82) | | $ (21,102.08) | $ (44,654.90) | | $ (1,970.29) | | $ 1,677.67 | $ (292.62) | $ 44,362.28 | | $ 4,005.04 | | $ 8,109.10 | $ 12,114.14 | $ 56,769.04 |
| **Common Stock:** | | | | | | | | | | | | | | | | | |
| Accenture PLC Class A Ordinary Shares | 37.000 | $ (450.66) | 37.000 | $ (450.66) | $ (901.32) | 37.000 | $ 13.32 | 37.000 | $ 13.32 | $ 26.64 | 927.96 | 37.000 | $ 144.60 | 37.000 | $ 144.60 | $ 289.20 | $ 1,190.52 |
| Alphabet Inc. Cap Stk Class A | 10.000 | (642.60) | 10.000 | (642.60) | (1,285.20) | 10.000 | 166.70 | 10.000 | 166.70 | 333.40 | 1,618.60 | 10.000 | 132.05 | 10.000 | 132.50 | 264.55 | 1,549.75 |
| Anheuser Busch InBev Sponsored ADR | 120.000 | (3,154.80) | 120.000 | (3,154.80) | (6,309.60) | 120.000 | (1,879.20) | 120.000 | (1,879.20) | (3,758.40) | 2,551.20 | 120.000 | (1,634.51) | 120.000 | (1,634.51) | (3,269.02) | 3,040.58 |
| Blackrock Inc. | 21.000 | (2,694.93) | 21.000 | (2,694.93) | (5,389.86) | 21.000 | (2,227.47) | 21.000 | (2,227.47) | (4,454.94) | 934.92 | 21.000 | (2,207.19) | 21.000 | (2,207.19) | (4,414.38) | 975.48 |
| Boeing Co. | 16.000 | (467.52) | 16.000 | (467.52) | (935.04) | 16.000 | 542.20 | 16.000 | 542.40 | 1,084.60 | 2,019.64 | 16.000 | 945.03 | 16.000 | 945.03 | 1,890.06 | 2,825.10 |
| Celgene Corp. | 145.000 | (1,958.95) | 145.000 | (1,958.95) | (3,917.90) | 145.000 | 1,574.70 | 145.000 | 1,574.70 | 3,149.40 | 7,067.30 | 145.000 | 1,500.60 | 145.000 | 1,500.60 | 3,001.20 | 6,919.10 |
| Ebay Inc. | 300.000 | (2,847.00) | 300.000 | (2,847.00) | (5,694.00) | 300.000 | (1,173.00) | 300.000 | (1,173.00) | (2,346.00) | 3,348.00 | 300.000 | (587.70) | 300.000 | (587.70) | (1,175.40) | 4,518.60 |
| First Rep Bk San Francisco Cal | 114.000 | (1,265.40) | 114.000 | (1,265.40) | (2,530.80) | 114.000 | (156.18) | 114.000 | (156.18) | (312.36) | 2,218.44 | 114.000 | 169.72 | 114.000 | 169.72 | 339.44 | 2,870.24 |
| Fortive Corp | 151.000 | (925.63) | 151.000 | (925.63) | (1,851.26) | 151.000 | 181.20 | 151.000 | 181.20 | 362.40 | 2,213.66 | 151.000 | 179.54 | 151.000 | 179.54 | 359.08 | 2,210.34 |
| Gilead Sciences | 169.000 | (792.71) | 169.000 | (792.71) | (1,585.42) | 169.000 | 468.03 | 169.000 | 468.03 | 936.06 | 2,521.48 | 169.000 | 268.46 | 169.000 | 268.46 | 536.92 | 2,122.34 |
| Halliburton Co. | 114.000 | (2,624.28) | 114.000 | (2,624.28) | (5,248.56) | 114.000 | (2,079.36) | 114.000 | (2,079.36) | (4,158.72) | 1,089.84 | 114.000 | (1,999.60) | 114.000 | (1,999.60) | (3,999.20) | 1,249.36 |
| Home Depot Inc. | 61.000 | (808.25) | 61.000 | (808.25) | (1,616.50) | 61.000 | (93.94) | 61.000 | (93.94) | (187.88) | 1,428.62 | 61.000 | (26.99) | 61.000 | (26.99) | (53.98) | 1,562.52 |
| Honeywell International Inc. | 76.000 | (742.48) | 76.000 | (742.48) | (1,484.96) | 76.000 | 132.28 | 76.000 | 132.28 | 264.56 | 1,749.52 | 76.000 | 529.07 | 76.000 | 529.07 | 1,058.14 | 2,543.10 |
| JP Morgan Chase & Co. | 101.000 | (778.27) | 101.000 | (778.28) | (1,556.55) | 101.000 | (184.39) | 101.000 | (184.40) | (368.79) | 1,187.76 | 101.000 | (434.99) | 101.000 | (163.33) | (598.32) | 958.23 |
| Lauder Estee Cos Inc. | 76.000 | (1,513.67) | 76.000 | (1,513.67) | (3,027.34) | 76.000 | (1,033.35) | 76.000 | (1,033.55) | (2,066.70) | 960.64 | 76.000 | 18.35 | 76.000 | 18.35 | 36.70 | 3,064.04 |
| Oracle Corp. | 243.000 | (247.49) | 243.000 | (247.50) | (494.99) | 243.000 | 986.95 | 243.000 | 986.94 | 1,973.89 | 2,468.88 | 243.000 | 1,227.38 | 243.000 | 1,227.37 | 2,454.75 | 2,949.74 |
| Raytheon Co. | 27.000 | (1,486.89) | 27.000 | (1,486.89) | (2,973.78) | 27.000 | (1,178.82) | 27.000 | (1,178.82) | (2,357.64) | 616.14 | 27.000 | (903.75) | 27.000 | (903.75) | (1,807.50) | 1,166.28 |
| Roper Technologies | 41.000 | (296.02) | 41.000 | (296.02) | (592.04) | 41.000 | 390.92 | 41.000 | 390.92 | 781.84 | 1,373.88 | 41.000 | 1,038.41 | 41.000 | 1,038.41 | 2,076.82 | 2,668.86 |
| S&P Global Inc. | 28.000 | (755.72) | 28.000 | (755.72) | (1,511.44) | 28.000 | (147.84) | 28.000 | (147.84) | (295.68) | 1,215.76 | 28.000 | (105.35) | 28.000 | (105.35) | (210.70) | 1,300.74 |
| Schlumberger Ltd. | 190.000 | (5,850.62) | 190.000 | (5,850.63) | (11,701.25) | 190.000 | (4,305.92) | 190.000 | (4,305.93) | (8,611.85) | 3,089.40 | 190.000 | (4,150.22) | 190.000 | (4,150.23) | (8,300.45) | 3,400.80 |
| Schwab Charles Corp. | 199.000 | (2,678.54) | 199.000 | (2,678.54) | (5,357.08) | 199.000 | (1,635.78) | 199.000 | (1,635.78) | (3,271.56) | 2,085.52 | 199.000 | (1,787.12) | 199.000 | (1,787.12) | (3,574.24) | 1,782.84 |
| Stryker Corp | 66.000 | (1,016.05) | 66.000 | (1,016.06) | (2,032.11) | 66.000 | 358.07 | 66.000 | 358.09 | 716.13 | 2,748.24 | 66.000 | 553.94 | 66.000 | 553.93 | 1,107.87 | 3,139.98 |
| Texas Instruments Inc. | 102.000 | (1,650.92) | 102.000 | (1,650.92) | (3,301.84) | 102.000 | (1,020.56) | 102.000 | (1,020.56) | (2,041.12) | 1,260.72 | 102.000 | (445.42) | 102.000 | (445.42) | (890.84) | 2,411.00 |
| **Total Common Stock:** | | $ (35,649.40) | | $ (35,649.44) | $ (71,298.84) | | $ (12,301.44) | | $ (12,301.28) | $ (24,602.72) | $ 46,696.12 | | $ (7,575.69) | | $ (7,303.61) | $ (14,879.30) | $ 56,419.54 |
| **Pooled Equity Funds:** | | | | | | | | | | | | | | | | | |
| Baird Midcap Fund - Inst | 6,049.711 | $ (14,317.08) | - | - | $ (14,317.08) | 6,049.711 | $ (4,758.54) | - | - | $ (4,758.54) | 9,558.54 | 6,049.711 | $ 3,832.05 | - | - | $ 3,832.05 | 18,149.13 |
| Causeway International Value Fund | 6,116.442 | (9,009.09) | 10,502.970 | (15,470.15) | (24,479.24) | 6,116.442 | (3,014.98) | 10,502.970 | (5,177.24) | (8,192.22) | 16,287.02 | 6,116.442 | 960.71 | 10,502.970 | 1,649.69 | 2,610.40 | 27,089.64 |
| CIBC Atlas Disciplined Equity Fund - Inst | 656.968 | (30.49) | - | - | (30.49) | 656.968 | 810.43 | - | - | 810.43 | 840.92 | 656.968 | 1,211.18 | - | - | 1,211.18 | 1,241.67 |
| DFA Tax Managed US Small Cap Portfolio | 2,645.960 | (14,941.70) | - | - | (14,941.70) | 2,645.960 | (5,045.81) | - | - | (5,045.81) | 9,895.89 | 2,645.960 | 193.19 | - | - | 193.19 | 15,134.89 |
| Janus Henderson Enterprise Fund I Share | - | - | 1,450.761 | (21,586.01) | (21,586.01) | - | - | 1,450.761 | (5,627.64) | (5,627.64) | 15,958.37 | - | - | 1,450.761 | 5,920.42 | 5,920.42 | 27,506.43 |
| John Hancock US Global Leaders Growth Fund Class I | 2,635.790 | (14,513.27) | - | - | (14,513.27) | 2,635.790 | (4,655.41) | - | - | (4,655.41) | 9,857.86 | 2,635.790 | 1,011.53 | - | - | 1,011.53 | 15,524.80 |
| Lazard International Strategic Equity Portfolio Inst | 14,490.567 | (38,971.08) | 1,792.282 | (1,799.54) | (40,770.62) | 14,490.567 | (26,219.38) | 1,792.282 | (222.33) | (26,441.71) | 14,328.91 | 14,490.567 | (19,698.63) | 1,792.282 | 584.20 | (19,114.43) | 21,656.19 |
| Oppenheimer Developing Markets Fund Class I | 3,094.435 | (11,952.21) | 2,999.349 | (18,262.07) | (30,214.29) | 3,094.435 | (2,019.08) | 2,999.349 | (8,634.16) | (10,653.24) | 19,561.05 | 3,094.435 | 611.19 | 2,999.349 | (6,084.72) | (5,473.53) | 24,740.76 |
| PIMCOCommodity Real Return Strategy Fund | 12,933.987 | (18,153.74) | 13,220.588 | (19,123.70) | (37,277.44) | 12,933.987 | (13,368.17) | 13,220.588 | (14,232.08) | (27,600.25) | 9,677.19 | 12,933.987 | (13,109.49) | 13,220.588 | (13,967.67) | (27,077.16) | 10,200.28 |
| Virtus Duff & Phelps Global Real Estate Securities Fund Class I | 4,139.099 | (1,738.42) | - | - | (1,738.42) | 4,139.099 | 10,306.35 | - | - | 10,306.35 | 12,044.77 | 4,139.099 | 11,175.56 | - | - | 11,175.56 | 12,913.98 |
| **Total Pooled Equity Funds:** | | $(123,627.10) | | $ (76,241.47) | $ (199,868.56) | | $ (47,964.59) | | $ (33,893.45) | $ (81,858.04) | $ 118,010.52 | | $ (13,812.71) | | $ (11,898.08) | $ (25,710.79) | $ 174,157.77 |
| **Exchange Traded Funds:** | | | | | | | | | | | | | | | | | |
| Ishares Russell Mid-Cap Value ETF | 560.000 | $ (4,156.15) | - | - | $ (4,156.15) | 560.000 | $ 211.85 | - | - | $ 211.85 | 4,368.00 | 560.000 | $ 1,718.25 | - | - | $ 1,718.25 | 5,874.40 |
| Ishares Russell 2000 ETF | 715.000 | (11,412.90) | 1,405.000 | (20,867.91) | (32,280.81) | 715.000 | (573.50) | 1,405.000 | 431.89 | (141.61) | 32,139.20 | 715.000 | 4,946.30 | 1,405.000 | 431.89 | 5,378.19 | 37,659.00 |
| JP Morgan Chase & Co Alerian ETN | 4,955.000 | (1,536.05) | 4,665.000 | (11,970.39) | (13,506.44) | 4,955.000 | 11,792.90 | 4,665.000 | 578.46 | 12,371.36 | 25,877.80 | 4,955.000 | 9,959.55 | 4,665.000 | 578.46 | 10,538.01 | 24,044.45 |
| Vanguard FTSE Developed Markets ETF | 4,840.000 | (32,137.60) | 7,669.000 | (58,411.70) | (90,549.30) | 4,840.000 | (18,730.80) | 7,669.000 | (37,168.57) | (55,899.37) | 34,649.93 | 4,840.000 | (14,229.60) | 7,669.000 | (37,168.57) | (51,398.17) | 39,151.13 |
| Vanguard Index Fds S&P 500 | - | - | 544.000 | (5,828.32) | (5,828.32) | - | - | 544.000 | 4,072.48 | 4,072.48 | 9,900.80 | - | - | 544.000 | 4,072.48 | 4,072.48 | 9,900.80 |
| **Total Exchange Traded Funds:** | | $ (49,242.70) | | $ (97,078.32) | $ (146,321.02) | | $ (7,299.55) | | $ (32,085.74) | $ (39,385.29) | $ 106,935.73 | | $ 2,394.50 | | $ (32,085.74) | $ (29,691.24) | $ 116,629.78 |
| **Total** | | $ (232,072.02) | | $ (230,071.31) | $ (462,143.32) | | $ (69,535.87) | | $ (76,602.80) | $ (146,138.67) | $ 316,004.65 | | $ (14,988.86) | | $ (43,178.33) | $ (58,167.19) | $ 403,976.13 |

Notes:

[1] The increase in the number of shares held in fixed income funds reflects reinvested dividends received.

[2] All investments in common stock and the PIMCO Commodity Real Return Strategy Fund were sold on 2/6/2019. I have analyzed the gain (loss) at time of sale for these securities.

Sources: Aaron Fleck Trust and Barbara Fleck Trust Accounts Statements

**Actual Portfolio Performance**                                            **ATTACHMENT 2A**

|  | Relevant Date | Aaron Fleck Trust | Barbara Fleck Trust | Combined |
|---|---|---|---|---|
| **Beginning Value** | 5/23/2018 | $ (4,000,000) | $ (4,000,000) | $ (8,000,000) |
| **Fees** | | | | |
| Quarterly Portfolio Fee - 6/30/18 | 7/20/2018 | 1,495 | 1,487 | 2,981 |
| Q218 Investment Management Fee | 7/20/2018 | 174 | 174 | 347 |
| Q318 Investment Management Fee | 10/12/2018 | 496 | 496 | 992 |
| Quarterly Portfolio Fee - 9/30/18 | 10/12/2018 | 3,547 | 3,517 | 7,064 |
| Q418 Investment Management Fee | 1/18/2019 | 462 | 462 | 924 |
| Quarterly Portfolio Fee - 12/31/18 | 1/18/2019 | 6,932 | 6,849 | 13,781 |
| Quarterly Portfolio Fee - 3/31/19 | 4/19/2019 | 6,874 | 6,777 | 13,651 |
| **Ending Value** | 5/6/2019 | 4,182,610 | 4,115,371 | 8,297,980 |
| **Actual Annualized Return** | | **5.33%** | **3.55%** | **4.44%** |
| Expected Annualized Return (from Attachment 2B) | | 4.12% | 4.12% | 4.12% |
| **Overperformance (Underperformance)** | | **1.20%** | **-0.57%** | **0.31%** |

*Sources: Aaron Fleck Trust and Barbara G. Fleck Trust Account Statements for May 2018 - May 2019; FLECK_000167; FLECK_000974*

**Expected Portfolio Return Based on Market Indices**                **ATTACHMENT 2B**

| Asset Class | Selected Index | Target Allocation | Index Return | Weighted Index Return |
|---|---|---|---|---|
| | | [1] | [2] | |
| US Large Cap Equities | S&P 500 | 13% | 9.76% | 1.27% |
| US Mid Cap Equities | S&P Midcap 400 | 4% | 3.07% | 0.12% |
| US Small Cap Equities | S&P SmallCap 600 | 6% | -0.14% | -0.01% |
| International Equities | S&P International 700 | 12% | -2.97% | -0.36% |
| Emerging Markets | S&P Emerging BMI | 3% | -2.31% | -0.07% |
| High Yield Bonds | S&P U.S. High Yield Corporate Bond Index | 4% | 7.00% | 0.28% |
| Fixed Income | S&P U.S. Aggregate Bond Index | 49% | 5.40% | 2.65% |
| Alternatives | *See Attachment 2C* | 8% | 2.71% | 0.22% |
| Cash and Equivalents | S&P US T-Bill | 1% | 2.26% | 0.02% |
| | | | **Expected Annualized Return** | **4.12%** |

*Sources:*
*[1] May 8, 2018 Investment Policy Statement, specifically FWTB_0000441*
*[2] S&P Indices data retrieved from www.spglobal.com*

**Alternative Investment Return Analysis**                                    **ATTACHMENT 2C**

**Weighted Return of Alternative Investments**

|  | Selected Index | Index Return, Annualized | Weight | Weighted Index Return, Annualized |
|---|---|---|---|---|
| REITs | S&P Global REIT | 13.36% | 25.0% | 3.34% |
| MLPs | S&P MLP Index | 0.83% | 25.0% | 0.21% |
| Commodities | S&P GSCI | -10.79% | 25.0% | -2.70% |
| Private Equity | S&P Listed Private Equity Index | 7.44% | 25.0% | 1.86% |
| **Total Alternatives** | | | **100.0%** | **2.71%** |

*Source: S&P Indices data retrieved from www.spglobal.com*

**Annualized Index Returns**                                                          **ATTACHMENT 2D**

| Asset Class | Selected Index | Selected Beginning Date | Index Value on Beginning Date | Selected Ending Date | Index Value on Ending Date | Lenth of Investment (Days) | Length of Investment (Years) | CAGR |
|---|---|---|---|---|---|---|---|---|
| US Large Cap Equities | S&P 500 | 5/23/2018 | 5,369.99 | 5/6/2019 | 5,868.45 | 348 | 0.95 | 9.76% |
| US Mid Cap Equities | S&P Midcap 400 | 5/23/2018 | 2,902.71 | 5/6/2019 | 2,987.53 | 348 | 0.95 | 3.07% |
| US Small Cap Equities | S&P SmallCap 600 | 5/23/2018 | 1,301.12 | 5/6/2019 | 1,299.36 | 348 | 0.95 | -0.14% |
| International Equities | S&P International 700 | 5/23/2018 | 3,453.02 | 5/6/2019 | 3,355.16 | 348 | 0.95 | -2.97% |
| Emerging Markets | S&P Emerging BMI | 5/23/2018 | 497.38 | 5/6/2019 | 486.41 | 348 | 0.95 | -2.31% |
| High Yield Bonds | S&P U.S. High Yield Corporate Bond Index | 5/23/2018 | 608.21 | 5/6/2019 | 648.72 | 348 | 0.95 | 7.00% |
| Fixed Income | S&P U.S. Aggregate Bond Index | 5/23/2018 | 189.43 | 5/6/2019 | 199.17 | 348 | 0.95 | 5.40% |
| Alternatives - PE | S&P Listed Private Equity Index | 5/23/2018 | 292.65 | 5/6/2019 | 313.36 | 348 | 0.95 | 7.44% |
| Alternatives - REITs | S&P Global REIT | 5/23/2018 | 531.18 | 5/6/2019 | 598.60 | 348 | 0.95 | 13.36% |
| Alternatives - MLPs | S&P MLP Index | 5/23/2018 | 4,704.40 | 5/6/2019 | 4,741.51 | 348 | 0.95 | 0.83% |
| Alternatives - Commodities | S&P GSCI | 5/23/2018 | 2,861.85 | 5/6/2019 | 2,566.77 | 348 | 0.95 | -10.79% |
| Cash and Equivalents | S&P US T-Bill | 5/23/2018 | 230.58 | 5/6/2019 | 235.55 | 348 | 0.95 | 2.26% |

*Source: S&P Indices data retrieved from www.spglobal.com*

Appendix A





707 Seventeenth Street
Suite 2125
Denver, CO 80202
Tel: (303) 704-4545
Cell: (303) 884-8384
Fax: (303) 704-4229

jahern@alvarezandmarsal.com

**Professional Certifications**

Certified Public Accountant (CO)

Chartered Global Management Accountant (CGMA)

**Professional History**

Alvarez & Marsal
(2008 – present)

Navigant Consulting, Inc.
(2004 – 2008)

Tucker Alan Inc.
(1994-2004)

Peterson Consulting, LP
(1992-1994)

**Education**

Colorado College
*Bachelor of Arts, Economics (1992)*
*Magna cum laude*

Metro State College of Denver
*Accounting coursework (2001 to 2005)*

**Honors**

Boettcher Scholar
Colorado College, 1988-1992

Phi Beta Kappa
Colorado College, 1992

**Professional Affiliations**

American Institute of Certified Public Accountants (AICPA)

## Jon S. Ahern, CPA, CGMA

Senior Director – Disputes and Investigations

Jon Ahern, a Senior Director in the Denver office of Alvarez & Marsal Disputes and Investigations, LLC, has thirty years of experience in analyzing complex financial, accounting and economic issues for corporate clients and counsel in the context of litigation and dispute resolution.

Mr. Ahern has assisted companies in numerous industries, including telecommunications, utilities, insurance, financial institutions, natural resources, computer software, government contracts, technology, construction, manufacturing, mining, automotive, agriculture, cannabis, and real estate.  Mr. Ahern has expertise in commercial damages, forensic accounting, business valuation, corporate investigations, intellectual property damages, employment-related damages, class actions, trusts and estates, complex data analysis, insurance coverage and other areas.

Mr. Ahern has provided expert witness testimony on approximately thirty matters in various forums, including matters pending before federal courts, state courts, arbitration panels and other venues.  Mr. Ahern has testified on commercial damages, valuation and forensic accounting analyses related to telecommunications, oil and gas, cannabis, automotive, leisure & travel, complex data analysis, manufacturing, class action litigation, fraud investigation, employment, personal injury, and other issues.

Mr. Ahern earned a Bachelor of Arts in Economics, magna cum laude, from Colorado College in 1992 and completed additional accounting coursework at Metro State College of Denver.  Mr. Ahern is a Certified Public Accountant (CPA) licensed by the State of Colorado and a Chartered Global Management Accountant (CGMA).

**Appendix A**

Jon S. Ahern, CPA

---

### *COMPLEX COMMERCIAL DAMAGES & BUSINESS VALUATION MATTERS:*

- Provided expert testimony in a dispute related to natural gas exploration, production, and transportation in Colorado.  Evaluated the potential economic impact of a delay in pipeline operations on completed and producing wells in the region, including production modeling, operating costs, transportation costs, cost of capital and natural gas futures markets.

- Provided expert testimony on valuation and commercial damages in a legal malpractice matter related to a commercial plant and flower growing operation.

- Provided expert testimony on damages issues in a partner dispute related to a luxury real estate and golf course development project.

- Provided expert testimony at arbitration related to commercial damages in the cannabis industry in a dispute regarding wrongful termination of franchise agreements and the related value of lost royalties and loss of "right of first refusal" to purchase the franchise.

- Provided expert testimony in deposition and at trial on a matter involving the value of lifetime ski pass privileges in the leisure and travel industry.  Evaluated 20 years of historical usage and developed a damages and valuation model based on up to 70 years of future use.  Considered industry trends, local economic factors and other issues to determine the net present value of potential losses.

- Evaluated complex executive compensation damages issues in an accounting malpractice matter related to failed tax shelter arrangements for senior executives of a public company.  Analyzed stock option grants/vesting/exercise, restricted stock grants, and other executive compensation to calculate potential economic losses under various scenarios.

- Provided expert testimony in several disputes related to automotive dealerships, including termination disputes and a new dealer protest action.  Evaluated financial condition and stability using dealership financial statements, performed comparisons to various geographical and size-based peer groups for dealerships for the same manufacturers and analyzed market data relevant to subject dealerships.

- Performed business valuations and analyzed valuation-related issues in numerous disputes in Bankruptcy Court and other forums.  Evaluated and weighted valuation approaches for companies in various industries including automotive parts, voting equipment and services, restaurants, real estate, technology, and other industries.

- Evaluated damages in a "failure to fund" matter related to an urban high-rise condominium development project.  Compared terms of replacement financing to original financing, and determined damages based on additional interest costs, additional project costs, delay-related costs, deferred take-down schedules for condo units, additional equity investments, and other factors.

- Assessed the damages to a natural gas marketing company due a breach of contract by the company engaged to provide interstate transportation services.  Evaluated the markets for supply and demand of natural gas at the wellhead and destination, as well as the potential profits that could have been realized under alternative shipping arrangements.

- Analyzed damages in a dispute between two mining companies over the purchase/sale of a gold mining operation in New Zealand.  Evaluated the mine's actual cash flow, remediations costs, and operating margins.  Presented findings at mediation.

- Analyzed damages issues in a dispute related to a failed land development partnership in Colorado.  Projected partnership cash flows and values overtime by forecasting development costs, lot values, take-down schedules, tap fees, partnership operating expenses and financing costs.  Developed a complex financial model and range of values before settlement of the case.

- Performed numerous lost compensation calculations related to wrongful termination, temporary disability,

Jon S. Ahern, CPA

permanent disability, and death. Utilized appropriate economic and financial data, including earning history, occupational information, demographic data and mitigating factors such as alternative employment income, future earning potential and the time value of money to determine economic loss.

- Calculated the pecuniary gain realized by the manufacturer of vitamin supplements in the context of a criminal proceeding related to the alleged substitution of ingredients. Analyzed production logs, raw materials inventory records, invoices, sales records, and other information.

### *FORENSIC ACCOUNTING AND CORPORATE INVESTIGATIONS:*

- Provided expert testimony in United States Bankruptcy court on financial and accounting issues related to substantive consolidation. Evaluated business records and accounting detail of a holding company and wholly-owned subsidiary in the voting systems industry to determine whether the companies' operations and financial condition were separate and could be reasonably distinguished.

- Provided expert testimony related to allegedly fraudulent distributions from an estate and assessed restitution and unjust enrichment from the perspective of the distributions' recipients.

- Worked directly with Special Counsel hired by the Audit Committee of a publicly-traded company related to a stock-option backdating investigation. Directed a team that reviewed option grant procedures, documentation, and timing. Presented findings to the company's Board.

- Performed forensic analysis of billions of dollars of transaction-level revenue in special purpose financial statements for a large telecommunications provider. Developed methods to compile and analyze local revenue, access revenue, long distance revenue and other revenue over a five-year period. Assisted with design and development of data repository and reporting tools.

### *TELECOMMUNICATIONS AND REGULATED INDUSTRY MATTERS:*

- Provided expert testimony at arbitration in a dispute related to wholesale telecommunications services. Analyzed charge detail, discounts, payments, credits and other information from over 250 invoices and reconciled totals with supporting call detail records. Evaluated damages issues related to alleged traffic losses caused by service quality and pricing issues.

- Evaluated over 30 million call detail records in the context of a dispute between a Regional Bell Operating Company (RBOC) and a Competitive Local Exchange Carrier (CLEC). Analyzed the CLEC's allegation that the RBOC was systematically under-reporting access call traffic, causing financial harm to CLEC. Developed analytical databases and ultimately matched or explained over 99% of the alleged unreported calls. Prepared expert report and provided deposition testimony.

- Assisted a large telecommunications company with the analysis of telephone rental charges to customers over a six-year period in the context of a class action matter. Developed a class member database to collect, compile and organize data for nearly 200,000 customers and provided declarations to the court related to potential class members and counsel's valuation of a settlement agreement.

- Analyzed the causes of failure of a global internet infrastructure company in the context of a dispute with a provider of a national, fiber optic indefeasible right of use (IRU). Evaluated financial, operational and market issues, including comparable IRU transactions, market valuations and international bandwidth pricing and demand trends.

- Evaluated damages and causation issues in fraud and breach of contract disputes between wireless telecommunications entities and third-party telemarketers and resellers of wireless services. Evaluated account information and call detail records to identify potentially fraudulent accounts wireless phone orders and developed a database model to track results.

- Assisted a major electric and gas utility in the analysis of general and administrative expenses for the

Jon S. Ahern, CPA

purposes of ratemaking.  Developed and implemented a web-based questionnaire for collection of each department's historical costs, cost forecasts and activity level work detail for use in regulatory filings.

- Created a valuation model for a nuclear power generating facility at the center of a dispute between members of an electric power cooperative.  Projected the detailed financial performance of the facility using factors related to rate base, cost of capital, demand for electric power and other relevant operational and market factors.

### *INTELLECTUAL PROPERTY MATTERS:*

- Evaluated damages in a trade secret misappropriation matters in numerous industries, including biotechnology, industrial ventilation, investment management, steel building construction, financial institutions, and other industries.  Analyzed lost profits, unjust enrichment, cost to cure, corrective advertising and other potential remedies.

- Analyzed lost profits and reasonable royalty damages in a patent dispute involving computer disk utility software.  Compiled and analyzed domestic and international product line sales data for two alleged infringers of the patent and used Panduit factors to determine lost profits versus reasonable royalty, by product line.

- Analyzed the lost profits of an international computer software company resulting from the alleged copyright infringement of a competitor.  Involved the assessment of industry and economic trends, product lifecycles, pricing policies and corporate cost allocation procedures.

- Determined damages in a trademark infringement case involving manufacturers of screen-printed shirts and other souvenirs.  Calculated the profits achieved by the infringing company, assessed the lost sales and income of the plaintiff, and analyzed the companies' cost structures to identify the variable expenditures associated with additional sales.

### *FINANCIAL INSTITUTION MATTERS:*

- Provided expert witness testimony related to a fraud investigation involving a warehouse line of credit for residential mortgage loans.  Performed detailed analysis of the bank's loan files, ownership and encumbrance reports and other information to understand and illustrate for the court how the alleged fraud was perpetrated.

- Analyzed the lost profits of a savings and loan institution due to a breach of contract by governmental and regulatory agencies.  Prepared a detailed financial model which simulated the financial position, operations and cash flows of the institution and its wholly-owned mortgage banking subsidiary.  Researched and incorporated variables related to cost of capital, portfolio yields, investment performance and regulatory compliance.

- Performed an analysis of the accounting records of a large financial institution to assess losses attributable to mismanagement and fraud by the institution's Directors and Officers.  Interviewed relevant personnel and prepared a detailed history of a $750 million loan portfolio that summarized the net cash loss to the institution.

- Performed a detailed loan review of certain insider and third-party transactions made by a failed savings and loan institution.  Researched and documented the credit analysis, underwriting and collateralization of each loan.  Used the findings to assess the appropriateness of the institution's lending decisions in the context of a directors' and officers' liability litigation proceeding.

Jon S. Ahern, CPA

---

### *CONSTRUCTION, INSURANCE COVERAGE AND OTHER MATTERS:*

- Analyzed damages issues in a dispute related to construction of a large U.S. wind farm.  Analyzed construction costs, change orders, cost overruns, delay impact on costs, demurrage, liquidated damages, and post-construction impact on project net present value.

- Investigated and analyzed vendor contracts and construction costs in a dispute related to expansion of a large domestic airport.

- Developed a forecasting and cost allocation database model for past and estimated future asbestos and silicosis claims of an industrial machinery manufacturer.  Analyzed and mapped over 300 insurance policies spanning a 40-year period.  Assisted client and counsel with numerous buy-out and cost sharing negotiations with insurance companies.

- Developed and utilized a spreadsheet model simulation of the Environmental Protection Agency's BEN Model to determine the economic benefit (or loss) realized by an equipment manufacturer through non-compliance with limits on the disposition of toxic by-products of a steel-coating process.

- Calculated the damages suffered by a major defense contracting firm resulting from a vendor's shipment of defective hybrid computer chips.  Identified and quantified the direct, indirect, and overhead cost increases incurred by the defense contractor in correcting the problem and accelerating its remaining schedule to meet delivery deadlines imposed by government production schedules.

- Analyzed various investments of a company that constructed, purchased and operated hydroelectric generating facilities in the Pacific Northwest.  Assessed the reasonableness of projections related to construction costs, rainfall, power output and cost of generation to evaluate whether or not the asset valuations reported by the company were supportable.

**Appendix B**



Jon S. Ahern
Deposition and Trial Testimony – Past Four Years

<u>GT Industrial Products, LLC v. Wells Fargo & Company, Wells Fargo Bank, N.A., and Aaron Talbot</u>; American Arbitration Association; Trial/Hearing, April 2022

<u>Medical Marijuana Access & Patient Safety, Inc. v. Keara Klinepeter, Acting Secretary, Pennsylvania Department of Health, et al.</u>; Commonwealth Court of Pennsylvania; Preliminary Injunction Hearing, February 2022

<u>Lambland, Inc. d/b/a A-1 Organics, Inc. v. Heartland Biogas, LLC</u>; United States District Court, District of Colorado; Trial, November 2021

<u>Jushi FL, SPV, LLC, as assignee of TGS National Franchise, LLC v. San Felasco Nurseries, Inc., as assignee of Florida Compassionate Growers, LLC</u>; American Arbitration Association; Arbitration, May 2021

<u>Gilbert Zambrano, d/b/a Taskmasters v. Sparkplug Capital, LLC and Red Dot Management, LLC</u>; United States District Court for the Northern District of Illinois; Deposition, April 2021

<u>Elk Creek Ranch Owners Association, et al. v. William Wheeler, et al.</u>; District Court, Rio Blanco County, Colorado; Deposition, August 2018; Trial, October 2020

<u>RV Horizons, Inc.; MHC America Fund, LLC, et al. v. Jamie Smith, Ryan Smith, MHPI VII, LLC, Elevation Capital Group, LLC, and Dahn Corporation</u>; United States District Court, District of Colorado; Deposition, April 2020

<u>In the Matter of the Estate of William J. Young, IV</u>; District Court, El Paso County, Colorado; Trial, July 2019

<u>Kevin R. Collins and Cicero Investments. LLC v. Glenn Jacks and Galileo Investments, LLC</u>; District Court, Douglas County, Colorado; Deposition, May 2019; Trial, July 2019

<u>Englebrecht Verbeek v. Moye White, LLP, et al.</u>; Judicial Arbiter Group, Inc.; Deposition, November 2018; Arbitration, February 2019

**Facts & Data Considered**                                    **Appendix C**

Legal Filings
1.  February 19, 2021 Complaint, Class Action Complaint, and Jury Demand
2.  May 14, 2021 First Amended Complaint
3.  March 15, 2021 Waiver and Acceptance of Service, with Exhibits
4.  June 3, 2021 Scheduling Order
5.  November 12, 2021 Plaintiffs' Objections and Responses to Defendants' First Set of Requests for Production and Interrogatories to Plaintiffs
6.  December 11, 2020 Mediation Statement

Expert Reports
7.  March 24, 2022 Expert Report of Joseph Rulison
8.  March 24, 2022 Expert Report of Robert Reidy
9.  Joseph Rulison CV

Depositions
10.  March 1, 2022 Deposition of Aaron Fleck, with Exhibits
11.  March 3, 2022 Deposition of Charles Bantis, with Exhibits
12.  March 7, 2022 Deposition of Andrew Godfrey, with Exhibits
13.  March 8, 2022 Deposition of Barbara Fleck, with Exhibits
14.  March 9, 2022 Deposition of John Sawyer, with Exhibits

Bates Stamped Documents
15.  2018.05 Account Statement Aaron, FWTB_0000300.pdf
16.  2018.05 Account Statement Barb FWTB_0000112.pdf
17.  2018.06 Account Statement Aaron, FWTB_0000271.pdf
18.  2018.06 Account Statement Barb, FWTB_0000085.pdf
19.  2018.06.30 Quarterly Performance Report, FWTB_0005167.pdf
20.  2018.07 Account Statement Barb, FWTB_0000068.pdf
21.  2018.07 Account Statement Aaron, FWTB_0000254.pdf
22.  2018.08 Account Statement Aaron, FWTB_0000193.pdf
23.  2018.08 Account Statement Barb, FWTB_0000010.pdf
24.  2018.09 Account Statement Aaron, FWTB_0000362.pdf
25.  2018.09 Account Statement Barb, FWTB_0000170.pdf
26.  2018.09.30 Quarterly Perfromance Report, FWTB_0005172.pdf
27.  2018.10 Account Statement Aaron, FWTB_0000346.pdf
28.  2018.10 Account Statement Barb, FWTB_0000155.pdf
29.  2018.11 Account Statement Aaron, FWTB_0000330.pdf
30.  2018.11 Account Statement Barb, FWTB_0000140.pdf
31.  2018.12 Account Statement Aaron, FWTB_0000207.pdf
32.  2018.12 Account Statement Barb, FWTB_0000024.pdf
33.  2018.12.31 Quarterly Performance Report, FWTB_0005177.pdf
34.  2019.01 Account Statement Aaron, FWTB_0000240.pdf
35.  2019.01 Account Statement Barb, FWTB_0000055.pdf
36.  2019.02 Account Statement Aaron, FWTB_0000226.pdf
37.  2019.02 Account Statement Barb, FWTB_0000041.pdf
38.  2019.03 Account Statement Aaron, FWTB_0000290.pdf
39.  2019.03 Account Statement Barb, FWTB_0000103.pdf
40.  2019.03.31 Quarterly Report re Performance, FWTB_0005162.pdf
41.  2019.04 Account Statement Aaron, FWTB_0000184.pdf
42.  2019.04 Account Statement Barb, FWTB_0000001.pdf

**Facts & Data Considered**                                   **Appendix C**

43.   2019.05 Account Statement Aaron, FWTB_0000319.pdf
44.   2019.05 Account Statement Barb, FWTB_0000130.pdf
45.   2019.05.06 FWTB gains and losses for Aaron Fleck_000971.pdf
46.   2019.05.06 FWTB gains and losses for Barbara Fleck_001101.pdf
47.   2019.06 Account Statement Aaron, FWTB_0000285.pdf
48.   2019.06 Account Statement Barb, FWTB_0000098.pdf
49.   2019.07 Account Statement Aaron, FWTB_0000268.pdf
50.   2019.07 Account Statement Barb, FWTB_0000082.pdf
51.   2018.05.08 Fee Agreement FWTB_0000426.pdf
52.   2018.05.08 Investment Services Agreement FWTB_0000414.pdf
53.   2018.05.08 IPS FWTB_0000437.pdf
54.   2019.04.22 Dreher Capital Loss Analysis FWTB_0002382.pdf
55.   2018.12 Tax Return (Draft), Fleck_007103.pdf
56.   2019.12.31 Fleck 2019 tax returns FLECK_000252.pdf
57.   2018.12.31 IRS Transcript, FLECK_007522-FLECK_007537.pdf

Documents Relied Upon by Rulison
58.   FLECK_000003-FLECK_000038 A Fleck Revocable Trust 12 1 18 12 31 18_REDACTED.pdf
59.   FLECK_000039-FLECK_000049 A Fleck Revocable Trust Income and Expenses 12 31 18 5 15 19_REDACTED.pdf
60.   FLECK_000072-FLECK_000090 Barbara Fleck Revocable Trusrt 12 31 18  5 15 19_REDACTED.pdf
61.   FLECK_000101-FLECK_000170 Fleck Revocable Trust 12 31 18   5 15 19_REDACTED.pdf
62.   FLECK_000171-FLECK_000251 Fleck Revocable Trust 4 1 19 41 30 19 Statement_REDACTED.pdf
63.   FWTB_0000010.pdf
64.   FWTB_0000024.pdf
65.   FWTB_0000041.pdf
66.   FWTB_0000055.pdf
67.   FWTB_0000068.pdf
68.   FWTB_0000082.pdf
69.   FWTB_0000085.pdf
70.   FWTB_0000098.pdf
71.   FWTB_0000103.pdf
72.   FWTB_0000112.pdf
73.   FWTB_0000130.pdf
74.   FWTB_0000140.pdf
75.   FWTB_0000155.pdf
76.   FWTB_0000170.pdf
77.   FWTB_0000184.pdf
78.   FWTB_0000193.pdf
79.   FWTB_0000207.pdf
80.   FWTB_0000226.pdf
81.   FWTB_0000240.pdf
82.   FWTB_0000254.pdf
83.   FWTB_0000268.pdf
84.   FWTB_0000271.pdf
85.   FWTB_0000285.pdf
86.   FWTB_0000290.pdf
87.   FWTB_0000300.pdf
88.   FWTB_0000319.pdf
89.   FWTB_0000330.pdf

**Facts & Data Considered**                              **Appendix C**

90.   FWTB_0000346.pdf
91.   FWTB_0000362.pdf
92.   FWTB_0000611.pdf
93.   FWTB_0000624.pdf
94.   FWTB_0000642.pdf
95.   FWTB_0000642.xlsx
96.   FWTB_0000643.pdf
97.   FWTB_0000643.xlsx
98.   FWTB_0000645.pdf
99.   FWTB_0000654.pdf
100.  FWTB_0000782.pdf
101.  FWTB_0000785.pdf
102.  FWTB_0000941.pdf
103.  FWTB_0001102.pdf
104.  FWTB_0001103.pdf
105.  FWTB_0001103.xlsx
106.  FWTB_0001105.pdf
107.  FWTB_0001114.pdf
108.  FWTB_0001819.pdf
109.  FWTB_0002658.pdf
110.  FWTB_0002664.pdf
111.  FWTB_0003963.pdf
112.  FWTB_0003970.pdf
113.  FWTB_0003970.xlsx
114.  FWTB_0005557.pdf
115.  FWTB_0005570.xlsx
116.  FLECK_000328-FLECK_000330 Letter to Podoll 9.10.2020.pdf
117.  FWTB_0000460.pdf
118.  FWTB_0000461.pdf
119.  FWTB_0000545.pdf
120.  FWTB_0000555.pdf
121.  FWTB_0000772.pdf
122.  FWTB_0000773.pdf
123.  FWTB_0000774.pdf
124.  FWTB_0000947.pdf
125.  FWTB_0001099.pdf
126.  FWTB_0001100.pdf
127.  FWTB_0001749.pdf
128.  FWTB_0002125.pdf
129.  FWTB_0002167.pdf
130.  FWTB_0002382.pdf
131.  FWTB_0002423.pdf
132.  FWTB_0002437.pdf
133.  FWTB_0002581.pdf
134.  FWTB_0002652.pdf
135.  FWTB_0002983.pdf
136.  FWTB_0003029.pdf
137.  FWTB_0003165.pdf
138.  FWTB_0003166.pdf
139.  FWTB_0007733.pdf

**Facts & Data Considered**                                                        **Appendix C**

140.  FWTB_0007748.pdf
141.  FWTB_0007753.pdf
142.  FWTB_0007767.pdf
143.  FWTB_0007769.pdf
144.  FWTB_0007770.pdf
145.  FWTB_0007775.pdf
146.  FWTB_0007779.pdf
147.  FWTB_0007783.pdf
148.  FWTB_0007787.pdf
149.  FWTB_0007789.pdf
150.  FWTB_0007790.pdf
151.  FWTB_0007793.pdf
152.  FWTB_0007796.pdf
153.  FWTB_0007807.pdf
154.  FWTB_0007810.pdf
155.  FWTB_0007818.pdf
156.  FWTB_0007917.pdf
157.  FWTB_0007934.pdf
158.  FWTB_0007945.pdf
159.  FWTB_0007948.pdf
160.  FWTB_0007984.pdf
161.  FWTB_0007992.pdf
162.  FWTB_0008328.pdf
163.  FWTB_0008343.pdf
164.  FWTB_0008358.pdf
165.  FLECK_000252-FLECK_000327 AARONHandBARBARAG_REDACTED.pdf
166.  Fleck_007103.pdf
167.  FWTB_0002126.pdf
168.  FWTB_0002126.xlsx
169.  FWTB_0007440.pdf
170.  FWTB_0007468.pdf
171.  FLECK_000050-FLECK_000055 A Fleck Trust Investment Svcs Agreement.pdf
172.  FLECK_000056-FLECK_000060 A Fleck Trust New Acct Info Form_REDACTED.pdf
173.  FLECK_000061-FLECK_000065 B Fleck New Acct Info Form_REDACTED.pdf
174.  FLECK_000066-FLECK_000071 B Fleck Trust Investment Svcs Agreement.pdf
175.  FLECK_000091-FLECK_000091 Fleck Fee Agreement.pdf
176.  FLECK_000092-FLECK_000098 Fleck IPS.pdf

Research

177.  AICPA Forensic & Valuation Services Practice Aid. *Measuring Damages Involving Individuals.*
178.  Fannon, Nancy J. and Dunitz, Jonathan M., *The Comprehensive Guide to Economic Damages* , 5th Ed.
179.  AICPA Forensic & Valuation Services Practice Aid. *Attaining Reasonable Certainty in Economic Damages Calculations.*
180.  Federal Rules of Evidence, Rule 702, Testimony by Expert Witness.