**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action Number: 21-cv-01073-CMA-CPG

THE AARON H. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck
and Barbara G. Fleck,
THE BARBARA G. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck
and Barbara G. Fleck,
AARON FLECK, and BARBARA G. FLECK,

      Plaintiffs,

v.

 FIRST WESTERN TRUST BANK
 CHARLES BANTIS, and
 ANDREW GODFREY

      Defendants.

---

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Pursuant to Federal Rule of Civil Procedure 56, Defendants First Western Trust Bank ("FWTB"), Charles Bantis, and Andrew Godfrey move for partial summary judgment.

## INTRODUCTION

Aaron Fleck and Barbara Fleck (the "Flecks") provided FWTB $8 million to invest on behalf of their Trusts (the Aaron H. Fleck Revocable Trust and Barbara H. Fleck Revocable Trust) for less than one year. FWTB grew that money slightly during a period of market turbulence, and then transferred it to another bank at the Flecks' request. The Flecks complain that FWTB should have made them more money. But FWTB invested in accordance with a detailed investment strategy that the Flecks agreed to by approving their Investment Policy Statement ("IPS"). For this reason and others, the Flecks' breach of contract claim lacks merit. FWTB, however, acknowledges that the issue of whether it invested pursuant to the IPS turns on factual issues that must be resolved through trial.

The Court can dispose of the remainder of Plaintiffs' claims now because they fail as a matter of law under the undisputed evidence.

First, Plaintiffs' claims for fraudulent inducement and fraudulent concealment are lawyer-driven claims that are contradicted by evidentiary record. The Flecks themselves disavowed the Amended Complaint's fraud theories in their depositions, and the record is clear that each alleged false statement was either (a) never made, (b) true, and/or (c) not relied upon by Plaintiffs. Plaintiffs' fraudulent concealment claim similarly fails because FWTB disclosed the truth to the Flecks and had no duty to disclose anything further.

Second, Plaintiffs' claims for breach of fiduciary duty are barred by the economic loss rule. With discovery now complete, this argument is no longer premature. The record

evidence is now clear that Plaintiffs' claims are exclusively governed by three detailed contracts: the IPS, an Investment Agreement, and a Fee Agreement. Plaintiffs complain that FWTB failed to follow a cohesive investment strategy, charged them undisclosed fees, and failed to follow Mr. Fleck's alleged instruction to sell securities at the end of 2018 for tax purposes. The merits of each claim turns on FWTB's contractual duties. Plaintiffs cannot identify any common law duty that is not subsumed by a more specific contractual duty.

Third, Plaintiffs' breach of contract claim for being charged undisclosed fees fails because the evidence indisputably shows that the approximately $55,000 in fees and $2,800 in commissions charged to the Flecks were agreed upon by the Flecks in advance.

## STATEMENT OF UNDISPUTED FACTS

**A.    In 2017 and early 2018, FWTB introduced Aaron Fleck to its investment management services and provided him with a bridge loan.**

1.    Aaron Fleck worked as a portfolio manager for decades, and formed his own investment firm which managed hundreds of millions of dollars of assets. Ex. 1, A. Fleck Dep. at 11:19-12:10.

2.    On March 10, 2017, Aaron Fleck asked Andrew Godfrey, a wealth advisor he knew at FWTB, to "recommend a smart honest Fund Manager with an office in Aspen." Ex. 2, March 23, 2017 Email Chain.

3.    In response to Mr. Fleck's email, on March 23, 2017, Mr. Godfrey invited Mr. Fleck to discuss FWTB's investment management services, and explained: "We are more than a bank and consider ourselves more like wealth managers with $5 Billion under management. We have an open architecture that I think could accommodate your unique style, combined with our Fiduciary capability, and be exactly what you are looking for." *Id.*

4.      On April 26, 2017, Doug Barker, who would later become the Flecks' portfolio manager, emailed Mr. Fleck stating: "I look forward to learning more about your estate planning and wealth transfer goals and will be prepared to explain more about our fiduciary services at First Western Trust Bank." Ex. 3, Apr. 26, 2017 Email.

5.      In early 2018, FWTB provided the Flecks with a bridge loan to finance their purchase of a new residence when they were in the process of selling their existing home in Aspen. Ex. 4, Bantis Dep. at 86:17-87:9.

6.      Later in 2018, the Flecks sold their Aspen home for approximately $19 million. Ex. 1, A. Fleck Dep. at 37:9-11.

7.      On February 9, 2018, Aaron Fleck and his daughter and son-in-law met with FWTB to discuss the possibility that FWTB would manage the investment of the net sale proceeds generated from the sale of the Flecks' home. Ex. 5, Sawyer Decl. ¶ 5; Ex. 1, A. Fleck Dep. at 105:2-106:22; Ex. 6, Godfrey Dep. at 56:18-24.

8.      During the February 9, 2018 meeting, Mr. Fleck explained that he was looking for an institution to invest his assets and provide yearly distributions to support his wife Barbara Fleck after his death, he conveyed his investment preferences, and FWTB discussed its investment approach including that FWTB focused on diversification and minimizing volatility. Ex. 5, Sawyer Decl. ¶ 6; Ex. 6, Godfrey Dep. at 58:18-59:13.

9.      During this meeting, FWTB explained to the Flecks that Doug Barker (who was at the meeting) would be the Flecks' portfolio manager, Mr. Barker would select investment strategies and funds approved by FWTB's Investment Policy Committee, and Mr. Godfrey and Mr. Bantis would be local contacts for the Flecks in Aspen (not portfolio

managers). Ex. 5, Sawyer Decl. ¶ 6; Ex. 6, Godfrey Dep. at 40:22-24, 63:20-64:7, 65:6-16; Ex. 4, Bantis Dep. at 14:12-15, 25:16-26:9, 32:20-25.

10.     Based on the Flecks' input during the February 9, 2018 meeting, FWTB prepared an Investment Policy Statement ("IPS") with a proposed investment approach and presented it to the Flecks. Ex. 7, IPS; Ex. 5, Sawyer Decl. ¶ 8.

11.     At the time, Mr. Fleck was considering three or four investment management firms, not just FWTB. Ex. 1, A. Fleck Dep. at 106:11-17.

12.     The Flecks ultimately hired FWTB because Mr. Fleck had known the Aspen branch manager Charlie Bantis "for at least 20 years … and he was very, very cooperative," and because Mr. Bantis immediately approved the Flecks' bridge loan which Mr. Fleck greatly appreciated. Ex. 1, A. Fleck. Dep. at 101:9-102:5.

**B.     In May 2018, Plaintiffs entered detailed contracts with FWTB governing how FWTB would  invest their funds.**

13.     On May 8, 2018, the Flecks approved and executed the IPS, the Investment Services and Custody Agreement ("Investment Agreement"), and the Fee Schedule Agreement ("Fee Agreement"), thereby authorizing FWTB to invest $8 million of their funds in accordance with the IPS. Ex. 7, IPS; Ex. 8, Investment Agreement; Ex. 9, Fee Agreement; Ex. 1 A. Fleck. Dep. at 109:11-17, 132:12-23, 147:5-8.

14.     The IPS is a "plan, developed jointly by First Western and [the Flecks], for the management of [the Flecks'] investment assets." Ex. 7, IPS at 2; Am. Compl. ¶ 32.

15.     The IPS sets forth the overall objectives of the account which include maintaining diversification of investment assets, achieving financial goals, and minimizing potential tax liabilities. Ex. 7, IPS at 3.

16.     The IPS specifies the amount of assets FWTB would invest ($8 million), the investment time horizon (10+ years) and cash flow objective ($500,000 per year), the Flecks' risk tolerance (stable growth and low level of income), the portfolio allocation (moderate), and the expected long-term return target (6.48%). Ex. 7, IPS at 2.

17.     The IPS specifies the asset classes and allocation ranges per asset class that FWTB would use to invest the Flecks' funds, which was as follows:

| Asset Class | Min % | Target% | Max % |
|---|---|---|---|
| US Large Cap Equities | 0% | 13% | 28% |
| US Mid Cap Equities | 0% | 4% | 14% |
| US Small Cap Equities | 0% | 6% | 16% |
| International Equities | 2% | 12% | 22% |
| Emerging Markets | 0% | 3% | 13% |
| High Yield Bonds | 0% | 4% | 14% |
| Fixed Income | 39% | 49% | 59% |
| Alternatives | 0% | 8% | 18% |
| Cash and Equivalents | 0% | 1% | 20% |

*Id.* at 5.

18.     The Flecks declined to list any "portfolio restrictions" in the section of the IPS that asked clients to list any particular restrictions. Ex. 7, IPS at 4.

19.     The IPS explains that the Flecks would receive "custodial statements detailing your portfolio holdings" "on no less than a quarterly basis." Ex. 7, IPS at 6.

20.     The Investment Agreement similarly states: "During the term of this Agreement, FWTB will provide statements of account no less than quarterly." Ex. 8, Investment Agreement § 5.

21.     The Flecks opted on their account intake form to receive electronic account statements only, not paper statements. Ex. 10, New Account Form at 3-4.

22.     The IPS explains that the Flecks' investment portfolio would be occasionally rebalanced "to meet the strategic asset allocation targets." Ex. 7, IPS at 5.

23.     The IPS states that "[a]ctual performance will vary" from projected returns, and "there is no guarantee that [your] return objective will be achieved in any single year or over longer time periods." Ex. 7, IPS at 5. The IPS contains a chart showing the expected variance from the target return after one, three, five, ten, and twenty years, with the variance being higher in the short term and lower in the long term. *Id.* at 6.

24.     The Investment Agreement granted FWTB "full and complete discretion and authority with respect to managing the investment of [the Flecks'] assets," but also allowed the Flecks "to direct and to determine at any and all times the selection of any security for purchase and sale in their account." Ex. 8, Investment Agreement § 3.

25.     The Investment Agreement contains the governing "Standard of Care" for liability, which requires FWTB to manage the Flecks' accounts in good faith pursuant to the parties' contracts and to "give to the securities in its custody the same degree of care and protection which it gives to its own property." Ex. 8, Investment Agreement §§ 8-9.

26.     The Investment Agreement provides that "FWTB shall not be liable for any loss or depreciation (including, without limitation, any decrease in value of assets held in the account due to market activity) resulting from any action or inaction of FWTB taken in good faith pursuant to the terms of this Agreement or as the result of following a direction or instruction from Client." Ex. 8, Investment Agreement § 8.

27.     The Investment Agreement further provides that "FWTB nor its agents shall be liable for any act, omission, loss, depreciation, or error in judgment that may occur in

connection with FWTB's handling of Client's account, except for such that may result from FWTB's gross negligence or willful misconduct." Ex. 8, Investment Agreement § 9.

28.    Mr. Fleck does not believe that he read any of the contracts—the IPS, the Investment Agreement, or the Fee Agreement—before signing them. Ex. 1, A. Fleck. Dep. at 116:5-117:1, 132:24-133:10, 147:9-12.

29.    When asked "Had you read this Investment Policy Statement, would you have still signed it?" Mr. Fleck testified "Probably not." *Id.* at 126:24-127:1.

**C.    Plaintiffs' fraud allegations are refuted by the record evidence.**

30.    While Plaintiffs have never clearly defined their fraud claims, they appear to claim that Defendants misled them about whether: (1) their investments would be overseen by "professional money managers" and "analysts"; and (2) FWTB was a Registered Investment Advisor ("RIA"). *See* Am. Compl. ¶¶ 86, 88, 98-99. The evidence shows neither theory has merit.

31.    *Professional Money Managers or Analysts.* Mr. Fleck believes he was told that FWTB has "analysts in Denver," but he does not recall anyone telling him that FWTB employed "professional money managers." Ex. 1, A. Fleck Dep. at 123:9-11, 164:17-22.

32.    Mrs. Fleck does not recall having ever met with FWTB, Andy Godfrey, Doug Barker, or Charlie Bantis, and does not claim to have been misled by Defendants. Ex. 11, B. Fleck Dep. at 10:9-19, 11:4-9.[1]

33.    When asked at his deposition, Mr. Fleck did not claim that FWTB does not

_____

[1] Mrs. Fleck, who has serious memory loss, did not approve of the lawsuit or review the complaint before it was filed, and defers to Mr. Fleck on the question of whether Defendants did anything wrong to her. Ex. 11, B. Fleck. Dep. at 9:2-10:8.

employ professional money managers. Ex. 1, A. Fleck Dep. at 167:6-8.

34.     The Flecks' investment account was managed by "professional money managers," including portfolio manager Doug Barker who, at the time, had several decades of experience in wealth management, an MBA, and the credentials of Certified Financial Planner and Accredited Investment Fiduciary. Ex. 5, Sawyer Decl. ¶ 11.

35.     FWTB also employed "analysts" and other investment professionals who selected the equities, investment strategies, and funds that were available to portfolio managers like Mr. Barker to select when creating client portfolios. Ex. 5, Sawyer Decl. ¶ 10. Those teams included approximately eight analysts and investment professionals: David Stern (Director of Investment Research), Sydney Young (Business Analyst), Brandon Teamer (Investment Research Analyst), Karen Post (Managing Director of Investments), John Sawyer (Chief Investment Officer ("CIO")), Brandon Humphryes (Director of Fixed Income Strategy), Debbie Silversmith (CIO Emeritus), and Warren Olsen (FWTB's former Chairman and former CIO). *Id.*

36.     *Registered Investment Advisor.* A "registered investment adviser" or RIA is a defined statutory term under the Investment Advisers Act of 1940. Certain investment managers are required to register with the SEC and state securities regulators and then are subject to those agencies' rules and regulations. *See* 15 U.S.C. § 80b-2(11).

37.     Banks like FWTB are excluded from the definition of "investment adviser" in the Investment Advisers Act, and are exempt from its requirements. *Id.*; *see also SEC v. Wall St. Transcript Corp.*, 422 F.2d 1371, 1382 (2d Cir. 1970) ("The term 'investment adviser' is so defined as specifically to exclude banks, bank holding-company

affiliates…") (quoting legislative history).

38.    Mr. Fleck does not recall anyone at FWTB telling him that FWTB "was a registered investment advisor;" nor does he recall believing that FWTB was an RIA when he hired FWTB on behalf of the Trusts. Ex. 1, A. Fleck Dep. at 164:10-16, 165:8-12.

39.    Mr. Fleck acknowledges that who is an RIA is publicly available, and that he never checked to see if FWTB was an RIA. Ex. 1, A. Fleck Dep. at 166:2-19.

40.    While Plaintiffs claim that FWTB hardly met with them, that is not true. Mr. Fleck frequently met with FWTB, including on February 9, 2018, November 6, 2018, throughout December and January 2019, and on February 6, 2019, March 18, 2019, April 12, 2019, and April 15, 2019. Ex. 13, Defs.' Resp. to Pls.' Interrogatory 10.

**D.    FWTB transferred all of the Flecks' investment funds and securities to Citi Private Bank at Mr. Fleck's direction.**

41.    On May 3, 2019, the Flecks requested that the FWTB transfer in kind all assets in the Trusts' accounts to Citi Private Bank. Ex. 12, Citi Account Transfer Forms.

42.    Plaintiffs' claim that they never received $800,000 of the Flecks' accounts, *see* Am. Compl. ¶ 40, is not true because FWTB transferred all assets in the Flecks' account to Citi Private Bank in May 2019, Ex. 5, Sawyer Decl. ¶ 12.

**E.    The Flecks approved of all fees charged by FWTB.**

43.    The contracts approved by the Flecks summarize the fees the Trusts would be charged. Ex. 8, Investment Agreement § 7; Ex. 9, Fee Agreement.

44.    The Investment Agreement discloses that the Trusts "shall pay FWTB a fee for investment advisory services, custody and transaction services ('Portfolio Fee')." Ex. 8, Investment Agreement § 7.

45.   The Fee Agreement, approved by the Flecks, provides that Annual Percentage Fee or Portfolio Fee will be charged according to the following table:

### ANNUAL FEE SCHEDULE
*Fees are paid quarterly, in arrears and directly from each account.

| MARKET VALUE | ANNUAL PERCENTAGE FEE |
|---|---|
| First $1,000,000 | 1.25% |
| Next $1,000,000 | 0.90% |
| Next $3,000,000 | 0.65% |
| Next $2,500,000 | 0.50% |
| Next $2,500,000 | 0.40% |
| Next $10,000,000 | 0.30% |
| Next $10,000,000 | 0.25% |
| Above $30,000,000 | Negotiable |

Ex. 9, Fee Agreement.

46.   The Fee Agreement also explains that FWTB "may direct client funds to be invested in shares or similar ownership interests of mutual funds, privately offered investment funds, managed accounts or other investment funds that are managed by an affiliate of FWTB. In such cases, the affiliate will charge an asset management fee within the investment fund or to the account in the case of a separate account. The asset management fee is separate from the Portfolio Fee charged directly by FWTB." *Id.*

47.   The Investment Agreement contains substantially similar language, and further explains: "In addition to the Portfolio Fee charged directly by FWTB, the client may also pay a direct asset management fee for separate account managers including managers affiliated with FWTB and an indirect asset management fee in each investment fund or mutual fund." Ex. 8, Investment Agreement § 7.

48.   The Investment Agreement also explains that the Flecks "may pay a commission to the executing broker, in the case of equity securities, which will be included

in the total cost of the trade." *Id.*

49.    In total, FWTB charged the Flecks fees of $54,917.10, which included a $51,630.64 management fee (calculated based on assets under management), a $3,264.40 fee for use of FWTB's Large Cap Core Portfolio, and a $22.66 foreign exchange fee in connection with a dividend paid by a foreign corporation. Ex. 5, Sawyer Decl. ¶ 9(a)-(c) & Exs. A-B.

50.    In total, FWTB charged the Flecks a total of $2,790.68 in commissions, 100% of which were paid to third-party brokers and none of which were kept by FWTB. Ex. 5, Sawyer Decl. ¶ 9(f)-(g) & Exs. C-D.

## LEGAL STANDARD

Summary judgment must be granted if the evidence demonstrates "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant makes that initial showing, "the burden shifts to the nonmovant to . . . 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.*

## ARGUMENT

I.   **THE UNDISPUTED EVIDENCE SHOWS PLAINTFFS WERE NOT FRAUDULENTLY INDUCED INTO PROVIDING FUNDS TO FWTB TO INVEST.**

To overcome a motion for summary judgment on a fraudulent misrepresentation claim, Plaintiffs must offer evidence that would allow a reasonable jury to conclude that

(1) Defendants made a fraudulent misrepresentation of material fact; (2) Plaintiffs relied on this misrepresentation; (3) Plaintiffs had a right to rely on, or were justified in relying on, the misrepresentation; and (4) Plaintiffs' reliance resulted in damages. *See Rocky Mtn. Exploration, Inc. v. Davis Graham & Stubbs LLP*, 2018 CO 54 ¶ 53, 420 P.3d 223, 234. The record makes clear that both of Plaintiffs' fraud theories are legally deficient.

First, Plaintiffs cannot establish a triable issue of fact on their claim that Defendants misrepresented whether FWTB employed "professional money managers" and "analysts" because (a) there is no evidence that Defendants made such representations, (b) these alleged representations are indisputably true, and (c) there is no evidence that Plaintiffs relied upon on these alleged representations.

As an initial matter, Plaintiffs have adduced no evidence that any Defendant ever said that FWTB employed "professional money managers" or "analysts." Mrs. Fleck has no recollection of ever communicating with any Defendant, *see* Statement of Undisputed Facts ("SUF") ¶ 32, and Mr. Fleck does not recall being told by any Defendant that FWTB has "professional money managers," SUF ¶ 31. While Mr. Fleck claims he was told FWTB had "analysts," *id.*, Plaintiffs have never identified the date of this alleged communication.

Regardless, it is indisputably true that FWTB did employ "professional money managers" and "analysts." The Flecks' portfolio was managed by Doug Barker who has two decades of experience in wealth management, an MBA, and credentials as a Certified Financial Planner and Accredited Investment Fiduciary. SUF ¶ 34. FWTB also had investment teams who selected the equities, investment strategies, and funds that were

available to portfolio managers like Mr. Barker, which included approximately eight investment professionals and/or analysts. SUF ¶ 35.

Additionally, Plaintiffs cannot show reliance. Mr. Fleck testified that he made his decision to hire FWTB over competing money managers because he knew Charlie Bantis and appreciated that Mr. Bantis was so cooperative and made him the bridge loan. SUF ¶¶ 11-12. There is no evidence that Mr. Fleck's decision was based on the fact that FWTB employed "professional money managers" or "analysts," and, in fact, such an assertion is implausible given that neither Fleck could recall being told that FWTB had "professional money managers," the alleged fraud asserted in the Amended Complaint. SUF ¶¶ 30-32.

Plaintiffs also cannot establish a triable issue of fact on their second fraud theory, *i.e.*, that Plaintiffs were misled about FWTB being an RIA, because there is no evidence that this alleged misrepresentation occurred or that Plaintiffs relied upon it.

The only evidence is that Defendants never told the Flecks that FWTB was an RIA. Mrs. Fleck has no recollection of communicating with Defendants, SUF ¶ 32, and Mr. Fleck testified that he does not recall Defendants ever stating that FWTB was an RIA, SUF ¶ 38. Plaintiffs cannot point to any written communication where FWTB advertised that it was an RIA. The relevant communications simply state that FWTB has "fiduciary capability" and offers "fiduciary services," both of which are true. SUF ¶¶ 3-4.

The evidence also makes clear that Plaintiffs again cannot establish reliance. Mr. Fleck did not believe FWTB was an RIA when he hired FWTB, SUF ¶ 38, and he hired FWTB because of his relationship with Mr. Bantis, not his view of FWTB's regulatory status, SUF ¶ 12. Moreover, Mr. Fleck acknowledged that the list of RIAs is publicly available and

he did not look up whether FWTB was an RIA before investing. SUF ¶ 39; https://adviserinfo.sec.gov/ (allowing public to search for RIAs). The public availability of who is an RIA precludes a showing of justifiable reliance. *See Rocky Mtn. Exploration,* 2018 CO 54, ¶ 53 ("A party's reliance on a purported misrepresentation is not justified when the party is … on inquiry notice of the falsity of the representation."); *Colorado Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 18 (Colo. App. 2010) (affirming finding that when alleged misrepresented information "was publically available … justifiable reliance cannot be proven because 'reasonable due diligence would reveal accurate information'").

## II.   THE UNDISPUTED EVIDENCE SHOWS NO FRAUDULENT CONCEALMENT OCCURRED.

To overcome a motion for summary judgment against a fraudulent concealment claim, Plaintiffs must offer evidence that would allow a reasonable jury to conclude that: (1) the concealment of a material existing fact that in equity and good conscience the defendant should have disclosed; (2) knowledge on the defendant's part that such a fact was being concealed; (3) ignorance of that fact on the plaintiff's part; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Rocky Mtn. Exploration*, 2018 CO ¶ 56.

Plaintiffs' fraudulent concealment claim is that Defendants should have disclosed (1) their approach to the management of Plaintiffs' investment accounts, and (2) their credentials. Am. Compl. ¶ 98. Plaintiffs cannot establish a triable issue of fact for their fraudulent concealment theories because (a) Defendants disclosed their investment approach and credentials, and (b) Plaintiffs cannot identify any additional information that Defendants had a duty to disclose.

The undisputed evidence shows that Plaintiffs were not ignorant of the investment approach FWTB would use since FWTB disclosed its investment approach. FWTB walked Mr. Fleck and his daughter-in-law and son-in-law through its investment approach at a February 9, 2018 meeting. SUF ¶¶ 7-8. The IPS also discloses in detail FWTB's investment approach, including the time horizon (10+ years), the risk tolerance (moderate, stable growth, and low level of income), the expected long-term return target (6.48%), and the specific ranges of asset allocation among small, mid, and large cap equities, emerging markets, bonds, fixed income, alternatives, and cash. SUF ¶¶ 14-17. Plaintiffs have not and cannot point to any undisclosed aspect of FWTB's "investment approach" that Defendants had a duty to disclose.[2] Thus, Plaintiffs cannot establish their ignorance of any material aspect of FWTB's investment approach.

Plaintiffs' failure to read the IPS confirms this. Aaron Fleck admitted he did not read the IPS, and claims he likely would not have signed it if he had read it. SUF ¶¶ 28-29. Courts reject fraud claims as a matter of law where, as here, the parties claiming fraud did not review the alleged fraudulent agreement before approving it. *See Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1994) (affirming summary judgment grant on fraud claims because "it was [the plaintiff's] duty to read and understand the provisions of the" contract and "a party cannot void a contract by claiming to be ignorant of

---

[2] Nor can Plaintiffs point to any reason why the individual Defendants—Charlie Bantis and Charlie Godfrey who are not fiduciaries and were not responsible for managing the Flecks' investment account, SUF ¶ 9—owed any duty to disclose at all. This is an additional ground for dismissal of all claims against the individual Defendants. *See Rocky Mtn. Exploration*, 2018 CO ¶ 56 ("To succeed on a claim for fraudulent concealment or nondisclosure, a plaintiff must thus show that the defendant had a duty to disclose the material information.").

its contents."); *Collins v. Trans Union, LLC*, No. 14-CV-00742-RBJ-NYW, 2015 WL 12550893, at *7 (D. Colo. June 10, 2015) (granting summary judgment based on same rationale), aff'd, 668 F. App'x 345 (10th Cir. 2016).

Plaintiffs' second fraudulent concealment theory similarly fails. Defendants did disclose that Plaintiffs' portfolio manager would be Doug Barker, and that Mr. Barker would select from strategies and funds approved by a team of professionals and analysts that included FWTB's Investment Policy Committee. SUF ¶¶ 9, 34-35. And, contrary to the Amended Complaint's asserted basis for the fraudulent concealment claim, Am. Compl. ¶ 103, Plaintiffs did not believe that FWTB was an RIA so Defendants had no obligation to clarify FWTB's credentials or regulatory status. SUF ¶¶ 36-39. Plaintiffs have not identified any relevant "credentials" about which they were ignorant, for which Defendants had a duty to disclose, or which affected their investment decision. Overall, there is no triable issue of fact on any fraudulent concealment claim. The Court should thus dismiss the claim.

**III.   THE UNDISPUTED EVIDENCE SHOWS THE ECONOMIC LOSS RULE BARS THE FIDCUIARY DUTY CLAIMS BECAUSE THE PARTIES' THREE CONTRACTS GOVERN ALL TRIABLE ISSUES AND SUBSUME ANY APPLICABLE COMMON LAW DUTIES.**

Under Colorado's economic loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such breach absent an independent duty of care under tort law." *Mid-Century Ins. Co. v. HIVE Constr.*, *Inc.*, -- P.3d --, 2023 COA 25, ¶ 26. For a duty to be independent, it must (1) "arise from a source other than the relevant contract," and (2) "not be a duty also imposed by the contract." *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009) (citation omitted). The economic loss rule is intended "to maintain a distinction between

contract and tort law" to foster "predictability on commercial transactions," and to encourage the parties to "confidently allocate risks and costs ... without fear that unanticipated liability may arise in the future." *Mid-Century Ins.*, 2023 COA 25 ¶ 26 (quoting *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150, 2019 CO 31).

On the motion to dismiss, the Court found dismissal under the economic loss rule was "premature without further factual development and discovery." ECF 50 at 10. The Court noted that the standard of care in the Investment Agreement is "sparse," and stated that "[i]t cannot determine, based on the record before it, whether this standard of care subsumes FWTB's alleged fiduciary duties." *Id.* at 13. With discovery now complete, it is clear that there is no triable issue of fact concerning any breach of fiduciary duty because all alleged breaches of duties are governed by the detailed IPS, the Investment Agreement, and the Fee Agreement. *See generally* SUF ¶¶ 13-29.

Plaintiffs' claim that FWTB breaches its fiduciary duty in three ways: (1) failing to follow a "cohesive investment strategy," (2) charging undisclosed fees, and (3) failing to "harvest tax losses" by not following Mr. Fleck's direction to sell all positions with paper (or unrealized) losses at the end of 2018. Am. Compl. ¶ 114. The duties relating to each of these issues is contained in the parties' contracts, and Plaintiffs are unable to identify any additional common law duties.

First, the investment strategy to be used by FWTB is set forth in detail in the IPS. The IPS specifies, among other things: the Flecks' goals, investment time horizon, and target return; the asset classes and allocation ranges per asset class to be used by FWTB; the frequency of when custodial statements would be provided to the Flecks; and how the

account will be rebalanced. SUF ¶¶ 13-23. Any trial in this case will address if FWTB invested in accordance with the IPS and if FWTB acted with gross negligence or wilful misconduct, which is the standard for liability in the Investment Agreement. SUF ¶¶ 24-27. Any common law duties of care and loyalty are subsumed by the more specific contractual provisions agreed upon by the parties, which precludes a separate tort claim. *See, e.g.*, *Mid-Century Ins.*, 2023 COA 25 ¶ 43 (affirming dismissal of negligence claim because the contract required the defendants to perform work in accordance with the contract's detailed specifications); *Micale v. Bank One N.A. (Chicago)*, 382 F. Supp. 2d 1207, 1221-22 (D. Colo. 2005) (dismissing fiduciary duty claim because even if the banks had common law fiduciary duties due to their role as financial advisors, those duties were "subsumed" by the contractual duties in the Investment Management Agreement).

Second, the fees to be charged are set forth in detail in the Fee Schedule and Investment Agreement. SUF ¶¶ 44-50. All fees charged were disclosed, as discussed in Argument IV below. If the Court, however, finds there is a triable issue of fact on the appropriateness of the fees charged, the triable issue would be a question of FWTB's compliance with the parties' contracts. Any common law duty (*e.g.*, to be loyal and act in good faith) is subsumed by the parties' more detailed contracts and will not answer the key question of whether the fees charged were disclosed and approved by the Flecks.

Third, the issue of harvesting tax losses is governed by the IPS. The IPS specifies that FWTB would invest with several objectives, including achieving financial goals and minimizing potential tax liabilities. SUF ¶ 15. Moreover, the Flecks granted FWTB full discretion to make all investment decisions, but retained the right to direct FWTB to make

specified purchases and sales of securities. SUF ¶ 24. Therefore, if the trier of fact concludes FWTB ignored an instruction from Mr. Fleck to sell securities for tax purposes, as Plaintiffs allege, the implications of that action, including if FWTB incurs liability as a result of it, will have to be decided based on the parties' contracts.[3]

The Court is required to honor the detailed risk allocation set by the parties' agreements, which includes a limitation of liability absent gross negligence or wilful misconduct. *See* SUF ¶¶ 25-27; *see also Mid-Century Ins.*, 2023 COA 25 ¶ 38 ("parties to a contract should confidently allocate risks in the contract" and "such allocations should be respected once made").  As such, any triable issue of fact on an alleged breach of duty by FWTB must be determined by evaluating FWTB's compliance with the parties' contracts, not under an independent fiduciary duty that may exist at common law.

**IV.    THE UNDISPUTED EVIDENCE SHOWS THAT THE FLECKS APPROVED AND AGREED UPFRONT TO ALL FEES CHARGED TO THEM.**

It is well-established that a court "must enforce an unambiguous contract in accordance with the plain and ordinary meaning of its terms." *See USI Properties E., Inc. v. Simpson*, 938 P.2d 168, 173 (Colo. 1997).

Here, all fees charged to the Flecks were expressly authorized by the unambiguous provisions of the Investment Agreement and Fee Agreement. There is no dispute that the Flecks were charged total fees of $54,917.10 (which included a management fee, a fee for use of FWTB's Large Cap Core Portfolio, and a small foreign

---

[3] To the extent Plaintiffs are claiming that FWTB breached its fiduciary duty by not sufficiently sending the Flecks' statements, that issue also is covered by the parties' contracts, which specified the method of delivery for statements (electronic) and the frequency of statements (quarterly). *See* SUF ¶¶ 19-21.

exchange fee), and $2,790.68 in commissions (100% of which was paid to third-party brokers and none of which was kept by FWTB). SUF ¶¶ 49-50. Each of the fees and commissions charged was specifically authorized by the Investment Agreement and Fee Agreement. *See* SUF ¶ 44, (Investment Agreement authorized portfolio fee); SUF ¶ 45 (Fee Agreement authorized portfolio fee and explained how it would be calculated); SUF ¶ 46 (Fee Agreement authorized FWTB to charge fees for use of "investment funds that are managed by an affiliate of FWTB"); SUF ¶ 47 (Investment Agreement authorized FWTB to charge "asset management fee for separate account managers including managers affiliated with FWTB"); SUF ¶ 48 (Investment Agreements authorized "commissions to the executing broker").

Because all fees charged by FWTB were expressly permitted by the Investment Agreement and the Fee Agreement, Defendants are entitled to summary judgment regarding all claims relating to fees charged by FWTB. *See Relative Value Stud., Inc. v. McGraw-Hill Cos.*, 981 P.2d 687, 690 (Colo. App. 1999) (affirming grant of summary judgment because contract was unambiguous).

## CONCLUSION

For these reasons, the Court should grant summary judgment, and dismiss with prejudice Plaintiffs' claims for fraudulent inducement, fraudulent concealment, breach of fiduciary duty, and breach of contract for charging undisclosed fees.

Dated: May 15, 2023

> /s/ Adam B. Stern
> BRYAN CAVE LEIGHTON PAISNER LLP
> Timothy R. Beyer
> Adam B. Stern
> 1700 Lincoln Street, Suite 4100
> Denver, CO 80203
> Telephone: (303) 861-7000
> tim.beyer@bclplaw.com
> adam.stern@bclplaw.com
>
> Attorneys for Defendants First Western Bank,
> Charles Bantis, and Andrew Godfrey

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this 15th day of May, 2023 a true and correct copy of **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed and served using the CM/ECF system, on the following:

PODOLL & PODOLL, P.C.
Richard B. Podoll
rich@podoll.net
Robert Kitsmiller
bob@podoll.net
Jacqueline E. Hill
jacqui@podoll.net

*Attorney for Plaintiffs*


*/s/ Adam B. Stern*
Adam B. Stern