Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF COLORADO
 3
 4   THE AARON H. FLECK REVOCABLE TRUST,
     through its Trustees, Aaron H. Fleck
 5   and Barbara G. Fleck, THE BARBARA G.
     FLECK REVOCABLE TRUST, through its
 6   Trustees, Aaron H. Fleck and Barbara G.
     Fleck, AARON FLECK, and BARBARA G. FLECK,
 7   on behalf of themselves and all others
     similarly situated,
 8
           Plaintiffs,
 9
     v.               Civil Action No. 21-cv-01073-CMA-GPG
10
     FIRST WESTERN TRUST BANK,
11   CHARLES BANTIS,
     and ANDREW GODFREY,
12
           Defendants.
13   _____
14            VIDEOCONFERENCE DEPOSITION
15                       OF
16                 AARON H. FLECK
17
18                 MARCH 1, 2022
                     9:00 A.M.
19                 ASPEN, COLORADO
20
21
22
23
24
         Jennifer R. Cormican, NVRA CVR No. 7645,
25    Notary Public in and for the State of Colorado
```

Page 2

```
 1                     APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF(S):
 4       RICHARD B. PODOLL, ESQUIRE
         PODOLL & PODOLL, P.C.
 5       5619 DTC PARKWAY, SUITE 1100
         GREENWOOD VILLAGE, COLORADO 80111
 6       303-861-4000
         RICH@PODOLL.NET
 7
 8
 9   ON BEHALF OF THE DEFENDANT(S):
10       ADAM B. STERN, ESQUIRE
         BRYAN CAVE LEIGHTON PAISNER, LLP
11       1700 LINCOLN STREET, SUITE 4100
         DENVER, COLORADO 80203
12       303-861-7000
         ADAM.STERN@BCLPLAW.COM
13
14
15   ALSO APPEARING:
16       TIMOTHY R. BEYER, CO-COUNSEL WITH MR. STERN
17       LAURA J. KNOPP, CO-COUNSEL WITH MR. PODOLL
18       ROBERT PODOLL, CO-COUNSEL WITH MR. RICH PODOLL
19       VIDEOGRAPHER, RALPH MITCHELL
20     **All parties appearing via Zoom videoconference**
21
22
23
24
25
```

Page 3

```
 1                       INDEX
 2   EXAMINATION
 3       By Mr. Stern.....................................5
 4   EXHIBITS
 5       No. 1; Interactive Brokers Statement for Barbara
             Fleck December 2018 Bates FLECK 7538-7542...20
 6
         No. 2; Account Listing Bates FLECK 2328........23
 7
         No. 3; IRS Tax Return Transcript ending
 8           12/31/2018 Bates FLECK 752-7537.............40
 9       No. 4; Draft 2018 Tax Return Bates
             7103-7165...................................50
10
         No. 5; Barbara G. Fleck Revocable Trust Statement
11           December 2018 Bates FLECK 1721-1741.........96
12       No. 6; Investment Policy Statement Bates FWTB
             437-443....................................108
13
         No. 7; Investment Services and Custody Agreement
14           Bates FWTB 414-419.........................132
15       No. 8; Email from Andrew Godfrey dated 5/11/2018
             Subject: Portfolio Bates FWTB 6891-6892....138
16
         No. 9; Fee Schedule Agreement Bates FWTB
17           426........................................146
18       No. 10; Aaron H. Fleck Revocable Trust Statement
             April 2019 Bates FWTB 184-192..............182
19
         No. 11; Barbara G. Fleck Revocable Trust
20           Statement April 2019 Bates FWTB 1-9........189
21       No. 12; Stifel Account Statement Pamela
             Brendlinger Bates FLECK 2814-2821..........197
22
         No. 13; 2019 Tax Return Bates FLECK 252-327...200
23
     DEPOSITION CONCLUDED...............................209
24
     REPORTER'S CERTIFICATE.............................210
25
     ERRATA SHEET.......................................211
```

Page 4

```
 1         PROCEEDINGS
 2      (On the record 9:00 a.m.)
 3      VIDEOGRAPHER:  We are now on the video
 4   record.  The time is 9:00 Mountain time
 5   March 1, 2022.  This begins the videotaped
 6   deposition of Aaron Fleck taken in the
 7   matter of the Aaron H. Fleck Revocable Trust
 8   through its trustees, Aaron H Fleck and
 9   Barbara G. Fleck, the Barbara G. Fleck
10   Revocable Trust through its trustees Aaron
11   H. Fleck and Barbara G. Fleck, Aaron Fleck
12   and Barbara G. Fleck versus First Western
13   Trust Bank, Charles Bantis, and Andrew
14   Godfrey, filed in the United States District
15   Court for the District of Colorado, case
16   number of which is 21-cv-01073-CMA-GPG.
17      I'm Ralph Mitchell your remote
18   videographer.  The court reporter is
19   Jennifer Cormican and we represent Esquire
20   Deposition Solutions.  Counsel, at this
21   time, if you would please state your names
22   and whom you represent, afterwards the court
23   reporter will swear in the witness.
24      MR. RICH PODOLL:  Richard Podoll
25   representing the plaintiffs.
```



ESQUIRE DEPOSITION SOLUTIONS  
800.211.  
*Esquire*  
Ex. 1

Page 9
1  preparation for your deposition, the letter that
2  Mr. Podoll submitted to the mediator in this matter?
3     A   Yes.
4     Q   Okay.  So I guess, other than the three
5  documents you just named, which I think is the
6  complaint, the expert report, and the mediation
7  letter, did you review any other documents in
8  preparation for your deposition today?
9     A   No.
10    Q   Did you have any meetings with Mr. Podoll or
11 others in preparation for your deposition today?
12    A   Yes.
13    Q   And when did that meeting occur?
14    A   Last night -- yesterday afternoon, I'm
15 sorry.
16    Q   And approximately how long was that meeting?
17    A   Half hour.
18    Q   Did you have any other meetings besides the
19 meeting yesterday with Mr. Podoll to prepare for your
20 deposition today?
21    A   No.
22    Q   I want to shift gears and talk about your
23 employment history and professional background for a
24 few minutes.  Are you a practicing attorney?
25    A   I have a license, yes, but I'm not

Page 10
1  practicing.
2     Q   Okay.  And when were you a practicing
3  attorney?
4     A   Last time I practiced was 1962.
5     Q   When you were a practicing attorney, what
6  was your practice area?
7     A   Workmen's compensation.
8     Q   And for how long, approximately, did you
9  practice law?
10    A   Fourteen years.
11    Q   After you were a practicing attorney, what
12 did you do professionally for work?
13    A   I was -- I did not work from 1962 to 1967
14 or -8, and then I became a registered stockbroker.
15    Q   What do you mean by registered stockbroker?
16    A   I had clients where I recommended purchase
17 of stocks.
18    Q   For how long were you a stockbroker?
19    A   I think until 1986 or -7.
20    Q   So is it accurate then that you were a
21 stockbroker for approximately 20 years, from around
22 1967 to 1986 or '87?
23    A   Yes.
24    Q   And then starting in 1986 or 1987, what did
25 you do professionally for work?

Page 11
1     A   I formed a company and I managed portfolios
2  for a few people.
3     Q   Is there a difference between, I guess,
4  between managing portfolios for clients and being a
5  stockbroker?
6     A   I would say, yes.
7     Q   What's the difference?
8     A   I really can't tell you except I felt, as a
9  registered investment advisor, that I had a superior
10 duty in investigating stocks, companies, and making
11 recommendations to the needs of -- to the needs that
12 they requested.
13    Q   So you use registered investment advisor,
14 what does that term mean?
15    A   Well, it's registered with the FCC.  I may
16 have been registered before that with the companies I
17 worked for.  I really can't -- I don't recall whether
18 I was or not.
19    Q   Okay.  And for how long, approximately, did
20 you manage investment portfolios for clients?
21    A   To 2010.  From 1987 or -- '8 to 2010.
22    Q   Okay.  And did you do that at Aaron Fleck
23 and Associates?
24    A   I think that was the name, yes.
25    Q   Approximately how many clients did Aaron

Page 12
1  Fleck and Associates have?
2     A   I cannot give you an accurate figure, but I
3  think more than 50, but I can't give you a figure.  I
4  don't -- I don't remember.
5     Q   Okay.  And at its high point, do you know
6  approximately how much assets under management Aaron
7  Fleck and Associates managed for clients?
8     A   I can only guess.  I can't give you an
9  accurate figure but I would say several hundred
10 million.  But that may be wrong.
11    Q   Okay.  But I mean, can we agree that Aaron
12 Fleck and Associates, you know, managed a significant
13 amount of assets for clients?
14    A   Well, those are the figures and for most
15 people, it's not very much.
16    Q   Would you call yourself sophisticated in the
17 world of investment management?
18        MR. RICH PODOLL:  Object to form.
19    A   What is your definition of sophistication?
20 BY MR. STERN:
21    Q   I would say knowledgeable and experienced.
22    A   I was knowledgeable, I worked very hard, I
23 did a lot of research and if that's sophistication,
24 then I was.
25    Q   Okay.  What was your responsibility at Aaron



Page 37

1  suffered damages due to the failure of First Western
2  to harvest additional tax losses for you?
3     A   I can't recall what I did then.
4     Q   Okay.  Are you aware that your counsel has
5  refused to produce to the defendants in this case, tax
6  returns and brokerage account statements from 2020,
7  forward?
8     A   I haven't discussed that with them.
9     Q   Okay.  How much did you and Barbara sell
10 your Aspen home for in 2018?
11    A   I believe 19 million.
12    Q   What was your gain on the -- on the sale?
13    A   I can't recall.  It's in the -- I know what
14 the -- well, I can't recall.
15    Q   Do you know what your cost basis in your
16 Aspen home was?
17    A   I though they were 14 million, but I think
18 there were a great deal more, but I cannot recall.
19    Q   Going into 2018, did you and Barbara have
20 carryforward capital losses?
21    A   Yes.
22    Q   Do you know approximately how many
23 carryforward capital losses you and Barbara had going
24 into 2018?
25    A   I thought I had, at the time we sold it, I

Page 38

1  thought we had a $5 million gain, and that's the
2  figure I thought.  I don't recall.  Now, what's this
3  question now?
4     Q   My question is:  Going into 2018, did you
5  and Barbara have carryforward capital losses?
6     A   I believe so.
7     Q   And you told that to First Western Trust
8  Bank in 2018, right?
9     A   I know they knew the cost of my house, they
10 knew what I sold it for, they helped finance my house
11 when I built it, they knew what I sold it for, and at
12 the time I spoke to them, I thought I had a $5 million
13 gain.
14    Q   Okay.  I asked you a different question,
15 though.  My question is:  You told First Western Trust
16 Bank in 2018 that you and Barbara had carryforward tax
17 losses, didn't you?
18    A   I don't recall that.
19        MR. RICH PODOLL:  Adam, when we can, if
20    you could reach a breaking point, we've been
21    going about an hour and a quarter.
22        MR. STERN:  Okay.  We can take a break,
23    that's fine.
24        MR. RICH PODOLL:  About 15 minutes?
25        MR. STERN:  That's fine.

Page 39

1         MR. RICH PODOLL:  Okay.  Thanks Adam,
2     we'll see ya in about 15 minutes.
3         VIDEOGRAPHER:  Okay.  Hearing no
4     objections then, going off the video record.
5     The time is 10:15 Mountain, going off the
6     video record.
7         (Off the record 10:15 a.m.)
8         (On the record 10:31 a.m.)
9         VIDEOGRAPHER:  The time is 10:31
10    Mountain.  We're back on video record.
11        MR. RICH PODOLL:  I just want to make a
12    record before we continue with the
13    deposition that I have a hearing that came
14    up that I need to attend and until I can get
15    the back, my brother and law partner Rob is
16    going to defend the deposition and represent
17    Mr. Fleck.
18        MR. STERN:  Okay.
19        MR. RICH PODOLL:  Thank you, Adam.
20 BY MR. STERN:
21    Q   Sitting here today, do you know how much in
22 taxes you and Barbara paid in 2018?
23    A   No.
24    Q   Well, you're aware, aren't you, that you and
25 Barbara paid less than a thousand dollars in taxes to

Page 40

1  the IRS in 2018, aren't you?
2     A   Am I aware of it today, no.
3     Q   Okay.  Well, I'm good to ask you to turn to
4  Tab 22 of your binder, which I'm going to mark as
5  Exhibit 3 and I'm also going to put Exhibit 3 up on
6  the screen so everyone can see it.
7         (Exhibit No. 3 marked.)
8     A   Twenty-three?
9  BY MR. STERN:
10    Q   Twenty-two.  It's Tab 22 of your binder.
11    A   Yes, okay.
12    Q   Okay.  So do you have a document in front of
13 you that says, Internal Revenue Service United States
14 Department of Treasury and then --
15    A   Yes.
16    Q   -- it goes on?
17    A   Yes.
18    Q   Okay.  So is Exhibit 3 a copy of your and
19 Barbara's tax transcript from the IRS for the year
20 2018?
21    A   Yes.
22    Q   Do you know what --
23    A   There --
24    Q   I didn't mean to cut you off.  Do you want
25 to finish your answer?



Page 101

1  have, why you think it was gross -- grossly negligent?
2        MR. ROB PODOLL:  Object.  Form.
3     A   I've already told you.
4  BY MR. STERN:
5     Q   Okay.  And what are the reasons?
6        MR. ROB PODOLL:  Object.  Form.
7     A   I've already answered.
8  BY MR. STERN:
9     Q   Why did you select First Western Trust Bank
10  to manage the trusts portfolios?
11    A   Okay.  First of all, I had done business
12  with Charlie for at least 20 years at another bank and
13  he was very, very cooperative.  Then, I bought a home.
14  The closing was in January.  The home I sold, I
15  believe was March or April, I can't recall.  So there
16  was a period then where I needed to close.  I was
17  short some money because I have been fully invested
18  for many years.  I didn't want to sell any securities
19  that we had so I asked Charlie if he would give me a
20  bridge loan.  He immediately said yes, he didn't ask
21  me to fill out any papers, he said how much do you
22  need, I told him, he said we'll give you 200,000 more
23  so you have some leeway.  I said thank you, that's
24  very nice.  I says, you're the kind of banker I like,
25  you do things to help a client.  I will give you some

Page 102

1  money to manage through your trust department.  I keep
2  my word.  I had other people that wanted to manage
3  some money for me, but I said I gave my word to
4  Charlie, I will give him some money to manage.  I keep
5  my word, they didn't keep theirs.
6     Q   Okay.  I think you said you didn't want to
7  keep sell any of the securities that you had, why was
8  that?
9     A   Because I had 80 to 90 percent profit in
10  every security, almost every security we owned.
11  That's why I think those figures were wrong.
12    Q   Okay.  Well, you know, don't you, that
13  Charlie Bantis is not a portfolio manager?
14    A   I know that he was the so-called president
15  of that branch.
16    Q   Okay.  So what --
17    A   I knew Andy because he was friends with my
18  daughter for years, she was married in 1992.  I think
19  he was part of the ceremony then, but I'm not certain
20  because she told me that she's known him all these
21  years, and I trusted him.
22    Q   Okay.  Did you take any steps to get
23  comfortable --
24    A   I also knew that he worked for a brokerage
25  firm prior to this.

Page 103

1     Q   Okay.  Did you take any steps to get
2  comfortable with First Western Trust Bank's approach
3  to portfolio management?
4     A   I listened to what they said, but I didn't
5  investigate it.  I trusted them.
6     Q   Okay.  Did you have a meeting in
7  February 2018 with First Western Trust Bank to discuss
8  whether they would be investing the trusts assets?
9     A   I didn't ask them ever to invest it back.  I
10  told them in January that I was seeking another
11  manager because of what they did.  And at that
12  meeting, Charlie, after talking for a long time, says
13  we made a mistake, we did the wrong thing.  Then, in
14  February, when I met him in the office, he said I want
15  you to know, we've changed our procedures.  We didn't
16  have that in our procedure -- I thought they did, and
17  we've changed it and we sent the directive out.  We
18  will notify our people in November.
19    Q   Okay.  Did you take any notes at your
20  meetings that you just discussed with Charlie in
21  January and February of 2019?
22    A   No, I didn't take any notes.  As I told you,
23  I trusted them.
24    Q   Okay.  And I was trying to ask you about a
25  meeting that occurred before the bank started

Page 104

1  investing for the trusts.  Before that bank started
2  investing for the trusts, did you have a meeting at
3  First Western's office to discuss the investment
4  policy statement and whether you were going to have
5  the bank invest the trusts' assets?
6     A   I can tell you that every time I came in,
7  not every time, most of the time when I came into
8  deposit a check, I had some words with Andy Godfrey.
9  Sometimes with -- a couple times with Charlie.  Not
10  often was Charlie as much as Andy.
11    Q   Okay.  But in early February 2018, did you
12  have a meeting that you brought your daughter Kathryn
13  Pasa and your son-in-law Harry Pasa to --
14    A   Yes, yes.  Well, I don't know about
15  February.
16    Q   Okay --
17    A   But I know what my son-in-law said.
18    Q   Before the bank started investing assets for
19  the trusts, did you --
20    A   That meeting wasn't in February, I though
21  that meeting was in the -- maybe in '18, yeah, maybe
22  '18.  We had a meeting before we invested.
23    Q   Okay.
24    A   That was a long time before.  That was
25  probably, maybe early in the year, not late in the



Page 105

1  year, the meeting they went to.
2    Q   Okay.  So I just want to make sure we get a
3  clear record because we spoke over each other a bit.
4  So at some point early in 2018 before the bank started
5  investing for the trusts, did you have a meeting with
6  the bank and --
7    A   Yes.
8    Q   -- you brought your daughter and son-in-law
9  to?
10   A   Yes.
11   Q   And at that meeting, do you know who went
12  for First Western?
13   A   I can't remember.
14   Q   Do you recall --
15   A   I'm trying to think.  There was somebody
16  there from Denver, I think.  And that was the purpose
17  of the meeting, either one or two people from Denver,
18  but I can't think who was at the table.
19   Q   Do you recall that John Sawyer, the chief
20  investment officer of First Western attended the
21  meeting in early 2018 with you?
22   A   If he was the person, yes.
23   Q   Do you recall that Doug Barker, a portfolio
24  manager at First Western also attended the meeting
25  with you and your daughter and son-in-law in early

Page 106

1  2018?
2    A   Yes.  As I said, I thought there were two
3  people there.
4    Q   And you also recall that Travis Van Domelen
5  attended the meeting with you and your son -- your
6  daughter and son-in-law in early 2018?
7    A   No, he was the intern at the bank.
8    Q   Okay.  Did Barbara attend the meeting in
9  early 2018?
10   A   I don't know.  I can't remember.
11   Q   Okay.  And the purpose of this meeting in
12  early 2018 was to talk about whether First Western
13  would be investing the trusts assets, right?
14   A   There is talk about their philosophies and
15  because they knew I was talking to three or four other
16  money managers and they were trying to sell us the
17  right to manage.  There were --
18   Q   And at that meeting, you went over an
19  Investment Policy Statement with First Western, didn't
20  you?
21   A   I think they had a chart that they put on
22  the wall.
23   Q   Who were the other investment managers you
24  were considering in 2018, other than First Western?
25   A   Republic Bank in LA, Fifth Third in

Page 107

1  Cincinnati, Citicorp, I don't know if I was talking to
2  Morgan Guaranty.  There was one or two others that I
3  had spoken to.  I don't recall them all.  And I had --
4    Q   And you --
5    A   And I had other friends were money managers,
6  but I didn't consider them.
7    Q   Okay.  So you chose First Western to manage
8  the trusts assets in 2018 over four or five other
9  banks; is that right?
10   A   Because I gave them my word and I've lived
11  up to my word my whole life.
12   Q   Okay.  Now --
13   A   I gave them an opportunity, my son-in-law
14  and daughter said, do not invest with them.  They are
15  not capable.  I said, I gave them my word.
16   Q   Okay.  Can you tell me what everything you
17  remember about what your son -- your daughter and
18  son-in-law told you about whether to invest in First
19  Western Trust Bank?
20   A   No, I can't remember everything.
21   Q   Okay.  What do you remember?
22       (Crosstalk.)
23   A   -- they said what they saw and didn't like.
24   Q   Okay.  And sitting here today, what do you
25  recall about why your daughter and son-in-law

Page 108

1  recommended that you not have First Western Trust Bank
2  invest the trusts assets?
3    A   I can't recall but I will ask them and get
4  that information for you.
5    Q   Okay.  Did you sign an Investment Policy
6  Statement before First Western began to invest the
7  trusts assets?
8    A   I can't recall when.
9    Q   Okay.  Let's put it on the screen.  So it's
10  Tab 10 in your binder and it's going to be Exhibit 6.
11  I will put it on the screen, too.
12       (Exhibit No. 6 marked.)
13   A   Six?
14  BY MR. STERN:
15   Q   Tab 10 in your binder.
16   A   Ten, I'm sorry.
17   Q   But we're marking it as Exhibit 6.
18   A   I guess Barbara was there, she signed.
19   Q   Okay.  So do you have in front of you a
20  document that says Investment Policy Statement for
21  Aaron and Barbara Fleck?
22   A   Yes.
23   Q   It's dated on the front 2/27/2018?
24   A   Yes.
25   Q   Okay.  So do you now recall that your



Page 109

1  meeting with First Western about whether they would
2  invest the trusts assets occurred in late
3  February 2018?
4      A   It was 2018, it was -- I think it was May or
5  June that we started.
6      Q   Okay.  If you go to the last page, you can
7  see you signed -- well, let me ask you, is that your
8  signature on the last page on the second line?
9      A   Yes.  Yes, it was May, like I just said, I
10 just testified to.
11     Q   Okay.  Did you sign this Investment Policy
12 Statement on May 8, 2018?
13     A   That's my signature.
14     Q   Okay.  And do you recognize whether the
15 signature on the line above yours is Barbara Fleck's
16 signature?
17     A   That is Barbara's signature.
18     Q   Okay.  And before you signed this Investment
19 Policy Statement, did you carefully review it?
20     A   I looked at it and I commented on it, but
21 they didn't change the comments.  They didn't put them
22 in.
23     Q   Okay.  What comments did you make?
24     A   They -- I told them I did not want any
25 commodities, I didn't want to have -- well, I see the

Page 110

1  bonds, but if they wanted to stand behind them, they
2  could put them in, but I have never invested in bonds
3  or commodities in our life and didn't want to start.
4  So they had, I guess, a lot of fixed income.  I told
5  them I never invested with fixed income either.
6          The alternatives, I don't -- we didn't talk
7  much, but I think they were talking alternatives,
8  commodities, and I didn't ever want to be in
9  commodities.  Some of the others, I didn't have much
10 ever in international equities, but I've had a lot in
11 emerging markets.  That these were -- and I gave them
12 my portfolio to show them what I had invested in and
13 that there were only 20 securities and I told them
14 that I don't want many securities.  I want a minimal
15 amount because that's what I believe that -- I didn't
16 believe in diversification.  And I talked about
17 diversification, and this was a little bit more than
18 I've ever done.  But, I guess I was testing them.
19     Q   Okay.  Before you signed the Investment
20 Policy Statement, did you agree with it?
21     A   No.  I told them I didn't, but I signed it.
22     Q   Why did you sign it if you didn't agree with
23 it?
24     A   Because I guess I was a fool and I trusted
25 them.

Page 111

1      Q   Okay.  But you understood, didn't you, that
2  this Investment Policy Statement was going to govern
3  the terms by which First Western invested the trusts
4  assets?
5      A   And then, when I saw what they invested in,
6  I think they put it in besides bonds, 185 and 50
7  stocks, 230 stocks, I said that's not investing.
8  That's taking somebody else's -- you don't know
9  anything about it, you don't have enough animus in
10 your company to cover that.  I did go in sometime in
11 October and November and tell them that.  I didn't
12 look at this until -- I was going to look at it at the
13 end of the year but I happened to look at it in
14 November or December, as I said.
15     Q   Okay.  Well, we'll get there, but I asked
16 you a different question.  My question is:  When you
17 signed the Investment Policy Statement, you
18 understood, didn't you, that it governed the terms by
19 which First Western would manage the trusts accounts?
20     A   And I told them my objection but I signed
21 the statement, yes.
22     Q   Okay.  Now, did you understand that the
23 purpose of the Investment Policy Statement was to put
24 forth a plan for the management of your investment
25 assets?

Page 112

1      A   And when I saw the plan later on, I told
2  them they didn't live up to my thoughts at the time.
3      Q   Okay.  Well, if you look at the first
4  sentence of the Investment Policy Statement, do you
5  see that it says that the statement was developed
6  jointly by First Western and you agreed to that,
7  didn't you?
8      A   I'm looking for that sentence.
9      Q   On the -- if you look at the first, the
10 second page, right under Overview it says, "The
11 purpose of this Investment Policy Statement (IPS) is
12 to put forth a plan, developed jointly by First
13 Western and you, for the management of your investment
14 assets"; do you see that?
15     A   Yes.
16     Q   Okay.  And you agreed by signing this
17 Investment Policy Statement that this statement had
18 been jointly developed by you and First Western,
19 right?
20     A   No, I agreed that that's what they were
21 proposing, but I told them how I felt.  They were
22 there to sign it, they didn't change it.  So I gave
23 them six months to see what they -- how they were
24 gonna manage it and whether they were going to listen
25 to what I said over and over every time I went into



AARON H. FLECK  
FLECK REVOCABLE TRUST vs FIRST WESTERN

March 01, 2022  
113–116

Page 113
1  the office.  I said, do you still have 185 securities
2  and, I guess, 50 or 80 in the second account and he
3  never answered me.  When I finally got their quarterly
4  statement, I think it was in November, when I saw what
5  they did, I complimented on the tax loss and told them
6  to take them out.  I already testified to that.
7     Q   Okay.  You and First Western agreed that the
8  investment time horizon for the trust accounts was ten
9  plus years, correct?
10    A   If they performed.
11    Q   Okay.  So it's your position --
12    A   The IPS -- they were not following what they
13  wanted and when they refused to take losses, and I saw
14  the January statement -- the December statement, I
15  told them I'm getting another manager and not to trade
16  anymore.
17    Q   Okay.  You and First Western agreed on a
18  risk tolerance of moderate, correct?
19    A   I don't remember those words but, you know,
20  it says moderate and that definitely wasn't moderate.
21    Q   And you understand --
22    A   The market -- if you know the market was up
23  at 23 percent and they were down 10 percent.  That's a
24  difference of 33 percent.  I don't call that moderate.
25    Q   Your position is that the market was up

Page 114
1  33 percent over what time period?
2     A   Twenty-three during the year of 2018.
3  That's what I remember, I could be wrong.  I've been
4  wrong before.
5     Q   Are you aware that the market was down
6  considerably in the fourth quarter of 2018?
7     A   I remember that it was up for the year.  I
8  don't remember that.
9     Q   Now, did you understand that a moderate risk
10  allocation would entail some stocks and some fixed
11  income assets?
12    A   No.  I was more interested in stocks than
13  income, than fixed income.
14    Q   Okay.  So was your position --
15    A   There were two objectives in this account,
16  which they sent.  I told them I need income of 600,000
17  a year.  They said we can do 4- to 600,000 a year
18  income for you.  And the second thing we'll do, we'll
19  also make at least 6 percent net, which they put in
20  the paper.
21    Q   So are you saying that First Western
22  guaranteed a 6 percent annual return?
23    A   I don't know what a guarantee is.  They told
24  me their word, I may be foolish to believe them, but I
25  did believe them.

Page 115
1     Q   Okay.  But as someone who has spent decades
2  in the investment management field, you must
3  understand that no portfolio manager can guarantee
4  returns, right?
5     A   You don't guarantee, but you do have a
6  target.  And at least I came dang close to my targets
7  for 20 -- let's see, '88 to 2010, I think I averaged
8  19 percent a year.
9     Q   Okay.  So you know that portfolio managers
10  never guarantee performance, they just have a
11  performance target, right?
12    A   We have targets and you try to live up to
13  your target.
14    Q   Okay.  And if you take a look at the second
15  page of the Investment Policy Statement at the bottom,
16  you see that the expected long-term return target for
17  the trust account was 6.48 percent, right?
18    A   They told me that was the yearly, second
19  page -- hold on, I'm on the wrong page.  Yes, 6.4.
20  That was the return and the income was 4- to 600,000.
21    Q   Okay.  But you understood that the return
22  target was a long-term target for an account investing
23  over 10 plus years, didn't you?
24    A   No.  I considered that yearly.
25    Q   You considered that yearly, okay.  Can you

Page 116
1  take a look at the fifth page of the Investment Policy
2  Statement and please go down to Section 7, and I'll
3  load it on my screen; do you see that?
4     A   Yes.
5     Q   Okay.  And did you read this before you
6  signed the Investment Policy Statement?
7           MR. ROB PODOLL:  Please give him a
8        moment to read it first, please.
9     A   That's when I said, they expected a return
10  of about 6 percent.
11  BY MR. STERN:
12    Q   Okay.
13    A   But their -- I don't know what this top line
14  means, percentile, that's the figure I don't
15  understand.  And the third line, I don't understand.
16    Q   Mr. Fleck, have you had a chance to review
17  paragraph seven of the Investment Policy Statement?
18    A   No.  In fact, I don't know if I ever read
19  it, but it's there.
20    Q   Okay.  So before you approved First Western
21  to invest $8 million of the trusts assets, did you
22  bother to read the expected return range in the
23  Investment Policy Statement?
24          MR. ROB PODOLL:  Objection.  Form.
25    A   I can't answer that at this time, I don't



Page 117
1  know.  I can't remember reading it.
2  BY MR. STERN:
3      Q    And do you see the third sentence of that
4  provision it says, "Actual performance will vary from
5  these assumed rates and there is no guarantee that
6  this return objective will be achieved either in any
7  single year or over longer time periods"; do you see
8  that?
9      A    Yes, I read that.
10     Q    And you knew that before you invest --
11 before you signed the Investment Policy Statement
12 didn't you?  You knew that First Western --
13     A    I can't recall.  I don't think I knew that.
14     Q    Okay.
15     A    I was going on what they told me because I
16 believed them.
17     Q    Okay.  Well, do you see this chart at the
18 top of page 6 of the Investment Policy Statement?
19     A    I don't understand what the percentile is.
20 I never worked with percentiles and I saw the expected
21 value.
22     Q    Do you see that --
23          (Crosstalk.)
24     A    -- is returned.  Actually, they told me a
25 higher return, but I told them that I was satisfied

Page 118
1  with six.
2      Q    Okay.  Do you understand the chart to be
3  saying --
4          (Crosstalk.)
5      A    -- they even told me 8 percent in figures in
6  what they said because I said, and I think they put
7  down on my paper 6 percent.
8      Q    Okay.  Mr. Fleck, I'm going to ask you to
9  only answer the question that I asked.  My question
10 is:  Do you understand that the column year one in the
11 chart at the top of page 6 of the Investment Policy
12 Statement, to be saying that First Western anticipates
13 that the returns in the first year will be somewhere
14 between negative 5.7 percent and 20.4 percent?
15     A    Nope, I didn't.  In fact, I really didn't
16 remember that chart.  All I saw was expected value to
17 go up 6 percent.  That's all I remember them saying.
18     Q    And if you look at the paragraph at the
19 bottom of Section 7, do you see that it says, "Based
20 on historical returns and First Western's 10-year
21 capital market assumptions the nominal, 10-year
22 expected annual return of your portfolio, net of fees,
23 but before any applicable taxes, is approximately
24 6.48 percent.  You're actual experience may vary
25 widely from this single point potential return as

Page 119
1  indicated by the 10-year range in the above table."
2      A    Where is that?
3      Q    It's the last paragraph of Section 7.
4      A    Yes.  Apparently, I didn't read that.  I
5  don't remember that.  I don't remember, but I don't
6  know whether I read it or not, but I don't remember
7  that.
8      Q    Okay.  Do you at least agree that if you had
9  read this Investment Policy Statement before you
10 signed it, you would have known that First Western's
11 return target was a long-term target not a single-year
12 target?
13     A    We only talked single years.  I told them
14 what I expect each year.  They said -- they didn't say
15 6.4.  They said 8 percent.  Then I said I'll be happy
16 with six.
17     Q    Okay.  But my question is:  Do you agree
18 with me that if you had read this Investment Policy
19 Statement before you signed it, you would have known
20 that this return target was a long-term target not a
21 single-year target?
22          MR. ROB PODOLL:  Object.  Form.
23     A    No.
24 BY MR. STERN:
25     Q    Okay.

Page 120
1      A    I judge them by their conversation which…
2      Q    Okay.  How long did First Western invest the
3  trusts assets?
4      A    Well, I told him to stop in January and
5  February.  I didn't get another manager until -- I
6  don't know exactly which month.  But they managed it
7  until I think May or June.  I'm not certain as to the
8  dates.
9      Q    Okay.  And First Western started investing
10 the trusts assets in late May 2018; is that accurate?
11     A    Yes.
12     Q    So overall --
13     A    When did they start?  They started in May.
14     Q    Yes.
15     A    Of '18.
16     Q    Okay.  Yes, that was my question, First
17 Western started investing the trusts assets in May
18 of 2018, correct?
19     A    Yes, yes.
20     Q    And overall, First Western invested the
21 trusts assets for less than a year, correct?
22     A    For one year.
23     Q    Okay.  And do you know what the return on
24 investment was for the trusts accounts over the one
25 year that First Western managed the accounts?



Page 121

1   A   I can't remember. I don't know. I don't
2   think they made any money.
3   Q   Okay. So you're not aware that the trust
4   did, in fact -- sorry, let me start over. Sitting
5   here today, are you aware that First Western made
6   several hundred thousand dollars for the trusts by
7   investing their assets?
8   A   I can't answer that. I don't -- I'm not
9   aware.
10  Q   Okay. Can you take a look at paragraph two
11  of the Investment Policy Statement, Time Horizon; do
12  you see that?
13  A   Yes.
14  Q   Do you see where it says, "Your investment
15  portfolio is based on an investment time horizon of
16  10-plus years. As a result, interim short-term
17  investment fluctuations should be viewed with
18  appropriate perspective. The strategic asset
19  allocation has been developed as a long-term strategy
20  for the management of your investment assets"; do you
21  see that?
22  A   I read it, yes.
23  Q   Okay. And did you know that before you
24  signed the Investment Policy Statement?
25  A   Frankly, I don't remember that. So I can't

Page 122

1   answer that. I don't remember saying 10 years to
2   them. I was doing it on a year-to-year basis, but I
3   see that.
4   Q   Okay. And if you had been aware that First
5   Western planned to manage the trusts assets on a
6   long-term 10-plus year basis, would you have let them
7   manage the trusts assets?
8   A   Would I have managed?
9   Q   Would you have let them manage the trusts
10  assets?
11  A   Probably not. I didn't expect to be a
12  co-manager for 10 years when I've had heart trouble,
13  with so-called stroke, and cancer, I didn't think I
14  would live out a whole year.
15  Q   Okay.
16  A   I wasn't given a year to live.
17  Q   But weren't these trusts set up to provide
18  income to your wife Barbara and your children?
19  A   It was to provide 600,000 a year income
20  which they said they would easily do and I don't know
21  what the actual was. I think it was 200,000, but I'm
22  not certain.
23  Q   Okay. Did you know that there was -- that
24  the Investment Policy Statement controlled what assets
25  the bank had to invest in for the trusts?

Page 123

1   A   Did I know -- say that again, please.
2   Q   Did you know that the Investment Policy
3   Statement controlled what asset classes the bank had
4   to invest in for the trusts?
5   A   I thought they listened to me because I was
6   in there very often talking about the numbers,
7   securities, and it doesn't make any sense.
8   Q   Okay.
9   A   And I told them -- I asked them, do you have
10  analysts in Denver that control all this? Yes, we
11  have analysts.
12  Q   We talked about this earlier, I mean, you
13  knew that the bank had discretion to select securities
14  for the trusts, right?
15  A   Yes.
16  Q   Okay. And did you think you had the right
17  to override the banks choice of securities?
18  A   I think they, in that paragraph you read,
19  they were going to listen to me and do what I asked of
20  them. They had my other accounts. They saw how many
21  securities was in each account.
22  Q   Okay. Do you agree that --
23  A   In fact, they knew that I managed money for
24  people and never had more than 30 accounts, usually 20
25  stocks in each account. They knew all that.

Page 124

1   Q   But First Western told you at the meeting in
2   early 2018 that they were -- had their own investment
3   philosophy, right, and it involved more
4   diversification than your typical -- than your
5   approach?
6   A   They told me that they were going to
7   diversify in large companies, smaller companies,
8   emerging companies. I never expected them to have 230
9   stocks in a small account of $8 million. If you
10  divide 235 into 8 million, you'll see that each
11  investment -- I don't know what it comes up to, $20-,
12  30-, $40,000. That's not investing. And they told
13  them that over a period of time.
14  Q   Okay. Do you agree that if you were silent
15  about security choice, First Western had full
16  discretion to choose what securities to invest in for
17  the trusts?
18      MR. ROB PODOLL: Object. Form.
19  A   I told them I was giving them a year. I
20  didn't realize that it was 10 years.
21  Q   Okay.
22  A   And I'll see how they perform. I will not
23  talk to them month-to-month. I will not talk to them
24  quarter-to-quarter, but I'll see what they did by the
25  end of the year.



AARON H. FLECK  
FLECK REVOCABLE TRUST vs FIRST WESTERN  
March 01, 2022  
125–128

Page 125
1  Q   Okay.  So I want to understand that last
2  point you made.  Did you tell the bank that you didn't
3  expect it --
4          (Crosstalk.)
5  A   -- I told that to the person I spoke to
6  most, was Andy.  The other young man -- what was his
7  name, it wasn't Paul, it was something else.
8  Q   Travis?
9  A   Yes, he wasn't registered to take orders.
10 He was still studying to become whatever he was trying
11 to become, an RIA or something, he never told me.  And
12 then he told me when he passed of the exam and I
13 congratulated him.
14 Q   Did you tell Andy Godfrey that you didn't
15 expect to talk to the bank on a monthly or quarterly
16 basis, you just wanted to see how they did for a year?
17 A   On the accounts on a monthly of basis, but I
18 was in there often and we paid off the loan when we --
19 every month I deposited checks there.
20 Q   Okay.  Do you see on paragraph five of the
21 Investment Policy Statement, Asset Class Holding
22 Ranges?
23 A   I don't know if this was -- paragraph five.
24 Yes, I read it.
25 Q   Okay.  At the time that you signed the

Page 126
1  Investment Policy Statement, did you understand that
2  First Western had certain ranges that they had to
3  invest in certain asset classes?
4  A   No.
5  Q   So did you understand that 39 to 59 percent
6  of the trust portfolios was going to be a fixed income
7  and it had to be under the Investment Policy
8  Statement; did you understand that?
9  A   I thought there would be maybe some fixed
10 income, not -- let's see, how much is it -- fixed
11 income, 73 percent, I never thought that there would
12 be 73 percent of fixed income.
13 Q   So this says --
14 A   They were going to put $5 million in fixed
15 income, that was crazy.
16 Q   Okay.  So I guess, at the time that you
17 signed the Investment Policy Statement, you didn't
18 realize that First Western had to invest 39 to
19 59 percent of the trusts assets in fixed income --
20 A   No.
21 Q   Right?
22 A   No.  I though a million dollars was what
23 they were going to invest in it.
24 Q   Had you have read this Investment Policy
25 Statement, would you have still signed it?

Page 127
1  A   Probably not.
2  Q   Okay.
3  A   Had they explained to me what they are doing
4  and how they managed money.  I trusted them and I was
5  trying to live up to my word by rewarding them with
6  something because I do not know their position in
7  town, but I said, you did do something good for me,
8  I'll do something good for you.
9  Q   Okay.  I'm going to ask you about one more
10 provision then we can go on.  Do you see paragraph
11 nine, Selection Criteria?
12 A   Paragraph nine.
13 Q   Do you see that paragraph nine of the
14 Investment Policy Statement says, "Securities and/or
15 investment sub-advisors used to implement the
16 investment portfolio and the period taken to fully
17 invest the portfolio to reach the target allocation,
18 shall be subject to selection criteria and discretion
19 of First Western Trust.  The securities and investment
20 sub-advisors will be monitored for adherence to your
21 IPS."
22 A   I don't recall reading it, but I see it.
23 Q   Okay.  But you understand those words to
24 mean that First Western Trust had discretion over your
25 trust accounts, right?

Page 128
1  A   I think Rule 401 supersedes this.
2  Q   Okay.
3  A   To know your customer.  And since I had
4  talked to them so much, I thought they knew me.  401
5  was not lived up to.
6  Q   Okay.  Do you know -- okay, let me ask you
7  this --
8  A   401 supersedes that paragraph.
9  Q   Okay.  Are you aware that the plaintiffs in
10 this case allege that First Western Trust Bank
11 breached the Investment Policy Statement?
12 A   Yes.
13 Q   Okay.  So you have the Investment Policy
14 Statement in front of you and I'm happy to put it back
15 on the screen.
16 A   Hold on one second.
17     (Deponent takes a phone call.)
18 A   I had to take that call.
19 BY MR. STERN:
20 Q   No problem.  Can you tell me every provision
21 of the Investment Policy Statement that you allege
22 First Western breached?  And if you want, I can put it
23 back on the screen but you also have it in front of
24 you.
25     MR. ROB PODOLL:  Object.  Form.



800.211.DEPO (3376)  
EsquireSolutions.com

Page 129
1   A   Can I tell you? I can read each one and I
2   think it's very clear that they kept, if any.
3   BY MR. STERN:
4       Q   So feel free to please tell me which
5   provisions of the Investment Policy Statement you
6   allege that First Western breached.
7           MR. ROB PODOLL: Object. Form.
8       A   I don't see them on the screen. I thought
9   you were going put them up on the screen.
10  BY MR. STERN:
11      Q   I can put them back on the screen. You also
12  have it in front of you, but here, I'll put it on the
13  screen.
14      A   It's difficult for me to read the small
15  print. As I told you, I only have one eye and that
16  eye is not 20/20.
17      Q   Okay.
18      A   It's going to take me an hour to read this.
19      Q   Okay. Well, let me ask you this: Sitting
20  here right now, can you identify any provision of the
21  Investment Policy Statement that First Western
22  breached?
23          MR. ROB PODOLL: Object. Form.
24      A   I think they're all in violation of 401.
25  BY MR. STERN:

Page 130
1       Q   Okay. Okay. Well, that didn't answer my
2   question. Sitting here today, can you identify any
3   provision in the Investment Policy Statement that
4   First Western breached?
5           MR. ROB PODOLL: Object. Form.
6       A   Not reading the last -- the third paragraph
7   fully, the last section is easily violated, there's
8   those certain sentences in the first paragraph. I'm
9   sorry, I can't read it all, even on your screen that
10  was there. Well, it says, "None currently
11  anticipated" under liquidity, I think that's wrong, I
12  didn't notice it at the time.
13  BY MR. STERN:
14      Q   Okay. I think we can move on.
15      A   It says, "Steady growth is expected," they
16  didn't have that. "Strategic portfolio, moderate"
17  well, that could be interpreted differently. They
18  told me it would be 6 percent a year and they have
19  that in writing elsewhere. The investment strategy,
20  they didn't live up to that. They didn't -- they
21  diversified, but not properly. "Seek to achieve
22  financial goals," they didn't do that. "Minimize tax
23  liabilities," they need to work at that. "Monitor and
24  revise portfolio periodically, as required," well,
25  they sort of did that but not fully.

Page 131
1       Q   Okay. I'm --
2       A   At the age that I was, I don't know how long
3   they expected me to live when they knew that my
4   timeframe was one year. So they're talking about
5   long-term for me.
6       Q   Okay. I think we can move on to a different
7   topic.
8       A   Well, I can go over paragraph by paragraph,
9   but I won't.
10      Q   Okay. Did you sign an Investment Services
11  and Custody Agreement with First Western before they
12  began to invest assets in the trusts?
13      A   I don't remember.
14      Q   So are you aware that the plaintiffs in this
15  case are alleging a breach of that Investment Services
16  and Custody Agreement?
17      A   When I can see it, I can comment. When did
18  I sign? Are you talking about signing a transfer of
19  assets or cash or what?
20      Q   No, here, I'll show you right now.
21      A   I don't know what you're talking about.
22      Q   Okay. I put it up on my screen a document
23  that is Tab 9 in your binder.
24      A   And what's the date of that agreement?
25      Q   Hold on one second. I ask the questions

Page 132
1   here. So I'm going to mark the Investment Services
2   and Custody Agreement Exhibit 7 and you're welcome to
3   look at the hard copy, which is Tab 9 in your binder,
4   but I'm also showing it on my screen. I'll go to the
5   last page of it and I'll ask you, is that your
6   signature on the Investment Services and Custody
7   Agreement dated May 2018?
8           (Exhibit No. 7 marked.)
9       A   I think that this was signed ten days before
10  they had any securities.
11  BY MR. STERN:
12      Q   Okay. So did you, in fact, sign the
13  Investment Services and Custody Agreement on May 8,
14  2018?
15      A   If that's the date they put there, I cannot
16  contest it now. I don't know.
17      Q   Is that your signature?
18      A   But I know -- I think the other agreement
19  was signed on the 18th.
20      Q   Is that your signature on page 6 of the
21  Investment Services and Custody Agreement?
22      A   It's my signature and it's Barbara's
23  signature.
24      Q   Okay. Did you review the Investment
25  Services and Custody Agreement before signing it?



AARON H. FLECK                                                                                                          March 01, 2022
FLECK REVOCABLE TRUST vs FIRST WESTERN                                                              133–136

Page 133
1  A  No, because I thought it was SOP.
2  Q  Okay. Did you understand that the
3  Investment Services and Custody Agreement governed
4  First Western's Trust and the trusts relationship?
5  A  I don't remember that, I don't think so.
6  Q  You don't think so?
7  A  I don't remember -- it says trust. I
8  fully -- I doubt if I read it. They put the papers in
9  front of me, we signed a lot of papers. I trusted
10 them.
11 Q  Okay. I want to go through a few provisions
12 in this contract. I want to start at paragraph three.
13 Do you see it says, "Client hereby grants First
14 Western--"
15 A  Wait a second. Let me get -- where does it
16 say client?
17 Q  It's up on my screen --
18 A  Okay. Right here, okay.
19 Q  Do you see that the first sentence of
20 paragraph three of the Investment Services and Custody
21 Agreement states, "Client hereby grants to FWTB, First
22 Western Trust Bank, full and complete discretion and
23 authority with respect to managing the investment of
24 client's assets"?
25 A  Yes.

Page 134
1  Q  You don't contest that, do you? You agree
2  that First Western Trust Bank had complete discretion
3  and authority, right?
4  A  Well, in another paragraph they say they
5  would consult with me. So this is different than the
6  other paragraph you read me before.
7  Q  Okay.
8  A  There's a difference in paragraphs.
9  Q  Okay. Can you see at the bottom there it
10 says, "Client reserves the authority to direct and
11 determine at any and all times the selection of any
12 security for purchase and sale in their account;
13 however, the exercise of this authority, with respect
14 to one or more individual securities, shall not be
15 construed as a revocation of the authority granted to
16 FWTB provided for in this agreement"?
17 A  Yes.
18 Q  So you realize, don't you, that you could
19 have called up First Western at anytime and told them
20 to change their investments, right?
21 A  You know, that may be true, but Andy said
22 since my experience, they welcomed my opinion any
23 time, all the time. He always said to me, we welcome
24 your opinions. You have more experience than any of
25 us.

Page 135
1  Q  Okay. But you didn't give any opinions to
2  First Western about what assets to buy, did you?
3  A  I gave them authority to invest the money,
4  yes. But I also --
5  Q  Did you give First -- did you ever instruct
6  First Western to buy specific securities for the trust
7  accounts?
8  A  They asked me almost every time I went,
9  where are you working? What are you researching?
10 Just tell us the name. I gave them a lot of names. I
11 can't tell you whether I said to buy or not, but I
12 said, I like this security, this is why I like it.
13 Q  Okay. I want to go to paragraph seven,
14 Fees. Well, I guess -- I mean, you understood that
15 First Western Trust Bank wasn't going to provide their
16 services for free, right?
17 A  Yes. I agreed to pay them a fee.
18 Q  And did you know that First Western Trust
19 Bank was going to charge you a portfolio fee based on
20 the number of assets under management?
21 A  Yes.
22 Q  You agreed to that before you allowed First
23 Western to invest the trust accounts, right?
24 A  I forgot -- I forgot what their fee was.
25 Q  Okay. And you also understood, didn't you,

Page 136
1  that if the trust invested in mutual funds or
2  investment funds, that the mutual or investment funds
3  might charge another fee, right?
4  A  No. They, as other managers, told me their
5  fee included those fees and I asked them many times,
6  what are these other people charging you? What am I
7  paying that I don't know? And they never told me
8  once. That was another reason I was unhappy with
9  them. I didn't know what they were paying all these
10 other managers that they had. And had I known, I
11 probably would have closed the account a lot sooner if
12 it was -- if it's as much as some people tell me they
13 charged.
14 Q  So do you see the second paragraph of
15 paragraph seven it says, "FWTB made direct client
16 funds to be invested in shares or similar ownership
17 interest in of mutual funds, privately offered
18 investment funds, manage accounts or other investment
19 funds. In addition to the portfolio fee charged
20 directly by FWTB, the client may also pay a direct
21 asset management fee for separate account managers
22 including managers affiliated with FWTB and an
23 indirect asset management fee to each investment fund
24 or mutual fund"?
25 A  I read that a little differently.



Page 145
1  be liable for any act, omission, loss, depreciation,
2  or error in judgment that may occur in connection with
3  FWTB's handling of the clients account, except for
4  such that may result from FWTB's gross negligence or
5  willfulness misconduct.  Client understands that
6  nothing in this agreement shall be construed as a
7  waiver or limitation of any rights the client may have
8  under applicable federal or state securities laws";
9  did you read that before you signed this agreement?
10     A    I don't recall reading it, but there are
11  cases that oppose that.
12     Q    Okay.  I mean, when you were an investment
13  advisor, or an investment manager, did you make your
14  clients sign similar agreements that exculpated you if
15  you acted in good faith?
16           MR. ROB PODOLL:  Object.  Form.
17     A    I didn't ask them to sign anything.  I
18  repeat something I said once or twice before:  I
19  trusted them that they would do the right thing.
20  BY MR. STERN:
21     Q    Okay.  Do you see in paragraph eight where
22  it says, at the last sentence, "Client agrees to
23  indemnify and hold harmless FWTB, and FWTB's officers,
24  employees and affiliates, from and against any loss,
25  damage, and expense (including reasonable attorneys

Page 146
1  fees) not directly resulting from a breach by FWTB of
2  its standard of care or for its willful misconduct"?
3     A    From what I know a little bit about other
4  cases, the courts have thrown this sentence out.
5     Q    Okay.  Can --
6     A    You cannot -- I won't go into the decisions
7  of other cases.
8     Q    Okay.  Do you agree that under this
9  provision, that First Western Trust Bank is found not
10  to be held liable in this case, that you and the
11  plaintiff will be required to pay their attorneys fees
12  and expenses?
13           MR. ROB PODOLL:  Object.  Form.
14     A    I cannot say I agreed to it.  I didn't know
15  it existed.
16  BY MR. STERN:
17     Q    Okay.  I'm going to ask you what about one
18  more agreement, which is the fee agreement.  This is
19  Tab 8 in your binder and I'm going to mark this as
20  Exhibit 10.
21           COURT REPORTER:  You are on Exhibit 9.
22           MR. STERN:  Okay.  Thank you.
23           (Exhibit No. 9 marked.)
24  BY MR. STERN:
25     Q    So to correct the record, the Fee Schedule

Page 147
1  Agreement which is Tab 8 in your binder will be
2  Exhibit 9.  And do you have the Fee Schedule Agreement
3  in front of you, Mr. Fleck?
4     A    Yes.
5     Q    Okay.  And did you, in fact, sign the Fee
6  Schedule Agreement; is that your signature on the
7  bottom?
8     A    Yes.
9     Q    And before you signed the Fee Schedule
10  Agreement, did you read it?
11     A    I doubt it, but I was told that we were paid
12  a total fee -- I'm not certain if it was 0.8 percent
13  for the $8 million.
14     Q    Okay.  Well, you can read the Fee Schedule
15  Agreement now, and do you see that it discloses what
16  annual percentage fee will be charged based on the
17  amount of assets under management?
18     A    I think I was told it's cumulative, they
19  don't do it first, second, and third million.  That
20  they do it on the total amount that you have and I
21  think they told me that the total amount I had, it
22  wasn't there than 0.8.
23     Q    But you agreed --
24           (Deponent crosstalk, inaudible.)
25     Q    Say that last thing again.

Page 148
1     A    It may have been 0.6 or 0.7.  I think the
2  total came to 0.8.
3     Q    Okay.  So you agreed that the trusts --
4  sorry, strike that.  You agreed that the bank, First
5  Western Trust Bank, could charge the trust an annual
6  portfolio fee of somewhere around 0.8 percent,
7  correct?
8     A    I can't recall exactly, but that stands out
9  in my mind.
10     Q    Okay.  And do you see the second bullet
11  under Additional Information in the Fee Schedule
12  Agreement where it says, "First Western Trust Bank may
13  direct client funds to be invested in shares or
14  similar ownership interests of mutual funds, privately
15  offered investment funds, managed accounts or other
16  investment funds that are managed by an affiliate of
17  FWTB.  In such cases, the affiliate will charge an
18  asset management fee within the investment fund or to
19  the account in the case of the separate account.  The
20  asset management fee is separate from the portfolio
21  fee charged directly by FWTB"; do you see that?
22     A    I see that, but I didn't know that before.
23     Q    But if you had bothered to read the Fee
24  Agreement, you would have known that the trusts were
25  going to be charged a portfolio fee and also a



Page 161
1   Q   Do you remember how he told you --
2   A   And he also told me they have analysts.
3   They watch the securities, they look at them, not that
4   they buy in pack. Whether they know anything -- a
5   money manager is supposed to know something about the
6   company he is recommending to a person. It turns out
7   they do nothing about any of the companies. They
8   couldn't tell me why they bought them.
9   Q   Okay.
10  A   They just buy a fund.
11  Q   Are you claiming that First Western promised
12  you that they would invest using the same philosophy
13  that you used?
14  A   Not the same philosophy I used, but in
15  concentration and not 185 or 200 different securities.
16  Q   And when did First Western tell you that
17  they would invest for the trusts using a concentrated
18  strategy rather than a diversified strategy?
19  A   Long before I turned over the stocks to
20  them.
21  Q   Who told you that?
22  A   The only person that really talked to me
23  over a period of time was Andy Godfrey. The young man
24  just sat there and never said a word. I told Charlie
25  Bantis that I would send over money to them and I kept

Page 162
1   my word, at my loss. But I kept my word, which I've
2   done all my life. When I spoke to -- there was two
3   men that came to the meeting, one was -- and what was
4   the other man's name, what was his name?
5   Q   John Sawyer or Doug Barker or Travis. I
6   think it was Barker but I'm not certain. But I spoke
7   to Barker on the Zoom and the questions I asked him,
8   he just didn't seem to understand.
9   Q   Okay. Why --
10  A   He was blank. And if he was a fund manager,
11  I was shocked.
12  Q   Okay. So before you approved First Western
13  investing for the trusts, you knew that Doug Barker
14  was the portfolio manager, right?
15  A   No, I think they had another name.
16  Q   Well, you met Doug Barker at the meeting in
17  2018, you said he was on Zoom, right?
18  A   I met two of them. They wanted me to talk
19  to them because they said they were the best of their
20  department, I was willing. I think it was a fund
21  manager, but I don't know.
22  Q   Okay.
23  A   But when we talked later on, he was the only
24  one who talked to me and nobody else.
25  Q   I want to go back to my specific -- my

Page 163
1   original question which I don't think I got an answer
2   to: Who told you that the bank would invest for the
3   trusts in a concentrated manner?
4   A   They told me that they had analysts and they
5   would look at to look at the securities that they
6   purchased. I showed them the way I liked it, I give
7   them two accounts, I thought they were going to do
8   that. When the first time I saw how many shares, I
9   went in and said to the bank and I said, I don't like
10  this and then I let it go on for months and I saw what
11  they did, they basically -- frankly, I don't think
12  they are money managers.
13  Q   Okay. I want to go back to my original
14  question: I think you've answered it --
15  A   They're fund buyers, that's what they are,
16  fund buyers.
17  Q   Please try to answer my question, Mr. Fleck.
18  Who told you, if anyone, that the bank would invest
19  the trusts assets in a concentrated manner?
20  A   The way Andy talked, I can't say he said, we
21  would do this, but he says, we see what you do and I
22  don't remember all his words.
23  Q   Okay. So to be clear, you don't have any
24  memory as we sit here today --
25  A   And I kept talking about concentration. So

Page 164
1   if they didn't have 20 stocks they had 40, that's
2   concentration, not 230.
3   Q   Okay. Sitting here today, you can't recall
4   any specific person at the bank who told you that they
5   would invest the trusts assets in a concentrated
6   manner; is that correct?
7   A   I really can't answer that question because
8   I'm not really thinking clearly, but I can't remember
9   who, but I know it was told to me.
10  Q   Okay. Did anyone at First Western Trust
11  Bank ever tell you that First Western Trust Bank was a
12  registered investment advisor?
13  A   I do not recall them saying that but most
14  banks that I know, their employees and their trust
15  departments are registered investment advisors. So I
16  can't tell you that anybody used the term RIA.
17  Q   Okay. Did anyone at the bank ever tell you
18  that First Western Trust Bank employed professional
19  money managers?
20  A   They told me they had their own analysts. I
21  don't recall whether they said professional money
22  managers.
23  Q   Okay.
24  A   I cannot recall the exact -- all the exact
25  words they said or promised.



Page 165
1  Q   Okay.  Who told you that the bank had
2  analysts, was that just Andy Godfrey?
3      A   I don't know if it was at the meeting with
4  the two guys or it was somebody in the office, but I
5  asked that question.  I think it was when the two guys
6  were there from Denver.  Do you have analysts and I
7  thought they said yes.
8      Q   Okay.  When you approved First Western to be
9  the -- manage the trusts assets, did you believe that
10 First Western was a registered investment advisor?
11     A   I cannot say yes or no.  I can't remember
12 what I believed on that score.
13     Q   Okay.  Are you aware that --
14     A   I don't know if they said yes or no.  It was
15 a question I asked, but I don't remember.
16     Q   Okay.  Are you aware that it's publicly
17 available who is a registered investment advisor?
18     A   I know that.  If you're saying I didn't
19 investigate the bank enough to say who they are and
20 what they've done and what they haven't done, yes.  I
21 did not investigate them because I made a promise,
22 maybe you don't understand.  I made a promise and I
23 kept it by giving them money.
24     Q   Okay.  So I know you're trying to anticipate
25 where my questions are going, but please just try to

Page 166
1  just answer my question.  I think this will go faster.
2  My question is:  Are you aware that who is a
3  registered investment advisor is publicly available?
4      A   Yes.
5      Q   Before you approved First Western Trust Bank
6  to --
7      A   Am I aware now?  I know there are lists but
8  I've never checked the lists.
9      Q   Okay.  So that was my next question.  So
10 hopefully you can confirm, is it correct that before
11 you approved First Western Trust Bank to invest for
12 the trusts, you didn't look up whether or not First
13 Western Trust Bank was a registered investment
14 advisor?
15     A   No, that's not true.
16     Q   Why is that not true?
17     A   I can't tell you today what's not true, but
18 I have never -- I don't think I've ever checked the
19 list of who's an RIA.
20     Q   Okay.  Were Morgan Stanley or Citigroup
21 registered investment advisers?
22     A   I don't know.
23     Q   So is it -- is it accurate that your
24 decision to hire First Western Trust Bank did not
25 hinge on the fact that they were a registered

Page 167
1  investment advisor?
2      A   I did not know.  They spent a year giving me
3  year information, having me participate in
4  conferences, and I thought the people I spoke to were
5  very smart.
6      Q   Okay.  Do you claim that First Western Trust
7  Bank did not employ professional money managers?
8      A   No.  I don't know whether they were or not.
9      Q   Okay.  Do you claim in this lawsuit that
10 First Western Trust Bank is liable for not earning a
11 higher rate of return for the trusts portfolios?
12     A   I can't recall everything else in the
13 complaints that you call them.  I don't recall
14 everything in the complaint.  There are many pages and
15 sometimes my memory doesn't include everything that
16 I'm supposed to know.
17     Q   I'm just trying to understand why you're
18 suing First Western Trust Bank.  I mean, are you suing
19 First Western Trust Bank for not earning a higher rate
20 of return for the trusts?
21     A   I'm suing them for the total misperformance,
22 the negligence, and for all the wrongs that they've
23 done to me and other clients.
24     Q   Do you claim that First Western Trust Bank
25 lost $800,000 of the trusts' funds?

Page 168
1      A   I don't know what happened to it, it just
2  disappeared out of the account.  I never got it.  When
3  Citicorp came, they said they never got it.  So I do
4  not know.  I cannot say what happened.  It just
5  disappeared.
6      Q   Okay.  So the trusts -- First Western made
7  approximately $800,000 in distributions to you from
8  the trust; do you agree with that?
9      A   I can't agree with that because I don't
10 remember.  I do not remember any 800,000.
11     Q   Okay.
12     A   When the facts -- it was transferred over,
13 they said it was included in what was transferred.
14 Citicorp says they never got it.  That's all I know.
15     Q   Okay.  Have you checked your checking
16 accounts to see whether the $800,000 was transferred
17 from the trust brokerage accounts to one of your or
18 Barbara's checking accounts?
19     A   There was never any 800,000 put into any of
20 our checking accounts.  Which checking account are you
21 talking about?  The checking accounts I had then were
22 at First Western.  They weren't in First Western
23 accounts.
24     Q   Okay.
25     A   You know, I can tell you that Citicorp kept

