Andrew Godfrey
March 07, 2022

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01073-CMA-CPG
_____

VIDEOTAPED REMOTEDEPO™ DEPOSITION OF:
ANDREW GODFREY - March 7, 2022
_____

THE AARON H. FLECK REVOCABLE TRUST, through its
Trustees, Aaron H. Fleck and Barbara G. Fleck,

THE BARBARA G. FLECK REVOCABLE TRUST, through its
Trustees, Aaron H. Fleck and Barbara G. Fleck,

AARON H. FLECK and BARBARA G. FLECK, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

FIRST WESTERN TRUST BANK,

CHARLES BANTIS and

ANDREW GODFREY,

Defendants.
_____

        PURSUANT TO NOTICE, the Videotaped
RemoteDepo™ deposition of ANDREW GODFREY was taken on
behalf of the Plaintiffs by remote means, on March 7,
2022 at 9:31 a.m., before Tracy R. Stonehocker,
Certified Realtime Reporter, Registered Professional
Reporter and Notary Public within Colorado, appearing
remotely from Jefferson County, Colorado.

Ex. 6

Andrew Godfrey
March 07, 2022

Page 38

1  junk drawer pitch, there was a document that showed
2  performance figures of First Western Trust Bank, funds
3  as opposed to other money managers.  Any other written
4  materials that you use in your marketing?
5          A.   There was lots of written materials.
6  But I'd say those were the ones that I focused on.
7          Q.   Were there others that you made
8  available to clients that you were attempting to
9  persuade to trust their money to First Western Trust
10 Bank to manage?
11         A.   Yeah, we had like a retirement brochure.
12 We had an investment management brochure.  We had a
13 depository service brochure.  There was one in each
14 category.
15         Q.   And were these written materials -- did
16 you make these written materials available to clients
17 when you were doing your presentation or your sales
18 pitch?
19         A.   Yes.
20         Q.   Okay.  Did you discuss in your sales
21 pitch who specifically would be making the investment
22 decisions and let's narrow this question to when you
23 were pitching fiduciary accounts.  Let us manage your
24 money.  Did you explain to the clients who
25 specifically would be doing -- making the investment

Page 39

1  decisions in their accounts?
2          A.   Yes.  So our investment policy committee
3  set our asset allocation models for all the various
4  silos and then it came down to the portfolio manager
5  level where the portfolio manager would basically just
6  implement the policies from the investment policy
7  committee and then directly to the client.
8          Q.   Would you explain to a prospective
9  client that the Aspen office wouldn't have anything to
10 do with setting investment policies or implementing
11 those policies or making decisions in regard to
12 specific investments that would be made in the
13 client's account?
14         A.   Yes, it was always explained in that
15 manner.  Investment policy committee, portfolio
16 managers, client.
17         Q.   Okay.  My question is a little bit
18 different than that.  Did you explain that neither you
19 nor anybody in the Aspen office would have anything to
20 do with managing the client's money if entrusted with
21 First Western Trust Bank?
22         A.   Well, at the time that we got Aaron's
23 account, the portfolio manager responsible for Aspen
24 worked remotely in Denver.
25         Q.   Right.  But he was not a member of the

Page 40

1  Aspen -- he was not part of the Aspen office, he was
2  employed by the Denver office, he was just responsible
3  for the Aspen accounts; is that fair?
4          A.   Yeah, he was employed in the Denver Tech
5  Center office.
6          Q.   Okay.  And he was delegated the Aspen
7  accounts because he was not employed in any manner by
8  the Aspen bank; is that correct?
9          A.   Well, there was a joint agreement
10 between the Aspen office and the Denver Tech Center
11 office to have Doug's services available to the Aspen
12 clients.
13         Q.   Right.  Services were delegated by the
14 Aspen office to the Denver Tech Center office,
15 correct?
16         A.   Yes, but we did have Travis Van Domelen
17 working as in assistant portfolio manager helping Doug
18 with the Aspen clients.
19         Q.   Travis didn't make any investment
20 decisions, did he?
21         A.   No.
22         Q.   Okay.  So the person who made the
23 investment decisions was Doug Barker, correct?
24         A.   Correct.
25         Q.   And Doug Barker was employed by the

Page 41

1  Denver Tech Center office, correct?
2          A.   Correct.
3          Q.   He was not employed by the Aspen
4  office?
5          A.   Well, I mean, when you say they were
6  sort of sharing his -- some of his compensation, I
7  don't know if you can technically say he wasn't
8  employed by the Aspen office.
9          Q.   Tell me about sharing his compensation.
10 What do you mean?
11         A.   The Aspen office was responsible for
12 part of his compensation.
13         Q.   Okay.  And how -- how did that work?
14         A.   I'm -- I wasn't privy to all the
15 details, but I just know they shared his compensation.
16         Q.   So do you know how he was compensated?
17 Was he compensated based upon each account he was
18 handling, trades, performance in the account?
19         A.   I don't -- I don't -- I don't know.
20         Q.   From what funds or what source of money
21 did the Aspen bank compensate Mr. Barker?
22         A.   From their total revenue.
23         Q.   And did the Aspen bank earn revenue from
24 the fiduciary accounts that it brought in -- that you
25 brought into that office?

Page 54
1    Q.   Okay.  All right.  Let's take a look at
2  the Exhibit 14, I believe, which is the
3  interrogatories, responses of First Western Trust Bank
4  and particularly on page 10.  Scroll -- okay, yeah.
5  Do you see the entry there?
6         MR. PODOLL:  You dropped it in the chat?
7         UNIDENTIFIED SPEAKER:  I did.
8    Q.   (BY MR. PODOLL)  Do you see the
9  February 9, 2018 entry?
10        MR. STERN:  Andrew, if you want to see
11  the whole answer, you can feel free to ask Mr. Podoll
12  to scroll up.  And, Rich, we can't actually see
13  anything on your screen right now either.
14        THE DEPONENT:  Yeah.
15   Q.   (BY MR. PODOLL)  Hold on.  We'll put it
16  on the screen.  Got it now?
17   A.   Okay.
18   Q.   Okay.
19   A.   It's small, though, so I can't --
20        MR. PODOLL:  Can you make it bigger?
21   A.   Okay.
22   Q.   (BY MR. PODOLL) Is that better?
23   A.   Yes.
24   Q.   Good.  Okay.  So basically, these
25  interrogatory response -- responses describe meetings,

Page 55
1  okay, with the Flecks.  And there's this one on
2  February 9, 2018.  States that "John Sawyer, Travis
3  Van Domelen, Andy Godfrey, Doug Barker met with Aaron
4  Fleck, Aaron's daughter Katherine and Katherine's
5  husband, Harry, to discuss potentially investing funds
6  on Mr. Fleck" -- "and Mr. Fleck's behalf using First
7  Western Trust Bank's conservative investment model."
8  Is this the meeting that you were referring to where
9  you made your sales pitch to Mr. Fleck?
10   A.   I don't know if I referred to this
11  meeting yet, but this was the formal presentation for
12  their -- to open their, you know, their investment
13  management account.
14   Q.   Okay.  And the house hadn't closed yet;
15  is that correct?
16   A.   I can't recall.  That's why I was asking
17  you, like when it closed.
18   Q.   Let's see if we can refresh your
19  recollection on that.  If you want to look at the
20  investment services agreement, which I think is
21  Exhibit 7.
22        Okay.  And if we go to the last page of
23  that document.  We'll see that it's signed on May 8,
24  2018.  So this is -- so would it be fair to say that
25  Mr. Fleck's house, the money he entrusted to First

Page 56
1  Western Trust Bank came from the proceeds of the sale
2  of his house, is that your understanding?
3    A.   Yes.
4    Q.   Okay.  So if the investment service
5  agreement was signed on May 8, 2018, would it be fair
6  to say that his house proposal closed in early May of
7  2018?
8    A.   I think it was before that, but I
9  can't -- I can't recall.
10   Q.   I'm just getting a ballpark time frame.
11  Somewhere shortly before May 8, 2018, is that -- does
12  that refresh your recollection at all?
13   A.   Before May of 2018, yes.
14   Q.   Shortly before?
15   A.   I think you'd have a better idea of
16  finding out exactly when the house closed when you
17  looked at the bridge loan portion of the loan.
18   Q.   Okay.  But we see in February 9, 2018
19  that you were discussing potentially investing money
20  with Mr. Fleck and his daughter and his daughter's
21  husband and Mr. Sawyer and Mr. Van Domelen and
22  Mr. Bantis?
23   A.   Yes.
24   Q.   So would it be fair to say as of
25  February 9, 2018, the closing hadn't taken place?

Page 57
1    A.   Hadn't taken place?
2    Q.   Do you recall that?
3    A.   I would think so, but I'm not sure.  I
4  recall there was several months where the money was
5  sitting somewhere and didn't come over.
6    Q.   Okay.  All right.  So we know that the
7  closing had to be before May 8, 2018 because that's
8  when the -- the fiduciary accounts were initiated?
9    A.   Yes.
10   Q.   We don't know exactly when and you don't
11  know if it was before or after February 9, is that
12  what you're telling me?
13   A.   Yes.
14   Q.   Okay.  Let's talk about the meeting
15  that's reflected in -- let's put up that exhibit
16  again.  Exhibit 14, page 10.  Okay.  Is it -- is it
17  your testimony -- all right.  Is it your testimony
18  that the sales pitch you made to Mr. Fleck was at this
19  meeting on February 9, 2018?
20   A.   Yes.
21   Q.   Okay.
22   A.   But I would rephrase that, Rich, I mean,
23  I wasn't running the show in that meeting.  John
24  Sawyer is our chief investment officer.  He ran the
25  show in that meeting.

Page 58
1    Q.    Okay.  He ran the show, but you had
2  several conversations with Mr. Fleck about allowing
3  First Western Trust Bank to invest proceeds prior to
4  this meeting that you received a commission when he
5  brought his money over; is that correct?
6    A.    Yes.
7    Q.    So he may have been running this
8  meeting, but Mr. Fleck was a -- a prospect that you
9  had sold bank services to and those services being
10 administer his fiduciary account and invest the monies
11 in his fiduciary account; is that correct?
12   A.    That's what we were proposing in that
13 meeting.
14   Q.    Okay.  And that's why you received bonus
15 compensation when Mr. Fleck did, in fact, bring his
16 money over?
17   A.    Yes.
18   Q.    Okay.  So let's talk about that meeting.
19 Okay.  I think what you've told me is that Mr. Sawyer
20 was running the meeting?
21   A.    Yes.
22   Q.    Okay.  So tell me what you recall
23 Mr. Sawyer telling Mr. Fleck about why he should
24 entrust the 8-million-dollar-proceeds from the sale of
25 his home to First Western Trust Bank to invest?

Page 59
1    A.    Because we managed money in a very
2  conservative way and that is specifically what Aaron
3  wanted because from day one, he said, I want this
4  money to be safe for Barbara's well-being in the event
5  that I am no longer here, to manage it as he had been
6  managing money his entire career.
7    Q.    Okay.  Was Mr. Sawyer -- I'm talking
8  specifically about what Mr. Sawyer told Mr. Fleck.  Is
9  that what Mr. Sawyer told Mr. Fleck?
10   A.    Yes, that we would manage it in a very
11 conservative way, which was the complete opposite of
12 the aggressive, volatile way that Aaron had always
13 managed money.
14   Q.    Okay.  Did Mr. Sawyer get into any
15 specifics about how the money would be invested?
16   A.    I'm sure he did.
17   Q.    Do you recall what he said?
18   A.    He said it would be a balanced portfolio
19 that did not have a lot of volatility associated with
20 it.
21   Q.    Do you recall anything else Mr. Sawyer
22 said to Mr. Fleck?
23   A.    Not that I can recall.
24   Q.    Okay.  Did he go into detail about what
25 that conservative investing model was other than it

Page 60
1  would be a balanced portfolio without a lot of
2  volatility?
3    A.    I'm sure he put up a chart that had a
4  asset allocation mix that was similar to what would be
5  implemented in the Fleck portfolio.
6    Q.    Okay.  Did Mr. Sawyer explain who would
7  be investing, who would be in charge of making the
8  actual investment decisions in Mr. Fleck's account?
9    A.    Yes.  Like I stated earlier, he would
10 have explained that the investment policy committee
11 sets the policy for the whole firm, and then it comes
12 down to the portfolio managers on the local level who
13 implement that strategy.
14   Q.    You preface that, I think, with he would
15 have said.  Do you recall him saying that?
16   A.    Yes.
17   Q.    Okay.  What else did he tell Mr. Fleck
18 about the -- how the -- about the conservative
19 investment model that -- did he talk about compared to
20 other companies or why First Western Trust Bank's
21 product was better than others?
22   A.    I don't recall him making comparisons to
23 other firms.
24   Q.    Okay.  Did he tell Mr. Fleck that --
25 Mr. Barker who was apparently at the meeting would be

Page 61
1  the person making investment decisions in his account?
2    A.    Well, overseeing the account.  Not
3  making investment decisions.  Portfolio managers don't
4  make investment decisions.
5    Q.    Can you elaborate on that a little more?
6    A.    They follow the guidance of the
7  investment policy committee.
8    Q.    Well, still, somebody has to be
9  responsible for making trades in --
10   A.    Yeah.  And that was Doug.
11   Q.    By the portfolio manager?
12   A.    Yes.
13   Q.    So wouldn't the portfolio manager be the
14 person who would decide I'm going to buy this equity,
15 I'm going to buy this equity, I'm not going to buy
16 this equity, I'm going to sell this equity?
17   A.    Well, they were all funds within the
18 portfolio.  No individual stocks.  And as long as --
19 sometimes the portfolio managers might have had
20 choices within the certain buckets of the asset
21 allocation model, but for the most part, they were
22 just following the guidelines set by the IDC.
23   Q.    So your testimony -- was this explained
24 to Mr. Fleck during this sales meeting?
25   A.    Yes.

Page 62

1    Q.   By who?
2    A.   By John, and Doug might have spoken as
3  well.
4    Q.   Okay.  We'll get to what each person
5  said, but what do you recall John Sawyer saying about
6  the portfolio manager not having any discretion and
7  not making investment decisions?
8    A.   What do I recall about that?
9    Q.   Yeah.
10   A.   Just, you know, overall description of
11 what I just said.  I don't think he would have
12 elaborated too much more than that.
13   Q.   Okay.  Do you remember anything else
14 John Sawyer said?
15   A.   No.
16   Q.   Okay.  Let's talk about you.  You --
17 this is your -- your contact, you're being paid
18 commission for this.  What did you tell Mr. Fleck and
19 his daughter and his daughter's husband at this
20 meeting about why he should entrust the proceeds from
21 the sale of his home to First Western Trust Bank?
22   A.   I probably said something along the
23 lines of, you know, we have five billion, probably,
24 under management at the time.  We have an excellent
25 track record.  Doug will be your portfolio manager

Page 63

1  remotely, but that Travis and I would be your local
2  contacts here in Aspen, your primary go-tos, if you
3  have questions or need help.
4    Q.   Did you tell Aaron Fleck and his
5  daughter and his daughter's husband that you and
6  Travis wouldn't have anything to do with making
7  investment decisions?
8    A.   I can't recall specifically saying that,
9  but I would think that it was understood.
10   Q.   You would think it was understood, but
11 you didn't specifically say -- you said that Travis
12 and I are your local contacts, but you thought it was
13 understood that you wouldn't be making investment
14 decisions, but you didn't tell Mr. Fleck or his
15 daughter that; is that fair?
16   A.   I -- I don't know if I would state it
17 the way you're saying it.
18   Q.   Well, is it correct or not?
19   A.   Can you repeat the way you stated it?
20   Q.   Yes.  Did you specifically tell
21 Mr. Fleck that you and Travis would be his local
22 contacts, but you would not be involved in making
23 investment decisions on his account?
24   A.   Yes.
25   Q.   Okay.  Tell me exactly what you told

Page 64

1  Mr. Fleck.
2    A.   That -- that we were simply local, you
3  know, contacts and that Travis, you know, was an
4  assistant portfolio manager, he did not have the --
5  you know, the ability, the credit to -- to make any
6  changes in the account, that Doug was the primary
7  portfolio manager and responsible for the management.
8    Q.   And did you tell Mr. Fleck and his
9  daughter that you didn't have any authority to make
10 any changes or investment decisions in the account?
11   A.   I can't recall.
12   Q.   Okay.  Did you tell Mr. Fleck and his
13 daughter that you and Mr. Van Domelen would have
14 nothing to do with supervising or oversight of the
15 investments that were made in his account by the
16 Denver Tech office?
17   A.   Supervising the account?
18   Q.   Supervising or oversight of the
19 investments made in his account by the Denver Tech
20 office, that you and Mr. Van Domelen would have
21 nothing to do with that.  Did you tell him that?
22   A.   I can't recall if we put it in those
23 terms.  I would have said Travis and I will be
24 following the account for you.
25   Q.   Right.  But you had -- that's different

Page 65

1  than telling him we're not going to make any
2  investments, we don't have the authority to do that?
3    A.   Yes.  Yes.  I communicated that Travis
4  and I did not have the authority to make investment
5  decisions on the account.
6    Q.   You also communicated that you and
7  Travis would have no ability to supervise or oversee
8  what the Denver Tech Center office was doing?
9    A.   Yes.
10   Q.   Okay.  Tell me what you told him.
11   A.   That we were not the ones responsible
12 for managing the account.
13   Q.   Okay.  And that nobody in the Aspen
14 office was responsible for that account, that would be
15 done by the Denver Tech office, did you tell him that?
16   A.   Yes.  Yes.
17   Q.   Okay.  What did Mr. Barker say in this
18 meeting?
19   A.   Just normal investment management
20 description, discussion of modern portfolio theory,
21 how the firm managed money conservatively.
22   Q.   What exactly did Mr. Barker say about
23 how the firm managed money conservatively?
24   A.   The type of investments that were in the
25 conservative portfolio, the types of returns that had