IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01073-CMA-GPG

THE AARON H. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck and Barbara G. Fleck,

THE BARBARA G. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck and Barbara G. Fleck,

AARON FLECK, and BARBARA G. FLECK, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FIRST WESTERN TRUST BANK,

CHARLES BANTIS, and

ANDREW GODFREY,

Defendants.

## RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs, by and through their attorneys, Podoll & Podoll, P.C., respond to Defendants' Motion for Partial Summary Judgment as follows:

### I.   INTRODUCTION

The Complaint in this action pleads in great factual detail how a bank, hungry for business oversold its fiduciary investment management capabilities to induce the Plaintiffs, Aaron H. Fleck and Barbara G. Fleck as trustees of the Aaron H. Fleck Revocable Trust and the Barbara G. Fleck Revocable Trust to allow Defendant First Western Trust Bank to manage $8 million of liquid assets belonging to the Trusts.

In 2016, Defendant First Western Trust Bank ("Bank") was a startup business in Aspen where Plaintiffs resided, The Bank had a business model of being a local depository and loan institution and also to provide investment advisor services. The Aspen branch of the Bank had no capacity to provide investment advisor services. It had an affiliate in Denver who would provide such services and divide the associated revenue. But advertising that arrangement wouldn't get the Bank trust clients, especially in Aspen.

Instead, the Bank advertised:

Locally, we have a wealth advisor;

We have a team, not just one person, working for your benefit so you gain access to the best financial planning minds in the business;

In addition to designing your personal portfolio, our experienced trust investment management service teams can also serve as an investment advisor to your trusts.

But that wasn't all. In addition to the advertising given to all potential customers, Defendant Bank assured the Plaintiffs as follows:

The local Wealth Management Advisor and the local Assistant Account Manager will follow your portfolio;

We believe income of $400,000 to $500,000 per year would be ascertainable for your portfolio;

We believe over time an overall return of 6.2% would be ascertainable for your portfolio;

Our track record is on par with anyone in the industry;

Our trust and wealth management teams are held to a fiduciary standard, meaning that we are committed to ensuring that your wishes are carried out.

However, the truth was far different than these representations. If the Bank were selling used cars, perhaps such misrepresentations could be tolerable. However, the Bank was selling trust and investment expertise. Its false representations induced the Plaintiffs to entrust $8 million to the professional team depicted by the Bank. What the Plaintiffs could not know was:

The Wealth Management Advisor did not advise anyone about wealth, or anything else for that matter. The Wealth Management Advisor's responsibility was solely to develop business for the Defendant Bank;

The Assistant Account Manager had nothing to do with the investments made by the Bank's trust department, or evaluating the performance of the trust department;

There was no team making decisions about the investments of the Flecks' portfolio, there was just one Account Manager;

No one designed a personal portfolio for the Fleck Trusts;

No one functioned as an investment advisor to the Fleck Trusts;

Instead, an investment committee dictated available funds that an account manager could select for investment of the Plaintiffs' assets;

The account manager met with Aaron Fleck only once;

The Bank's idea of fiduciary obligations was that the customer's interests were put first, unless, of course, they conflicted with the Bank's interests.

The targeted returns of $400,000 – $500,000 per year of income represented income returns of 5% to 6.25% of total funds under management, and in 2018 were unattainable in a balanced portfolio with conservative or moderate risk.

In short, everything that was told to the Flecks was untrue, grossly overstated, but material to the Flecks' decision;

3

Still, without trial, the Bank moves for summary judgment concentrating on specific titles of investment advisors rather than the falsehoods told to the Plaintiffs.

## II. RESPONSE TO DEFENDANTS' UNCONTESTED FACTS

1. Undisputed.

2. Undisputed.

3. Undisputed.

4. Undisputed.

5. Undisputed.

6. Undisputed.

7. Undisputed.

8. Disputed. Mr. Fleck testified that at the February meeting, FWTB's officers "talk[ed] about their philosophies … because they knew [Mr. Fleck] was talking to three or four other money managers and they were trying to sell [the Flecks] the right to manage [the trusts]." (Fleck Depo., 106:14-106:17, 3/1/2022.) Mr. Fleck chose to have the trusts' assets managed by a third party because of his failing health. (*Id*. at 31:13-19.)

9. Disputed. Mr. Fleck did learn that Doug Barker would be the portfolio manager, but not that Mr. Barker's selections would be curtailed by pre-approved securities.

10. Undisputed that the Bank prepared an Investment Policy Statement ("IPS"). Disputed that this was based on the Flecks' input from the February 2018 Meeting. (*See* Declaration of Aaron Fleck, Exhibit D, hereto.)

11. Undisputed.

12. Disputed. This oversimplifies and mischaracterizes Mr. Fleck's testimony and the reasons why he ultimately hired FWTB. It is undisputed that Mr. Bantis assisted the Flecks in obtaining a bridge loan and Mr. Fleck agreed to "give [Mr. Bantis] some money to manage through [FWTB's] trust department." (Fleck Depo., 101:9-102:5, 3/1/2022.) However, the ultimate decision to hire FWTB was based on, *inter alia*, the numerous representations made by the bank to Mr. Fleck before he entrusted it with management of the trust assets. (*See* Declaration of Aaron Fleck, Exhibit D, hereto.) This includes their representations regarding how the assets would be invested. (Sawyer Depo., 80:25-82:16, 3/9/2022)

13. Undisputed that the Flecks executed the IPS and other documents on May 8, 2018. Disputed that the Fleck's "approved" any of the documents. Mr. Fleck testified that he told FWTB

4

of his objections to the IPS when he executed it and subsequently voiced his objection to the Bank's investment plan. (Fleck Depo., 111:16-112:2, 3/1/2022)

14. Disputed. The IPS was not jointly developed by FWTB and the Flecks. Mr. Fleck testified regarding this provision:

> Q   Okay. And you agreed by signing this Investment Policy Statement that this statement had been jointly developed by you and First Western, right?
>
> A   No, I agreed that that's what they were proposing, but I told them how I felt. They were there to sign it, they didn't change it. So I gave them six months to see what they -- how they were gonna manage it and whether they were going to listen to what I said over and over every time I went into the office. I said, do you still have 185 securities and, I guess, 50 or 80 in the second account and he never answered me. When I finally got their quarterly statement, I think it was in November, when I saw what they did, I complimented on the tax loss and told them to take them out.

(Fleck depo, 112:16-113:6, 3/1/2022.)

15. The IPS speaks for itself.

16. The IPS speaks for itself.

17. The IPS speaks for itself. Mr. Sawyer also testified that these asset classes and allocation ranges "are guidelines; they're not fixed limits." (Sawyer Depo., 80:15-80:15, 3/9/2022.)

18. Undisputed.

19. The IPS speaks for itself.

20. The Investment Agreement speaks for itself.

21. Undisputed.

22. The IPS speaks for itself.

23. The IPS speaks for itself.

24. The Investment Agreement speaks for itself.

25. The Investment Agreement speaks for itself.

26. The Investment Agreement speaks for itself.

27. The Investment Agreement speaks for itself.

28. Disputed. Mr. Fleck testified that he didn't know or couldn't recall whether he read certain provisions of the IPS before signing it and relied on the concurrent representations of FWTB's officers. (Fleck Depo., 116:20-118:17, 3/1/2022.)

29. *See id.*

30. Paragraph 30 involves a question of law regarding the adequacy of Plaintiffs' allegations of fraud which this Court has already addressed in denying the Bank's motion to dismiss. [*See* ECF Nos. 47 & 50]. Plaintiffs dispute Defendants' mischaracterization and oversimplification of their fraud claims. (*See* Fleck Declaration, Exhibit D, hereto.)

31. Disputed. Mr. Fleck testified that he didn't recall "***whether*** [the Bank] said [they had] professional money managers" and that he could not "recall…all the exact words they said or promised." (Fleck Depo., 164:21-164:25, 3/1/2022.)

32. Undisputed.

33. Paragraph 33 states that "Mr. Fleck did not claim that FWTB does not employ professional money managers."

This is a double negative and confusing at best. Mr. Fleck stated in his deposition that he didn't know whether or not FWTB employed professional money managers. (Fleck Depo., 167:6-167:8, 3/1/2022.)

34. Disputed. The Trusts' investment account was to be managed by a team of professional wealth managers. In fact, all of the investment decisions were vested in only Mr. Barker.

35. Disputed. Although additional analysts may have been in the employ of the Bank, the Trusts were supposed to have a team of professional wealth managers who were skilled, sophisticated, and experienced and would be available to the Trusts to help design individual portfolios.

36. Undisputed.

37. Paragraph 37 states a legal conclusion to which no response is required.

38. Undisputed.

39. Undisputed.

40. It is undisputed that the Flecks met with FWTB officers on the dates reflected. Plaintiffs dispute that, for example, two meetings in the first eight months of portfolio management constitutes adequate and effective communication.

41. Undisputed.

42. Disputed. Citi Private Bank never received the funds. (Fleck Depo., 167:24-168:23, 3/1/2022.)

43. The Investment Agreement speaks for itself.

44. The Investment Agreement speaks for itself.

45. The Fee Agreement speaks for itself.

46. The Fee Agreement speaks for itself.

47. The Investment Agreement speaks for itself.

48. The Investment Agreement speaks for itself.

49. Undisputed.

50. Undisputed.

### III.   ARGUMENT

**A.   THE DISPUTED EVIDENCE PRESENTS GENUINE ISSUES OF MATERIAL FACT FOR TRIAL ON THE CLAIMS OF FRAUD**

The elements of fraudulent misrepresentation are:

> (1) that the defendant made a false representation of a material fact; (2) that the one making the representation knew it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff.

*Bristol Bay Prods., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013).

Defendants ask for judgment without the necessity for a trial by contending that the undisputed evidence belies the claim that the Plaintiffs were deceived.

Specifically, Defendants contend that the Plaintiffs were not told that the Bank employed Registered Investment Advisors or that its account managers were Professional Money Managers. While it is true that Aaron Fleck, whose age has passed the century mark, could not remember in

deposition the precise terms used by the Bank, that hardly is a valid excuse to ignore the significant fraud committed by the Bank.

The Bank intentionally and repeatedly marketed its trust services as a team of investment professionals which would be at the disposal of the trust clients. In paragraph 27 of the First Amended Complaint, Plaintiffs alleged in part:

FWTB promotes itself as follows:

> At First Western Trust, we understand that much of building your wealth involves protecting your family, creating a lasting legacy, and ensuring the ability to live out the lifestyle you desire. Our experienced teams are discipline in all areas of wealth management, including wealth planning, trust and estates, investment management, private banking, risk management insurance, and mortgage services. We have a team, not just one person, working for your benefit so that you gain access to the best financial planning minds in the business.

The Bank admitted these allegations in its Answer.

In paragraph 28 of the First Amended Complaint, Plaintiffs alleged:

> 28. Regarding Trust Investment Management Services, FWTB markets its management as follows:
>
> In addition to designing your personal portfolio, our experienced trust investment management service teams can also serve as an *investment advisor* to your trusts. We are dedicated to supporting your beneficiaries and building an [sic] trust investment management plan that will help you leave a positive and lasting legacy. (*Emphasis added*).

The Bank admitted these allegations in its Answer.

Bank employee Andrew Godfrey was credited with bringing the Flecks' trust relationship to the Bank. Mr. Godfrey was a Wealth Management Advisor at the Bank. However, Mr. Godfrey had no expertise in wealth management and he never advised anyone of anything in wealth

8

management. Mr. Godfrey's sole responsibilities at the Bank were to develop business. He was in sales, not investment management. *See* Godfrey deposition excerpt, attached as Exhibit A.

Still, to sell the Flecks on the service level of the trust management department at the Bank, Mr. Godfrey represented that Mr. Barker would be the portfolio manager remotely, but that Mr. Godfrey and Mr. Van Domelen would be local contacts here in Aspen and would be the Flecks' primary contacts to answer questions or help with the accounts. *Id.*

However, Mr. Godfrey had no connection with the management of the Flecks' trusts. While Mr. Van Domelen had the title of "Assistant Portfolio Manager", he was providing clerical assistance to the remote portfolio manager and had no authority over the investment accounts. *See* Godfrey Depo. excerpts, Exhibit A hereto, and Sawyer Depo. excerpts, Exhibit B hereto. Neither Mr. Godfrey nor Mr. Van Domelen were a part of the vaunted wealth management team which would provide the Plaintiffs with access to the best financial management teams in the business.

Whereas, the Bank represented that a team of investment professionals would design a personal portfolio for the Flecks' trusts, the reality was that the Bank's personalized portfolio was nothing more than a group of pre-arranged securities from a selection committee, including six funds managed by the First Western Funds Trust, an affiliate of the Bank. *See* Godfrey deposition exhibits, Exhibit A hereto, and Sawyer deposition excerpts, Exhibit B hereto. Three of the funds were fixed income funds, and three were equity funds. *See* Sawyer deposition excerpts, Exhibit B. The allocation of fund assets among the six different funds was a part of the "personalization" of a client's portfolio, *See* Godfrey deposition excerpts, Exhibit A hereto.

The Bank also represented to the Plaintiffs that there would be strong communication between client and the Bank's Investment Advisors. In ¶ 35 of the First Amended Complaint, the Plaintiffs alleged:

9

> 35. The Investment Policy Statement also provided:
>
> On a no less than quarterly basis, you will receive a custodial statement detailing your portfolio holdings. Performance is calculated quarterly on both an absolute and relative basis as compared to appropriate benchmark indices. First Western will review your investment program with you periodically to determine the continued feasibility of achieving your investment objectives and the appropriateness of this IPS for achieving those objectives

The Bank admitted these allegations in its Answer.

However, the Bank was not set up to provide access to the best financial planning minds in the business, since any such minds were not available to provide advice to the Flecks or to design a portfolio for them. In reality, their remote Account Manager was charged with communicating with the Flecks. However, the remote financial manager was one hundred fifty miles away in Denver. Between May and December 2018, there was but one meeting between the Flecks and the remote financial manager. Far from a team of the best financial planning minds in the business, Plaintiffs trust administration was limited to a single person remotely allocating their assets among pre-selected stocks and funds.

Mr. Sawyer was the Chief Investment Officer of the Bank. *See* Sawyer Depo. excerpts, Exhibit B hereto. Although Mr. Sawyer claimed to have managerial oversight of the Plaintiffs' accounts, his management was limited to looking at the results of the investments perhaps once a month for 10 minutes on his computer. *Id.* He also had meetings with the Account Manager at which they discussed all of the accounts under management with the manager, not specifically the Plaintiffs' accounts. *Id.* The Account Manager didn't report to Mr. Sawyer, the Chief Investment Officer. The Account Manager reported to the Denver Tech Center Market President, who in turn reported to the Regional Bank President. *Id.* Mr. Sawyer had no meetings with the Plaintiffs concerning the investment of their funds. *Id.*

The Bank represented that it was acting as the fiduciary of its trust department clients. In paragraph 31 of the First Amended Complaint, the Plaintiffs alleged:

> 31. In carrying out its services, FWTB represented that it was held to a fiduciary standard:
>
> At First Western Trust, our trust and wealth management teams are held to a fiduciary standard, which means that we are committed to ensuring that your wishes are carried out and that your loved ones are taken care of to the best of our ability.

The Bank admitted that the quoted language came from the Bank's materials in its Answer.

However, the Bank failed to disclose what it meant by its fiduciary duties. According to the President of the Aspen branch of the Bank, the Bank's idea of fiduciary duties would put the interests of the trust client first, unless that conflicted with the priorities of the Bank. *See* Bantis Depo. excerpt, Exhibit C hereto. Accordingly, the fiduciary duties recognized by the bank wouldn't put the interests of the trust client first at all. The interests of the client would always be subservient to the interests of the Bank. *Id.*

This perhaps best sums up the relationship between the Bank and the Plaintiffs who entrusted $8 million of their assets to the Bank's wealth management department. Fiduciary duties concerning loyalty, honesty, good faith, and diligence in performance were all sacrificed to the greater good of obtaining assets to manage.

The Plaintiffs relied upon the sales pitch of the Bank, and their reliance was reasonable. The Bank's lofty claims of a team of wealth management professionals designing a personalized portfolio for trust assets and access to the finest financial planning minds in the business were quite attractive. The problem was that none of this was true.

The great void between the representations made by the Bank and the reality of the Bank's trust management services present genuine issues of material fact for trial.

To prove the Plaintiffs' claims for the fraudulent failure to disclose, the evidence is similar to the Bank's false representations. The elements of a claim of fraudulent omission are:

> (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages.

*BP Am. Prod. Co. v. Patterson*, 263 P.3d 103, 109 (Colo. 2011).

The Plaintiffs allege that the Bank failed to disclose that it had no cohesive and comprehensive investment strategy. The Bank failed to disclose that its team approach was largely made up. The Bank failed to disclose that its personalized investment portfolio consisted of preselected stocks and preselected funds, including 6 funds from a Bank affiliate.

The Bank failed to disclose that it had no established means of effective communication with Trust department clients. The Bank failed to disclose that the Account Manager was not responsible to the Chief Investment Officer. The Bank failed to disclose that its Wealth Management Advisor was unqualified and provided no wealth management advice. The Bank failed to disclose that Plaintiffs' local contacts had no authority over the trust accounts and that the assistant account manager was performing ministerial functions only. The Bank failed to disclose that its lack of established communications with trust clients made the Bank unable to respond to the requests or directives of the Plaintiffs, including the failure to harvest losses at year's end. *See* Declaration of Aaron Fleck, Exhibit D hereto.

These omissions were material. *Id.*

The Bank had a duty to disclose these material facts to the Plaintiffs, both because they knew that the Plaintiffs had no knowledge of the facts and because the representations of the Bank

created false impressions in the minds of the Plaintiffs. *See Bair v. Pub. Serv. Emps. Credit Union*, 709 P.2d 961, 962 (Colo. App. 1985); and *Berger v. Sec. Pac. Info. Sys., Inc.*, 795 P.2d 1380, 1383 (Colo. App. 1990) (*Citing Cahill v. Readon*, 85 Colo. 9, 273 P. 653 (1928)).

The Bank intended that the Plaintiffs rely upon the omitted facts as demonstrated by their marketing materials, quoted in the First Amended Complaint. The Plaintiffs did rely upon the omitted facts. *See* Declaration of Aaron Fleck, Exhibit D hereto.

The representations and omissions were significant and material. They went to the heart of the decision of the Plaintiffs to entrust the Bank with $8 million of their assets. These claims are not subject to summary judgment as Defendants contend merely because the Bank did or did not use the terms Registered Investment Advisor or Wealth Planning Professional to describe its employees.

**B.      PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE ECONOMIC LOSS RULE.**

The Bank also reprises the argument in its Motion to Dismiss, claiming that the claim of breach of fiduciary duty is barred by the economic loss rule. As before, the Bank recognizes that the economic loss rule bars tort claims which allege nothing more than the breach of a contractual duty.

It is widely recognized that fiduciary duties have their basis in common law and are not contractually derived. Still, the Bank persists in claiming that no independent duty exists because the Investment Policy Statement ("IPS") provides separate and exclusive fiduciary duties in the relationship between the Bank and its trust department client. The immediate problem with the Bank's argument is that the IPS does not impose fiduciary duties, quasi fiduciary duties or any imaginable type of fiduciary duty. Rather, the Bank's fiduciary duties in this relationship – the

13

duty of honesty, loyalty, good faith and allegiance to the purpose of the relationship – all come from the common law, not the Bank's contracts.

The language of the IPS, which Defendants fail to even include, does not describe any duty that could subsume the recognized independent duties of care that underlie Plaintiffs' suit. The Bank cites as authority the holding of the Colorado Court of Appeals in *Mid-Century Ins. Co.* v. *Hive Constr.*, 2023 COA 25. The issue in *Mid-Century Ins. Co.* was the failure to follow materials specifications in the contract. *Mid-Century Ins. Co. v. HIVE Constr.*, 2023 COA 25 (Colo. App. 2023). Defendants argue that the contract duty not to substitute materials in *Mid-Century* is analogous to independently recognized fiduciary duties or fraud duties. The duties in the Bank's relationship arise from the common law, not the contract. The Bank only points to exculpatory language in its contract attempting to disclaim negligence. This does not encompass a fiduciary or fraud duty.

"A party may be liable in tort for breaching an independent duty towards another, even where the relationship creating such a duty originates in the parties' contract." *Hess Oil Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1202 (10th Cir. 1988). *See also Bermel v. Blueradios, Inc.*, 440 P.3d 1150, Footnote 6 (Colo. 2019). ("[W]e note that the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation.")

To bring the Plaintiffs' tort claims within the reach of the economic loss rule, the Bank departs from the purpose of the rule which disallows claims where no independent duty exists. The Bank only claims that the particular violations of the breach of fiduciary duties are also violations of the contract. Such duplication does not implicate the economic loss rule. *See Mcwhinney Centerra Lifestyle Ctr, LLC v. Poag & McEwen Lifestyle Centers – Centerra LLC*, 486 P.3d 434,

454-455 (Colo.App. 2021). ("While the conduct underlying each of these claims may also support a breach of contract claim in this case, we are not persuaded that the economic loss rule should shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation.")  Further, as the Colorado Supreme Court observed:

> *Keller* was thus integral to our recognition of the economic loss rule in Colorado. As to the second, we see no reason to limit the reasoning of *Keller* to the purchase of a product. The key in that case is our recognition of an independent tort duty regarding negligent misrepresentations inducing the contractual arrangement, not the subject (that is, product or services) of the arrangement itself.

*Van Rees v. Unleaded Software, Inc.*, 2016 CO 51, P17.

Plaintiffs' claims extend far beyond the scope of any language found in the contracts. The Court previously addressed this issue in the context of Defendants' Motion to Dismiss, finding that "Taking the allegations in the Complaint to be true, Plaintiffs allege claims regarding FWTB's incompetence, lack of good faith, self-dealing, disloyalty, and failure to communicate, which goes beyond just a claim of mismanagement of the account." ECF 47 at 9. Those claims persist in this case, and are not barred by the scope of the Bank's contract.

The claims here are not based upon contractual performance, such as the failure to follow the Bank's published Investment Policy Statement. Rather the breach of fiduciary duties allege the failures of the Bank to discharge their fiduciary duties of honesty, loyalty, good faith and allegiance to the purpose of the relationship. In this case, the Bank's wealth management structure ensured that communications would be ineffective, which in turn created the failure of the Bank to execute the instructions of the client to harvest his account losses at the end of the year. The poor performance of Plaintiffs' accounts is explained by the Bank's wealth management structure which isolated an Account Manager who was permitted to choose investments without consultation with either the client or the best minds in the industry to try to achieve the clients' objectives. The poor

15

performance is further blamed upon the failure to pay any respect to the investment philosophies of the client, even while acknowledging that investments should be selected in conjunction with the client and regularly reviewed with the client. No such selection or review was performed. In fact, the Account Manager met with the Plaintiffs only once in eight months in 2018.

The Bank asks the Court to reconsider its earlier ruling based upon the allegation that the breach of fiduciary duties may also be breaches of contract. The Bank misses the point. The alleged breaches of fiduciary duty are not based upon contractual duties. They are based upon common law duties when one party acts with the property of another. As the court previously noted, "The only actual affirmative duty arising from the contract is for Defendants to "give to the securities in its custody the same degree of care and protection which it gives to its own property." To apply the economic loss rule, the Bank asks the Court to read language into the contract that is simply not there." ECF 47 at 9. As such, the renewed argument for application of the economic loss rule is unavailing.

C.   A BREACHING FIDUCIARY MUST DISGORGE FEES.

The Bank argues that its fees were allowed by contract and since the contract is ambiguous, the Bank is entitled to summary judgment on the claims against it as they relate to fees.

The Bank misunderstands the nature of the claims against it. A breaching fiduciary must disgorge his fees. *See, e.g., Estate of Keenan v. Colo. State Bank & Trust,* 252 P.3d 539 (Colo. App., 2011); and *Hoff & Leigh v. Byler*, 62 P.3d 1077 (Colo.App. 2002).

A party who committed fraud may also be compelled to respond in damages. *See Stamp v. Rippe,* 483 P.2d 420 (Colo.App 1971) (Special damages are the natural and proximate result of the fraud).

That the fees collected by the Bank were authorized by contract is not determinative if the Bank breached its fiduciary duties or defrauded the Plaintiffs. In such circumstances, the fees may be proper measures of damages suffered by the Plaintiffs.

## IV.   CONCLUSION

For the reasons expressed above, the Motion for Partial Summary Judgment should be denied.

Dated: June 26, 2023

                                        PODOLL & PODOLL, PC

                                        By:   *s/ Richard B. Podoll, Esq.*
                                                 Robert A. Kitsmiller
                                                 Podoll & Podoll, P.C.
                                                 5619 DTC Pkwy, Ste 1100
                                                 Greenwood Village, CO 80111
                                                 Tel: 303 861-4000
                                                 Fax: 303-861-4001
                                                 Email: bob@podoll.net
                                                 Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 26, 2023, a true and correct copy of the foregoing was served via PACER/ECF upon the following:

***Attorneys for Defendants***
Timothy R. Beyer, Esq.
Adam B. Stern, Esq.
BRYAN CAVE LEIGHTON PAISNER LLP
1700 Lincoln Street, Suite 4100
Denver, Colorado 80203
(303) 861-7000
tim.beyer@bclplaw.com
adam.stern@bclplaw.com

I hereby certify that on June 26, 2023, a true and correct copy of the foregoing was served via email on Plaintiffs pursuant to D.C.COLO.LCivR 6.1(c).

By:    *s/Richard B. Podoll*
       Richard B. Podoll