**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

**Pg: 27 Ln: 9 - 10**

**Annotation:**

```
27: 9    All right.  And who hired you?
    10            A.   Charlie Bantis.
```

**Pg: 27 Ln: 11 - 22**

**Annotation:**

```
27:11   Okay.  And what were you hired to do?
   12           A.   To be a wealth advisor.
   13           Q.   Okay.  That was your job title?
   14           A.   Yeah, I don't know if it was wealth
   15   planning advisor.  Something like that.  Yeah.
   16           Q.   Does wealth advisor and client
   17   strategist ring a bell?
   18           A.   Yeah, because the -- my title
   19   transitioned shortly, like the next year of client
   20   strategist.  The bank was trying to figure out what to
   21   call it.  It's basically a business development
   22   position, so. . .
```

**Pg: 28 Ln: 11 - 20**

**Annotation:**

```
28:11    Okay.  So tell me what your job
   12   responsibilities were as a wealth strategist.
   13           A.   Client strategist.
   14           Q.   Well, I'm seeing two titles.  One
   15   is -- I'm sorry, I think I misspoke.  Wealth advisor.
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
    16    Tell me what your job responsibilities were as a
    17    wealth advisor.
    18            A.   To promote all the various aspects of
    19    the bank, so lending, investment management, 401(k)
    20    planning, estate -- trust and estate planning.
```

**Pg: 29 Ln: 1 - 3**

**Annotation:**

```
 29: 1    Q.   Okay.  And how about as a client
     2    strategist, what were your job responsibilities?
     3            A.   Same thing, just different title.
```

**Pg: 31 Ln: 14 - 21**

**Annotation:**

```
 31:14    Q.   How much fiduciary accounts were
    15    entrusted to First Western Trust Bank on November 21,
    16    2016?
    17            A.   I can't recall, but I would say maybe a
    18    half dozen to a dozen.
    19            Q.   That business really hadn't been
    20    developed very much; is that fair?
    21            A.   Correct.
```

**Pg: 34 Ln: 8 - Pg: 35 Ln: 25**

**Annotation:**

```
 34: 8    Q.   Okay.  When you went about your job
     9    responsibilities as a wealth advisor and client
    10    strategist, which we've agreed had marketing, did you
```

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
11   have a methodology that you used?  And by that I mean
12   did you have written materials you would give a
13   customer, did you develop a, for lack of a better way
14   of putting it, a sales pitch?
15        A.   Yes.
16        Q.   Okay.  Tell me about that.  What written
17   materials did you provide to customers that you were
18   asking to open fiduciary managed accounts and or
19   trusted to running by Western Federal Trust Bank?
20        A.   First Western.
21        Q.   Okay.
22        A.   First Western Trust Bank.
23        Q.   First Western Trust Bank, correct.  I'm
24   sorry.
25        A.   They had a piece that showed how the
35: 1   trust department was positioned versus other
  2   investment management warehouses and other trust
  3   companies.  That was a one-pager that was useful.
  4   They also had a -- it wasn't so much of a written
  5   piece, but it was one of the -- one of the investment
  6   professionals who had left before I got there had a
  7   good pitch, he called it the junk drawer pitch, which
  8   would talk about how scattered people's assets and
  9   financial plans were, and how it was good to aggregate
 10   in one place.
 11        Q.   Was that a written document, the junk
 12   drawer pitch?
 13        A.   No, it was a -- it was sort of a video.
 14        Q.   Okay.  So that was like a -- how long a
 15   video, like a five-minute video or presentation?
 16        A.   Yeah.  Yeah.  Few-minute video.
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
17            Q.   Tell me in a little more detail about
18   this -- this junk drawer pitch, few-minute video.
19   What did it communicate to the prospective client?
20            A.   The -- basically most people were
21   getting services from various different places,
22   multiple bank accounts, maybe multiple investment
23   accounts and no one was really taking a look at the
24   big picture.  And, again, coming in that fiduciary
25   capacity.
```

**Pg: 36 Ln: 1 - 7**

**Annotation:**

```
36: 1    Q.   What representations were made to the
     2   client about what First Western Trust Bank would do in
     3   this junk drawer video pitch?
     4            A.   I would say there was sort of a simplify
     5   your life sort of thing.
     6            Q.   Let us take care of your investment,
     7   simplify your life, that sort of thing?
```

**Pg: 36 Ln: 9 - 13**

**Annotation:**

```
36: 9    Q.   What representations were made about the
    10   quality of the investments, fiduciary investments that
    11   would be made on behalf of a client?
    12            A.   Very high quality.  Able to go toe to
    13   toe with all the best investment firms in the country.
```

**Pg: 36 Ln: 21 - Pg: 37 Ln: 16**

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

**Annotation:**

```
36:21    Q.   Okay.  That was just part of your sales
   22    presentation to a prospective client, we can go toe to
   23    toe with the best investment firms and our results are
   24    as good or better?
   25          A.   Yeah.  I mean, that -- in all of our
37: 1    written, you know, in all of our performance figures,
    2    we would demonstrate how, you know, we were matched in
    3    the averages, keeping up with the benchmarks.
    4          Q.   Was that another document that you used
    5    in sales pitches, performance figures?
    6          A.   Yes.  The individual fund performance
    7    figures.
    8          Q.   What individual funds are we talking
    9    about here?
   10          A.   Well, we had three fixed income and
   11    three equity funds.
   12          Q.   Okay.  So you had written promotional
   13    materials that said look at our funds and how they
   14    perform in regard -- in comparison to other money
   15    managers' funds, is that what you were doing?
   16          A.   Correct.
```

**Pg: 38 Ln: 20 - Pg: 39 Ln: 16**

**Annotation:**

```
38:20    Q.   Okay.  Did you discuss in your sales
   21    pitch who specifically would be making the investment
   22    decisions and let's narrow this question to when you
   23    were pitching fiduciary accounts.  Let us manage your
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
   24   money.  Did you explain to the clients who
   25   specifically would be doing -- making the investment
39: 1   decisions in their accounts?
    2           A.   Yes.  So our investment policy committee
    3   set our asset allocation models for all the various
    4   silos and then it came down to the portfolio manager
    5   level where the portfolio manager would basically just
    6   implement the policies from the investment policy
    7   committee and then directly to the client.
    8           Q.   Would you explain to a prospective
    9   client that the Aspen office wouldn't have anything to
   10   do with setting investment policies or implementing
   11   those policies or making decisions in regard to
   12   specific investments that would be made in the
   13   client's account?
   14           A.   Yes, it was always explained in that
   15   manner.  Investment policy committee, portfolio
   16   managers, client.
```

**Pg: 39 Ln: 17 - Pg: 40 Ln: 5**

**Annotation:**

```
39:17   Q.   Okay.  My question is a little bit
   18   different than that.  Did you explain that neither you
   19   nor anybody in the Aspen office would have anything to
   20   do with managing the client's money if entrusted with
   21   First Western Trust Bank?
   22           A.   Well, at the time that we got Aaron's
   23   account, the portfolio manager responsible for Aspen
   24   worked remotely in Denver.
   25           Q.   Right.  But he was not a member of the
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
40: 1    Aspen -- he was not part of the Aspen office, he was
    2    employed by the Denver office, he was just responsible
    3    for the Aspen accounts; is that fair?
    4            A.   Yeah, he was employed in the Denver Tech
    5    Center office.
```

**Pg: 40 Ln: 22 - Pg: 41 Ln: 2**

**Annotation:**

```
40:22    Okay.  So the person who made the
   23    investment decisions was Doug Barker, correct?
   24            A.   Correct.
   25            Q.   And Doug Barker was employed by the
41: 1    Denver Tech Center office, correct?
    2            A.   Correct.
```

**Pg: 58 Ln: 22 - Pg: 59 Ln: 6**

**Annotation:**

```
58:22    Q.   Okay.  So tell me what you recall
   23    Mr. Sawyer telling Mr. Fleck about why he should
   24    entrust the 8-million-dollar-proceeds from the sale of
   25    his home to First Western Trust Bank to invest?
59: 1            A.   Because we managed money in a very
    2    conservative way and that is specifically what Aaron
    3    wanted because from day one, he said, I want this
    4    money to be safe for Barbara's well-being in the event
    5    that I am no longer here, to manage it as he had been
    6    managing money his entire career.
```

**Pg: 59 Ln: 14 - 20**

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

**Annotation:**

```
59:14   Q.   Okay.  Did Mr. Sawyer get into any
    15   specifics about how the money would be invested?
    16        A.   I'm sure he did.
    17        Q.   Do you recall what he said?
    18        A.   He said it would be a balanced portfolio
    19   that did not have a lot of volatility associated with
    20   it.
```

**Pg: 59 Ln: 24 - Pg: 60 Ln: 13**

**Annotation:**

```
59:24   Q.   Okay.  Did he go into detail about what
    25   that conservative investing model was other than it
60: 1   would be a balanced portfolio without a lot of
     2   volatility?
     3        A.   I'm sure he put up a chart that had a
     4   asset allocation mix that was similar to what would be
     5   implemented in the Fleck portfolio.
     6        Q.   Okay.  Did Mr. Sawyer explain who would
     7   be investing, who would be in charge of making the
     8   actual investment decisions in Mr. Fleck's account?
     9        A.   Yes.  Like I stated earlier, he would
    10   have explained that the investment policy committee
    11   sets the policy for the whole firm, and then it comes
    12   down to the portfolio managers on the local level who
    13   implement that strategy.
```

**Pg: 60 Ln: 24 - Pg: 61 Ln: 4**

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

**Annotation:**

```
60:24   Q.   Okay.  Did he tell Mr. Fleck that --
   25   Mr. Barker who was apparently at the meeting would be
61: 1   the person making investment decisions in his account?
    2        A.   Well, overseeing the account.  Not
    3   making investment decisions.  Portfolio managers don't
    4   make investment decisions.
```

**Pg: 61 Ln: 5 - 7**

**Annotation:**

```
61: 5   Q.   Can you elaborate on that a little more?
    6        A.   They follow the guidance of the
    7   investment policy committee.
```

**Pg: 61 Ln: 13 - 22**

**Annotation:**

```
61:13   Q.   So wouldn't the portfolio manager be the
   14   person who would decide I'm going to buy this equity,
   15   I'm going to buy this equity, I'm not going to buy
   16   this equity, I'm going to sell this equity?
   17        A.   Well, they were all funds within the
   18   portfolio.  No individual stocks.  And as long as --
   19   sometimes the portfolio managers might have had
   20   choices within the certain buckets of the asset
   21   allocation model, but for the most part, they were
   22   just following the guidelines set by the IDC.
```

**Pg: 62 Ln: 4 - 12**

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

**Annotation:**

```
62:  4    Q.  Okay.  We'll get to what each person
      5    said, but what do you recall John Sawyer saying about
      6    the portfolio manager not having any discretion and
      7    not making investment decisions?
      8         A.  What do I recall about that?
      9         Q.  Yeah.
     10         A.  Just, you know, overall description of
     11    what I just said.  I don't think he would have
     12    elaborated too much more than that.
```

**Pg: 62 Ln: 13 - 15**

**Annotation:**

```
62:13    Q.  Okay.  Do you remember anything else
   14    John Sawyer said?
   15         A.  No.
```

**Pg: 62 Ln: 16 - Pg: 63 Ln: 3**

**Annotation:**

```
62:16    Q.  Okay.  Let's talk about you.  You --
   17    this is your -- your contact, you're being paid
   18    commission for this.  What did you tell Mr. Fleck and
   19    his daughter and his daughter's husband at this
   20    meeting about why he should entrust the proceeds from
   21    the sale of his home to First Western Trust Bank?
   22         A.  I probably said something along the
   23    lines of, you know, we have five billion, probably,
   24    under management at the time.  We have an excellent
   25    track record.  Doug will be your portfolio manager
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
63: 1    remotely, but that Travis and I would be your local
    2    contacts here in Aspen, your primary go-tos, if you
    3    have questions or need help.
```

**Pg: 63 Ln: 4 - 9**

**Annotation:**

```
63: 4    Q.   Did you tell Aaron Fleck and his
    5    daughter and his daughter's husband that you and
    6    Travis wouldn't have anything to do with making
    7    investment decisions?
    8         A.   I can't recall specifically saying that,
    9    but I would think that it was understood.
```

**Pg: 63 Ln: 25 - Pg: 64 Ln: 7**

**Annotation:**

```
63:25    Q.   Okay.  Tell me exactly what you told
64: 1    Mr. Fleck.
    2         A.   That -- that we were simply local, you
    3    know, contacts and that Travis, you know, was an
    4    assistant portfolio manager, he did not have the --
    5    you know, the ability, the credit to -- to make any
    6    changes in the account, that Doug was the primary
    7    portfolio manager and responsible for the management.
```

**Pg: 64 Ln: 8 - 11**

**Annotation:**

```
64: 8    Q.   And did you tell Mr. Fleck and his
    9    daughter that you didn't have any authority to make
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
    10    any changes or investment decisions in the account?
    11             A.   I can't recall.
```

**Pg: 64 Ln: 12 - 24**

**Annotation:**

```
 64:12   Q.   Okay.  Did you tell Mr. Fleck and his
    13   daughter that you and Mr. Van Domelen would have
    14   nothing to do with supervising or oversight of the
    15   investments that were made in his account by the
    16   Denver Tech office?
    17            A.   Supervising the account?
    18            Q.   Supervising or oversight of the
    19   investments made in his account by the Denver Tech
    20   office, that you and Mr. Van Domelen would have
    21   nothing to do with that.  Did you tell him that?
    22            A.   I can't recall if we put it in those
    23   terms.  I would have said Travis and I will be
    24   following the account for you.
```

**Pg: 64 Ln: 25 - Pg: 65 Ln: 5**

**Annotation:**

```
 64:25   Q.   Right.  But you had -- that's different
 65: 1   than telling him we're not going to make any
     2   investments, we don't have the authority to do that?
     3            A.   Yes.  Yes.  I communicated that Travis
     4   and I did not have the authority to make investment
     5   decisions on the account.
```

**Pg: 65 Ln: 6 - 12**

# EXHIBIT A

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

**Annotation:**

```
65: 6    Q.   You also communicated that you and
    7    Travis would have no ability to supervise or oversee
    8    what the Denver Tech Center office was doing?
    9         A.   Yes.
   10         Q.   Okay.  Tell me what you told him.
   11         A.   That we were not the ones responsible
   12    for managing the account.
```

**Pg: 65 Ln: 13 - 16**

**Annotation:**

```
65:13   Q.   Okay.  And that nobody in the Aspen
   14   office was responsible for that account, that would be
   15   done by the Denver Tech office, did you tell him that?
   16        A.   Yes.  Yes.
```

**Pg: 66 Ln: 8 - 13**

**Annotation:**

```
66: 8   Q.   What did he say?
    9        A.   He said we manage money through the use
   10   of mutual funds.
   11        Q.   Anything else?
   12        A.   I can't recall specifically anything
   13   else he said.
```

**Pg: 66 Ln: 20 - 25**

**Annotation:**

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
66:20    Q.   Did he say he had no discretion to buy
   21    equities or individual securities in the portfolio?
   22         A.   Yes.
   23         Q.   Did he say he had no discretion to make
   24    investment decisions in the portfolio?
   25         A.   Yes.
```

**Pg: 67 Ln: 1 - 8**

**Annotation:**

```
67: 1    Q.   Did he say that his job was just to
    2    follow the investment policy committee guidelines?
    3         A.   Yes.
    4         Q.   Did he give Mr. Fleck a -- did he
    5    describe the investment committee policy -- committee
    6    guidelines that would be applicable to Mr. Fleck's
    7    account?
    8         A.   Yes.
```

**Pg: 67 Ln: 23 - Pg: 68 Ln: 8**

**Annotation:**

```
67:23    Q.   Okay.  Aside from the conservative
   24    investment model, did Mr. Barker talk to Mr. Fleck at
   25    all about investment strategy?
68: 1         A.   You know, I recall there being
    2    discussion that this was so unlike what Aaron was used
    3    to because he was used to very concentrated positions
    4    in individual securities, that this was a departure
    5    from his comfort zone and he was well aware of that
    6    departure, and he said I'm not going to try to
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
 7    micromanage you guys.  I'm going to let you do your
 8    thing.  And this is the best for Barbara.
```

**Pg: 69 Ln: 1 - 18**

**Annotation:**

```
69: 1    A.    We discussed rough, yeah, parameters
     2    about what the potential returns could be in a
     3    historically conservative portfolio like that.
     4         Q.    And what percentage return was discussed
     5    with Mr. Fleck at this meeting?
     6         A.    Something in the 5 percent range per
     7    year.
     8         Q.    Okay.  And who made that representation?
     9         A.    That would have either been John or
    10    Doug.
    11         Q.    Not you?
    12         A.    I could have on occasion as well.
    13         Q.    Okay.  So that could have been part of
    14    your input at this meeting too, is, you know, we
    15    can -- you know, historically we've generated 5
    16    percent and we would anticipate that level of
    17    performance, something like that?
    18         A.    Yeah.  Yes.
```

**Pg: 70 Ln: 25 - Pg: 71 Ln: 14**

**Annotation:**

```
70:25    Q.    Sure.  Were other promotional -- written
71: 1    promotional materials given to Mr. Fleck at the
     2    February 9, 2018 meeting other than the chart showing
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
 3   the distribution in the conservative investment model
 4   that you referenced before that Mr. Sawyer used?
 5        A.   I think he would have been given a copy
 6   of the PowerPoint that we used during that meeting.
 7        Q.   Okay.  And tell us what the PowerPoint
 8   consisted of.
 9        A.   Oh, it would have been, you know,
10   description of -- of the investment process that we
11   discussed and then, you know, it would have had an
12   actual layout of the funds within the portfolio, the
13   conservative portfolio and then it would have had a
14   fee structure attached to it as well.
```

**Pg: 72 Ln: 16 - Pg: 73 Ln: 12**

**Annotation:**

```
72:16   Q.   Okay.  Did Mr. Barker ever conduct a
   17   quarterly meeting with Aaron and/or Barbara Fleck
   18   between May of 2018 and November of 2018?
   19        A.   So the end of the second quarter, you
   20   know, we basically had money for a month and so I
   21   think that's why a second quarter meeting was not
   22   necessary.
   23        Q.   The second quarter ended in May of 2018?
   24        A.   End of June.
   25        Q.   Okay.  If you look at the interrogatory
73: 1   responses again, on page 10, you see the next meeting
    2   identified is November 6?
    3        A.   Right.  That was the third quarter
    4   meeting.
    5        Q.   Well, I'm not understanding.  If the
```

**EXHIBIT A**

*Fleck v. First Western Trust Bank*
**March 7, 2022, Deposition of Andrew Godfrey**

```
 6    second quarter ended in June --
 7         A.   Yeah.
 8         Q.   -- wouldn't the third quarter meeting be
 9    held in September or maybe early October?
10         A.   I -- well, September is the end of the
11    third quarter, so the meetings were usually about a
12    month after the end of each quarter.
```