# EXHIBIT C

**Fleck v. First Western Trust Bank**
**March 3, 2022, Deposition of Charles Bantis**

**Pg: 25 Ln: 23 - Pg: 26 Ln: 9**

**Annotation:**

25:23   What were his responsibilities as a

24   portfolio manager?

25           A.   To the extent -- to the short time he

26: 1   was in it, it would have been to help -- one, help

2   bring in asset management business and then manage it,

3   but I don't think he was in that position more than a

4   couple months if I -- if I remember the time

5   correctly.

6           Q.   Okay.  Then after -- okay.  After

7   portfolio manager, what was his job title?

8           A.   We called it wealth advisor.

9   Responsibility was business development.

**Pg: 26 Ln: 21 - Pg: 27 Ln: 12**

**Annotation:**

26:21   D-o-m-e-l-e-n, Van Domelen?

22           A.   That sounds right, yes.  That sounds

23   right.

24           Q.   And that was late 2016 or early 2017,

25   you believe, but you're not --

27: 1           A.   I believe so.  Yeah.

2           Q.   What was he hired to do?

3           A.   He was originally hired to -- his

4   original title was investment associate, I think, and

5   he was hired to provide day-to-day assistance to the

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

```
 6    investment clients we had at that time, and also to

 7    help provide backup to our private banker when she was

 8    unavailable.

 9        Q.   Okay.  So investment associate to

10    provide day-to-day assistance to investment accounts

11    and to assist the private banker?

12        A.   Yes.  That pretty well sums it up.
```

**Pg: 32 Ln: 16 - 25**

**Annotation:**

```
32:16    Q.   Okay.  How about in 2018, was Mr. Barker

17    still making the investment decisions for fiduciary

18    accounts in the Aspen office?

19        A.   I believe so.

20        Q.   Okay.  Did you have anything to do with

21    the investment decisions?

22        A.   No.

23        Q.   Okay.  Did Mr. Godfrey have anything to

24    do with the investment decisions?

25        A.   Not to my knowledge.
```

**Pg: 34 Ln: 25 - Pg: 35 Ln: 6**

**Annotation:**

```
34:25    Q.   Okay.  Did you discuss with -- was

35: 1    Mr. Barker the primary person making investment

 2    decisions in the Fleck accounts?

 3             MR. STERN:  Objection, foundation.

 4        Q.   (BY MR. PODOLL) If you know.
```

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

> 5          A.   As the portfolio manager, that was, I
>
> 6   believe, his responsibility.

**Pg: 35 Ln: 7 - 12**

Annotation:

35: 7     Q.   Do you know if Mr. Barker was making

8   investment decisions hands-on or if others were making

9   investment decisions for him?

10          A.   I don't.

11          Q.   Did you ever inquire?

12          A.   Not to my recollection.

**Pg: 35 Ln: 13 - 17**

Annotation:

35:13    Q.   Okay.  Who in the Aspen office of First

14   Western Trust Bank was involved in making investment

15   decisions in regard to the assets of Aaron and Barbara

16   Fleck?

17          A.   No one in this office.

**Pg: 35 Ln: 18 - 23**

Annotation:

35:18   Q.   Okay.  Do you have an understanding of

19   Mr. Barker's credentials to invest money in a

20   fiduciary capacity?

21          A.   I don't recollect his -- I don't

22   recollect his credentials if he had any initials

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

        23   behind his name.


**Pg: 36 Ln: 9 - Pg: 37 Ln: 6**


**Annotation:**

36: 9   Q.   Okay.  By "this" you mean actually being

    10   a person who decides what -- how the assets in a

    11   fiduciary account should be invested?

    12          A.   Being a portfolio manager.

    13          Q.   Okay.  Did you ever in his quarterly

    14   visits or any of your conversations with Mr. Barker

    15   discuss with him his investment philosophy or how he

    16   was investing accounts in fiduciary -- how he was

    17   investing money into fiduciary accounts entrusted to

    18   the Aspen office?

    19          A.   No.  Not to my recollection.

    20          Q.   So you just left it to Mr. Barker and

    21   assumed he would do everything okay?

    22          A.   No.

    23          Q.   Okay.  What did you do to satisfy

    24   yourself that the monies being invested in fiduciary

    25   accounts entrusted to the Aspen office were being

37: 1   properly invested or appropriately invested by the

    2   portfolio manager?

    3          A.   First Western Trust has a system set up

    4   so that the portfolio managers have a limited range of

    5   options and they're also governed by -- governed by,

    6   among other things, the IPS.


**Pg: 37 Ln: 20 - 23**

# EXHIBIT C

**Fleck v. First Western Trust Bank**
**March 3, 2022, Deposition of Charles Bantis**

**Annotation:**

```
37:20    Q.   How many times have you discussed with

   21    Mr. Barker how he approached investments and how he

   22    met client's needs, how many separate occasions?

   23         A.   I don't recall.
```

**Pg: 37 Ln: 24 - Pg: 38 Ln: 3**

**Annotation:**

```
37:24    Q.   Okay.  Do you recall prior to May of

   25    2019 ever discussing with Mr. Barker how he approached

38: 1    investing money in fiduciary accounts and how the

    2    systems worked?

    3         A.   Again, no recollection.
```

**Pg: 38 Ln: 20 - Pg: 39 Ln: 13**

**Annotation:**

```
38:20    Q.   Okay.  How does the system work?

   21         A.   Understanding that this is not an area

   22    of expertise for me, this is what I'm going to tell

   23    you is my observation after some years with the

   24    company.  Going from the top down, it starts with the

   25    investment policy committee, which sets overall

39: 1    parameters, I believe, for how we invest client's

    2    funds, considers all sorts of macro and micro economic

    3    indicators.  There is adjusted weightings within

    4    portfolio models.  Then there's a small group that

    5    monitors all of the funds that we keep on our platform
```

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

> 6    to invest client funds in.  Then the portfolio
> 7    managers working with clients determine which -- you
> 8    know, risk tolerance level, what the needs for the
> 9    funds are and then working within the system as
> 10   designed, create a portfolio out of the funds
> 11   available and within the tolerances for the level of
> 12   risk that the investment policy committee has set and
> 13   then those accounts are reviewed periodically.

**Pg: 39 Ln: 19 - 24**

**Annotation:**

39:19   Q.   Let me break it down.  I'm sorry.  The
     20   investment policy committee doesn't decide how assets
     21   in fiduciary accounts are specifically invested?  In
     22   other words, what securities to buy, what funds to
     23   buy, they just set policy; is that right?
     24          A.   To my understanding.

**Pg: 39 Ln: 25 - Pg: 40 Ln: 4**

**Annotation:**

39:25   Q.   All right.  And the group that monitors
40: 1   the funds doesn't decide on specific funds that were
     2   purchased in the fiduciary accounts; is that correct?
     3   They just monitor the funds; is that right?
     4          A.   Again, to my understanding.

**Pg: 40 Ln: 5 - 10**

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

**Annotation:**

40: 5    Q.   And the portfolio manager is the one who

6    makes the specific investment decisions, what

7    securities to buy, what funds to buy, what ETFs to

8    buy, how to invest the assets within the account; is

9    that correct?

10          A.   Again, that's my understanding, yes.


**Pg: 40 Ln: 11 - 20**


**Annotation:**

40:11    Q.   Okay.  And the investments are

12    periodically reviewed by someone; is that correct?

13          A.   Yes.  Yes.

14          Q.   How frequently are investments in

15    fiduciary accounts reviewed to your knowledge?

16          A.   With the client, at least quarterly.

17    Internally, I believe there is a review and I'm not

18    quite sure of the time frame of all accounts, and

19    those that are outside of the recommended parameters

20    are tagged for discussion.


**Pg: 40 Ln: 21 - Pg: 41 Ln: 11**


**Annotation:**

40:21    Q.   Okay.  I'm sorry, what is tagged for

22    discussion?

23          A.   They're flagged for discussion if

24    there's more equity or, you know, more fixed income

25    than is set -- that is -- if either of those, for

# EXHIBIT C

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

41: 1    example, were outside the parameters of what the

2    investment policy committee calls for or if

3    performance might have been outside of parameters,

4    they're flagged and they're reviewed.

5              Q.   Flagged by who?

6              A.   Someone.  I don't know who.

7              Q.   Reviewed by who?

8              A.   I believe the investment policy

9    committee, but I could be wrong.

10              Q.   Okay.  How frequently?

11              A.   I don't know.  Periodically.

**Pg: 42 Ln: 1 - 9**

**Annotation:**

42: 1    Q.   Do you know if Mr. Barker ever met with

2    Aaron and Barbara Fleck to review his investment

3    decisions or how he was investing the assets in their

4    trust accounts?

5              A.   Yes, he did.

6              Q.   When?

7              A.   I believe one meeting was November 6, if

8    I recall, 2018.  There were probably others that I was

9    not involved in.

**Pg: 43 Ln: 6 - 21**

**Annotation:**

43: 6    To your knowledge, did Mr. Barker ever meet

7    with Aaron or Barbara Fleck?

# EXHIBIT C

***Fleck v. First Western Trust Bank***
**March 3, 2022, Deposition of Charles Bantis**

        8           A.   Yes, he did.

        9           Q.   Okay.  When was that, prior to November

    10   6 of 2018?

    11           A.   Possibly, I don't recall a specific date

    12   prior to then.

    13           Q.   When and where?

    14           A.   I don't know.

    15           Q.   Where, Aspen, did he ever --

    16           A.   Likely in our office.

    17           Q.   But you don't have a specific

    18   recollection of it, you're just thinking it's

    19   something that may have happened?

    20           A.   I didn't attend all those meetings.  He

    21   may well have.


**Pg: 44 Ln: 4 - 9**


**Annotation:**

    44: 4     Q.   And is it fair to say that you can't

        5   tell me a specific time that Mr. Barker ever met with

        6   Aaron or Barbara Fleck to discuss specific investments

        7   he was making in their accounts, is that accurate?

        8           A.   Outside of the November 6 meeting, which

        9   I attended, I can't name a specific time, no.


**Pg: 44 Ln: 20 - Pg: 45 Ln: 4**


**Annotation:**

    44:20   Q.   (BY MR. PODOLL) Okay.  Mr. Bantis, in

        21   2018, how many fiduciary accounts were being

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

```
 22    administered by First Western Trust Bank in the Denver

 23    office?

 24             MR. STERN:  Objection, foundation.

 25         A.  I don't know.

45: 1          Q.  (BY MR. PODOLL) Okay.  Do you know the

  2    asset -- the value of the assets under administration

  3    in the First Western Trust Bank Denver office?

  4         A.  No.
```

**Pg: 45 Ln: 8 - 11**


**Annotation:**

```
45: 8    Do you know if investment decisions were

  9    made in the Fleck accounts by anyone other than Doug

 10    Barker in the Denver office?

 11         A.  No.
```

**Pg: 45 Ln: 12 - 18**


**Annotation:**

```
45:12    Q.  Okay.  And from your prior testimony, is

 13    my understanding correct that as the market president

 14    in the Aspen office, you relied upon the Denver office

 15    to make investment decisions in regard to fiduciary

 16    accounts and assets under administration and those

 17    fiduciary accounts?

 18             A.  Yes.
```

**Pg: 45 Ln: 22 - Pg: 46 Ln: 15**

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
*March 3, 2022, Deposition of Charles Bantis*

**Annotation:**

45:22   Q.   Did you work with anyone other than

23   Mr. Barker?

24            A.   With regard to the Flecks or in general?

25            Q.   With regard to investing assets in

46: 1   fiduciary accounts.

2            A.   As I said at the time, earlier I said we

3   worked with the group out in Los Angeles for specific

4   accounts that needed their expertise.  Occasionally

5   John Sawyer would become involved for a larger

6   prospect.  That's about what I can recall.

7            Q.   Okay.  Did the bond group in Los Angeles

8   make individual investment decisions for assets held

9   in fiduciary accounts in the Aspen office or was it

10   just sort of an overview process of reviewing the

11   quality of bonds?

12            A.   They -- no, they managed a bond

13   portfolio for a specific or two specific clients.

14            Q.   Okay.  Was Mr. Fleck one of them?

15            A.   Not to my knowledge.

**Pg: 46 Ln: 16 - 19**

**Annotation:**

46:16   Q.   Okay.  And John Sawyer, who is John

17   Sawyer?

18            A.   John Sawyer is our chief investment

19   officer.

**Pg: 46 Ln: 24 - Pg: 47 Ln: 2**

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
March 3, 2022, Deposition of Charles Bantis

**Annotation:**

46:24    Q.   And do you know if he ever had anything

    25   to do with making specific investment decisions in the

47: 1   Flecks' accounts?

    2           A.   I do not know.


**Pg: 47 Ln: 3 - 8**


**Annotation:**

47: 3   Q.   Okay.  So is it fair to say that as far

    4   as providing trust and fiduciary services, the Aspen

    5   office of First Western Trust Bank delegated that

    6   function to the Denver office of First Western Trust

    7   Bank?

    8           A.   Yes.


**Pg: 48 Ln: 2 - 9**


**Annotation:**

48: 2   Q.   Right.  So we know that the Flecks'

    3   accounts were fiduciary accounts, correct?

    4           A.   Right.

    5           Q.   And First Western Trust Bank was

    6   entrusted with the responsibility of making

    7   investments with the assets in those accounts,

    8   correct?

    9           A.   Correct.


**Pg: 48 Ln: 21 - Pg: 49 Ln: 3**

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

**Annotation:**

```
48:21   Q.   Do you know the dollar -- the asset

   22   value of the fiduciary accounts that First Western

   23   Trust Bank manages in its Denver office in 2018?

   24           A.   I -- I do not know.

   25           Q.   Did you ever discuss that with

49: 1   Mr. Barker?

    2           A.   I have no recollection of that.   No

    3   idea.
```

**Pg: 49 Ln: 14 - 24**

**Annotation:**

```
49:14   Q.   What knowledge do you have of how

   15   Mr. Barker's investment activities were supervised?

   16           A.   The knowledge I have is what I had said

   17   before.   There was a system by which the -- by which

   18   the portfolio managers had to operate within.

   19           Q.   Did Mr. Barker report to you in any

   20   capacity?

   21           A.   No.

   22           Q.   Do you know who he directly reported to?

   23           A.   No, I don't -- no, I don't know who he

   24   directly reported to.
```

**Pg: 50 Ln: 22 - Pg: 51 Ln: 4**

**Annotation:**

```
50:22   Q.   Okay.   But aside from the system, you
```

# EXHIBIT C

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

```
23    don't know if individuals, live people, actually had

24    any oversight or supervision over what Mr. Barker was

25    buying and selling on a daily basis?

51: 1                MR. STERN:  Objection to the form of the

2     question.

3                Q.   (BY MR. PODOLL) You can answer.

4                A.   I do not.
```

**Pg: 51 Ln: 5 - 9**

**Annotation:**

```
51: 5   Q.   And do you recall -- do you know if

6     there was any person who regularly supervised what

7     Mr. Barker was buying or selling in the Fleck

8     accounts?

9                A.   I don't know.
```

**Pg: 51 Ln: 10 - 19**

**Annotation:**

```
51:10   Q.   Some of the materials I've reviewed,

11    promotional materials, indicated that First Western

12    Trust Bank had a team approach -- a team approach to

13    investment, are you aware of that?

14                A.   Yes.

15                Q.   What was the team approach?

16                A.   Team approach is that the portfolio

17    manager does not work in a vacuum.  The system, as I

18    described it, is there for them to -- to support them

19    and help make good decisions.
```

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
March 3, 2022, Deposition of Charles Bantis

**Pg: 51 Ln: 20 - 24**

**Annotation:**

```
51:20    Q.   So your understanding of the team
    21    approach is that the portfolio manager can rely on
    22    systems that are in place, is that a fair
    23    characterization?
    24             A.   Yes.
```

**Pg: 52 Ln: 23 - Pg: 53 Ln: 4**

**Annotation:**

```
52:23    Q.   Sure.  To your understanding, is the
    24    portfolio manager, Mr. Barker, in the case of the
    25    Flecks, responsible for creating an investment
53: 1    strategy for the assets in the Flecks' fiduciary
     2    accounts?
     3             A.   My understanding is that that is -- that
     4    is done on a joint basis with the clients.
```

**Pg: 53 Ln: 10 - 13**

**Annotation:**

```
53:10    Q.   Are you aware of any specific phone call
    11    or meeting between Mr. Barker and the Flecks for the
    12    purpose of forming an investment strategy?
    13             A.   I don't recall any specific meetings.
```

**Pg: 53 Ln: 20 - 24**

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

**Annotation:**

```
53:20   Q.   How about registered investment

    21   advisors; to your knowledge, are there any registered

    22   investment advisors in the Denver office?

    23         A.   To my knowledge, no.  As a bank, we

    24   don't do RIA.  We're separate.
```

**Pg: 53 Ln: 25 - Pg: 54 Ln: 4**

**Annotation:**

```
53:25   Q.   Okay.  Are you aware of any written

54: 1   policies in regard to investing monies or assets in

    2   fiduciary accounts that First Western Trust Bank has?

    3         A.   Specifically, no.  I know we have

    4   policies.
```

**Pg: 54 Ln: 11 - 14**

**Annotation:**

```
54:11   Q.   Have you ever seen a written policy

    12   statement in regard to investing assets in a fiduciary

    13   account?

    14         A.   Not to my recollection.
```

**Pg: 54 Ln: 21 - Pg: 55 Ln: 5**

**Annotation:**

```
54:21   Q.   Okay.  To your understanding, does a

    22   regulatory requirement of know your client apply to
```

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

    23   the individual who is tasked with the responsibility

    24   of investing the client's money?

    25             MR. STERN:  Objection, foundation.

55: 1             Q.  (BY MR. PODOLL) You can answer.

     2             A.  I believe the responsibility for that

     3   lies elsewhere.

     4             Q.  Okay.  Where does it lie?

     5             A.  Typically at the office level.


**Pg: 55 Ln: 8 - Pg: 56 Ln: 2**


**Annotation:**

55: 8   Q.  So let me see if I understand your

     9   testimony.  The regulatory requirement of know your

    10   client means, to you, that the Aspen office has to

    11   know its client, but if the Aspen office delegates the

    12   function of investing client's money to the Denver

    13   office, the people investing the client's money in the

    14   Denver office do not have to know your client, is that

    15   what you're saying?

    16             A.   In the regulatory sense, that only has

    17   to be done once at the institutional level, and there

    18   are certain documents and parameters around meeting

    19   the regulatory requirements.  Once it's been done, it

    20   does not need to be done again.

    21             Q.   Okay.  So if I'm understanding you

    22   correctly, once the paperwork is filled out, as you --

    23   is what you testified to as a regulatory requirement,

    24   it wouldn't be necessary for the person who is

    25   actually doing the investment 100 miles away to know

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

```
56: 1   your client?

     2            A.   From a regulatory perspective, no.
```

**Pg: 56 Ln: 20 - 24**

**Annotation:**

```
56:20   Q.   (BY MR. PODOLL) Is it your understanding

   21   that no meeting took place between Mr. Barker and

   22   Aaron Fleck between February of 2018 and November 6 of

   23   2018?

   24            A.   I don't know.
```

**Pg: 56 Ln: 25 - Pg: 57 Ln: 6**

**Annotation:**

```
56:25   Q.   Okay.  Could you tell me your

57: 1   understanding of how Mr. Barker knows your client in

   2   regard to Aaron Fleck?

   3            A.   Clearly from the fact they had a meeting

   4   in February, he had been introduced.

   5            Q.   Okay.  Anything else?

   6            A.   No.
```

**Pg: 57 Ln: 23 - Pg: 58 Ln: 1**

**Annotation:**

```
57:23   Q.   Okay.  Other than what's published under

   24   intranet page, are there other written policies or

   25   guidelines in regard to know your client?

58: 1            A.   None that I'm aware of.
```

**EXHIBIT C**

***Fleck v. First Western Trust Bank***
**March 3, 2022, Deposition of Charles Bantis**

**Pg: 59 Ln: 25 - Pg: 60 Ln: 10**

**Annotation:**

59:25    Now, besides those two meetings, okay,

60: 1    and Mr. Fleck dropping in, and telephone calls with

    2    Mr. Fleck, was there any time between May of 2018 and

    3    November of 2018 where you or anyone else sat down

    4    with Mr. Fleck to review his investments in his

    5    accounts, investment strategy, the performance of his

    6    accounts?

    7            MR. STERN:  Objection, foundation.

    8        Q.   (BY MR. PODOLL)  You can answer.

    9        A.   I did not and I don't know that anyone

    10    else did or did not.

**Pg: 67 Ln: 3 - 8**

**Annotation:**

67: 3    Q.   Did you take any steps whatsoever in

    4    2018 to assure the money in Aaron and Barbara Fleck's

    5    trust account was being appropriately invested

    6    consistent with their needs and fiduciary standards?

    7        A.   No, and it was not my responsibility to

    8    do so.

**Pg: 67 Ln: 12 - 19**

**Annotation:**

67:12    Q.   So Mr. Barker was the portfolio manager.

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

> 13   It would have been his -- to your understanding, would
>
> 14   it have been his responsibility to assure that the
>
> 15   money in Aaron and Barbara Fleck's trust account was
>
> 16   being appropriately invested consistent with their
>
> 17   needs and fiduciary standards?
>
> 18          A.   His responsibility was to be sure the
>
> 19   money was invested according to the IPS.

**Pg: 67 Ln: 20 - Pg: 68 Ln: 2**

**Annotation:**

67:20   Q.   And fiduciary standards; is that

   21   correct?

   22          A.   And fiduciary standards, yes.

   23          Q.   Okay.   Was there anyone else responsible

   24   for assuring that the Flecks' assets were being

   25   appropriately invested consistent with their needs and

68: 1   fiduciary standards?

    2          A.   I can't name anyone specific.

**Pg: 69 Ln: 19 - 23**

**Annotation:**

69:19   Q.   Can you tell me your understanding,

   20   Mr. Bantis, of what it means to be a fiduciary?

   21          A.   Being a fiduciary means placing the

   22   client's interest first with -- unless -- unless it

   23   potentially could be detrimental to the institutions.

**Pg: 69 Ln: 24 - Pg: 70 Ln: 9**

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
March 3, 2022, Deposition of Charles Bantis

**Annotation:**

69:24   Q.   Okay.   Let me break that down.   The

25   first thing you said is a fiduciary -- in a fiduciary

70: 1   relationship, you have to put the client's interest

2   first; is that correct?

3          A.   Yes.

4          Q.   Okay.   Are you telling me an exception

5   to that is if putting the client's interest first

6   would be somehow detrimental to the institution?

7          A.   I think in that case, we would probably

8   no longer have -- we would ask the client to leave if

9   that ever became the case.

**Pg: 70 Ln: 10 - 16**

**Annotation:**

70:10   Q.   Okay.   Would you agree with me that as

11   long as you manage in a fiduciary capacity, being a

12   fiduciary means you put the client's interest first

13   period, whether it's detrimental to the institution or

14   not?

15          A.   That's contradictory, I would not agree

16   with that statement.

**Pg: 70 Ln: 25 - Pg: 71 Ln: 13**

**Annotation:**

70:25   Q.   Sure.   So it wasn't an answer at all.

71: 1          To your understanding, would it be a --

# EXHIBIT C

**Fleck v. First Western Trust Bank**
**March 3, 2022, Deposition of Charles Bantis**

```
 2   would it be proper when serving in a fiduciary role to

 3   not put a client's interest first if putting the

 4   client's interest first would be detrimental to the

 5   institution?

 6        A.   As I said just a moment ago, I think in

 7   a situation like that, we would ask the client to

 8   leave if we felt that -- this is how it's been

 9   explained to me -- well, how I interpret what you're

10   saying is if something that was in the client's

11   interest was detrimental to us as an institution, we

12   wouldn't do it, but we would ask the client to go

13   elsewhere.
```

**Pg: 71 Ln: 14 - 19**


**Annotation:**

```
71:14  Q.   Okay.  But in that time period when

15   we're not doing it and a client hasn't gone elsewhere,

16   isn't it fair that you still have to act -- put the

17   client's interest first even if it is detrimental to

18   the institution?

19        A.   I don't know the answer to that.
```

**Pg: 73 Ln: 9 - 16**


**Annotation:**

```
73: 9  Q.   Tell me your understanding of the

10   primary fiduciary duties.

11             MR. STERN:  Objection, foundation.

12        Q.   (BY MR. PODOLL)  If you have one.  If
```

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

```
13   you don't, you can so state.

14          A.   Like I said before, that we try -- we

15   try to place the client's interests first and serve

16   the client's needs.
```

**Pg: 74 Ln: 16 - 23**

**Annotation:**

```
74:16   Q.   (BY MR. PODOLL)  Put the interest of the

17   client first; is that right?

18          A.   Well, the total extent of what I said

19   before.

20          Q.   What does that mean?

21          A.   It means put the client's interest first

22   unless it might be, in some way, detrimental to the

23   institution.
```

**Pg: 75 Ln: 15 - 25**

**Annotation:**

```
75:15   Q.   So based on that answer, is it your

16   testimony that because you are an officer of the bank,

17   even in a role of a fiduciary, you cannot have

18   undivided loyalty to the client?

19          MR. STERN:  Objection to the form of the

20   question.

21          A.   I don't know.  What we're doing depends

22   on what we're doing with that client.

23          Q.   (BY MR. PODOLL)  Excuse me?

24          A.   I think it would depend upon what
```

**EXHIBIT C**

*Fleck v. First Western Trust Bank*
**March 3, 2022, Deposition of Charles Bantis**

    25   business we are working with that client on.