IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01073-CMA-CPG
_____

VIDEOTAPED REMOTEDEPO™ DEPOSITION OF:
CHARLES BANTIS - March 3, 2022
_____

THE AARON H. FLECK REVOCABLE TRUST, through its
Trustees, Aaron H. Fleck and Barbara G. Fleck,

THE BARBARA G. FLECK REVOCABLE TRUST, through its
Trustees, Aaron H. Fleck and Barbara G. Fleck,

AARON H. FLECK and BARBARA G. FLECK, on behalf of
themselves and all others similarly situated,

Plaintiffs,

v.

FIRST WESTERN TRUST BANK,

CHARLES BANTIS and

ANDREW GODFREY,

Defendants.
_____

PURSUANT TO NOTICE, the Videotaped
RemoteDepo™ deposition of CHARLES BANTIS was taken on
behalf of the Plaintiffs by remote means, on March 3,
2022 at 9:30 a.m., before Tracy R. Stonehocker,
Certified Realtime Reporter, Registered Professional
Reporter and Notary Public within Colorado, appearing
remotely from Jefferson County, Colorado.

Ex. 14

Page 154
1  Aaron.
2      Q.   Okay.  Do you recall Mr. Fleck saying --
3  that he expressed the opinion the guys in Denver were
4  not too sharp?
5      A.   I -- I do recall.
6      Q.   Did you respond to that one way or
7  another?
8      A.   I probably did, but I do not recall my
9  exact response.
10     Q.   Do you have any basis -- do you have any
11 basis for forming an opinion one way or the other as
12 to whether the guys, particularly Doug Barker, who was
13 pushing the buttons and investing Aaron's money, was
14 sharp or not sharp?
15     A.   My opinion that they know what they're
16 doing and they're very competent.
17     Q.   Okay.  And upon what is that opinion
18 based?
19     A.   Well, that was over six years of working
20 with a lot of the same people.  At the time it had
21 been three-ish years, and, you know, in getting to
22 know them and seeing how they worked.  Exposure.
23     Q.   In May of -- May of 2018, what did you
24 know about Doug Barker?
25     A.   Doug Barker had been with First Western

Page 155
1  for some time.  I don't recall exactly how long.  He
2  was managing a fair-size portfolio.  As I said before,
3  I don't recall size.  Appeared to be well regarded for
4  his abilities.
5      Q.   Was he managing any of the fiduciary
6  accounts from the Aspen office in May of 2018?
7      A.   In May of '18, he would have been for
8  the ones we had at that time.  I don't remember who
9  our clients were at that time.
10     Q.   In May of '18, there were less than 10
11 fiduciary accounts at First Western Trust Bank that
12 had been entrusted to managers; is that correct in
13 Aspen?
14     A.   I believe that number is correct, yeah.
15     Q.   You've told me that you don't do
16 investments.  The same is true of Mr. Godfrey, he
17 doesn't do investments either; is that correct?
18     A.   Correct.
19     Q.   Okay.  Let's take a short break and let
20 me check my notes.  I'm getting close to finish this
21 afternoon.
22          THE VIDEOGRAPHER:  Going off record.
23 The time is 10:04 p.m. UTC, 3:04 p.m. Mountain Time.
24          (Recess taken, 3:04 p.m. to 3:10 p.m.)
25          THE VIDEOGRAPHER:  Back on the record.

Page 156
1  The time is 10:10 p.m. UTC, 3:10 p.m. Mountain Time.
2          MR. PODOLL:  Okay.  I don't have any
3  further questions of Mr. Bantis today.  Thank you,
4  Mr. Bantis, for your time and cooperation.
5          MR. STERN:  Okay.  I have a few
6  follow-up questions for Mr. Bantis.
7          MR. PODOLL:  Okay.
8          THE DEPONENT:  I'm having real trouble
9  hearing.
10         MR. STERN:  Okay.  Can you hear me now?
11         THE DEPONENT:  Try again.
12         MR. STERN:  Can you hear me now?
13         THE DEPONENT:  Much better.  My speaker
14 got turned off.
15         MR. PODOLL:  That would explain it.
16         THE DEPONENT:  That will do it.
17              EXAMINATION
18 BY MR. STERN:
19     Q.   Mr. Bantis, I'm going to ask you a few
20 follow-up questions and I wanted to start by touching
21 on the area of fiduciary duties.  Mr. Podoll asked you
22 a number of questions in this area and I wanted to ask
23 you some questions that he chose not to ask you.  So,
24 forensic interviews, do you consider yourself an
25 expert in the area of fiduciary duties?

Page 157
1      A.   No.
2      Q.   Are you aware, though, that First
3  Western Trust Bank sometimes does serve clients in a
4  fiduciary capacity?
5      A.   Yes.
6      Q.   And one of those times is when it
7  manages investment accounts for clients, is that
8  correct?
9      A.   Yes.
10     Q.   Are you personally responsible for
11 managing investment accounts for clients?
12     A.   No.
13     Q.   Have you ever been personally
14 responsible for managing investment accounts for
15 clients?
16     A.   No.
17     Q.   Do you believe First Western Trust Bank
18 upheld its fiduciary duties to the Flecks?
19     A.   I do.
20         MR. PODOLL:  Objection, calls for
21 speculation this witness has testified he's not
22 qualified to give.
23     Q.   (BY MR. STERN)  To your knowledge, did
24 First Western Trust Bank always put the Flecks'
25 interest first?

**Page 158**

1  MR. PODOLL: Objection, foundation.
2  A. To my knowledge -- okay. To my
3  knowledge, yes.
4  Q. (BY MR. STERN) To your knowledge, was
5  there ever a conflict between the Flecks' interest and
6  First Western Trust Bank's interest?
7  MR. PODOLL: Objection, calls for a
8  legal conclusion and foundation.
9  A. To my knowledge, no.
10  Q. (BY MR. STERN) Can you repeat that? It
11  was a little choppy.
12  A. To my knowledge, there was no conflict.
13  Q. Okay. And you mentioned, when
14  Mr. Podoll was asking you questions, that you thought
15  the bank could not act for a client if acting for a
16  client is detrimental to the bank. Did I get that
17  correct?
18  MR. PODOLL: Object to the form.
19  A. Yes.
20  Q. (BY MR. STERN) Okay.
21  A. Yes.
22  Q. And if First Western Trust Bank believed
23  that the client's interests were detrimental to its
24  interest, what would it do?
25  MR. PODOLL: Objection, form,

**Page 159**

1  speculation.
2  A. As I said, if we could not work that out
3  with the client, then we probably would ask them to go
4  elsewhere.
5  Q. (BY MR. STERN) Okay. Did the situation
6  with -- okay. Let me start over. To your knowledge,
7  did this situation ever occur with the Flecks where
8  you believed that acting for the Flecks was
9  detrimental to the bank's interest?
10  A. No, not to my knowledge.
11  Q. Okay. Can you provide us an example of
12  a situation where a client's interest might be
13  detrimental to First Western Trust Bank's interest?
14  MR. PODOLL: Objection, form.
15  A. Sure.
16  Q. (BY MR. STERN) You can answer.
17  A. Sure. For example, if a client wanted
18  us to (inaudible) for example.
19  Q. Sorry. I didn't hear that. Can you
20  repeat it, please?
21  MR. PODOLL: I didn't hear it either.
22  A. Sorry. I'm looking at the camera and to
23  the phone. If a client -- for example, if a client
24  wanted us to supply records on their behalf that is
25  clearly not in our interest, then we wouldn't do it.

**Page 160**

1  Q. (BY MR. STERN) I want to shift gears
2  and ask you about something Mr. Podoll asked you
3  about. He asked you about whether there was a written
4  strategy you're aware of for the Flecks' trust
5  accounts and I thought your answers were not exactly
6  clear, so I wanted to give you another chance to
7  provide a clear answer. Are you aware of any written
8  strategy for the Flecks' trust accounts that was in
9  place?
10  MR. PODOLL: Object to the form.
11  A. Right. Objection, form. Okay. The
12  IPS, the investment policy strategy.
13  Q. (BY MR. STERN) Mr. Podoll also asked
14  you some questions about your personal role with
15  respect to the Flecks' trust accounts and I want to
16  revisit that. Were you responsible personally for
17  managing the Flecks' trust accounts?
18  A. No.
19  Q. And what steps, if any, did you take to
20  make sure that the Flecks' trust accounts were
21  appropriately managed?
22  A. I made sure that I -- that we connected
23  them with the right people within the company whose
24  role and whose job is to manage -- manage money for
25  our clients.

**Page 161**

1  Q. Did you have confidence in those
2  people's ability to serve the Flecks' interest?
3  A. I did.
4  MR. STERN: I have no further questions.
5  MR. PODOLL: I have a few.
6  EXAMINATION
7  BY MR. PODOLL:
8  Q. Okay, Mr. Bantis, you testified that you
9  don't manage investment accounts for clients; is that
10  correct?
11  A. That is true.
12  Q. Did you explain that specifically to
13  Mr. Fleck?
14  A. I don't recall doing so.
15  Q. Okay. Did you explain to Mr. Fleck that
16  you did not have anything to do or would not have
17  anything to do with managing the money in his
18  fiduciary accounts?
19  A. I think when I introduced him or we
20  introduced him to Doug Barker, I made Doug's role
21  clear and my role is not -- was not to be managing
22  their money.
23  Q. Did you specifically tell Mr. Fleck, I
24  will have nothing to do with managing the money in
25  your fiduciary accounts?

Charles Bantis
March 03, 2022

```
 1  Errata Sheet
 2
 3  NAME OF CASE: THE AARON H. FLECK REVOCABLE TRUST vs FIRST WESTERN TRUST BANK
 4  DATE OF DEPOSITION: 03/03/2022
 5  NAME OF WITNESS: Charles Bantis
 6  Reason Codes:
 7       1. To clarify the record.
 8       2. To conform to the facts.
 9       3. To correct transcription errors.
10  Page  26  Line  12  Reason  2     ( Deletz )
11  From  Ho's              to  WITH US
12  Page  27  Line  21  Reason  2
13  From  TIm /KASSN        to  SURU     ACTUALLY HAS ONE OTHER PB IN BETWEEN, Alicia BIANCY
14  Page  28  Line  7   Reason  2
15  From _____ to _____
16  Page  159 Line  24  Reason  1
17  From  WANT US          to  ON THEIR BEHALF    — Believe I said "falsify", NOT supply.
18  Page ____ Line ____ Reason ____
19  From _____ to _____
20  Page ____ Line ____ Reason ____
21  From _____ to _____
22  Page ____ Line ____ Reason ____
23  From _____ to _____
24
25                           _____
```