**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 21-cv-01073-CMA-NRN

THE AARON H. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck and Barbara G. Fleck,
THE BARBARA G. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck and Barbara G. Fleck,
AARON FLECK, and
BARBARA G. FLECK, on behalf of themselves and all others similarly situated,

      Plaintiffs,

v.

FIRST WESTERN TRUST BANK,
CHARLES BANTIS, and
ANDREW GODFREY,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION
FOR PARTIAL SUMMARY JUDGMENT**

---

This matter is before the Court on Defendants First Western Trust Bank ("FWTB"), Charles Bantis, and Andrew Godfrey's Motion for Partial Summary Judgment. (Doc. # 86.) For the following reasons, the motion is granted in part and denied in part.

## I.    **BACKGROUND**

This case arises from Defendants' management of investment accounts for Plaintiffs Aaron and Barbara Fleck ("the Flecks"). Unless otherwise indicated, the following material facts are undisputed.

A.     **THE FLECKS' DECISION TO INVEST WITH FWTB**

In 2017 and 2018, the Flecks were looking into the possibility of selling their home in Aspen, Colorado and investing the proceeds. Plaintiff Aaron Fleck had worked as a portfolio manager for decades and previously owned his own investment firm that managed several hundred million dollars in assets. (Doc. # 86-1 at 2.) On March 10, 2017, Mr. Fleck emailed Defendant Andrew Godfrey, a wealth advisor he knew at FWTB, and asked him to "recommend a smart honest Fund Manager with an office in Aspen." (Doc. # 86-2 at 1.) Mr. Godfrey responded to Mr. Fleck inviting him to consider FWTB's investment management services. (*Id.*) Mr. Godfrey wrote:

> As you know, we are more than a bank and consider ourselves more like wealth managers with $5 Billion under management. We have an open architecture that I think could accommodate your unique style, combined with our Fiduciary capability, and be exactly what you are looking for. Please give me a call, or stop by whenever is convenient for you, and we can discuss further.

(*Id.*) On April 26, 2017, Douglas Barker, a portfolio manager at FWTB based in the Denver area, emailed Mr. Fleck stating that it was nice to speak with Mr. Fleck the day before and that Mr. Barker would be available in Aspen in June to meet in person. (Doc. # 86-3 at 1.) Mr. Barker wrote, "I look forward to learning more about your estate planning and wealth transfer goals and will be prepared to explain more about our fiduciary services at First Western Trust." (*Id.*)

In early 2018, FWTB provided the Flecks with a bridge loan to finance their purchase of a new house while they were in the process of selling their home in Aspen. (Doc. # 86-4 at 6.) On February 9, 2018, Mr. Fleck, his daughter, and his son-in-law met with FWTB to discuss the possibility that FWTB would manage the investment of the net

sale proceeds generated from the sale of the Flecks' home. (Doc. # 86-1 at 5; Doc. # 86-5 at 2.) Mr. Fleck was looking for a third party to invest his assets because his health was failing and he wanted the trusts to provide yearly distributions to support his wife, Barbara.[1] (Doc. # 86-1 at 5; Doc. # 86-5 at 2.) During the meeting, FWTB discussed its investment approach and philosophies, which focused on "diversification and minimizing volatility." (Doc. # 86-5 at 2.) FWTB stated that it would manage the money in a conservative way, as opposed to the more aggressive approach that Mr. Fleck had used as an investment manager.[2] (*Id.*; Doc. # 86-6 at 4.)  FWTB explained that Mr. Barker, who was at the meeting, would be the Flecks' portfolio manager, and Mr. Godfrey and Charles Bantis would be local contacts for the Flecks in Aspen. (Doc. # 86-5 at 2; Doc. # 86-6 at 2, 4–5.) FWTB also explained that Mr. Barker would select investment strategies and funds approved by FWTB's Investment Policy Committee.[3] (Doc. # 86-5 at 2.)

When asked during his deposition if anyone at FWTB ever told him that FWTB "employed professional money managers," Mr. Fleck testified that he recalled FWTB

---

[1] At the time the Flecks hired FWTB, Aaron Fleck was 97 years old. (Doc. # 18 at 3.)

[2] Plaintiffs state that this fact is disputed, but they point to no evidence in the record contradicting Defendants' evidence that FWTB explained its investment approach as conservative and focused on diversification. (Doc. # 93 at 4.) As such, the Court considers the fact undisputed.

[3] Again, without pointing to any evidence, Plaintiffs dispute that Mr. Fleck learned that "Mr. Barker's selections would be curtailed by pre-approved securities." (Doc. # 93 at 4.) In the absence of any contradictory evidence, the Court finds that Plaintiffs have failed to establish a genuine dispute of material fact as to whether FWTB communicated to Mr. Fleck that Mr. Barker would select investment strategies and funds from those approved by FWTB's Investment Policy Committee.

saying that "they had their analysts," but he could not recall "whether they said professional managers." (Doc. # 86-1 at 14.) Mr. Fleck also could not recall whether anyone at FWTB told him that FWTB was a registered investment advisor ("RIA").[4] (*Id.*) It is undisputed that banks like FWTB are excluded from the definition of "investment advisor" in the Investment Advisers Act and are exempt from its requirements. (Doc. # 86 at 8; Doc. # 93 at 6); *see* 15 U.S.C. § 80b-2(a)(11). During his deposition, Mr. Fleck acknowledged that who is an RIA is publicly available and that he never checked to see if FWTB was an RIA. (Doc. # 86-1 at 15.)

After the February 9, 2018 meeting, FWTB prepared an Investment Policy Statement ("IPS") with a proposed investment approach for the Flecks. (Doc. # 86-7; Doc. # 86-5 at 3.) At the time, the Flecks were considering three or four investment management firms, but they ultimately chose to hire FWTB. (Doc. # 86-1 at 5.) Mr. Fleck testified that he chose FWTB because he "had done business with Charlie [Bantis] for at least 20 years at another bank" and Mr. Bantis had assisted the Flecks with obtaining the bridge loan. (Doc. # 86-1 at 4.) Mr. Fleck testified that because of the way Mr. Bantis handled the bridge loan, he told Mr. Bantis, "you're the kind of banker I like, you do things to help a client. I will give you some money to manage through your trust department." (*Id.*) Although Mr. Fleck "had other people that wanted to manage some money for [him]," Mr. Fleck "gave [his] word" to Mr. Bantis and gave him "some money to manage." (*Id.*)

---

[4] An "investment advisor" or RIA is a defined statutory term under the Investment Advisers Act of 1940. An RIA is an investment manager who is required to register with the SEC and state securities regulators and is subject to related rules and regulations. *See* 18 U.S.C. § 80b-2(11).

The Flecks sold their Aspen home in 2018 for approximately $19 million. (Doc. # 86-1 at 5.) On May 8, 2018, the Flecks signed the IPS (Doc. # 86-7), an Investment Services and Custody Agreement ("Investment Agreement") (Doc. # 86-8), and a Fee Schedule Agreement ("Fee Agreement") (collectively, "Agreements") (Doc. # 86-9), thereby authorizing FWTB to invest $8 million of their funds. It is undisputed that the Flecks executed all of these agreements. (Doc. # 93 at 4.)

**B.    THE AGREEMENTS**

The IPS states that its purpose "is to put forth a plan, developed jointly by First Western and [the Flecks], for the management of [the Flecks'] investment assets." (Doc. # 86-7 at 2.) It provides that the objectives of the account include maintaining diversification of investment assets, seeking to achieve financial goals, and minimizing potential tax liabilities. (*Id.* at 3.) The IPS defines the investment time horizon as "10+ years," describes the Flecks' "stated personal risk capacity" as "Moderate," and explains that "[t]he main objective is to provide steady growth while limiting fluctuations to less than those of the overall stock market." (*Id.*) The IPS also sets forth the asset classes and allocation ranges per asset class that FWTB would use to invest the Flecks' funds (*id.* at 5), and it shows that the Flecks did not specify any "portfolio restrictions" (*id.* at 4). With respect to communication, the IPS states that FWTB "will provide statements of account no less than quarterly." (*Id.* at 6.)

The Investment Agreement, which the Flecks also executed on May 8, 2018, grants FWTB "full and complete discretion and authority with respect to managing the investment of [the Flecks'] assets." (Doc. # 86-8 at 2.) However, it reserves to the

Flecks "the authority to direct and determine at any and all times the selection of any

security for purchase and sale in their account." (*Id.*) The Investment Agreement

includes the following section titled "Standard of Care and Indemnification":

> FWTB shall give to the securities in its custody the same degree of care
> and protection which it gives to its own property. FWTB shall be under no
> duty to take or omit to take any action with respect to any assets held in
> this Account, except in accordance with the foregoing provisions. FWTB
> shall not be liable for any loss or depreciation (including, without limitation,
> any decrease in value of assets held in the account due to market activity)
> resulting from any action or inaction of FWTB taken in good faith pursuant
> to the terms of this Agreement or as the result of following a direction or
> instruction from Client. Client agrees to indemnify and hold harmless
> FWTB, and FWTB's officers, employees and affiliates, from and against
> any loss, damage, and expense (including reasonable attorneys' fees) not
> directly resulting from a breach by FWTB of its standard of care or its
> willful misconduct.

(*Id.* at 3–4.) In addition, the Investment Agreement contains a "Waiver of Liability for

Negligence" section which provides that "neither FWTB nor its agents shall be liable for

any act, omission, loss, depreciation, or error in judgment that may occur in connection

with FWTB's handling of Client's account, except for such that may result from FWTB's

gross negligence or willful misconduct." (*Id.* at 4.)

The Investment Agreement and the Fee Agreement set forth the fees that the

Flecks' trusts would be charged for investment advisory services and custody and

transaction services ("Portfolio Fees"). (*Id.* at 3; Doc. # 86-9.) The Investment

Agreement and Fee Agreement also specify other fees that may be incurred separate

from the Portfolio Fee charged directly by FWTB, including an asset management fee

that could be charged by affiliates and commissions that may be paid to third-party

executing brokers when trading equity securities. (Doc. # 86-8 at 3; Doc. # 86-9 at 1.)

Plaintiffs do not dispute that the Flecks executed the IPS, the Investment Agreement, and the Fee Agreement. (Doc. # 93 at 4.) However, Plaintiffs dispute that the Flecks "approved" of the IPS. (*Id.* at 4–5.) Mr. Fleck testified that he told FWTB that he did not agree with the IPS, but he signed it anyway. (Doc. # 86-1 at 6.) Mr. Fleck also testified that the IPS "didn't live up to [his] thoughts at the time," that he "agreed that that's what they were proposing," and that he "gave them six months to see what they – how they were gonna manage it and whether they were going to listen to what I said over and over every time I went into the office." (*Id.*) In addition to stating he disagreed with the IPS, Mr. Fleck testified that he "d[id] not know if [he] ever read" the IPS. (*Id.* at 7–8.) When asked, "Had you have read this [IPS], would you have still signed it?" Mr. Fleck answered "No." (*Id.* at 10.)

## C.    FWTB'S MANAGEMENT OF THE INVESTMENT ACCOUNTS

FWTB managed the trust investments for approximately one year. During that period, it is undisputed that Mr. Fleck met with FWTB on November 6, 2018, throughout December and January 2019, on February 6, 2019, March 18, 2019, April 12, 2019, and April 15, 2019. (Doc. # 86-13 at 3–4.)

The Flecks' investment account was managed by Mr. Barker. (Doc. # 86 at 9.) At the time, Mr. Barker had more than 20 years of experience in wealth management, an MBA, and was credentialed as a Certified Financial Planner and Accredited Investment Fiduciary. (Doc. # 86-5 at 6.) FWTB also employed analysts and other investment professionals who "selected the equities, investment strategies, and funds that were available to portfolio managers like Mr. Barker to select when creating client portfolios."

7

(Doc. # 86 at 9.)[5] These included David Stern (Director of Investment Research), Sydney Young (Business Analyst), Brandon Teamer (Investment Research Analyst), Karen Post (Managing Director of Investments), John Sawyer (Chief Investment Officer ("CIO")), Brandon Humphryes (Director of Fixed Income Strategy), Debbie Silversmith (CIO Emeritus), and Warren Olsen (FWTB's former Chairman and former CIO). (Doc. # 86-5 at 4–5.)

During the time that FWTB managed the investments, FWTB charged the Flecks fees in the total amount of $54,917.10. (Doc. # 86 at 12.) This included a $51,630.64 management fee, a $3,264.40 fee for use of FWTB's Large Cap Core Portfolio, and a $22.66 foreign exchange fee in connection with a dividend paid by a foreign corporation. (*Id.*; Doc. # 86-5 at 3.)  FWTB also charged the Flecks a total of $2,790.68 in commissions, which were paid to third-party brokers. (Doc. # 86-5 at 4.)

On May 3, 2019, the Flecks requested that FWTB transfer in kind all assets in their accounts to Citi Private Bank. (Doc. # 86-12.) The parties dispute whether FWTB failed to transfer $800,000 of the Flecks' accounts. *Compare* (Doc. # 86 at 10), *with* (Doc. # 93 at 7). In a sworn declaration, John Sawyer, FWTB's CIO, stated that "[i]n May 2019, all funds and securities in the Flecks' accounts were transferred to Citigroup" and denied that FWTB kept $800,000 of the Flecks' funds or made an $800,000

---

[5] Plaintiffs do not dispute that FWTB employed additional analysts. (Doc. # 93 at 6.) However, Plaintiffs "dispute" this fact, without citing to any evidence, and argue that "the Trusts were supposed to have a team of professional wealth managers who were skilled, sophisticated, and experienced and would be available to the Trusts to help design individual portfolios." (*Id.*)

distribution that was never received. (Doc. # 86-5 at 6.) In his deposition, Mr. Fleck

testified as follows:

> Q. Do you claim that First Western Trust Bank lost $800,000 of the trusts' funds?
>
> A. I don't know what happened to it, it just disappeared out of the account. I never got it. When Citicorp came, they said they never got it. So I do not know. I cannot say what happened. It just disappeared.

(Doc. # 86-1 at 15.) When asked if First Western made approximately $800,000 in

distributions to the Flecks, Mr. Fleck answered, "Citicorp says they never got it. That's

all I know." (*Id.*)

## D.   PROCEDURAL HISTORY

Plaintiffs filed this lawsuit in Colorado state court in the District Court of Pitkin

County on March 16, 2021. (Doc. # 4.) Defendants thereafter removed the case to this

Court. (Doc. # 1.) In their Amended Complaint, Plaintiffs assert five claims for relief: (1)

breach of fiduciary duty as an individual and class action claim against FWTB;[6] (2)

fraudulent inducement as an individual claim against all Defendants; (3) fraudulent

concealment/non-disclosure as an individual claim against all Defendants; (4) breach of

fiduciary duty as an individual claim against FWTB; and (5) breach of contract as an

individual claim against FWTB. *See generally* (Doc. # 18.)

Defendants filed the instant Motion for Partial Summary Judgment on May 15,

2023. (Doc. # 86.) Therein, Defendants argue that they are entitled to summary

judgment on Plaintiffs' fraudulent inducement, fraudulent concealment, and breach of

---

[6] This Court denied Plaintiffs' Motion for Class Certification on December 27, 2022. (Doc. # 70.)

fiduciary duty claims, as well as Plaintiffs' breach of contract claim with respect to the issue of charging undisclosed fees. (Doc. # 86 at 20.) However, Defendants concede that Plaintiffs' breach of contract claim cannot be resolved fully at the summary judgment stage because the issue of whether FWTB invested pursuant to the IPS turns on factual issues that must be resolved through trial. (*Id.* at 1.) Plaintiffs filed a Response (Doc. # 93), and Defendants followed with their Reply (Doc. # 99). The matter is now ripe for review.

## II.   LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to the proper disposition of the claim under the relevant substantive law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). A dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee, Okla.*, 119 F.3d 837, 839 (10th Cir. 1997). When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. *See id.* However, conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law. *Id.* In attempting to meet this standard, a movant who does not bear the ultimate burden of

persuasion at trial does not need to disprove the other party's claim; rather, the movant need simply point out to the Court a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

Once the movant has met its initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Id.* Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. Stated differently, the party must provide "significantly probative evidence" that would support a verdict in his favor. *Jaramillo v. Adams Cnty. Sch. Dist. 14*, 680 F.3d 1267, 1269 (10th Cir. 2012). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671.

## III.   DISCUSSION

The Court will address in turn Defendants' arguments that they are entitled to judgment as a matter of law on Plaintiffs' fraudulent inducement, fraudulent concealment, and breach of fiduciary duty claims, as well as Plaintiffs' breach of contract claim with respect to fees.

### A.   FRAUDULENT INDUCEMENT

In order to prevail on their claim for fraudulent inducement or fraudulent misrepresentation, Plaintiffs must offer evidence that would allow a reasonable jury to

conclude (1) Defendants made a fraudulent misrepresentation of material fact; (2) Plaintiffs relied on this misrepresentation; (3) Plaintiffs had a right to rely on, or were justified in relying on, the misrepresentation; and (4) Plaintiffs' reliance resulted in damages. *Rocky Mountain Exploration, Inc. v. Davis Graham & Stubbs LLP*, 420 P.3d 223, 234 (Colo. 2018). "In addition, in part to protect defendants from reputational harm that may result from unsupported allegations of fraud . . . special pleading requirements apply to claims of fraud." *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012) (citation omitted). Specifically, a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake" in their pleading. Fed. R. Civ. P. 9(b); *see Vinton*, 269 P.3d at 1247; Colo. R. Civ. P. 9(b).

Plaintiffs' theory of fraud, as alleged in their Amended Complaint, is that between February and May 2018, FWTB, Mr. Bantis, and Mr. Godfrey fraudulently induced Plaintiffs to entrust their accounts with FWTB by "misrepresenting that the accounts would be managed by both Registered Investment Advisors or professional money managers." (Doc. # 18 at ¶¶ 86–88.) Plaintiffs allege that had they "been aware of the true facts that their accounts would not be managed by Registered Investment Advisors and professional money managers, and the management of their accounts would be done in a haphazard manner without a coherent investment strategy, they would not have entrusted their fiduciary accounts to FWTB." (*Id.* at ¶ 93.)

As an initial matter, the Court finds that Defendants are entitled to summary judgment on Plaintiffs' fraudulent inducement claim with respect to whether Defendants misrepresented that FWTB was an RIA. Significantly, Plaintiffs appear to concede their

RIA theory of fraud because Plaintiffs do not dispute that (1) Mr. Fleck does not recall anyone at FWTB telling him that FWTB was a "registered investment advisor"; (2) Mr. Fleck does not recall believing that FWTB was an RIA when he hired FWTB; (3) who is an RIA is publicly available; and (4) FWTB, as a bank, is exempted from the statutory definition of an RIA. (Doc. # 86 at 9–10; Doc. # 93 at 6.) Based on these undisputed material facts, Plaintiffs cannot establish that Defendants fraudulently misrepresented to them that FWTB was an RIA. *See Colo. Coffee Bean, LLC v. Peaberry Coffee Inc.*, 251 P.3d 9, 18 (Colo. App. 2010) (affirming the trial court's conclusion that "where 'the information . . . was publicly available and any Plaintiff could have obtained this information,' justifiable reliance cannot be proven because 'reasonable due diligence would reveal accurate information'"); *Cherrington v. Woods*, 290 P.2d 226, 228 (Colo. 1955) (concluding that fraud and misrepresentation claims were unfounded "[w]here the means of knowledge [we]re at hand and equally available to both parties" (internal quotations omitted)).

Plaintiffs' fraudulent inducement claim therefore hinges on whether Defendants fraudulently misrepresented that the accounts would be managed by "professional money managers." The Court agrees with Defendants that Plaintiffs cannot establish a triable issue of fact as to whether Defendants misrepresented that FWTB employed "professional money managers" because (a) there is insufficient evidence that Defendants made such alleged misrepresentations; (b) regardless, the alleged misrepresentations are indisputably true; and (c) there is no evidence that Plaintiffs relied on these alleged misrepresentations.

First, the only evidence that Plaintiffs point to in support of their argument that Defendants falsely represented that the Flecks' accounts would be managed by "professional money managers" is Mr. Fleck's Declaration, signed on June 26, 2023, and his deposition testimony. In his Declaration, Mr. Fleck states that FWTB represented to him that FWTB "had a team which would be working on [his] investments, and they were the best financial planning minds in the business." (Doc. # 93-4 at 2.) In his deposition, Mr. Fleck stated, "I don't recall whether they said professional money managers." (Doc. # 86-1 at 14.) Such evidence is insufficient for a reasonable jury to determine that Defendants made the alleged misrepresentation.

Regardless, even assuming Defendants *did* represent to the Flecks that their accounts would be managed by "professional money managers" or an investment "team," the evidence produced by Defendants establishes that this representation was true. Plaintiffs do not dispute that Mr. Barker, the Flecks' portfolio manager, was a "professional money manager" with two decades of experience in wealth management, an MBA, and credentials as a Certified Financial Planner and Accredited Investment Fiduciary. (Doc. # 86-5 at 6.) Plaintiffs also fail to establish a genuine dispute of material fact that FWTB employed other analysts and investment professionals who "selected the equities, investment strategies, and funds that were available to portfolio managers like Mr. Barker to select when creating client portfolios." (Doc. # 86 at 9.)[7] Instead, Plaintiffs merely argue—without pointing to any specific evidence in the record—that the

---

[7] Although Plaintiffs state that they "dispute" this fact, they do not point to any evidence and they do not dispute that FWTB employed additional analysts. (Doc. # 93 at 6.)

Flecks' accounts were "supposed to have a team of professional wealth managers who were skilled, sophisticated, and experienced and would be available to the Trusts to help design individual portfolios." Absent any evidence showing that this representation was (a) made or (b) false, Plaintiffs cannot prove their fraudulent inducement claim.

Finally, the Court agrees with Defendants that Plaintiffs have not established that the Flecks relied on the alleged misrepresentation in choosing to entrust their accounts with FWTB. Although Mr. Fleck stated in his declaration that the representations "were important to [him] and crucial to [his] decision to invest [his] funds" (Doc. # 93-4 at 2), Mr. Fleck testified during his deposition that he chose to invest with FWTB because of his relationship with Mr. Bantis and his appreciation for Mr. Bantis's help in providing the Flecks a bridge loan (Doc. # 86-1 at 4). In light of Mr. Fleck's contradictory deposition testimony, the Court finds that Mr. Fleck's declaration is insufficient to create a genuine dispute of material fact as to whether the Flecks relied on the alleged misrepresentation in choosing to invest with FWTB. *See, e.g.*, *Frontrange Sols. USA, Inc. v. Newroad Software, Inc.*, 505 F. Supp. 2d 821, 829–30 (D. Colo. 2007) (observing that affidavits containing self-serving assertions "not corroborated by reference to any record evidence or contradicted by the evidence or the affiant's previous deposition testimony" are insufficient to create a genuine dispute of material fact).

In an effort to salvage their claim, Plaintiffs pivot in their response to assert different theories of fraudulent inducement. First, Plaintiffs assert that FWTB's advertising purportedly falsely misrepresented that FWTB has "experienced trust investment management service teams." (Doc. # 93 at 8.) FWTB also allegedly

advertised: "We have a team, not just one person, working for your benefit so that you gain access to the best financial planning minds in the business." (*Id.*) Plaintiffs point to no evidence in the record establishing that these advertisements exist aside from Plaintiffs' own quotations in their Amended Complaint. *See* (*id.*); (Doc. # 18). Even if Plaintiffs had proven that FWTB made these representations, a representation that FWTB had "the best financial planning minds in the business" "cannot trigger liability because it amounts to mere puffery." *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1107 (10th Cir. 2009); *see also Intermountain Stroke Ctr., Inc. v. Intermountain Health Care, Inc.*, 638 F. App'x 778, 786 (10th Cir. 2016) (advertisement that defendant provided the "best medical practices" and "best medical care" was not actionable because it constituted "sales puffery" rather than statements of fact). Further, Defendants have sufficiently established that FWTB *did* employ a "team" of analysts and advisors.

Lastly, Plaintiffs argue in their Response that FWTB fraudulently misrepresented other aspects of the investment relationship, including the roles that Mr. Godfrey, Mr. Sawyer, and other FWTB employees held with respect to managing the investments and the level of communication that FWTB team members would have with the Flecks. (Doc. # 93 at 10–11.) Plaintiffs did not allege these theories in their fraudulent inducement claim in their Amended Complaint, and they do not request to amend their pleading now. (Doc. # 18); *See L-3 Commc'ns Corp. v. Jaxon Eng'g & Maint., Inc.*, 125 F. Supp. 3d 1155, 1172–73 (D. Colo. 2015) (rejecting plaintiff's "attempt to shift the focus of its fraud claim" at summary judgment without amending its complaint).

Accordingly, the Court concludes that Defendants are entitled to summary judgment on Plaintiffs' fraudulent inducement claim.

### B.      FRAUDULENT CONCEALMENT/NON-DISCLOSURE

To establish a claim for fraudulent concealment, a plaintiff must prove (1) the concealment of a material existing fact that in equity and good conscience the defendant should have disclosed; (2) knowledge on the defendant's part that such a fact was being concealed; (3) ignorance of that fact on the plaintiff's part; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Rocky Mountain Exploration*, 420 P.3d at 234.

In their Amended Complaint, Plaintiffs allege that FWTB, Mr. Bantis, and Mr. Godfrey "had a duty to disclose material facts relating to their credentials and approach to the management of Plaintiffs' fiduciary accounts." (Doc. # 18 at ¶ 98.) Plaintiffs allege that these material facts include "that Plaintiffs' fiduciary accounts would not be managed by Registered Investment Advisors or professional money managers and that FWTB would not pursue a cohesive considered approach in managing the Flecks' accounts." (*Id.* at ¶ 103.) For reasons already stated, the Court finds that Defendants are entitled to summary judgment with respect to Plaintiffs' theories of fraud as to whether FWTB was an RIA and whether it employed professional money managers.

The Court also concludes that Plaintiffs cannot establish that Defendants fraudulently concealed FWTB's investment approach. The undisputed evidence shows that Defendants told Mr. Fleck that Mr. Barker would be the Flecks' portfolio manager and presented the Flecks with the IPS, which discloses in detail FWTB's customized

investment approach, goals, and strategy for the Flecks' accounts. That Mr. Fleck failed to read the IPS before signing it is insufficient to establish Plaintiffs' ignorance of FWTB's stated investment approach. *See Flight Concepts Ltd. P'ship v. Boeing Co.*, 38 F.3d 1152, 1157 (10th Cir. 1993) (affirming summary judgment on a fraudulent inducement and misrepresentation claim where a plaintiff claimed that defendants misrepresented contract provisions but the plaintiff did not read it before signing).

Plaintiffs again improperly shift theories in their response and provide two narrative paragraphs of "material facts" that Defendants purportedly failed to disclose, including that "[FWTB's] team approach was largely made up"; "[FWTB] had no established means of effective communication with Trust department clients"; and "[FWTB's] Wealth Management Adviser was unqualified and provided no wealth management advice." (Doc. # 93 at 12.) To prove these alleged non-disclosed material facts, Plaintiffs cite only to Mr. Fleck's declaration. (*Id.*) Again, the Court finds that it is inappropriate for Plaintiffs to shift fraud theories in an effort to survive summary judgment. *See* Fed. R. Civ. P. 9(b); *L-3 Commc'ns*, 125 F. Supp. 3d at 1172–73; *Vinton*, 269 P.3d at 1247. Moreover, the Court has carefully reviewed the summary judgment briefing and the evidence submitted by both parties and finds that Plaintiffs have not presented sufficient evidence for a reasonable jury to conclude that Defendants fraudulently concealed any material facts that they had a duty to disclose. The Court therefore grants Defendants' Motion for Partial Summary Judgment as to Plaintiffs' fraud claims.

## C.     BREACH OF FIDUCIARY DUTY

Next, Defendants argue that they are entitled to summary judgment on Plaintiffs' breach of fiduciary duty claims because such claims are barred by Colorado's economic loss rule. (Doc. # 86 at 17.)

The economic loss rule is broadly intended "to maintain a distinction between contract and tort law." *Town of Alma v. AZCO Const., Inc.*, 10 P.3d 1256, 1262 (Colo. 2000). As such, the rule provides that "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law." *Id.* at 1264. To be independent of the contract, the duty must (1) arise from a source other than the contract, and (2) must not be a duty imposed by the contract. *Haynes Trane Serv. Agency, Inc. v. Am. Standard, Inc.*, 573 F.3d 947, 962 (10th Cir. 2009). The Court must "focus on the source of the duty alleged to have been violated" and determine whether the duty exists independent of any contractual obligations. *Town of Alma*, 10 P.3d at 1263.

Recently, in *Bermel v. BlueRadios, Inc.*, 440 P.3d 1150, 1155 (Colo. 2019), the Colorado Supreme Court observed that "since adopting the economic loss rule, we have applied it only to bar common law tort claims of negligence or negligent misrepresentation." The court noted "that the economic loss rule generally should not be available to shield intentional tortfeasors from liability for misconduct that happens also to breach a contractual obligation." *Id.* at 1155 n.6.

Defendants argue that the economic loss rule applies because "all alleged breaches of duties are governed by the detailed IPS, the Investment Agreement, and the Fee Agreement." (Doc. # 86 at 17.) In so arguing, Defendants characterize Plaintiffs' breach of fiduciary duty claims as alleging three breaches by FWTB: (1) failing to follow a "cohesive investment strategy"; (2) charging undisclosed fees; and (3) failing to "harvest tax losses" by not following Mr. Fleck's directions. (*Id.*)

The Court disagrees with Defendants' narrow summary of Plaintiffs' breach of fiduciary duty claims. Plaintiffs also allege that Defendants failed to discharge their fiduciary duties of loyalty, competence, good faith, and avoidance of self-dealing in their relationship with Plaintiffs and in handling Plaintiffs' fiduciary accounts. (Doc. # 18 at ¶¶ 110–118.) For example, Plaintiffs contend that FWTB breached its fiduciary duties by failing to adequately communicate with Plaintiffs, incompetently managing the accounts in such a way that caused poor performance, incompetently failing to harvest tax losses, and initiating transactions to generate excessive management fees. (*Id.*) The Investment Agreement, which requires only that FWTB "give to the securities in its custody the same degree of care and protection which it gives its own property," does not set forth any specific affirmative duties that address these additional alleged fiduciary duties. *See* (Doc. # 86-8 at 3–4.) The Court therefore agrees with Plaintiffs that their claims implicate fiduciary duties independent of the Agreements.[8] *See Hess Oil*

---

[8] In their Motion to Dismiss, Defendants raised this same argument that Plaintiffs' breach of fiduciary duty claims are barred by the economic loss rule because any breach of fiduciary duty is governed by the Agreements in this case. *See* (Doc. # 21.) In a well-written and thoughtful Recommendation, then-United States Magistrate Judge Gordon P. Gallagher rejected

*Virgin Islands Corp. v. UOP, Inc.*, 861 F.2d 1197, 1202 (10th Cir. 1988) ("A party may be liable in tort for breaching an independent duty towards another, even where the relationship creating such a duty originates in the parties' contract."). As such, the Court concludes that the economic loss rule does not bar Plaintiffs' breach of fiduciary duty claims in this case.

## D.   FEES

Lastly, Defendants argue that they are entitled to summary judgment regarding claims relating to fees because "all fees charged by FWTB were expressly permitted by the Investment Agreement and the Fee Agreement." (Doc. # 86 at 20–21.) In response, Plaintiffs clarify that they do not claim that the fees charged by FWTB were disallowed by the Agreements, but rather that the fees "may be proper measures of damages suffered by the Plaintiffs" for Plaintiffs' breach of fiduciary duty and fraud claims. (Doc. # 93 at 16–17.) Relevant to their remaining breach of fiduciary duty claims, Plaintiffs argue that a typical remedy is disgorgement of a breaching fiduciary's fees. (*Id.* at 16.)

Plaintiffs do not dispute that the fees charged were consistent with the Agreements in this case. Because Plaintiffs appear to concede that fees are relevant only as a remedy in this case, rather than as a basis for liability, the Court concludes that Defendants' motion for summary judgment may be granted with respect to any liability for breach of contract as to fees.

---

Defendants' argument for the same reasons and stated that Defendants were asking the Court "to read language into the contract that is simply not there." (Doc. # 47 at 9.)

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, it is ORDERED as follows:

- Defendants' Motion for Partial Summary Judgment (Doc. # 86) is GRANTED IN PART and DENIED IN PART. It is GRANTED with respect to Plaintiffs' fraudulent inducement and fraudulent concealment claims and as to whether Defendants may be liable for breach of contract on the basis of charged fees. It is DENIED as to Plaintiffs' breach of fiduciary duty claims.

DATED: October 3, 2023

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge