**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Number: 21-cv-01073-CMA-CPG

THE AARON H. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck and Barbara G. Fleck,
THE BARBARA G. FLECK REVOCABLE TRUST, through its Trustees, Aaron H. Fleck and Barbara G. Fleck,
AARON FLECK, and BARBARA G. FLECK,

      Plaintiffs,

v.

FIRST WESTERN TRUST BANK
CHARLES BANTIS, and
ANDREW GODFREY

      Defendants.

**DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' DAMAGES EXPERT, LARI MASTEN**

**INTRODUCTION**

The Court should exclude Lari Masten's damages opinions under Federal Rule of Evidence 702 because they are not based on a sound methodology or the facts of this case. Masten is a forensic accountant who admits she is not an expert in portfolio management. Yet she created her own benchmarks of portfolio performance to measure the alleged shortcoming of First Western Trust Bank's ("FWTB") management of the Flecks' accounts. Masten is unqualified to offer an opinion about account performance, and her proffered opinion on this topic is irrelevant because it uses benchmarks that are inconsistent with how FWTB was required to invest the Flecks' funds under the Investment Policy Statement ("IPS").

The Court also should exclude Masten's opinions regarding the lost equity value allegedly resulting from FWTB's failure to harvest tax losses. These opinions imagine a hypothetical and irrelevant counterfactual: What if, on December 3, 2018, FWTB had harvested all of the Flecks' losses from the stock market, held all the proceeds in cash equivalents for the next 30 days, and then repurchased the original securities 31 days later? These opinions are unhelpful and unreliable because there is no basis for (1) using December 3 as the date for capturing losses, or (2) imagining FWTB would deviate from standard practice by holding stock market proceeds in cash equivalents for 30 days instead of reinvesting them in other securities.[1] Because there is no basis in the case for these assumptions, her opinions should be excluded.

With five years of hindsight, the motivation behind Masten's hypothetical

---

[1] Consistent with Masten's lack of expertise, the source of her 30-day reinvestment timeline is the IRS's "wash sale" rule, IRS Pub 550, which prohibits an investor from selling a security to realize a tax loss and immediately reinvesting the proceeds in a "substantially identical" security. The rule, however, does not require investors to hold cash for 30 days. It permits immediate reinvestment in different securities.

1

exercise is clear. There was a brief market slump between December 3, 2018, and January 3, 2019, so that anyone holding cash for those specific 30 days could purchase the same securities at a discount before the prices rebounded in early January. The Court should not permit Masten to offer an irrelevant opinion about how much more money FWTB could have made for the Flecks had it predicted the December 2018 market slump and held a large portion of the Flecks' funds in cash that month. There is no claim in the case about FWTB's failure to predict the market's ups and downs. While all of Masten's opinions are unhelpful and unreliable as set forth below, at the very most, Masten should be permitted to testify about the additional tax burden the Flecks could have incurred due to FWTB's alleged failure to realize additional losses (opinions 1 and 2), which she opines was approximately $36,000.[2]

## **FACTS**

**I.     Background**

In May 2018, the Flecks opened two new accounts with FWTB to invest approximately $8 million. Doc. 106 at 5. The Flecks and FWTB met to discuss the Flecks' investment goals and risk tolerance, and together entered into the IPS, which outlined the categories in which the funds would be invested (*e.g.*, large, medium and small cap stocks, fixed income, international equities, alternatives and cash), and tailored the investment allocations within each category to the Flecks' risk tolerance and return objectives. *See* Ex A., Masten Report, ¶¶ 23, 72-73. The Flecks desired a moderate investment strategy with a long-term (10+ year) returns of 6.48% and $500,000 in annual cash flows. Doc. 18, ¶¶ 24, 33; Ex A., Masten Report, ¶ 23.

---

[2] Counsel for Defendants made a good faith effort to confer with counsel for Plaintiffs regarding this motion on December 7 and December 11, 2023 by email. Counsel for Plaintiffs did not respond to Defendants' conferral attempts.

Between May and December 2018, FWTB closed out certain portfolio positions for the Flecks at a loss. When that occurred, FWTB reinvested the proceeds in other securities instead of "sitting" on the cash. Ex. B, Masten Dep. 116:3-12, 174:19-22.

As pleaded, in December 2018, Mr. Fleck "realized there were major losses in both Trust portfolios in excess of $500,000. *At that time*, Aaron Fleck instructed FWTB to harvest the losses to offset other gains he had realized on other personal transactions." Doc. 18, ¶ 48 (emphasis added). FWTB disputes that Mr. Fleck gave this instruction. Even Mr. Fleck agrees, however, he did *not* instruct FWTB on what to do with the proceeds from harvesting tax losses. Ex. C, Fleck Dep. 100:2-5; Ex. B, Masten Dep. 40:23-41:9, 174:3-8. FWTB could decide how to invest the proceeds. Ex. B, Masten Dep. 174:15-18. Ultimately, the Flecks closed their account after one year.

## II. Masten's Qualifications

Masten holds a dual undergraduate degree in electrical engineering and secondary education, with a master's degree in accounting. Ex. B, Masten Dep. 10:18-12:7. Her company, Masten Valuation, is an expert witness firm that practices in the areas of damages, forensic accounting, and business valuation. *Id.* at 8:11-25, 10:12-17. Masten seeks to testify on behalf of the Flecks as a damages expert, not a liability expert. *Id.* at 22:17-19, 27:16-23, 38:15-19.

Masten is not a licensed or registered investment advisor. *Id.* at 39:3-8. She has never worked for a wealth management firm or an investment advisory firm, and she lacks the required licenses and certifications to be an advisor. *Id.* at 35:25-36:16. By Masten's own admission, she is not qualified to serve as an expert witness on investment strategy or how to manage investment portfolios. *Id.* at 39:25-40:12, 43:4-

3

21, 120:17-18, 134:5-6, 163:4-5, 186:5-7.

### III. Masten's Opinions

Masten offers damages opinions related to the Flecks' claims concerning both tax loss harvesting and portfolio management. Her opinions concern: (1) the value of unharvested tax losses; (2) the loss of tax shield against the Flecks' income; (3) the "point-in-time" loss of equity value as of January 3, 2019; (4) the "point-in-time" loss of equity value as of February 6, 2019; (5) the "point-in-time" loss of equity value as of May 13, 2019; (6) the loss in value of the portfolios based on "shortcomings" in performance; and (7) calculating management fees incurred. Ex A., Masten Report, pp. 6-7.

#### A. Measuring Portfolio Performance

Masten purports to calculate damages by comparing the actual portfolio performance over one year with a hypothetical allocation of a 100% investment in the U.S. large cap S&P 500 index. *Id.*, ¶¶ 81, 83. Such an allocation, however, would violate the parties' contractually agreed portfolio allocation in the IPS, which limited the U.S. large cap allocation to a *maximum* of 28%, and also mandated minimum allocations into fixed income (at least 39%) and international equities (at least 2%). *See id.*, ¶ 73. Masten also purports to measure the portfolio's performance over one year against the IPS's projected long-term return over *10+* years. *Id.*, ¶¶ 23, 81, 83.

#### B. Masten's "Cash" Reinvestment Strategy

Masten's other damages opinions rely on an extremely narrow set of assumptions that are inconsistent with the record evidence. First, Masten assumes that FWTB would have harvested all available tax losses on the highly specific date of December 3, 2018, and not on any other day in November or December 2018. *Id.*, pp.

4

6-7, 11-13. Second, Masten assumes that FWTB would have: (1) harvested the losses from stocks, pooled equity funds, and an ETF; (2) reinvested the proceeds in low-interest cash equivalents—not other securities; and then (3) repurchased the identical stocks, pooled equity funds, and ETF exactly 31 days later in identically weighted amounts. *Id.*, p. 13 & Schedules 1, 7a, 7b.

Masten did not perform this exercise based on any established investment strategy. That is, she did not consider how an *actual* investment advisor would reinvest the proceeds of the sales, including by strategically reinvesting the proceeds immediately in a similar (or different) type of security, which would not trigger the IRS's "wash sale" rule. Ex. B, Masten Dep. 44:3-22. Masten also has "no evidence" that Mr. Fleck instructed FWTB to hold the proceeds in cash as opposed to reinvesting them in a similar security. *Id.* at 41:12-17. Indeed, Masten "cannot point to a text or a resource that said, Lari Masten, do your damages this way." *Id.* at 47:6-19.

Masten admits she is not an expert on whether it is more appropriate to hold sale proceeds in cash or to reinvest them, *id.* at 43:4-21, but nevertheless bases her damages on her own assumption FWTB would have chosen to hold the proceeds entirely in cash. Masten is not, however, aware of any instance in which FWTB ever sold securities for a loss and then sat on the cash for 30 days before reinvesting like this. *Id.* at 75:14-18, 118:11-119:3. On the contrary, Masten concedes that, on a regular basis, FWTB would immediately reinvest the proceeds of unrealized losses in other securities *instead of* sitting on the cash. *Id.* at 61:4-10, 116:3-12. In fact, Masten expects that investing in equities would generally perform better than investing in cash, *id.* at 162:12-17, making it implausible that FWTB would choose this option.

The Flecks' own liability expert, Joseph Rulison, favored taking advantage of

5

the market during the 30-day hiatus through investing in different securities, perhaps in the same industry, or through investing in ETFs or mutual funds. Ex. D, Rulison Dep. 78:8-79:14, 103:12-105:15. This strategy is consistent with Mr. Fleck's own experience as a former portfolio manager. Ex. C, Fleck Dep. 61:20-23 ("Well, usually, if they sold a security, they would buy a similar security, maybe the same field, maybe in another field and that security will probably go up more than had he kept it.").

Masten rejected these reasonable and preferred strategies and imputed to FWTB only the cash option. She did not even bother to analyze the other options because it was easier for her to analyze damages this way. Notwithstanding the record evidence, she claims "it would have been pure speculation for me to say they would have been reinvested in different securities or different equity funds." Ex. B, Masten Dep. 49:8-11. In Masten's mind, her cash model is speculative, but the "least speculative." *Id.* at 73:19-74:7. But she is demonstrably wrong. FWTB's expert had no difficulty modelling damages in the scenario where FWTB sold the Fleck securities and reinvested in similar securities, as it had done previously for the Flecks. *See* Ex. E, Ahern Rebuttal Report, ¶ 66.

### C. Masten's Selection of a December 3 Tax Loss Harvesting Date

Masten selected December 3 for harvesting tax losses. The First Amended Complaint ("FAC") implausibly contends Mr. Fleck instructed FWTB to sell and capture losses on December 2, 2018, a Sunday. Doc. 18, ¶ 48. Undeterred by Mr. Fleck's allegation, Masten has deviated from the pleadings and assumed that "the directive to harvest the losses for tax purposes would have been late November 2018." Ex A., Masten Report, ¶ 28. Mr. Fleck testified, however, that "the first time I *noticed* tax losses was in late November or December." Ex. C, Fleck Dep. 82:20-23. He never

6

says he gave the instruction to FWTB in that time period, yet Masten bases her selection of December 3 on conflating Mr. Fleck's first *observation* of losses in the account with him *instructing* FWTB to capture them. He claims he delivered the instruction during a meeting with multiple employees of FWTB, but he can't pinpoint when that meeting happened. *Id.* at 85:1-10. On summary judgment, it was undisputed that Mr. Fleck met with FWTB on November 6, 2018 and "throughout" December 2019. Doc. 86, ¶ 40; Doc. 93, ¶ 40. There is no evidence of an intervening "late November" meeting date between November 6 and Sunday, December 2, so there is no basis for using December 3 as the day on which FWTB would have sold in response to instructions from Mr. Fleck.

The Flecks allege that Mr. Fleck gave the instruction because he noticed losses of approximately $500,000. Doc. 18, ¶ 48. During his deposition, Mr. Fleck contended the operative losses that caused him to instruct the bank to sell were $575,000. Ex. C, Fleck Dep. 85:11-20. Masten chose December 3 based on her belief that Mr. Fleck directed FWTB to harvest tax losses based on his October 2018 portfolio statements "given the ranges of losses he described in his deposition." Ex A., Masten Report, ¶ 27. The October 2018 portfolio reflects losses of $302,585, not $575,000. Ex. E, Ahern Rebuttal Report, ¶ 52.[3] Apparently realizing that December 2 was a Sunday when no meeting was held, Masten assumes that, "reasonably speaking, Mr. Fleck received these statements in the first few weeks of November. Thanksgiving fell on November 22nd in 2018, the third, full week of the month, so the meeting was likely the last week of November 2018." Report, ¶ 27; *see also* Ex. B, Masten Dep. 32:14-

---

[3] The only point from October through December at which the portfolio had close to $500,000 of losses potentially available for harvesting was in *late* December 2018, not on or before December 3, 2018. Ex. E, Ahern Rebuttal Report, ¶ 52.

19. Instead of using any day that week, "given the . . . Thanksgiving holidays"—which had already occurred on November 22—"all of those elements, December 3rd is the first business day, Monday, following all of that, that that would have been a reasonable enough amount of time for them to execute his wishes." Ex. B, Masten Dep. 34:1-5.

Masten claims she did not perform full modeling for any other date in December—only December 3. Ex. B, Masten Dep. 29:5-30:8, 31:2-8; *see also* 122:19-23. Coincidentally, December 3 happens to be the date in December that yields the highest "point-in-time" lost equity value under Masten's hypothetical cash investment exercise. Ex. E, Ahern Rebuttal Report, ¶¶ 54-55.

By imagining FWTB would have parked the proceeds in cash for 30 days on December 3 instead of reinvesting in other securities, Masten's model manufactures special purchasing power to repurchase the identical weighted distribution of identical securities at a discount in early January before prices rebounded. *See* Ex A., Masten Report, Schedule 3. In fact, Masten's hand-selected December 3 date not only happens to be the "highest value" harvesting date for Plaintiffs, but it is in the minority of dates that result in any damages at all. Ex. E, Ahern Rebuttal Report, ¶ 56. Of the 19 total trading days in December, only six harvesting days would even result in damages. *Id.*

## LEGAL STANDARD

Rule 702 imposes a "gatekeeper obligation" on district courts to ensure that all expert testimony or evidence admitted is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). District courts follow a two-step analysis. *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022). First, the

8

Court must determine whether the expert is "qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *Id.* (citing Fed. R. Evid. 702). Second, if the expert is qualified, the Court must determine whether the opinions are reliable under the principles set forth in *Daubert*. *Id.* The burden of proof rests with the proponent of the expert. *See* Fed. R. Evid. 702.

## **ARGUMENT**

**I.   Masten Is Not Qualified to Measure the Relative Performance of the Flecks' Investment Portfolio and Uses Irrelevant Benchmarks to Measure Performance.**

"Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Here, Masten is not qualified by "knowledge, skill, experience, training, or education" to provide opinions on portfolio management or investment strategy. Fed. R. Evid. 702. She fully concedes this point. *See* Ex. B, Masten Dep. 39:25-40:3 (admitting she is not qualified to be an expert witness on "how to manage investment portfolios"); *id.* at 120:17-18 ("I don't consider myself to be an expert in investment advisory."); *id.* at 163:4-5 ("I am not in a position to – to give opinions on First Western's investment style."); *id.* at 186:5-8 (admitting she is "not an expert in portfolio management").

In Opinion 6, however, Masten purports to measure damages for the alleged "shortcoming" of the Flecks' portfolio. Ex A., Masten Report, ¶ 11. Implicit in any such opinion is the need, and Masten's ability, to select an appropriate benchmark to measure performance. *See, e.g.*, *In re Executive Telecard, Ltd. Secs. Litig.*, 979 F. Supp. 1021, 1027 (S.D.N.Y. 1997) (striking expert opinion as unreliable for lack of a "precisely correlated portfolio of securities"). Consistent with her lack of expertise,

9

Masten claims she is *not* providing opinions on "appropriate benchmarks for measuring performance returns in investment portfolios." Ex. B, Masten Dep. 38:20-23. She admits: "I would probably not be the best person to be giving opinions on what an investment advisor is supposed to do or the benchmarks that they are supposed to use." *Id.* at 39:12-15.

Nevertheless, to generate her damages opinion, Masten picked two benchmarks: (1) the S&P 500's performance during the same timeframe, and (2) the IPS's target long-term return over 10+ years. *Id.* at 179:4-9. These comparisons are inapposite. The parties' IPS prohibits the first approach. Aside from providing "target" allocations, the IPS *required* FWTB to invest *no more than* 28% of the account in large cap equities—which is the sole asset type in the S&P 500—and to invest *at least* 41% of the portfolio in fixed income (39%) and international equities (2%). Ex A., Masten Report, ¶ 73.  Next, Masten compares a single year's performance against the IPS's long-term return target over a 10+ year horizon. *Id.*, ¶ 23. That is not the relevant comparison and would not be helpful to the finder of fact.

These two benchmarks did not come from the proffered liability experts. Ex. B, Masten Dep. 180:3-9, 181:15-183:11. Instead, Masten admits she "picked those benchmarks even though [she] already said that [she's] not an expert in identifying what benchmarks are appropriate for investment portfolios." *Id.* at 179:16-20.

As a result, there is no competent evidence that establishes the appropriate benchmarks for Masten to measure the Flecks' portfolio performance to properly calculate damages. Accordingly, the Court should exclude Opinion 6.

10

**II.     Masten's Opinions Are Unhelpful and Unreliable Because of Her Unsupported Assumption that FWTB Would Have Reinvested the Sale Proceeds from Tax Loss Harvesting in Cash Equivalents Instead of Other Securities.**

*Daubert*'s "gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003). An expert opinion must be "based on sufficient data, sound methods, and the facts of the case." *Roe*, 42 F.4th at 1181. Furthermore, "[u]nder *Daubert*, any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Dodge*, 328 F.3d at 1222 (internal quotation omitted).

Here, Masten's damages opinions rest on a highly specific, narrow assumption: that, on December 3, 2018 (not any other date), FWTB would have liquidated the Flecks' positions in various stocks, pooled equity funds, and an ETF, reinvested those proceeds in cash equivalents for the next 30 days, and then repurchased the original securities in identical weighted amounts 31 days later. The key assumptions underlying Masten's opinion have no basis in the record.

Masten's damages opinion rests upon an unsupported and impermissible assumption about a unique investment strategy beyond the scope of her expertise as a forensic accountant. For the reasons set forth above, Masten is not qualified by "knowledge, skill, experience, training, or education" to provide an opinion on appropriate investment strategy. Fed. R. Evid. 702; *see* Ex. B, Masten Dep. 39:25-40:12, 120:17-18, 134:5-6, 163:4-5, 186:5-8.

**A.     Mr. Fleck and Plaintiff's Expert Do Not Provide the Basis for Masten's Assumptions on Investment Strategy.**

If Masten is unqualified to furnish this assumption herself, *Daubert* requires

11

the assumption to come from another valid source. But Masten's assumed investment strategy has no basis in expert testimony. The Flecks' other expert, Joseph Rulison, did not disclose such an opinion. In fact, when asked about wash sales, Rulison explained that, in most cases, clients invest in a different security, maybe in the same industry to maintain a roughly equivalent position. Ex. D, Rulison Dep. 78:8-79:14. If the client wants to buy back the *same* security, to avoid missing out on upside risk over the next 30 days, he recommended investments in ETF and mutual funds to continue participating in the market. *Id.* at 103:12-105:15. Had FWTB done what this other Fleck expert says is customary, Masten's damages model has no application.

### B. Masten's Assumption Is a Counterfactual Inconsistent With FWTB's Practices and the Flecks' Allegations.

The other evidence does not support this assumption either because it confirms FWTB's standing practice with the Flecks' portfolio was to reinvest proceeds from losses in other securities, not hold cash. Ex. B, Masten Dep. 61:4-10, 75:14-18, 116:3-12, 118:11-119:3. Furthermore, even accepting *arguendo* Mr. Fleck's (heavily disputed) claim that he instructed FWTB to harvest losses, Mr. Fleck did *not* instruct FWTB to invest the proceeds in cash equivalents and repurchase the same securities 31 days later. Ex. C, Fleck Dep. 100:2-5; Ex. B, Masten Dep. 40:23-41:9, 174:3-8, 174:5-18.

Masten's thought exercise deviates from the Flecks' own theory of the case, and measures damages for a claim not pleaded about predicting market timing. Indeed, Masten's entire model is a counterfactual because Mr. Fleck was supposedly dissatisfied with the performance of his portfolio. Masten's unique strategy represents a decision to forgo any potential upside in the market for 30 days to reinvest in the same securities. These were the securities resulting in *losses* to the Flecks. If they

were dissatisfied and believed other securities would perform better, it would make sense to shift *away*, not double down by holding cash to reinvest in the same ones.

Masten apparently attempts to use the IRS's wash sale rule as a pretext for her model. Masten's fixation with that rule is a red herring because the IRS rule does not *command* that the client sit in cash for 30 days or repurchase of the identical security 31 days later. There are virtually infinite options, including investing in any other security, subject to limitations in the IPS, as long as it is not substantially identical. *Cf. Roe*, 42 F.4th at 1182-83 (expert failed to establish that scenario was "highly probable"). The IRS rule only exists to prevent investors, as a matter of fairness, from harvesting a loss for tax purposes and then reinvesting the proceeds immediately in the same (or substantially identical) security to enjoy the full upside. Masten did not consider standard industry investment strategies, much less demonstrate that this unique and undesirable strategy is highly probable. She made it up. The only evidence is that this strategy is highly *unlikely*.

### C. Masten's Assumption Is Speculative and Subject to Hindsight Bias.

In the end, Masten, the non-expert, concedes that her investment strategy is speculative, but claims that it is the "least speculative." This is not only wrong, but insufficient. *See Dodge*, 328 F.3d at 1222 (a reliable opinion must be "based on actual knowledge, not subjective belief or unsupported speculation"). What Masten really means that it was the *easiest* calculation for her, as a damages expert, because the Flecks have failed to develop evidence about reinvesting the tax losses consistent with FWTB's existing practices. As a result, Masten took the easy way out and dumped all the proceeds into cash. Easiness is not a substitute for soundness under Rule 702.

The true goal of Masten's model is to exploit hindsight bias. Five years later,

13

we know that the per-share price of the relevant securities, as a group, had temporarily decreased 30 days after December 3 and then rebounded before the Flecks transferred their account. *See* Ex A., Masten Report, Schedule 3.[4] By pretending FWTB would have reinvested in cash instead of reinvesting in similar (or different) securities, Masten engineers a special "point in time" scenario with the unique ability to use the stability of cash to purchase, at a discount, the same amounts of the same securities. This is an irrelevant and unreliable damages model that is not grounded in the evidence or the Flecks' claims. Thus, Opinions 1 through 5 should be excluded.

**III.   Masten's Selection of December 3 for Harvesting Tax Losses Is Unsupported by the Evidence.**

Masten's opinions are also unreliable because there is no evidentiary basis for selecting December 3 as the date for FWTB to harvest tax losses. Courts properly strike an expert opinion if "there is simply too great an analytical gap between the data and the opinion proffered." *Roe*, 42 F.4th at 1181 (quoting *Joiner*, 522 U.S. at 146).

Masten's selection of this date is a seemingly unexplainable fiction—except that it happens to generate the most alleged damages for the Flecks. The implausible allegation in the FAC—that Mr. Fleck instructed FWTB to harvest tax losses on Sunday, December 2—is not evidence. In fact, Masten has not assumed that unfounded allegation is true. Mr. Fleck does not claim he sent the alleged instruction in writing. Ex. C, Fleck Dep. 84:20-25. Instead, he claims that it occurred during a meeting with multiple employees of FWTB. *Id.* at 85:1-10. The only potential meetings occurred on November 6 and "throughout" December. Doc. 86, ¶ 40; Doc. 93, ¶ 40.

---

[4] As shown in Masten's report, between December 3 and January 3, 15 of 16 securities' prices dropped, while only one increased. But between December 3 and February 6, only 8 prices dropped, 8 prices increased (sometimes significantly), and many of these price movements remained relatively flat.

14

But Mr. Fleck claims he first "noticed" the tax losses in late November or December, Ex. C, Fleck Dep. 82:20-23, thereby eliminating November 6 and leaving the possibility of only December meetings. Mr. Fleck also claims that the amount of losses he "noticed" was $500,000 or more, indicating late December. Ex. E, Ahern Rebuttal Report, ¶ 53.

Instead of adhering to the evidence, Masten has assumed that Mr. Fleck gave the instruction on an unspecified date in "late November," and more specifically during the last week of November. Ex A., Masten Report, ¶¶ 27-28; Ex. B, Masten Dep. 32:14-19. There is no evidentiary support for any such meeting on that date. Using that fictional meeting Masten—who has no experience working in this industry—has decided on, in her mind, a "reasonable enough amount of time" for FWTB to carry out that instruction, landing on December 3 instead of any prior day in late November or any other day throughout December because it "made sense to me". Ex. B, Masten Dep. 32:14-19, 34:1-5.

The "analytical gap" is stark. Masten's opinions consist of searching for a way to back into the desired December 3 date instead of following the evidence. Accordingly, Opinions 1 through 5 should be stricken on this basis as well.

### IV. Masten's Calculation of Fees Does Not Assist the Jury.

Finally, Masten's Opinion 7 is nothing more than an arithmetical calculation of the fees charged the Flecks' accounts based on undisputed documentary evidence. The parties agree on the final amount. *See* Doc. 86 at 11. Expert testimony is unnecessary to "help" the jury perform straightforward addition.

### **CONCLUSION**

The Court should exclude the opinions of Plaintiffs' expert, Lari Masten.

Dated: December 14, 2023

*/s/ Timothy R. Beyer*
BRYAN CAVE LEIGHTON PAISNER LLP
Timothy R. Beyer
Adam B. Stern
1700 Lincoln Street, Suite 4100
Denver, CO 80203
Telephone: (303) 861-7000
tim.beyer@bclplaw.com
adam.stern@bclplaw.com

Attorneys for Defendants First Western Bank, Charles Bantis, and Andrew Godfrey

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 14th day of December, 2023 a true and correct copy of **DEFENDANTS' MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' DAMAGES EXPERT, LARI MASTEN** was filed and served using the CM/ECF system, on the following:

PODOLL & PODOLL, P.C.
Richard B. Podoll
rich@podoll.net
Robert Kitsmiller
bob@podoll.net
Jacqueline E. Hill
jacqui@podoll.net

*Attorney for Plaintiffs*

*/s/ Timothy R. Beyer*
Timothy R. Beyer