Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 21-cv-01073-CMA-CPG

_____

VIDEOCONFERENCE DEPOSITION OF          August 28, 2023
LARI MASTEN

_____

THE AARON H. FLECK REVOCABLE TRUST, through its
Trustees Aaron H Fleck and Barbara G. Fleck,
THE BARBARA G. FLECK REVOCABLE TRUST, through its
Trustees, Aaron H. Fleck and Barbara G. Fleck,
AARON FLECK, and BARBARA G. FLECK,

          Plaintiffs,

vs.

FIRST WESTERN TRUST BANK, CHARLES BANTIS,
and ANDREW GODFREY,

          Defendants.


_____


        The deposition of LARI MASTEN, taken before

Leeann Stellor, a Registered Merit Reporter,

Certified Realtime Reporter, and a Notary Public in

and for the County of Summit and the State of

Colorado, via Zoom videoconference, on Monday,

August 28, 2023, at the hour of 9:02 a.m.



Ex. B

Page 6

1    A.   April of 2023.
2    Q.   Who contacted you?
3    A.   Rich Podoll.
4    Q.   What did he tell you about the case?
5    A.   I don't recall the specifics, but just
6    generally discussing that he had a client who had
7    some claims, that he needed some damages amounts
8    calculated, that there were other experts involved,
9    liability experts on specific matters, and that he
10   wanted to retain me to look at the complaint and
11   assess damages based on what is represented in the
12   other expert reports.
13   Q.   You're aware that John Ahern from the
14   Alvarez & Marsal firm has prepared one or more
15   reports in this case, correct?
16   A.   I was not aware until four days ago that
17   he had written a report, and I am aware that he
18   issued a report in April of 2022.
19   Q.   So you have seen Mr. Ahern's April 2022
20   report?
21   A.   I have.
22   Q.   Okay.  But you had not seen it when you
23   issued your May 15, 2023 report?
24   A.   That's correct.
25   Q.   Are you even aware that Mr. Ahern

Page 7

1    provided a rebuttal report on June 15, 2023,
2    rebutting your May 15, 2023 report?
3    A.   I am not.
4    Q.   Is it fair to say that Mr. Ahern's April
5    2022 report did not form any of the basis and was
6    not taken into consideration by you in forming any
7    of your opinions contained in your April 15, 2023
8    report?
9    A.   In my May 15 report of 2023, that's
10   correct.  I had not seen his report.  I was unaware
11   of his involvement in the case.
12   Q.   Did reading his report -- let me withdraw
13   that.
14        I assume that since receiving it
15   in the last four days, you had an opportunity to
16   read it, Mr. Ahern's report?
17   A.   I did.
18   Q.   And did that cause you to reconsider any
19   of your opinions?
20   A.   No.
21   Q.   Did it cause you to think that you needed
22   to do any additional work?
23   A.   No.
24   Q.   Okay.  Have you been asked to provide any
25   kind of a response to Mr. Ahern's report?

Page 8

1    A.   No, not as of this time.
2    Q.   Have you been asked as of this time to do
3    any further work in this matter, other than
4    potentially testifying here in your deposition and
5    possibly at a trial?
6    A.   Not at this time.
7    Q.   All right.  Now, the entity that was
8    retained in this matter is called Masten Valuation;
9    is that right?
10   A.   That's correct.
11   Q.   What is the business of Masten Valuation?
12   A.   We're a forensic accounting firm.  We
13   generally do anything involved with litigation.
14   Part of our practice is doing valuation for other
15   purposes, gift and estate purposes, you know,
16   divorce cases, anything mostly related to
17   litigation.  Some of it is just regular compliance.
18   Q.   It appears from your bio in the CV that
19   you provided, that your primary area of expertise is
20   in business valuation; is that true?
21   A.   I'm -- I'm deeply rooted in business
22   valuation.  But as far as practice cases, I would
23   say only 10 or 15 percent really are valuation
24   centric.  More of it is forensic accounting and
25   damages work.

Page 9

1    Q.   Do you teach?
2    A.   Yes, I do.
3    Q.   And where do you teach?
4    A.   I teach several credentialing courses for
5    national and international organizations, both on
6    business valuation and forensic, financial
7    forensics.  So I'm a lead instructor in the National
8    Organization of Certified Valuation Analysts, so I'm
9    a lead instructor there for them there for two types
10   of courses that lead to credentials.  One credential
11   is the Certified Valuation Analyst Credential and
12   the other credential is the Master Analyst in
13   Financial Forensics credential.
14        I also teach internationally as
15   well for other organizations who have forensic
16   accounting and valuation credentials.  I'm an
17   adjunct with University of Denver as well.
18   Q.   In what area?
19   A.   The teaching of business valuation cap
20   storm -- capstone course to their master's in
21   accounting majors, but there's finance majors that
22   also take that course.
23   Q.   So the teaching is in the valuation area?
24   A.   Valuation and financial forensics.  So
25   I'm also an instructor on the MAFF, Master Analyst





Page 10

1    in Financial Forensics, team.
2        Q.   And what does that mean?  What does that
3    entail?
4        A.   It's taking forensic accounting, business
5    valuation, fraud detection, you know, all types of
6    areas of practice expertise, and the focus is in a
7    litigation environment; you know, how you handle the
8    processes, doing the actual calculations, you know,
9    best practices, those types of things.  But it's
10   basically a fundamentals course leading to the
11   credential.
12       Q.   Is Masten Valuation basically an expert
13   witness firm, providing expert work in litigation
14   and valuation matters?
15       A.   Yes, generally.  We do not do any
16   traditional accounting, if that's what you're
17   asking.
18       Q.   What is your education?
19       A.   I have a master's degree in accounting.
20   My undergraduate and graduate degrees are different.
21   But my end, my terminal, I guess, degree is focused
22   on audit and accounting.
23            And so my initial starting in my
24   career, I started with Coopers before they merged
25   with PricewaterhouseCoopers.  I was an auditor and

Page 11

1    tax practitioner with them for several years.  And
2    then I developed an interest in doing forensic
3    accounting and litigation work, and then for the
4    last almost 25 years had a pure focus on just the
5    forensic accounting and litigation areas.
6        Q.   So when did you get your undergraduate
7    degree?
8        A.   Gosh, I believe my undergraduate was
9    1990.
10       Q.   From where?
11       A.   Texas Tech University.
12       Q.   In what?
13       A.   It was engineering and education, a
14   combined dual degree.  Electrical engineering and
15   secondary education.
16       Q.   All right.  And then your master's is in
17   accounting?
18       A.   That's correct.
19       Q.   And when did you get that?
20       A.   I don't recall my year of graduation.
21   It's just not something that I keep track of.  I
22   believe it was like '94 or '95.  It took a while
23   because my undergraduate was not in accounting, so
24   it wasn't a typical 36-hour master's program.  I
25   wound up having to take an additional 127 hours of

Page 12

1    college credit courses to get the master's.
2        Q.   Where did you get your master's from?
3        A.   Texas Tech University.
4        Q.   And those are -- so you have a BS degree
5    and a master's in accounting.  Is that the extent of
6    your degrees?
7        A.   That's correct.
8        Q.   Has your testimony in a case ever been
9    excluded by a court under the Daubert line of cases?
10       A.   Not -- I know there's certain portions of
11   my opinions that have been excluded.  But to my
12   knowledge, I've never been fully excluded.
13       Q.   How many times has a court excluded a
14   portion of your proposed testimony on the basis of
15   Daubert?
16       A.   Well, if you're using Daubert -- and
17   these have been state court cases, so it's not
18   necessarily Daubert.  But it's just been two or
19   three times portions of my report have been
20   excluded.
21            And generally those have been
22   excluded because the areas of opinions that I was
23   giving from a legal perspective, those were
24   dismissed or rea -- you know, the court -- it wasn't
25   useful to the court for the purpose that the

Page 13

1    attorneys needed it simply because their claims were
2    being excluded, you know, from a legal perspective.
3        Q.   Okay.  But has your testimony ever been
4    excluded under Daubert in a federal court?
5        A.   Not to my knowledge.
6        Q.   Do you recall the Knudson versus Walker &
7    Associates case in 2005 in Judge Figa's court?
8        A.   Yes, I do.
9        Q.   Isn't it true that your testimony was
10   excluded in that case under Daubert?
11       A.   I don't recall the purpose of -- I don't
12   recall the outcome of that and how it was excluded.
13   But I do know the directive I was given from the
14   attorneys was not in line with their claims in that
15   case.
16       Q.   Isn't it true that in that case your
17   testimony was excluded because you testified about
18   valuation of the wrong subject matter?
19       A.   I can give you some details about that
20   case.  It sounds like you've read it.  But there
21   were assets involved, and the directive I was given
22   was to value the business, the collective of the
23   assets, and the focus of that case was specific
24   assets.
25            And for that reason, the judge



Page 22

1  longest, if you collectively looked at everything,
2  I've probably, from a singular firm standpoint, have
3  done more work for the Podolls than any other single
4  firm.  But I -- I can't confirm that because I've
5  not run any of those statistics.
6      Q.   Have you ever taken an engagement where
7  the Podoll firm was on the other side?
8      A.   I don't believe so.
9      Q.   All right.  So when you were contacted in
10  April of this year by Mr. Rich Podoll, what was your
11  assignment?
12     A.   I believe we discussed that already.  But
13  generally, he wanted me to look at the case facts,
14  read the complaint, read the reports that have been
15  written by the liability experts, and quantify areas
16  of damages that have been identified.
17     Q.   So you were being hired as a damages
18  expert in this case?
19     A.   That's correct.
20     Q.   And you were being asked to quantify the
21  damages as set forth or described in the complaint?
22     A.   Well, the complaint is a basis for them.
23  It's certainly -- you know, part of my work was to
24  dig deeper, investigate, and as complaints are
25  filed, specific details of -- of facts change.  And

Page 23

1  so to, you know, use that as a -- kind of a
2  framework.  But generally looking at the complaints
3  that were there and investigating on a monetary
4  standpoint of what damages stem from what was being
5  complained about.
6      Q.   And just so that I'm clear.  When you
7  were hired to be the damages expert for the
8  plaintiffs in this case, you were not told that
9  there was a damages expert on behalf of the
10  defendants who had provided a report a year earlier?
11     A.   I was not -- as I told you earlier, I was
12  not aware that Mr. Ahern was involved.  I asked for
13  any expert reports.  I do know at the time that I
14  was hired there were other matters that the Podolls
15  were dealing with.
16          But yeah, I -- I asked for any
17  reports.  And at that time the reports that I had --
18  I believe there were two reports, Mr. Reidy and
19  Mr. Rulison, that I had access to.
20     Q.   So you asked for all the expert reports,
21  and the two that you were provided was Mr. Reidy and
22  Mr. Rulison?
23     A.   That's correct.
24     Q.   And you weren't even told about the
25  existence of the damages report from Mr. Ahern?

Page 24

1      A.   I was not.  My -- my reading of
2  Mr. Ahern's report is that it was responding to
3  Mr. Rulison.  Not that that's an excuse.  But maybe
4  at the time when I was making the request, it was
5  deemed not relevant at the law firm level.
6      Q.   Well, what you're saying is that you
7  don't know why you weren't provided with Mr. Ahern's
8  report.  But you asked for the expert reports, and
9  you were not provided with his report, right?
10     A.   That's correct.
11     Q.   And have you -- since receiving that
12  report four days ago, have you discussed with
13  anybody, any of the attorneys on behalf of the
14  plaintiffs, why you hadn't been provided that report
15  previously and why you were being provided with it
16  all of a sudden now?
17     A.   I had a discussion with Mr. Rob Podoll.
18  And I wasn't demanding in any manner, but I did ask,
19  you know, is this report out there and can I have a
20  copy of it?  I didn't ask for reasons why I was not
21  provided with it.
22     Q.   So you're saying that the -- the reason
23  you received the report four days ago of Mr. Ahern
24  was because you asked for it, not because anybody at
25  the Podoll firm provided it to you?

Page 25

1      A.   Well, it was a discussion.
2          MR. PODOLL:  Objection.
3      A.   It came up.
4      Q.   So tell me about the discussion that
5  resulted in you becoming aware of the Ahern report
6  from 2022 for the first time and being provided with
7  it four days ago?
8      A.   Okay.  I do want to correct that.  I
9  don't know why.  You would have to ask the Podolls.
10         But number two, it was in
11  preparation for the deposition.  My question was
12  have there been any other expert reports issued in
13  this case that I need to be aware of or understand
14  prior to my deposition.
15         And the response was, well,
16  besides Ahern and Reidy, and I think there was a
17  couple of other expert names in there, we don't have
18  anything.  And I was like, oh, well, I didn't know
19  Mr. Ahern was involved.
20     Q.   And so?
21     A.   And so that's what triggered me getting a
22  copy of his April 2022 report.
23     Q.   Did you ask whether that was the only
24  damages report that had been provided in the case at
25  that point?

MAGNA
LEGAL SERVICES

Page 26

```
 1         A.   I don't recall if I asked if that was the
 2    only one, but I guess maybe I was under the
 3    assumption that if I was inquiring about it, that
 4    any and all reports that he had issued would have
 5    been given to me.
 6         Q.   Your expectation, based on the
 7    conversation, was that whatever reports particularly
 8    relating to damages, which is your area, that were
 9    in the case would be provided to you.  And in
10    response to that, you were provided with Ahern's
11    April 2022 report; is that right?
12         A.   That's correct.
13         Q.   Okay.  And is the first time you became
14    aware that there was a rebuttal to your report in
15    this deposition today?
16         A.   That's correct.  Yes.
17         Q.   Does that surprise you that there's a
18    expert damages report directly rebutting your May
19    2023 report and you've never been told about it or
20    provided with it?
21              MR. PODOLL:  Objection.  Relevance.
22         A.   Yes.
23         Q.   All right.  Who did you meet with or
24    speak with to discuss the details of the engagement
25    that is at issue in the case and what topics
```

Page 27

```
 1    specifically would be appropriate for you to opine
 2    on?
 3         A.   I spoke with several members of the
 4    Podoll firm.  Rich, Rob, Jackie Hill, and I believe
 5    Bob Kitsmiller at one point.  But I don't think Bob
 6    and I were talking about specifics on this case.  It
 7    was just administrative and coordinating access to
 8    documents.
 9              But generally, it was Mr. Rich
10    Podoll who was giving me directive to be retained
11    and to analyze damages in this matter.
12         Q.   In your discussions with the lawyers, did
13    you discuss the facts of the case?
14         A.   I'm sure we have, yes.  I mean, many
15    times.
16         Q.   Were you told to make any assumptions for
17    purposes of your work?
18         A.   I was asked to assume that the plaintiffs
19    would prove liability, and that I'm not giving
20    opinions on liability in this case, that I am just
21    using the information available and determining the
22    damages based on the factual evidence and the
23    opinions that have been offered.
24         Q.   All right.  Now, skipping ahead a little
25    bit.  You have set up a construct for damages in
```

Page 28

```
 1    which you are assuming that First Western Trust Bank
 2    would have sold loss positions in the Flecks'
 3    accounts on December 3rd, 2018, correct?
 4         A.   Correct.
 5         Q.   Okay.  Did you discuss with the lawyers
 6    the use of that date as opposed to other dates?
 7         A.   I do believe there was a discussion on
 8    that.  I was looking for evidence regarding when
 9    Mr. Fleck had his meeting and conversations.  I
10    looked at Mr. Fleck's deposition testimony, those
11    types of things.
12              So yeah, this was definitely an
13    element that I discussed with them, is what was kind
14    of a reasonable date to look at when the loss
15    harvest sale should have occurred based on
16    information that they had.
17         Q.   And did the lawyers tell you that they
18    believed the reasonable date used was December 3rd,
19    or did you come up with that date?
20         A.   I came up with that date.
21         Q.   And in the course of coming up with that
22    date, did you run calculations as to what the
23    damages would be -- would be using that date as
24    opposed to other dates?
25         A.   Well --
```

Page 29

```
 1              MR. PODOLL:  Object.  Object.  Form.
 2         A.   I first determined the date and then ran
 3    the calculations.  I didn't run it on multiple dates
 4    to see if there's a difference in calculations.
 5         Q.   Okay.  So you have never run your
 6    calculations using the model that you're using here,
 7    using any date other than December 3, 2018; is that
 8    true?
 9         A.   It's a work in progress until it's
10    finalized.  I -- I can tell you that there -- I
11    don't have a schedule that uses an alternative date.
12    I'm sure there were considerations as we were
13    working through creating the framework for the
14    damages analysis.  But this December 3rd was the one
15    that made the most sense, given the testimony --
16    the -- the deposition testimony and the records.
17         Q.   Okay.  Well, we'll get to that in a bit.
18    But right now all I'm asking is did you ever run
19    calculations using any date other than December 3rd,
20    2018?
21         A.   To my knowledge, I did not.
22         Q.   So you have no idea what the damages
23    calculation would be under your model if you were to
24    use December 4th, 2018; is that true?
25         A.   I -- I did not run it on December 4th, so
```

8  (Pages 26 to 29)



Page 30

1 that would be a true statement.
2 Q. And the same would be true as to any
3 other date in 2018, you do not know what the damages
4 would be if you were to use any date other than
5 December 3rd, correct?
6 A. That's correct. I would not go through
7 the entire model and do it on a date that I didn't
8 deem was the appropriate date.
9 Q. Okay. And what I want to make sure, is I
10 understand that in your report you only used
11 December 3rd. But I want to make sure that you
12 never, as part of your work in this matter, did
13 anything to figure out what the damages would be if
14 you used any other date other than December 3rd?
15 A. As I mentioned, it's a work in progress.
16 You don't sit down and just punch a number and
17 things are populated.
18 There may have been dates that
19 were looked at. I -- I don't recall. It was a long
20 process. We have over 90 hours in preparing this
21 report. So I -- I can't definitively say that
22 there's nothing that was ever a different date.
23 But that date was determined
24 fairly early on in my analysis. I did not compare
25 it to see if a different, you know, December 4th or

Page 31

1 December 5th provided a higher or lower number.
2 Q. But you're -- you're being somewhat
3 equivocal about this, and I want to get to the
4 bottom of this. So I'm going to probe a little bit
5 more on that.
6 In your report, the only date you
7 used is December 3rd, correct?
8 A. Correct.
9 MR. PODOLL: Objection to form.
10 Q. And my question is: In the course of
11 doing your work in this matter, before the report,
12 since the report, at any time, have you ever
13 performed a damage calculation assuming that the
14 securities would have been sold on any date other
15 than December 3rd?
16 A. Not to my recollection.
17 Q. Okay. And did you discuss with any of
18 the lawyers the decision to use December 3rd and not
19 to take a look at what the damages might be if you
20 used some other date?
21 A. I don't recall if that was something that
22 we discussed.
23 Q. But the decision to use December 3rd and
24 only December 3rd, as far as running calculations,
25 was yours, not the lawyers'; is that right?

Page 32

1 A. Well, I'm sure it's something that I
2 discussed. I believe at that time I might have been
3 having discussions with Mr. Rob Podoll. And I do
4 recall making maybe a comment, not a calculation,
5 but a comment, that it seemed odd that everyone was
6 assuming a December 31st sell-off.
7 But confirming and validating
8 December 3rd certainly was a discussion because the
9 law firm had knowledge of other depositions and
10 things that had taken place. They had records that
11 were available to them regarding communications
12 across the parties that I was requesting. So it was
13 a part of a conversation.
14 But at the end of the day, the
15 December 3rd, 2018, as it's written in my report,
16 made sense to me from the standpoint of the timing
17 of the statements being issued and the amounts of
18 losses that were being discussed in Mr. Fleck's
19 deposition. So ultimately what was reasonable as an
20 estimate was December 3rd, in my opinion. And I
21 don't recall being told or given a directive by the
22 law firm of Podoll & Podoll that I must use December
23 3rd, 2018.
24 Q. When you say that December 3rd was
25 reasonable as an estimate, was that a determination

Page 33

1 that you -- that you made based on your review of
2 the facts in the case, or is it something that you
3 were told by the lawyers to use?
4 A. I believe I just answered that. But I
5 was not told by the lawyers to use this date. I
6 asked about when the conversation occurred because
7 there was record of Mr. Fleck having conversations
8 about harvesting losses.
9 So from a reasonable standpoint,
10 in my mind, it was important to establish when and
11 at what point in time that would have happened. And
12 part of the claims in this case is -- case is
13 failure to harvest those losses. So it was
14 important to me to try to see what was a reasonable
15 date that the bank -- had they acted given
16 Mr. Fleck's directive, when that date would be.
17 Q. All right.
18 A. And so I requested lots of documents,
19 looked at evidence, and came up with December 3rd,
20 2018.
21 Q. All right. And you said that was
22 reasonable as an estimate of the date on which First
23 Western should have or would have harvested the
24 losses?
25 A. If they were listening to their client



MAGNA
LEGAL SERVICES

## Page 34

```
1   and his request, given the holidays, Thanksgiving
2   holidays, all of those elements, December 3rd is the
3   first business day, Monday, following all of that,
4   that that would have been a reasonable enough amount
5   of time for them to execute his wishes.
6        Q.   And I wrote down the words you used.  You
7   said that was reasonable as an estimate of the date,
8   right?
9        A.   That's correct.
10       Q.   All right.  Now, when somebody arrives at
11  an estimate, often they consider periods of time
12  before or after that estimate because the estimate
13  isn't precise.  That's the nature of an estimate.
14            So why didn't you look to see
15  whether dates around this estimated reasonable date
16  of December 3rd is, what the results would have been?
17       MR. PODOLL:  Object.  Form.
18       A.   I was less driven by the dollar amount
19  impact that a different date would have and more
20  driven by what would reasonable reaction time be and
21  when should the execution of selling and harvesting
22  those losses would have occurred.
23       Q.   I understand.  But you used the term
24  "reasonable as an estimate."  And given the fact
25  that an estimate by its nature isn't precise, why
```

## Page 35

```
1   didn't you, since this was an estimate, consider
2   dates on either side of it so that you had a more
3   complete picture?
4        A.   I made the determination that that first
5   business day, Monday of the first week of the month
6   following the holidays, following all the
7   discussions, following the meetings, if you had a
8   client, if I were in that position, that said please
9   do something, that would have been the date that
10  made the most sense to me.
11            And so why I didn't run
12  calculations on the Friday before or the Thursday
13  after, simply I'm running this as an estimate, and
14  it's quite time consuming to pull all the records
15  and combine all of it together.  I picked
16  December 3rd.  I talked about that with counsel.
17  They assessed, and given my reasoning, yes, that's
18  reasonable.  So for those reasons, I did not run
19  multiple calculations.
20       Q.   So you took the date that you thought was
21  a reasonable estimate of the date that the sales
22  would have occurred and you used only that date,
23  correct?
24       A.   That's correct.
25       Q.   Okay.  Now, have you ever worked for a
```

## Page 36

```
1   wealth management firm?
2        A.   I've never been an employee of a wealth
3   management firm.
4        Q.   Have you ever worked for an investment
5   advisory firm?
6        A.   I've never been an employee of an
7   investment advisory firm.
8        Q.   Have you yourself, regardless of who your
9   employer is, have you yourself ever worked as a
10  wealth management -- wealth manager or investment
11  advisor?
12       A.   No.  Those require specific
13  certifications and licenses, and I do not have any
14  of those.  I have six other certifications, but not
15  in wealth management or advisory services for
16  investing.
17       Q.   Are you giving any opinions in this case
18  that the investment policy statement required a tax
19  loss harvesting?
20       A.   I am not giving any opinions on
21  liability.  I'm only giving damages opinions on
22  quantifying damages resulting from activities or
23  failure to perform.
24       Q.   So is the answer to my question no?
25       A.   That would be a short answer, yes.
```

## Page 37

```
1        Q.   Are you giving any opinions as to whether
2   Mr. Fleck ever instructed First Western Trust Bank
3   to harvest tax losses?
4        A.   I'm not giving opinions on Mr. Fleck's
5   statements, no.
6        Q.   So the answer to my question is no?
7        A.   That's correct.
8        Q.   Are you giving any opinions that
9   Mr. Fleck had a meeting on December 2nd, 2018 with
10  First Western Trust Bank?
11       A.   I am not giving opinions on Mr. Fleck's
12  date of meetings, no.
13       Q.   Are you aware from the documents of a
14  meeting that Mr. Fleck did have with First Western
15  Trust Bank on November 6th, 2018?
16       A.   I don't recall exact dates, but I do know
17  there were meetings in November.
18       Q.   You know that there was a quarterly
19  meeting following the end of the third quarter,
20  correct?
21       A.   I don't know the calendaring of their
22  established meetings, but I do know that there were
23  supposed to be regular meetings regarding the trust
24  accounts.
25       Q.   Let me just try to be clear.
```



MAGNA
LEGAL SERVICES

Page 38

```
 1              Are you aware there was a
 2   quarterly meeting held on November 6th, 2018 to
 3   discuss the --
 4        A.   I don't --
 5        Q.   -- performance at the end of the third
 6   quarter?
 7        A.   I don't recall the title of the meeting,
 8   that it was just to be a quarterly meeting.  But I
 9   am aware that there was a meeting.
10        Q.   Are you giving an opinion that there were
11   any other meetings between Mr. Fleck and First
12   Western Trust Bank following the November 6th, 2018
13   meeting?
14        A.   I am not.
15        Q.   Are you giving any opinions on industry
16   custom in the investment management industry on
17   investing or tax loss harvesting?
18        A.   I am not giving opinions on liability,
19   including those elements.
20        Q.   Are you giving any opinions on
21   appropriate benchmarks for measuring performance
22   returns in investment portfolios?
23        A.   I am not.
24        Q.   You're not qualified to give an opinion
25   on that topic, are you?
```

Page 39

```
 1        A.   I was not asked to be in that space and I
 2   am not giving opinions on liability in this case.
 3        Q.   In fact, you're not qualified to give
 4   opinions as to benchmarks or appropriate benchmarks
 5   for measuring performance returns in investment
 6   portfolios, are you?
 7        A.   I am not a licensed or a registered
 8   investment advisor.
 9        Q.   That's not what I asked you, Ms. Masten.
10        A.   I am capable of those doing things, but I
11   am not hired in this case for that.  I don't know
12   that I would not be qualified, but I would probably
13   not be the best person to be giving opinions on what
14   an investment advisor is supposed to do or the
15   benchmarks that they are supposed to use.
16        Q.   You're not an expert on -- I'm sorry, let
17   me withdraw that.
18              You're not giving any opinions on
19   how to rebalance portfolios, investment portfolios,
20   are you?
21        A.   I am not.
22        Q.   You're not giving any opinions on how to
23   manage investment portfolios, are you?
24        A.   I am not.
25        Q.   And again, you wouldn't be qualified to
```

Page 40

```
 1   be an expert witness as to how to manage investment
 2   portfolios, would you?
 3        A.   That is not my area of expertise, no.
 4        Q.   Are you giving any opinions in this case
 5   as to whether it's appropriate to hold sale proceeds
 6   in cash or to reinvest them?
 7        A.   I am -- I am not giving opinions on the
 8   appropriateness of that.  I have given opinions
 9   regarding tax loss harvesting that include wash-sale
10   rules, which set aside and reinvest.  But I'm not
11   giving opinions on to -- as to the strategy behind
12   that.
13        Q.   Okay.  So, for example, in this case,
14   your opinion assumes that First Western Trust Bank
15   would have sold certain securities on December 3rd,
16   2018 and then would have held the proceeds in cash
17   until the wash-sale rule expired, right?
18        A.   That's correct.  Because the directive
19   is -- my understanding is Mr. Fleck's directive was
20   to harvest the losses.  And that's part of the loss
21   harvest strategy, is selling off, setting aside the
22   proceeds, and reinvesting after the 30-day period.
23        Q.   Okay.  You're aware, aren't you, though,
24   that another strategy to deal with the wash-sale
25   rule is to immediately reinvest the proceeds in a
```

Page 41

```
 1   similar security rather than sitting in cash?
 2   You're aware that that's another strategy, right?
 3        A.   There are lots of strategies, yes.  But
 4   in this instance, based on Mr. Fleck's directive,
 5   harvesting the losses, my understanding is that he
 6   was not requesting that anything else be done, other
 7   than harvest those losses so that we can use them as
 8   a tax shield and reinvest the money in an
 9   appropriate time.
10        Q.   You think that Mr. Fleck -- let me
11   withdraw that.
12              Do you have any evidence in this
13   case that causes you to think that Mr. Fleck
14   specifically instructed First Western when they sold
15   the securities to hold the proceeds in cash as
16   opposed to reinvesting them in a similar security?
17        A.   I have no evidence of that.
18              My analysis was assuming the most
19   conservative, in my opinion, way of looking at how
20   that would be handled.  And so that was to set aside
21   earned interest during that month and then to
22   reinvest.
23        Q.   You are aware, though, that another
24   strategy that would still comply with the wash-sale
25   rule would be to sell on a particular date and then
```



Page 42

```
 1   immediately reinvest in similar securities rather
 2   than holding it in cash for 30 days.  You're aware
 3   that that's another strategy that can be employed,
 4   right?
 5        A.   I'm aware that there's lots of
 6   strategies, and the strategies are generally
 7   investor specific.  And so there's multitudes of
 8   ways that can -- you know, these -- the wash-sale
 9   rule can be deployed.
10        Specifically at the end of the
11   year, though, there's generally a tendency to set
12   that aside and then take a -- take advantage of a
13   general trend in the market at the end of the year
14   and reinvest at the beginning of the year.
15        Q.   Well, I asked you a more specific
16   question than that.
17        Isn't it true that you're aware
18   that another strategy for dealing with the wash-sale
19   rule is instead of holding the proceeds in cash, to
20   immediately reinvest them in a similar security?
21        MR. PODOLL:  Objection.
22        A.   You can do that.  It's --
23        MR. PODOLL:  (Simultaneous speaking).
24        THE WITNESS:  Sorry, Rob.
25        MR. PODOLL:  Go ahead.
```

Page 43

```
 1        Q.   Your answer is what?
 2        A.   Yes, I -- yes, I have said that there are
 3   multiple strategies, and that would be one of them.
 4        Q.   And you're not an expert on whether it is
 5   more appropriate to hold proceeds in cash or to
 6   reinvest them.  That decision is not something that
 7   is within your area of expertise, right?
 8        A.   As I've mentioned multiple times, I am
 9   not giving an opinion as an RIA or an investment
10   advisor.  My specialty is forensic accounting, and I
11   am offering opinions here on the damages here in
12   this case based on the expertise of other experts
13   and the facts in the case.
14        Q.   That's not what I asked you.  Would you
15   like to hear my question again?
16        A.   Certainly.
17        Q.   Okay.
18        MR. BEYER:  Leeann, would you mind
19   reading back my question.
20        (Record read.)
21        A.   Correct.
22        Q.   But, nevertheless, you have in your
23   damages model assumed that the strategy that would
24   have been employed was to -- would have been to hold
25   all the proceeds in cash until the 30 days expired
```

Page 44

```
 1   and then to buy back the same securities, right?
 2        A.   That's correct.
 3        Q.   Did you do any work in your analysis to
 4   determine what the damages might be in the event
 5   that instead of holding all the proceeds in cash,
 6   First Western had reinvested them in a similar
 7   security?
 8        A.   I did not.
 9        Q.   Did you do anything to analyze any other
10   strategy?  You've said there are a multitude of them
11   for dealing with the wash-sale rule.  Did you
12   consider any of those other strategies in your
13   analysis of the damages in this case?
14        A.   I did not.  I have memorialized my
15   opinions and the basis for those opinions in my
16   report, and the opinions that I have are based on
17   selling, setting aside the cash, and reinvesting
18   after the 30 day wash-sale rule expired.
19        Q.   And you did not consider any other
20   possible scenarios for how an investment advisor
21   might deal with the wash-sale rule, right?
22        A.   That is correct.
23        Q.   Okay.  And did you discuss that with the
24   lawyers, that you were going to pick that one
25   approach, and not consider any others?
```

Page 45

```
 1        A.   I don't recall having discussions about
 2   the approach.  I do recall having discussions
 3   regarding any conversations they might have had with
 4   Mr. Fleck, as far as was any additional directive
 5   given.  But what -- again, what made sense at the
 6   time is to set it aside in cash and reinvest it.
 7        Q.   When you say that -- I'm sorry.  You say
 8   that made sense.  But you've already said you're not
 9   an expert on whether that's the appropriate strategy
10   or not, right?
11        A.   I'm not a registered advisor, that's
12   correct.  I am here trying to estimate damages.  And
13   using what evidence that I have, in my opinion the
14   most reasonable way to assess damages was to look at
15   what the proceeds from those -- harvesting of those
16   losses would have been, setting it aside, and then
17   reinvesting.  I did not run multiple scenarios.
18        Q.   What I'm having trouble understanding is
19   given the fact that you've conceded that you're not
20   an expert on the -- on -- on the strategies and
21   which strategies to use in dealing with the
22   wash-sale rule, and recognizing as you have that
23   there are a multitude of them, why did you say you
24   picked only one of them and didn't consider any of
25   the others in your analysis?  Why did you do that?
```



Page 46

1       A.   At the time when I was preparing my
2   analysis, and still as I sit here today, this makes
3   the most sense.  And it's my job is to estimate
4   those damages.
5       Q.   Well, did you look at any authoritative
6   texts, for example, to find out whether using the
7   assumption that the proceeds would be held in cash
8   rather than reinvested -- rather than being
9   reinvested would make sense for this analysis that
10  you're doing?
11      A.   I did do some research.  I certainly
12  sharpened my skills and refreshed my recollection on
13  how wash sales worked both from a tax perspective
14  and an investment advisory perspective.
15           I did not come across any text
16  that had 10 or five or multiple ways of dealing with
17  this specific situation.  But in assessing the facts
18  and at looking at the evidence that was in front of
19  me, this is the manner in which the calculation of
20  the damages for this portion of my opinions made the
21  most sense.
22      Q.   All right.  Well, identify any of these
23  sources that you believe instructed you that the
24  appropriate construct here was one of assuming that
25  the proceeds would have been held in cash rather than

Page 47

1   being reinvested.
2       A.   Identify a resource that told me that?
3       Q.   Yes.
4       A.   Is that what your question was?
5       Q.   Yeah.
6       A.   I don't have a resource that told me,
7   Lari Masten, to do my damage analysis in this way.
8       Q.   Well, I'm looking for a resource that
9   addressed the question of whether it is reasonable
10  to assume that the investment advisor would have
11  held the proceeds in cash rather than reinvesting
12  them so that you then would, based on that, make the
13  assumption that you did, which is that all the
14  proceeds would be held in cash rather than be
15  reinvested?
16           MR. PODOLL:  Object to form.
17      A.   I cannot point to a text or a resource
18  that said, Lari Masten, do your damages in this way.
19  This was my decision.
20      Q.   That's not what I asked you.
21           I'm asking whether the decision
22  that you made was guided in any way by some
23  resource, authoritative texts, some other materials
24  that caused you to make the decision that you should
25  assume that all the proceeds would have been held in

Page 48

1   cash rather than be reinvested?
2            MR. PODOLL:  Object.  Form.
3       A.   I believe I've answered that question
4   multiple times.  There's not a resource that I
5   looked at that directed one versus another.  It is
6   my -- my assessment of looking at the facts, looking
7   at where the money would have gone.  It would have
8   been -- if I were to select under your scenario a
9   different model of similar investments, there's so
10  much speculation about picking those investments.
11  That did not make sense to me.
12           But within their own portfolio,
13  they had an opportunity to put that money with First
14  Western Trust Bank, in their interest-bearing
15  accounts for 30 days, and that made sense to me.
16      Q.   What facts did you rely on that led you
17  to the assumption that First Western Trust Bank
18  would have held all the proceeds in cash rather than
19  reinvesting them?
20      A.   Well, the fact that they had the First
21  Western Trust short-term, medium-term cash accounts,
22  cash and cash equivalence, and they were using them
23  in a similar manner in other sales of other
24  securities.
25      Q.   Okay.  So one of the facts that led you

Page 49

1   to -- I'm sorry, let me withdraw that.
2            Is your list complete as to the
3   facts that caused you to assume that First Western
4   would have kept the proceeds in cash rather than
5   reinvesting them?
6       A.   For the most part, that is a primary
7   reason.  Again, going back to I looked at what would
8   have happened to that cash.  But it would have been
9   pure speculation for me to say they would have been
10  reinvested in different securities or different
11  equity funds, so I made the assumption that the rate
12  of return would be interest for those 30 days.
13      Q.   All right.  And isn't it true that that's
14  pure speculation on your part, as to what First
15  Western would have done had they sold the securities
16  on December 3rd, as to whether they would have kept
17  it in cash or reinvested them in similar securities?
18  You're speculating, aren't you?
19      A.   Well, First Western definitely has
20  they're -- they're on record, Mr. Sawyer, I believe,
21  that they have a very conservative approach of
22  investment advisory.  They have a history within
23  these portfolios of fluctuating in those cash and
24  cash equivalent accounts.
25           And so it -- looking at the

13  (Pages 46 to 49)



MAGNA
LEGAL SERVICES

Page 58

1  of pages on the purchases, you see corresponding
2  purchases at or about the same time, right?
3       A.   Yes.
4       Q.   And if you go to the next -- the Barbara
5  Fleck for that same period of time, this one ends in
6  Bates number starting 140.  You can just tell me
7  when you're there.
8       A.   Give me a second.  Okay.  I have that
9  document open.
10      Q.   Okay.  And if you look on pages 12 and
11 13.
12      A.   Yes.
13      Q.   You'll see the sales or losses, correct,
14 totaling 70,000?
15      A.   That's correct.
16      Q.   And if you look back at purchases,
17 pages 11 and 12 of that same document, you see
18 corresponding purchases at about the same time for
19 all of the proceeds of the losses, right?
20      A.   So total purchases are 1,191,000 and
21 total sales were 1,186,000, so yes, very similar.
22      Q.   So with respect to the Aaron Fleck and
23 Barbara Fleck statements in November of 2018, you
24 would agree that there were sales resulting in
25 losses, right?

Page 59

1       A.   Correct.
2       Q.   And all of those losses were almost
3  immediately reinvested in other securities, right?
4       A.   That's correct.
5       Q.   All right.  Let's look at the December
6  statements.  Pull up the December statement for
7  Aaron Fleck, please.
8       Do you have a Bates number on that,
9  please?
10      Q.   Yes.  The first page ends in 207.
11      A.   Thank you.
12      Q.   Yeah.  If you look on pages 16 and 17,
13 you'll see sales totaling 350,000, right?
14      A.   Sorry.  I'm -- I'm still getting it open.
15      Okay.  Yes, so the page 17 of 18
16 shows $350,000, roughly, in sales proceeds for
17 Mr. Fleck's trust.
18      Q.   And within a few days, purchases of
19 369,000, right?
20      A.   You know, the purchases range from
21 December 3rd to the, I think, the 27th, and the
22 sales range from, I think it's the, December 17th to
23 December 31st.
24      Q.   So the dates of the repurchases do not --
25 are within a few days, but they're not necessarily

Page 60

1  one day or the same day as the sales, right?
2       MR. PODOLL:  Object.  Form.
3       A.   I would have to go in and track the dates
4  for each other.  But generally the sales dates are
5  heavier weighted in the later part of the month and
6  the purchases are earlier, just looking at it on a
7  cursory basis as we sit here.
8       Q.   And some of those sales were losses,
9  right?
10      A.   Yes.  And they were put to cash until the
11 purchases were made.
12      Q.   And the purchases were all made within a
13 few days of the sales, right?
14      A.   Well, that's what I'm looking at.
15 Because the purchase date ranges, I want to just
16 take a second to look at the -- what they're
17 purchasing because some of it's cash.  But some of
18 it's like early in December, December 3rd, into a
19 fixed income fund, December 4th into Oppenheimer,
20 December 17th, John Hancock.
21      And then the sales are December
22 27th, 21st, the 19th.  So the sales seem to be
23 later.  But, yeah, generally the sales and the
24 proceeds are reinvested.
25      Q.   Okay.  Within the same month?

Page 61

1       A.   Yeah.  I would -- I would have to look
2  and see what the cash balances are, if those are
3  fluctuating, if they're setting aside any of that.
4       Q.   All right.  So given what you've seen
5  there and what I'm sure you saw before, isn't it
6  true that First Western, when they sold losses in
7  their account, at least during this period in late
8  2018, rather than sitting on cash with the proceeds
9  they reinvested it almost immediately?
10      A.   Yes, they did.
11      Q.   Now, did you read Mr. Fleck's deposition?
12      A.   I did many months ago, yes.
13      Q.   Did Mr. Fleck say anything in his
14 deposition about whether he thought First Western
15 was required to hold the money in cash or should
16 have held the money in cash versus reinvesting it?
17      A.   I -- I don't recall.  I would have to go
18 back and review his deposition to be able to answer
19 that statement.
20      Q.   Well, would you agree that that is
21 important in your determination of whether your
22 assumption was a reasonable one, that they would
23 have held all the proceeds in cash, to find out what
24 Mr. Fleck had to say on that subject?
25      A.   Well, his deposition doesn't give a

16  (Pages 58 to 61)



Page 70

1    reinvested in.  But you know that based on their
2    experience at around the same time with other losses
3    that they captured in the Fleck accounts, they would
4    have reinvested and they would have figured out what
5    to reinvest in, right?
6        A.   Well, I didn't -- I see -- I see losses
7    and gains and sales and trades.  But generally when
8    you see that pattern, it's because they're targeting
9    a portfolio waiting, and they're not trying to
10   specifically harvest losses and take advantage of
11   those at year end.
12            And so I -- I see that there's a
13   pattern of reinvestment.  But specifically under the
14   concept of tax loss harvesting, I don't know what
15   their philosophy is, other than the deposition
16   testimony and the fact that the advisors did not do
17   that in December; that there were sales in February,
18   there was reallocations later, but it didn't occur
19   timely.
20       Q.   Okay.  Why does the purpose of selling
21   and repurchasing securities in a portfolio make any
22   difference?  The fact is that they sold and captured
23   losses in November, as we looked at, that they --
24   the wash-sale rules still apply, right, to those
25   sales?

Page 71

1        A.   Yes.  Wash-sale rules can apply to any
2    point in time in the year.
3        Q.   Right.  It doesn't have to be --
4    wash-sales -- the wash-sale rule doesn't only apply
5    when the purpose of selling securities is to tax
6    loss harvest, right?
7            MR. PODOLL:  Objection to form.
8        Q.   It applies to any sales?
9            MR. PODOLL:  I'm sorry.  I didn't
10   mean to cut you off.
11           Object to form.
12       A.   Yes.  Tax loss -- the wash-sale rules
13   apply on any sale.
14       Q.   And we know empirically that around the
15   same time that when First Western sold and took
16   losses in the Fleck accounts, they, in fact,
17   reinvested at almost the same time, right?
18       A.   Generally speaking, yes.
19       Q.   And yet you have made an assumption in
20   your analysis here that they would have, in
21   December, instead of acting the way they had been
22   acting throughout the portfolio, they would have,
23   for the first time, sat on $1.1 million of cash,
24   right?
25           MR. PODOLL:  Object.  Form.

Page 72

1        A.   I have because of the timing of the year,
2    that this would be the time that they could also
3    take advantage of the January effect.
4        Q.   But if they had sold securities at losses
5    in November, they could take advantage of
6    performance in December, right?
7        A.   That's true for them, yes.
8        Q.   But we know that in November they didn't
9    do that.  They reinvested promptly, instead of
10   sitting on cash for 30 days and waiting for
11   December, right?
12       A.   Yes.
13       Q.   And are you aware that historically
14   December is a higher performing month than January?
15       A.   I --
16       Q.   In the S&P?  In the S&P?  Sorry.
17       A.   I, again, remind you I have not looked at
18   that and studied that in great detail in recent
19   times.  I am aware that there's generally
20   fluctuations.  But I can't answer that question.
21   That's not my area of expertise and that's not --
22   I'm not here as a registered advisor saying that the
23   advice that I would be giving these clients is to
24   invest in one or another during one month or
25   another.

Page 73

1        Q.   Can you think of any reason why First
2    Western would have reinvested proceeds of lost sales
3    in other months, but in December would have instead
4    kept all the money in cash and treated that month
5    different from other months?
6        A.   Well, certainly there is the January
7    effect concept, and that would be a reason to do
8    that.  But again, the reason in my model I did that
9    was because I believed it was too speculative for me
10   to reach into their mind and see what they would
11   have reinvested in.  And putting it in cash and
12   reinvesting in early January to take effect -- to
13   take advantage of that January effect, that would
14   certainly be a consideration of an investor.
15           Whether these particular advisors
16   would have had that consideration, I don't know.
17   But in other months, the sales and holding off to
18   cash would not have made sense.
19       Q.   So you're saying that the reason why you
20   used, in your model, the assumption that all the
21   proceeds would be held in cash is because you
22   weren't capable, without speculating, of figuring
23   out the but-for world as to say what they would have
24   invested in.  That's the reason why you decided to
25   assume that they would stick it in cash?

19 (Pages 70 to 73)



Page 74

1    A.   I decided that the least speculative way
2    was to leave it in cash.
3    Q.   Okay.  And that's the reason why you made
4    the assumption in your model that they would have
5    left it in cash, because it resulted in the least
6    amount of speculation on your part?
7    A.   Yes.
8    Q.   Okay.
9         MS. COURT REPORTER:  Can we take a
10   quick break?
11        (Break from 10:42 a.m. to
12        10:56 a.m.)
13   BY MR. BEYER:
14   Q.   Ms. Masten, we're back on the record.
15        Are you aware of any situation in
16   either of the Fleck accounts where First Western
17   ever sold proceeds reflecting a loss and then held
18   the proceeds in cash for 30 days?
19   A.   I did not track details regarding that,
20   as far as reinvestment.  I am aware that there's
21   certainly variations throughout the time period of the
22   portfolios where sales occurred and they were
23   reinvested within a matter of days or weeks.  But
24   not where there was a wash-sale issue, where they're
25   trying to reinvest in the same securities, where

Page 75

1    they held cash.
2    Q.   So is the answer to my question no?
3    A.   Am I aware -- if you could repeat the
4    question.  But I think your question was am I aware
5    of any time where they sold and set aside in cash.
6         There are instances where there
7    were sales and money went to cash short term and
8    then other investments were reinvested in.  I'm not
9    aware of any time in this portfolio where money was
10   set aside to reinvest under the wash-sale rules in
11   the same securities.
12   Q.   That's not the question I asked, so I'll
13   try it again.
14        Are you aware of any situations in
15   the Fleck portfolios where First Western sold
16   securities, generating a loss, and then sat on the
17   cash for 30 days before reinvesting it?
18   A.   I am not aware of it.
19   Q.   You're not aware of that ever having
20   happened, right?
21   A.   I am not.
22   Q.   All right.  I want to look at Appendix D
23   to your report, which is the Summary of Report
24   Information and Data Sources.  These are the
25   materials that you were provided, that went into

Page 76

1    your analysis and resulted in your conclusions,
2    correct?
3    A.   Correct.
4    Q.   And this is a complete and accurate list
5    as of the date of your report?
6    A.   Yes.
7    Q.   Now, since May 15th, 2023, the date of
8    this report, you've said that you were provided with
9    the April 2022 report of John Ahern, correct?
10   A.   That's correct.
11   Q.   Have you been provided with any other
12   materials in this case other than Mr. Ahern's report
13   between May 15th and the present?
14   A.   I believe I was provided with an
15   additional deposition record.  Give me a second and
16   I can tell you what that was.  Mr. Rulison's
17   deposition.
18   Q.   Was there anything in Mr. Rulison's
19   deposition that affected or affects any of the
20   opinions that you're giving in this case?
21   A.   Well, based on his report, there's
22   indications in my report where I'm relying on his
23   assessment.  I just got his deposition yesterday
24   afternoon at 4:22, so I have not had a chance to
25   read it in all detail.  I did a cursory look.  And

Page 77

1    so as I sit here, there's nothing in addition to the
2    influence that he's had on my opinions based on
3    that.  But again, I haven't read the complete
4    deposition.
5    Q.   Anything other than the Ahern report of
6    2022 and the Rulison deposition transcript that you
7    had been provided since Appendix D up to today?
8    A.   I don't believe so, no.
9    Q.   And the Rulison deposition transcript was
10   provided to you on August 27th, late in the
11   afternoon; is that right?
12   A.   That's correct.
13   Q.   And as of the time of your deposition,
14   you haven't had a chance to read it thoroughly?
15   A.   That's correct.
16   Q.   And the Ahern 2022 report was provided to
17   you on August 24th?
18   A.   Yes, that's correct, the afternoon of
19   August 24th.
20   Q.   All right.  Now, looking on your list,
21   you say, "I was provided the documents and files
22   listed below."  One of them is -- the third item is
23   "Confidential mediation statement."
24        Do you see that?
25   A.   I do.




Page 114

1  looking at portfolio asset allocation.
2           But if you're specifically wanting
3  to take advantage of the wash-sale rules, you sell
4  and you rebuy the same security after the 30 days.
5       Q.   All right.  But --
6       A.   So in that case you would need that cash
7  available to reinvest.
8       Q.   Okay.  But I thought we had covered this,
9  but maybe we didn't sufficiently.
10          So it's your understanding that
11 in harvest -- when the purpose of selling is to
12 harvest losses, you necessarily leave the proceeds
13 in cash until the wash-sale period has expired and
14 then use that cash to buy back the same securities?
15      A.   Your -- the wash -- so you're combining a
16 couple concepts.  But the wash-sale rules are
17 reinvesting in the same securities.  And so you
18 would set aside that cash, and maybe that cash could
19 be invested in some other securities, some fund,
20 sell it, come back.
21          But generally if you want to
22 reinvest in the same securities, as you have the
23 30-day period of time that you're looking at, you're
24 not going to reinvest those in other securities
25 because you're specifically interested in what your

Page 115

1  investment was in.  So it's separate from the
2  portfolio mix of just selling losses and then
3  reinvesting in different investments.
4       Q.   But my question is:  Are you testifying
5  that when you -- when an investment advisor sells
6  securities to capture a loss, they necessarily have
7  to keep the proceeds in cash for the 30 days in
8  order to buy back the original securities?  Is that
9  what you're saying?
10      A.   That is not my testimony.
11      Q.   No, because you know perfectly well that
12 that's not the case.  That another strategy is to
13 take the proceeds and immediately reinvest them in a
14 security that won't violate the wash-sale rule
15 rather than sitting on the cash.  You know that
16 that's an acceptable strategy too, right?
17      A.   But if your strategy is to have the same
18 position --
19      Q.   No.  No.  No.  No.
20      A.   -- in those securities --
21      Q.   I'm going to jump in because you're again
22 evading my question and answering a different
23 question.  Please answer my question first.
24          You know that is an acceptable
25 strategy, right?

Page 116

1       A.   Can you restate your theory?
2       Q.   It's not a theory.  It's a question.
3  ==Isn't it true that you're well==
4  ==aware that it is permissible, as a strategy, to sell==
5  ==securities to capture a loss and to reinvest==
6  ==immediately the proceeds from that sale rather than==
7  ==sitting on the cash?==
8  ==     A.   Yes, you absolutely do that.  That==
9  ==happens on a regular basis.==
10 ==     Q.   And as we went through, First Western did==
11 ==it on a regular basis in the Fleck accounts, right?==
12 ==     A.   Yes, they did.==
13      Q.   Okay.  But for purposes of your analysis,
14 you have assumed that instead First Western would
15 have sat on the cash instead of reinvesting, right?
16      A.   Under the wash-sale rules, yes, I have.
17          MR. BEYER:  Well, I move to strike
18 the portion of that that's not responsive to my
19 question.
20      Q.   That's not under the wash-sale rules that
21 they did that.  Under the wash-sale rules they could
22 either reinvest in a substitute security immediately
23 or sit on cash.  Either one of those would be
24 consistent with the wash-sale rule, right?
25      A.   My assumption is that they were going to

Page 117

1  reinvest in the same securities.
2       Q.   Not the question.
3       A.   How they've set the money aside -- and
4  we've talked this also.  I'll argue back with you
5  for just a second, that it would be speculative of
6  me to determine what other securities they wanted.
7          But if they were to reinvest in
8  the same securities, it's most reasonable they would
9  have set that cash aside in the beginning of
10 December, knowing that there is potential for that
11 equity to decline in December.  They would want to
12 preserve that and reinvest after the 30 days for the
13 wash-sale rules.
14          MR. BEYER:  Okay.  I'm going to move
15 to strike that as nonresponsive to my question.
16      Q.   Isn't it true that you're well aware that
17 it would be consistent with the wash-sale rule to
18 either sit on the cash for 30 days or immediately
19 reinvest the proceeds in a substitute security, and
20 that --
21      A.   And I said yes, that's a possibility.
22      Q.   Okay.  However, even though both of those
23 are possibilities and both of those would comport
24 with the wash-sale rules, you have chosen to assume
25 that First Western would have stayed in cash rather



Page 118

1  than reinvesting in substitute securities, right?
2       A.   I have, and I've stated that multiple
3  times today.
4       Q.   And that's true even though First
5  Western, based on the statements you've looked at,
6  never sold, captured losses in the Fleck portfolios
7  and held it in cash, right?
8       A.   They never took advantage of wash-sale
9  rules, that's correct.
10      Q.   No, that's not what I asked you.
11           They never held it in cash when
12  they collected losses in those accounts, did they?
13  I'm not asking about the wash-sale rules. I'm asking
14  just a factual question. Isn't it true that they
15  never sat on cash when they sold loss positions in
16  the Fleck accounts?
17      A.   That's not true. Just it's not feasible
18  for them to not sit on cash, to immediately transfer
19  it over. They would sell, and then as you observed
20  in the statements, within days there was
21  reinvestment.
22      Q.   Okay.
23      A.   Where did that money go in the meantime,
24  that would be in cash.
25           But no, they did not sit on cash

Page 119

1  for a 30-day period of time. It was going to be
2  reinvested at this level of investment, the
3  1.1 million.
4       Q.   So you're assuming that they would
5  have -- that First Western would have done something
6  that empirically and historically in the Fleck
7  accounts they had never done, right?
8       A.   I am.
9       Q.   And you're assuming that they would not
10 have done what empirically and historically they had
11 done in prior months to the Fleck accounts, right?
12      A.   I am -- that's correct. Because for the
13 wash-sale, and it's clear, my testimony is that they
14 would have sold, set it aside in cash. Because for
15 me to determine what they would have invested in
16 would be speculative.
17      Q.   And that -- that is the only reason that
18 supports your decision to assume that First Western
19 would have sat on cash, is that for you to figure
20 out what they would have substituted instead would
21 be too speculative for you to do, right?
22      A.   I think there's a combination of events
23 that lead to that decision. But that's certainly
24 one of them, is that for me to assess where they
25 would have reinvested.

Page 120

1            They were not being asked to do
2  anything other than take advantage of the wash-sale
3  rules here, to take advantage -- harvest those
4  losses. There was no indication in the information
5  that Mr. Fleck wanted different securities. And so
6  I think it's reasonable to assume that he would have
7  wanted them to harvest those losses, reinvest in the
8  same securities.
9            I don't know their profile. I am
10 here to assess the damages side, the liability side.
11 What First Western should have done is outside of my
12 testimony.
13      Q.   Okay. And -- and I'm starting to think
14 you're not very familiar with the wash-sale rules.
15 Do you think that you are or do you consider
16 yourself an expert on the wash-sale rules?
17      A.   I don't consider myself to be an expert
18 in investment advisory. I am familiar with the
19 wash-sale rules. I am a -- in my career I've
20 prepared taxes, a lot of Schedule Ds, and dealt with
21 this with high wealth clients.
22           But as far as what First Western's
23 philosophy is and the directive, I am not familiar
24 with those between them and the client, other than
25 the client did direct them to harvest these losses.

Page 121

1       Q.   But that's an assumption you're making,
2  that the client made that instruction. You don't
3  know whether that happened independently of the
4  facts in this case, do you?
5       A.   Yes. If you were to ask me if I'm
6  assuming that he gave that directive, yes.
7       Q.   Now, you keep talking about taking
8  advantage of the wash-sale rules. The wash-sale
9  rules aren't something that you take advantage of,
10 are they? Aren't it something that keeps you from
11 doing something that you otherwise would like to do?
12      A.   Well, taking advantage of not getting in
13 trouble with wash-sale rules. I mean, it's a waste
14 of time if you don't abide by them, if your intent
15 is to reinvest in the same securities.
16      Q.   So the wash-sale rules are keeping you
17 doing something you would rather do, which is to
18 sell on day one and buy back the exact same security
19 on day two and try to capture the tax losses.
20 That's what you'd like to do, right? But wash-sale
21 rules tell you you can't do that. You have to wait
22 30 days, right?
23      A.   That's the IRS rules, yes, that's
24 correct.
25      Q.   And what section of the code is that?



---

Page 122

```
 1        A.   I don't have that memorized.
 2        Q.   Okay.  But it does not run afoul of the
 3   wash-sale rules to sell a particular security,
 4   immediately invest in a similar security, and then
 5   after 30 days sell the similar security and buy back
 6   the original security, correct?
 7        A.   That's not -- that's like a double
 8   negative question.  Yes, you can do that.
 9        Q.   Thank you.
10             You are, however, assuming that
11   First Western would not have done that.  Instead
12   they would have sat in cash, right?  Right?
13        A.   Yes.
14        Q.   Now, your opinion, in Opinion No. 1, is
15   that there were $128,000 roughly of unrealized
16   losses in the Fleck accounts as of December 3rd,
17   2018, right?
18        A.   That's correct.
19        Q.   What were the unrealized losses on
20   December 10th?
21        A.   I don't know.  I did not calculate that.
22        Q.   What were they on December 4th?
23        A.   I do not know.  I did not calculate that.
24        Q.   Do you know what the unrealized losses in
25   the Fleck accounts were on any day other than
```

Page 123

```
 1   December 3rd, 2018?
 2        A.   Well, certainly we have all the trust
 3   statements that give us the month-end amounts of
 4   unrealized losses.
 5        Q.   Did you consider using as the unrealized
 6   loss number anything than the number on December
 7   3rd?
 8        A.   I did look at the November 30th amounts,
 9   and I do discuss that in my report as far as
10   excluding certain securities that on December 3rd
11   would have not had a loss, but as of November did
12   have losses.  And so there were, I believe, seven or
13   eight securities that I excluded from my analysis
14   because they did have losses prior to December 3rd,
15   but on December 3rd they would not have had losses.
16   So I had that consideration.
17        Q.   You reviewed the e-mail from Brittany
18   Dreher, I don't know how to pronounce that,
19   D-r-e-h-e-r, on April 22nd, 2019.  That was the
20   source of your 28.43 percent tax rate, right?
21        A.   Yes, I recall that.
22        Q.   And you recall that in that e-mail she
23   says, she refers to the cost of not harvesting the
24   roughly 585,000 of losses.
25        A.   I would -- it's been months since I've
```

Page 124

```
 1   looked at that e-mail, so I would have to pull that
 2   up and confirm that.
 3        Q.   All right.  Well, it's Bates No. 2382.
 4   The date is May 1, 2019.  Actually, her e-mail is
 5   April 22nd, but the top e-mail in the chain is
 6   May 1.
 7        A.   Give me a second.
 8             MR. PODOLL:  What was that number
 9   again?
10             MR. BEYER:  It ends in -- it's a
11   First Western document ending in 2382.
12             MR. PODOLL:  Thank you.
13        Q.   Do you have that, Ms. Masten?
14        A.   I do not yet.  I'm sorry, I'm looking for
15   it.
16        Q.   All right.  If this is going to take a
17   lot of time, it's not important.  I can ask you my
18   question without you having the document in front of
19   you.
20        A.   Yeah, I'm not finding 2382 quickly.
21        Q.   Okay.  Well, you recall the e-mail
22   because it's where you derive the tax rate from,
23   right?
24        A.   Yes.
25        Q.   And I'll tell you it says, "The cost of
```

Page 125

```
 1   not harvesting -- harvesting the roughly 585,000 of
 2   losses in 2018."  And then it goes on and talks
 3   about the tax rate and do the calculation.
 4             And my question is simply:  Did
 5   you do anything to figure out what 585,000 number
 6   she was referring to?
 7        A.   Sorry, I believe I have a -- a different
 8   document.  I was just going to look at my footnote
 9   because I think the Bates reference on that was a
10   different reference.  I don't know if it's a
11   duplicate document.  But that marginal capital tax
12   rate by Brittany was Bates ending in 773, so I don't
13   know if the same granular data was on there.
14        Q.   But does it have the same sentence, "The
15   cost of not harvesting the roughly 585,000 in losses
16   in 2018"?
17        A.   That's -- I'm still trying to find that
18   document.
19        Q.   All right.  My question is simply:  I've
20   read it to you.  It's in the e-mail.  Did you do
21   anything to consider where the $585,000 number came
22   from?
23        A.   I do remember looking at that, and that
24   would have been something, again, that would have
25   driven my questions to can I get a copy of the 2018
```

32 (Pages 122 to 125)



Page 118

1   than reinvesting in substitute securities, right?
2       A.   I have, and I've stated that multiple
3   times today.
4       Q.    And that's true even though First
5   Western, based on the statements you've looked at,
6   never sold, captured losses in the Fleck portfolios
7   and held it in cash, right?
8       A.   They never took advantage of wash-sale
9   rules, that's correct.
10      Q.   No, that's not what I asked you.
11  They never held it in cash when
12  they collected losses in those accounts, did they?
13  I'm not asking about the wash-sale rules. I'm asking
14  just a factual question. Isn't it true that they
15  never sat on cash when they sold loss positions in
16  the Fleck accounts?
17      A.   That's not true. Just it's not feasible
18  for them to not sit on cash, to immediately transfer
19  it over. They would sell, and then as you observed
20  in the statements, within days there was
21  reinvestment.
22      Q.   Okay.
23      A.   Where did that money go in the meantime,
24  that would be in cash.
25           But no, they did not sit on cash

Page 119

1   for a 30-day period of time. It was going to be
2   reinvested at this level of investment, the
3   1.1 million.
4       Q.   So you're assuming that they would
5   have -- that First Western would have done something
6   that empirically and historically in the Fleck
7   accounts they had never done, right?
8       A.   I am.
9       Q.   And you're assuming that they would not
10  have done what empirically and historically they had
11  done in prior months to the Fleck accounts, right?
12      A.   I am -- that's correct. Because for the
13  wash-sale, and it's clear, my testimony is that they
14  would have sold, set it aside in cash. Because for
15  me to determine what they would have invested in
16  would be speculative.
17      Q.   And that -- that is the only reason that
18  supports your decision to assume that First Western
19  would have sat on cash, is that for you to figure
20  out what they would have substituted instead would
21  be too speculative for you to do, right?
22      A.   I think there's a combination of events
23  that lead to that decision. But that's certainly
24  one of them, is that for me to assess where they
25  would have reinvested.

Page 120

1            They were not being asked to do
2   anything other than take advantage of the wash-sale
3   rules here, to take advantage -- harvest those
4   losses. There was no indication in the information
5   that Mr. Fleck wanted different securities. And so
6   I think it's reasonable to assume that he would have
7   wanted them to harvest those losses, reinvest in the
8   same securities.
9            I don't know their profile. I am
10  here to assess the damages side, the liability side.
11  What First Western should have done is outside of my
12  testimony.
13      Q.   Okay. And -- and I'm starting to think
14  you're not very familiar with the wash-sale rules.
15  Do you think that you are or do you consider
16  yourself an expert on the wash-sale rules?
17      A.   I don't consider myself to be an expert
18  in investment advisory. I am familiar with the
19  wash-sale rules. I am a -- in my career I've
20  prepared taxes, a lot of Schedule Ds, and dealt with
21  this with high wealth clients.
22           But as far as what First Western's
23  philosophy is and the directive, I am not familiar
24  with those between them and the client, other than
25  the client did direct them to harvest these losses.

Page 121

1       Q.   But that's an assumption you're making,
2   that the client made that instruction. You don't
3   know whether that happened independently of the
4   facts in this case, do you?
5       A.   Yes. If you were to ask me if I'm
6   assuming that he gave that directive, yes.
7       Q.   Now, you keep talking about taking
8   advantage of the wash-sale rules. The wash-sale
9   rules aren't something that you take advantage of,
10  are they? Aren't it something that keeps you from
11  doing something that you otherwise would like to do?
12      A.   Well, taking advantage of not getting in
13  trouble with wash-sale rules. I mean, it's a waste
14  of time if you don't abide by them, if your intent
15  is to reinvest in the same securities.
16      Q.   So the wash-sale rules are keeping you
17  doing something you would rather do, which is to
18  sell on day one and buy back the exact same security
19  on day two and try to capture the tax losses.
20  That's what you'd like to do, right? But wash-sale
21  rules tell you you can't do that. You have to wait
22  30 days, right?
23      A.   That's the IRS rules, yes, that's
24  correct.
25      Q.   And what section of the code is that?



Page 122

1      A.   I don't have that memorized.
2      Q.   Okay.  But it does not run afoul of the
3  wash-sale rules to sell a particular security,
4  immediately invest in a similar security, and then
5  after 30 days sell the similar security and buy back
6  the original security, correct?
7      A.   That's not -- that's like a double
8  negative question.  Yes, you can do that.
9      Q.   Thank you.
10          You are, however, assuming that
11  First Western would not have done that.  Instead
12  they would have sat in cash, right?  Right?
13      A.   Yes.
14      Q.   Now, your opinion, in Opinion No. 1, is
15  that there were $128,000 roughly of unrealized
16  losses in the Fleck accounts as of December 3rd,
17  2018, right?
18      A.   That's correct.
19      Q.   What were the unrealized losses on
20  December 10th?
21      A.   I don't know.  I did not calculate that.
22      Q.   What were they on December 4th?
23      A.   I do not know.  I did not calculate that.
24      Q.   Do you know what the unrealized losses in
25  the Fleck accounts were on any day other than

Page 123

1  December 3rd, 2018?
2      A.   Well, certainly we have all the trust
3  statements that give us the month-end amounts of
4  unrealized losses.
5      Q.   Did you consider using as the unrealized
6  loss number anything than the number on December
7  3rd?
8      A.   I did look at the November 30th amounts,
9  and I do discuss that in my report as far as
10  excluding certain securities that on December 3rd
11  would have not had a loss, but as of November did
12  have losses.  And so there were, I believe, seven or
13  eight securities that I excluded from my analysis
14  because they did have losses prior to December 3rd,
15  but on December 3rd they would not have had losses.
16  So I had that consideration.
17      Q.   You reviewed the e-mail from Brittany
18  Dreher, I don't know how to pronounce that,
19  D-r-e-h-e-r, on April 22nd, 2019.  That was the
20  source of your 28.43 percent tax rate, right?
21      A.   Yes, I recall that.
22      Q.   And you recall that in that e-mail she
23  says, she refers to the cost of not harvesting the
24  roughly 585,000 of losses.
25      A.   I would -- it's been months since I've

Page 124

1  looked at that e-mail, so I would have to pull that
2  up and confirm that.
3      Q.   All right.  Well, it's Bates No. 2382.
4  The date is May 1, 2019.  Actually, her e-mail is
5  April 22nd, but the top e-mail in the chain is
6  May 1.
7      A.   Give me a second.
8          MR. PODOLL:  What was that number
9  again?
10          MR. BEYER:  It ends in -- it's a
11  First Western document ending in 2382.
12          MR. PODOLL:  Thank you.
13      Q.   Do you have that, Ms. Masten?
14      A.   I do not yet.  I'm sorry, I'm looking for
15  it.
16      Q.   All right.  If this is going to take a
17  lot of time, it's not important.  I can ask you my
18  question without you having the document in front of
19  you.
20      A.   Yeah, I'm not finding 2382 quickly.
21      Q.   Okay.  Well, you recall the e-mail
22  because it's where you derive the tax rate from,
23  right?
24      A.   Yes.
25      Q.   And I'll tell you it says, "The cost of

Page 125

1  not harvesting -- harvesting the roughly 585,000 of
2  losses in 2018."  And then it goes on and talks
3  about the tax rate and do the calculation.
4          And my question is simply:  Did
5  you do anything to figure out what 585,000 number
6  she was referring to?
7      A.   Sorry, I believe I have a -- a different
8  document.  I was just going to look at my footnote
9  because I think the Bates reference on that was a
10  different reference.  I don't know if it's a
11  duplicate document.  But that marginal capital tax
12  rate by Brittany was Bates ending in 773, so I don't
13  know if the same granular data was on there.
14      Q.   But does it have the same sentence, "The
15  cost of not harvesting the roughly 585,000 in losses
16  in 2018"?
17      A.   That's -- I'm still trying to find that
18  document.
19      Q.   All right.  My question is simply:  I've
20  read it to you.  It's in the e-mail.  Did you do
21  anything to consider where the $585,000 number came
22  from?
23      A.   I do remember looking at that, and that
24  would have been something, again, that would have
25  driven my questions to can I get a copy of the 2018



Page 134

1    difficult to assess what you're asking.  But in
2    general, those losses will offset on a short-term
3    basis gains, as that's kind of how you are
4    realigning portfolios.
5    But again, my specialty is not in
6    investment strategy.  I'm here to discuss the
7    damages.  I think Mr. Rulison would be better to
8    answer issues on how that strategy works from a tax
9    perspective.  Knowing that this is a long-term hold
10   portfolio, there would just be a continued effort,
11   like the Flecks have had in the past, of having
12   gains and you have losses, and you try to use those
13   losses to offset the gains, which would result in a
14   minimal amount on those subsequent transactions that
15   you're talking about, like the sale of
16   Anheuser-Busch.
17   Q.    Now, using Anheuser-Busch as an example,
18   that was not a long-term hold, was it?  Mr. Fleck
19   instructed First Western to sell that on February
20   6th?
21   A.    I don't know what the directive on
22   February 6th was.  I don't know how that date was
23   specific.  But I do know that stocks were sold.  I
24   believe I read an e-mail from one of the advisors
25   saying we're going to sell these and enter into

Page 135

1    these pooled equity funds.  But I don't know if that
2    was Mr. Fleck's decision to specifically sell
3    Anheuser-Busch or not.  Maybe there is some evidence
4    that that was his decision.  I don't know.
5    Q.    In any event, Anheuser-Busch was not held
6    long term.  It was sold on February 6th, right?
7    A.    That's correct.
8    Q.    And the same is true with a number of
9    other securities in the portfolios?
10   A.    That's correct.  But to your point, at
11   the same time there was -- there was --
12   Q.    Ms. Masten, I'm asking you questions.
13   A.    -- a loss that would have offset
14   specifically Anheuser-Busch.
15        MR. BEYER:  And I move to strike all
16   of that.
17   Q.    I am just asking you questions, and I
18   would appreciate it if you would just answer my
19   question.  I don't know why that's so difficult.
20        A number of securities from this
21   portfolio were sold on February 6th and not held
22   long term, right?
23   A.    Yes.
24   Q.    And you have not done anything to
25   consider what the actual tax burden on those sales

Page 136

1    was by virtue of the hypothetical that you have in
2    your damage calculations of selling -- of selling on
3    December 3rd and rebuying on January 3rd and then
4    these sales that actually happened on February 6th.
5    You haven't considered the February 6th effect on
6    your damages, have you?
7    A.    I have not assessed the tax implications
8    of the February 6th transactions, that is correct.
9    Yes.
10   Q.    And so to the extent that in your damage
11   scenario basis in these stocks was lowered, and then
12   when sold in February resulted in additional tax,
13   that is something that you have not considered in
14   your calculations, right?
15   A.    That is correct.
16   Q.    Thank you.
17        Do you know what the number is, as
18   of February 6th, that whether the Flecks were net
19   positive or net negative from a tax standpoint when
20   you do consider the additional tax that was incurred
21   because of lowering the basis?
22   A.    I do not have enough evidence to
23   calculate that, so no, I do not.
24   Q.    How much in long-term capital gains did
25   the Flecks have in 2018 that would have benefitted

Page 137

1    from losses that they didn't have?
2    A.    I don't have granular detail.  All I have
3    is the transcript, so I can't answer that question.
4    Q.    Can you pull up the transcript?  Do you
5    have that available?
6    A.    Yes.
7    Q.    All right.  Isn't it true that the tax
8    paid by the Flecks in 2018 was $774?
9    A.    That is true.  Based on the transcript,
10   yes.  Well, that was the tax due, not -- you know,
11   they had carry forwards and they had pre-paids and
12   extension payments.  But the dollar amount of
13   taxable amount on their income was 774.
14   Q.    And just to confirm that.  If you look on
15   the second page of the transcript near the bottom,
16   there's a tax on income, less Social Security
17   income, per computer, is $774, right?
18   A.    Yes.  That's tax on 270,000 of gross
19   income, adjusted gross income.
20   Q.    That's pretty good.  I wish I only had to
21   pay that percentage of tax.
22        All right.  And if you look on
23   page 4, or the fourth page.  It's not numbered, but
24   the fourth page.  You can see a total payments of
25   $11,006, and the overage applied to the next year is

MAGNA
LEGAL SERVICES

Page 162

```
 1    on the stocks, not on the other aspects of it.
 2           Your question was does it make
 3    sense if they were to put it in a lower return.
 4    Well, they were getting 2.3 percent returns in cash,
 5    and that was similar to the returns they were
 6    getting in some of those other funds outside of the
 7    direct stock securities.
 8      Q.   My question, though, was isn't it true
 9    that what you are saying they should have sold were
10    equities?
11      A.   That is true, yes.
12      Q.   Okay.  And as between reinvesting in
13    similar equities and putting the money in cash,
14    wouldn't the expectation be that being invested in
15    equities would have a better performance than being
16    in cash?
17      A.   Generally, that's true.  Yes.
18      Q.   Okay.
19      A.   Depending on what's going on in the
20    market and what the returns are at any given point
21    in time.
22      Q.   So at a time when the client is
23    complaining about the returns in the portfolio, do
24    you think it's reasonable to think that First
25    Western would have placed 1 million of the 8 million
```

Page 163

```
 1    total in a cash fund at 2 percent rather than find
 2    substitute equities that would be expected to
 3    perform better than that?
 4      A.   I am not in a position to -- to give
 5    opinions on First Western's investment style.
 6    That's another expert is giving opinions on that
 7    area.
 8      Q.   Okay.
 9      A.   I thought for purposes of my analysis, it
10    was reasonable to make that assumption.
11      Q.   It was reasonable to make the assumption
12    that First Western would have put all the proceeds
13    of those sales of equities into a 2 percent cash
14    fund at a time when the client was complaining about
15    the return on the portfolio?
16      A.   That that is the -- the one area that I
17    could do because it's, as we discussed, speculative
18    for me to determine where else they would have
19    reinvested.
20           So yes, I, in my analysis and my
21    estimate, determined that's reasonable.  Especially
22    looking at their overall estimated returns on the
23    entire portfolio, that is a very similar 2.3 percent
24    at the time.
25      Q.   Which is the return that the client was
```

Page 164

```
 1    complaining about, right?
 2      A.   Correct.  But at least it wasn't going to
 3    decline, if it was in cash.
 4      Q.   Well, in that theory, shouldn't the
 5    entire portfolio always be in risk-free investments,
 6    so that you can make sure that it never goes down?
 7      A.   No.  You're mis --
 8      Q.   You're not saying that, are you?
 9      A.   You're misconstruing my comment.  No, for
10    purposes of complying with this wash-sale event.
11      Q.   I see.  You read the Rulison report and
12    deposition; is that right?
13      A.   I did.
14      Q.   Actually, did you read the Rulison
15    deposition?
16      A.   I reviewed it.  I didn't read it in
17    detail, so I don't have any of the discussion, as I
18    mentioned this morning, kind of memorized.
19      Q.   That's the one you received yesterday
20    late afternoon, right?
21      A.   That's correct.
22      Q.   Okay.  Do you remember Rulison stating in
23    his report that if a fund is sold to harvest the
24    loss, a similar fund could be simultaneously
25    purchased to eliminate the risk of missing out on a
```

Page 165

```
 1    market upswing?
 2      A.   I don't remember that exact statement.
 3    The concept, I do recall.
 4      Q.   And so why did you not assume that
 5    Mr. Rulison's strategy would have been pursued by
 6    First Western?
 7      A.   Because without specific information
 8    about which securities would have been the
 9    replacement investments, as I've said multiple
10    times, the potential economic impact on that, I
11    couldn't assess.  But going to the returns that they
12    were getting on cash was something that I could
13    assess, and that was something that was not going to
14    be as speculative as me determining which
15    investments they wanted to park the money in.
16      Q.   And you made that assumption even though
17    you were aware of the Fleck's own expert,
18    Mr. Rulison, who purports to be an industry expert,
19    stating that -- stating that this strategy would be
20    an available strategy?
21      A.   Well, I would have to look at Rulison's
22    specific statement to see in what context he was
23    making that statement.
24           But generally, there is also in
25    Rulison's report the concept of timing your gains
```

42 (Pages 162 to 165)


MAGNA
LEGAL SERVICES

Page 174

1    A.   Or based on his deposition, that's
2    correct.
3    Q.   And you agree that they had multiple
4    options as to what to do with the proceeds of those
5    sales, right?
6    A.   Yeah.  I agree that Mr. Fleck is stating
7    that he did not give them instructions on what to do
8    with those proceeds.
9    Q.   And that they had multiple options as to
10   what to do with the proceeds, right?
11   A.   Yes.
12   Q.   Only one of which was to hold the funds
13   in cash, right?
14   A.   Yes.
15   Q.   And you agree that Mr. Fleck didn't tell
16   First Western which of those options to take.  That
17   it was up to them, right?
18   A.   That's what he states, correct.
19   Q.   And you know that previously when selling
20   positions with unrealized losses, First Western had,
21   in fact, reinvested and not sat on cash, right?
22   A.   That's correct.
23   Q.   And had First Western, instead of holding
24   it in cash, reinvested promptly in substitute
25   securities, you have no basis for opining on what

Page 175

1    the effect would have been in terms of whether there
2    were damages or no damages, right?
3    A.   That's not a scenario I ran, that's
4    correct.
5    Q.   All right.  I want to ask you about
6    Opinions 4 and 5.  Are 4 and 5 the same thing as 3,
7    just using different measurement dates?
8    A.   I'm just pulling up my report again.
9    Sorry.  Give me a second.
10          So Opinions 3, 4, and 5 are all
11   using different measurements.  They're point-in-time
12   losses.  And so when you look at Opinion 3, losses
13   as of January 3rd, February 6th.  Opinion 4 is
14   February 6th.  Those are just point-in-time losses.
15   It's not cumulative.
16   Q.   Okay.
17   A.   Per se.
18   Q.   That's what I wanted to get at.  These
19   are not to be added together.  These are
20   alternatives, depending on which dates were picked?
21   A.   That's correct.  And that's why they're
22   kind of, like, italicized and marked off, separated
23   out on the summary table.
24   Q.   All right.  That's what I wanted to know.
25   All right.  Now I want to ask you about exhibit --

Page 176

1    or Opinion 6, shortcoming of portfolio performance.
2           I think we established earlier
3    that you don't have expertise in portfolio
4    management, right?
5    A.   That's correct.
6    Q.   So why are you purporting to give an
7    opinion that the performance of the portfolio was
8    less than it should have been?
9    A.   I was asked to look at what the
10   benchmarks were and what was included in the
11   investment portfolio statement -- or the investment
12   policy statement, and then determine given the
13   expectations of the parties investing -- you know,
14   they could have -- if they just wanted S&P 500, they
15   didn't need First Western to do that for them.  They
16   were looking for higher returns.
17          And so given the information that
18   was in the IPS and basic benchmarks that had been
19   discussed by the other experts, Mr. Reidy and
20   Mr. Rulison, given those, you know, metrics and the
21   percentages that were included in the IPS, generally
22   speaking, you know, what -- I was asked to kind of
23   account for and quantify what those losses were
24   based on the expectation versus what they actually
25   achieved.

Page 177

1    Q.   So are you yourself deciding that or
2    opining that S&P and the IPS expected returns are
3    appropriate benchmarks, or are you taking those as a
4    given from somebody else and then just calculating
5    the numbers using those benchmarks?
6    A.   I'm calculating a range that would be
7    something that is used by the trier of fact based on
8    other testimony that's given.  And so on the lower
9    end I'm using the 5.4 percent, which is the S&P 500
10   returns.  And on the upper end, the amount that was
11   stated in the IPS as far as the 6.48 percent.  Just
12   to give a range, so if it was determined by the
13   trier of fact that this was relevant and it was a
14   damage that needed to be quantified, that these are
15   my numbers.
16          And so in coming up with, you
17   know, what would be my benchmarks for the ranges, I
18   looked at what the other experts had discussed in
19   their reports regarding benchmarking.  And so that's
20   where the S&P 500 was discussed multiple times,
21   numerous times.  As benchmarking discussion of
22   expected range of returns of 5 to 6 percent was a
23   lot, in a lot of testimony and reports, and then the
24   IPS itself had the 6.48 percent and there was some,
25   you know, range references based over years.  So I

45 (Pages 174 to 177)



## Page 178

1 felt that in order to put out something, these two
2 kind of bookends would be a reasonable range of
3 expected returns.
4 So I'm not giving opinions on
5 investment policy and, you know, performance and
6 what should have been done in that respect.  That's
7 other experts.  But I am quantifying it based on
8 what has been put out in their opinions.
9 Q.  All right.  Do you want to hear my
10 question again?  That had nothing to do with my
11 question.  That whole long speech had nothing to do
12 with my question.  Do you want to hear it again or
13 should I ask it again?
14 A.  Please ask it again.
15 Q.  Okay.
16 Did you pick the benchmarks of the
17 S&P and the IPS expected return number, or did
18 somebody else pick those and then you just
19 calculated based on those?
20 A.  So I will repeat.  I looked at all that
21 information.  I looked at the range.  I selected the
22 upper and lower bounds of that, but I am not
23 supporting those as upper and lower bounds.  That is
24 someone else's opinions as far as whether those are
25 reasonable.  But those would be the range.  That

## Page 179

1 seems a reasonable range to me, so that was me
2 picking those based on their reports and their
3 testimony.
4 Q.  All right.  So you picked the S&P as an
5 appropriate benchmark?
6 A.  Yes.
7 Q.  And you picked the IPS expected return
8 number as a reasonable benchmark?
9 A.  Yes.
10 Q.  And then you calculated the difference
11 between actual performance at each of those
12 benchmarks?
13 A.  Yes.  Between -- of -- of what actually
14 occurred in a portfolio versus what those expected
15 returns would have been.
16 Q.  So you picked those benchmarks even
17 though you've already said that you're not an expert
18 in identifying what benchmarks are appropriate for
19 investment portfolios, right?
20 A.  I did.  That's why I'm relying on
21 Mr. Rulison and Mr. Reidy's testimony and the
22 information that was provided in the IPS.
23 Q.  I thought you said that you picked those
24 benchmarks?
25 A.  I did, but those are documented and

## Page 180

1 memorialized in those reports, depositions, and
2 documents.
3 Q.  Find me a place where Mr. Reidy said that
4 an appropriate benchmark to use against the actual
5 performance in the Fleck portfolios is the S&P 500.
6 A.  Mr. Reidy does not have a specific
7 statement on that, but he does reference and
8 illustrate multiple times -- I have a footnote.
9 Give me a second.
10 Q.  Ms. Masten, are you saying that the
11 number of times somebody refers to the S&P 500 is
12 somehow a basis for concluding that it is an
13 appropriate benchmark in this case?
14 A.  I'm not, and I wasn't finished with my
15 first response.
16 But I'm -- I'm stating that given
17 my task to estimate damages, that a reasonable
18 expectation would be what are the returns in the
19 market, the broader market, and a specific
20 expectation would be what was in the contract
21 between the plaintiffs and the defendants.
22 Q.  I'm asking you --
23 A.  And if it's determined that it's a
24 different -- sorry.  If it's determined that it's a
25 different benchmark, then I would have no problem in

## Page 181

1 recalculating.  But I was trying to give a range for
2 any decisions that needed to be made.
3 Q.  Okay.  My question was much different
4 from that, not surprisingly.
5 I asked you is the number of times
6 that Mr. Reidy referred to the S&P 500 in his report
7 a basis, in your mind, for using that as a benchmark
8 for the performance of the Fleck accounts?  Just for
9 the --
10 A.  (Simultaneous speaking).
11 Q.  -- fact that -- just the number of times
12 he mentions it in his report?
13 A.  The sheer number of times is not as
14 relevant as the focus.
15 Q.  Okay.  And where in his report did he say
16 anything to the effect that an appropriate benchmark
17 to measure against the actual Fleck portfolio
18 performance is the S&P 500?
19 A.  As I've stated, he does not have a
20 specific statement to that.  Otherwise, I would have
21 cited that statement in my report as a basis for
22 using it.
23 Q.  Okay.  Anything even to the effect of
24 that?  Even if he doesn't have a direct declarative
25 statement to that effect, anything that's even close



Page 182

1   to suggesting that an appropriate benchmark to
2   compare against the actual performance of a
3   diversified portfolio like the Flecks' is the
4   S&P 500 Index?
5        A.   I'm sorry, I would have to go back to be
6   fully responsive to your question, because you're
7   very sensitive to that.  I would have to go back to
8   either one of his reports.
9        Q.   The report that you prepared, which is
10  supposed to be a full disclosure of your opinions
11  and the bases for them, do you identify anywhere in
12  your report where you cite to anything from
13  Mr. Reidy to the effect that the S&P 500 Index would
14  be an appropriate benchmark to use against the
15  performance of an actual -- of a diversified
16  portfolio like the Flecks'?  Where is that in your
17  report?
18       A.   I don't have -- I don't have that in my
19  report, as I stated.  If there was a statement like
20  that, I would have cited it.
21       Q.   How about when with Mr. Rulison.  Where
22  in your report do you disclose to us anything about
23  Mr. Rulison's report or testimony that you think
24  provides that in his opinion the S&P 500 is an
25  appropriate benchmark to use in measuring the

Page 183

1   performance of a diversified portfolio like the
2   Flecks'?  Where is that in your report?
3        A.   I do have a citation of Footnote 15 that
4   refers to both Mr. Reidy and Mr. Rulison and their
5   discussions; Mr. Rulison's referring to a range of
6   expectations between 5 and 6 percent, Mr. Reidy's
7   report, using illustrations throughout his report
8   based on the S&P 500.  So there's no direct
9   statement, but these are implications of
10  expectations of returns of a portfolio that's fully
11  diversified in the public market.
12       Q.   You don't provide us any information at
13  all where it is in these reports or testimony that
14  you interpret as saying that they think that an
15  appropriate benchmark to use against the actual
16  performance of the Flecks' portfolio is the S&P 500,
17  do you?
18       A.   Well, their reports are totally focused
19  on the Flecks.  And as I stated, maybe this is the
20  fourth time, there's no specific sentence that says
21  that that should be the benchmark.  But their
22  illustrations and their discussion is all
23  surrounding the S&P 500 and expectations of 5 to
24  6 percent.
25       Q.   Now, does it make sense to you that --

Page 184

1   well, let me withdraw that.
2             What is the S&P 500 Index?
3        A.   It is an index that's been around for
4   decades, that tracks the top 500 individual
5   corporations in the market.  Those corporations
6   change, and it's all based on market cap.  So it's
7   not on a value basis.  You know, market cap is the
8   one measure of size.  And so it tracks the S&P,
9   those 500 companies and their performance over time.
10            And generally there's indices that
11  track them over the years.  But specific companies
12  that are involved in the 500 mix change over time as
13  they, you know, maybe fall below the market cap or
14  they have a new entrant into the market.
15       Q.   These are all US companies, right?
16       A.   In the S&P 500, generally, yes.  There
17  are some foreign corporations who operate here in
18  the US, out of the US.  But generally these are --
19  we're not looking at Dimer (ph).
20       Q.   These are large cap US stocks, right?
21       A.   Yes.
22       Q.   And that is an asset class in a
23  diversified portfolio, including the Flecks'
24  portfolio.  Large cap US stocks is one of the asset
25  classes, correct?

Page 185

1        A.   That's correct.
2        Q.   And in the IPS, how much of the portfolio
3   was targeted to be invested in large cap US
4   equities?
5        A.   Sorry.  I'm just pulling up the IPS.  My
6   computer is slow.  So the minimum is zero percent,
7   the target is 13 percent, and the max is 28 percent.
8        Q.   And what kind of risk tolerance do the
9   Flecks' IPS provide for?
10       A.   And that -- so this is page 5 of the IPS.
11  The heading above that is "Holding Limits and Ranges
12  for Moderate."
13       Q.   And if you look on page 2, it
14  specifically says "Moderate," right?
15       A.   Long-term strategic portfolio allocation
16  is moderate; is that correct.
17       Q.   So this was not intended to be a
18  high-risk, high-yield kind of a portfolio, was it?
19       A.   Well, the stated expected target of
20  6.48 percent is a pretty high return.  And when we
21  look at companies and we look at risk and return
22  rates, they're kind of tied in some way.
23            So the -- what is -- what was to
24  me, when I was looking at this based on my knowledge
25  of cost to capital and the markets and sizes and



Page 186

1   different asset classes, is that with this mix, it
2   would be almost impossible to achieve those returns
3   with only, say, a 13 percent investment in those
4   large cap equities.
5       Q.   But again, you're not an expert in
6   portfolio management, are you?
7       A.   I am not.  And that's why that's not the
8   area of opinions that I'm providing in this case.
9       Q.   But you do know, as a matter of fact from
10  reading this, that the risk tolerance for the Flecks
11  was agreed by them and First Western to be moderate,
12  right?
13      A.   That is stated in this IPS, that's
14  correct.
15      Q.   And you understand the IPS is an
16  agreement between the Flecks and First Western, as
17  to how their portfolio -- portfolio will be managed,
18  right?
19      A.   Of course.
20      Q.   Okay.  It's even signed by both Flecks
21  and First Western, isn't it?
22      A.   Yes, it is.
23      Q.   So you think that a fair benchmark
24  against a moderate risk tolerance portfolio, with
25  the asset class targets minimums and maximums

Page 187

1   expressed in this IPS, is the -- is a 100 percent
2   investment in S&P 500 Index.  Is that what you're
3   saying?
4       A.   Those are not my opinions.
5            But based on ranges of returns
6   that are stated in the IPS, that their target is
7   6.48 percent, that the capital objective is 500,000
8   a year on an $8 million investment, that they have
9   different allocations in here.  Then yes, in order
10  to look at what the possible ranges are, we look at
11  the mix, and I've done this in my analysis.
12           What is problematic is there's
13  inconsistencies in the IPS itself, and so that's
14  where I come up with my S&P 500 as a low end and the
15  stated expected target return of 6.48 percent as the
16  high end.
17      Q.   As usual, that does not answer my
18  question, so I'm going to ask it again.
19           Are you saying that you think
20  in -- that it's fair to compare a Fleck asset class
21  agreement, as set forth here in the IPS, against
22  the performance of a 100 percent investment in the
23  S&P 500?
24      A.   I do not.  That's why I talk about --
25           MR. PODOLL:  Objection.

Page 188

1       A.   -- the inconsistencies in --
2            MR. PODOLL:  Objection.  Form.
3       Q.   If you can answer my question.
4            You do not, right?  You do not
5   think that's a fair comparison?
6       A.   I do not, and this is not the area of my
7   opinions.  This is -- these are not opinions that
8   I'm giving in this case.  I am using these as
9   benchmarks.  And it's up to other experts to defend
10  whether or not these expectations were reasonable,
11  what the investment policies were.  I am using the
12  investment policy statement as a guide.
13      Q.   Okay.  But you testified, though, that
14  you're the one who selected the S&P as one of the
15  benchmarks, right?
16      A.   I did because in the year with the
17  returns of 5.4 percent, that fits pretty evenly
18  within the 5 to 6 percent expected returns range of
19  the entire portfolio.
20      Q.   How would anybody have known that going
21  into 2018, how the S&P would perform?
22      A.   It was an unknown.
23      Q.   All right.  Now, why didn't you, in order
24  to find appropriate benchmarks to compare against
25  First Western's performance, go through each of

Page 189

1   these asset classes and find a suitable benchmark
2   for each?
3       A.   To do what?  Because I have multiple
4   analyses.  So specific to which opinion?
5       Q.   Well, why -- well, we're in Opinion
6   No. 6.  And you're saying that First Western
7   performed inadequately.  It underperformed, right?
8       A.   Yes.
9       Q.   Okay.  And so one of the comparisons you
10  say is, well, if they had just invested in the
11  S&P 500, 100 percent of the portfolio, they would
12  have returned a different amount, right?
13      A.   Right.  And I previously stated that
14  if --
15      Q.   No, I just need an answer.  I just need a
16  yes or no.  I don't need you to go on explaining.
17  Just answer my question, please.
18           That's what you did, right?
19      A.   Can you please repeat your question or
20  have it read back to me?
21      Q.   Yeah.
22           You --
23           MR. BEYER:  Leeann, why don't you go
24  ahead and read it back.
25           (Record read.)

