AARON H. FLECK  
FLECK REVOCABLE TRUST vs FIRST WESTERN

March 01, 2022  
1–4

## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF COLORADO
 3
 4   THE AARON H. FLECK REVOCABLE TRUST,
     through its Trustees, Aaron H. Fleck
 5   and Barbara G. Fleck, THE BARBARA G.
     FLECK REVOCABLE TRUST, through its
 6   Trustees, Aaron H. Fleck and Barbara G.
     Fleck, AARON FLECK, and BARBARA G. FLECK,
 7   on behalf of themselves and all others
     similarly situated,
 8
           Plaintiffs,
 9
     v.               Civil Action No. 21-cv-01073-CMA-GPG
10
     FIRST WESTERN TRUST BANK,
11   CHARLES BANTIS,
     and ANDREW GODFREY,
12
           Defendants.
13   _____
14              VIDEOCONFERENCE DEPOSITION
15                          OF
16                    AARON H. FLECK
17
18                   MARCH 1, 2022
                      9:00 A.M.
19                  ASPEN, COLORADO
20
21
22
23
24
        Jennifer R. Cormican, NVRA CVR No. 7645,
25     Notary Public in and for the State of Colorado
```

## Page 2

```
 1                       APPEARANCES
 2
 3   ON BEHALF OF THE PLAINTIFF(S):
 4       RICHARD B. PODOLL, ESQUIRE
         PODOLL & PODOLL, P.C.
 5       5619 DTC PARKWAY, SUITE 1100
         GREENWOOD VILLAGE, COLORADO 80111
 6       303-861-4000
         RICH@PODOLL.NET
 7
 8
 9   ON BEHALF OF THE DEFENDANT(S):
10       ADAM B. STERN, ESQUIRE
         BRYAN CAVE LEIGHTON PAISNER, LLP
11       1700 LINCOLN STREET, SUITE 4100
         DENVER, COLORADO 80203
12       303-861-7000
         ADAM.STERN@BCLPLAW.COM
13
14
15   ALSO APPEARING:
16       TIMOTHY R. BEYER, CO-COUNSEL WITH MR. STERN
17       LAURA J. KNOPP, CO-COUNSEL WITH MR. PODOLL
18       ROBERT PODOLL, CO-COUNSEL WITH MR. RICH PODOLL
19       VIDEOGRAPHER, RALPH MITCHELL
20     **All parties appearing via Zoom videoconference**
21
22
23
24
25
```

## Page 3

```
 1                         INDEX
 2   EXAMINATION
 3       By Mr. Stern.....................................5
 4   EXHIBITS
 5       No. 1; Interactive Brokers Statement for Barbara
             Fleck December 2018 Bates FLECK 7538-7542...20
 6
         No. 2; Account Listing Bates FLECK 2328........23
 7
         No. 3; IRS Tax Return Transcript ending
 8           12/31/2018 Bates FLECK 752-7537.............40
 9       No. 4; Draft 2018 Tax Return Bates
             7103-7165...................................50
10
         No. 5; Barbara G. Fleck Revocable Trust Statement
11           December 2018 Bates FLECK 1721-1741.........96
12       No. 6; Investment Policy Statement Bates FWTB
             437-443....................................108
13
         No. 7; Investment Services and Custody Agreement
14           Bates FWTB 414-419.........................132
15       No. 8; Email from Andrew Godfrey dated 5/11/2018
             Subject: Portfolio Bates FWTB 6891-6892....138
16
         No. 9; Fee Schedule Agreement Bates FWTB
17           426........................................146
18       No. 10; Aaron H. Fleck Revocable Trust Statement
             April 2019 Bates FWTB 184-192..............182
19
         No. 11; Barbara G. Fleck Revocable Trust
20           Statement April 2019 Bates FWTB 1-9........189
21       No. 12; Stifel Account Statement Pamela
             Brendlinger Bates FLECK 2814-2821..........197
22
         No. 13; 2019 Tax Return Bates FLECK 252-327...200
23
     DEPOSITION CONCLUDED..............................209
24
     REPORTER'S CERTIFICATE............................210
25
     ERRATA SHEET......................................211
```

## Page 4

1  PROCEEDINGS  
2  (On the record 9:00 a.m.)  
3  VIDEOGRAPHER: We are now on the video  
4  record. The time is 9:00 Mountain time  
5  March 1, 2022. This begins the videotaped  
6  deposition of Aaron Fleck taken in the  
7  matter of the Aaron H. Fleck Revocable Trust  
8  through its trustees, Aaron H Fleck and  
9  Barbara G. Fleck, the Barbara G. Fleck  
10 Revocable Trust through its trustees Aaron  
11 H. Fleck and Barbara G. Fleck, Aaron Fleck  
12 and Barbara G. Fleck versus First Western  
13 Trust Bank, Charles Bantis, and Andrew  
14 Godfrey, filed in the United States District  
15 Court for the District of Colorado, case  
16 number of which is 21-cv-01073-CMA-GPG.  
17 I'm Ralph Mitchell your remote  
18 videographer. The court reporter is  
19 Jennifer Cormican and we represent Esquire  
20 Deposition Solutions. Counsel, at this  
21 time, if you would please state your names  
22 and whom you represent, afterwards the court  
23 reporter will swear in the witness.  
24 MR. RICH PODOLL: Richard Podoll  
25 representing the plaintiffs.



800.211.DEP  
EsquireSolut...

Ex. C

Page 61
1     Form.
2     A    First, I could not take a loss
3  indiscriminately.  Every time there was a loss, I
4  asked them whether it would give him an advantage.  To
5  offset against profits or otherwise, whether he would
6  like to do it, and they had the choice.
7  BY MR. STERN:
8     Q    Okay.  When you were a portfolio manager,
9  did you ever have clients who chose not to harvest
10  short-term capital losses?
11    A    I can't recall that.  I had -- I had many
12  clients at one time and a lot of clients.  I can't
13  recall.
14    Q    You agree that a potential downside of
15  harvesting tax losses is that the security holder
16  cannot buy back the same security for 31 days, and
17  therefore, may miss appreciation in the security over
18  that 31-day period?
19        MR. ROB PODOLL:  Object.  Form.
20    A    Well, usually, if they sold a security, they
21  would buy a similar security, maybe the same field,
22  maybe in another field and that security will probably
23  go up more than had he kept it.
24  BY MR. STERN:
25    Q    Okay.  So I guess there is a few different

Page 62
1  things you could do with the proceeds from a security
2  sale for tax purposes, and I want to ask, I guess what
3  those different alternatives are.  So I guess, to your
4  knowledge, what are the options that someone has for
5  use of the proceeds of a sale of a security for tax
6  purposes?
7        MR. ROB PODOLL:  Object.  Form.
8     A    I'd have to think about them all and there
9  too many and we don't have enough time today to go
10  into all of them and the reasons for it.
11  BY MR. STERN:
12    Q    Okay.  Well, one thing you could do is, you
13  could hold the money in cash, the proceeds that you
14  get from the sale of a security, right?
15    A    Yes.
16        MR. ROB PODOLL:  Object to form.
17  BY MR. STERN:
18    Q    And when you were a portfolio manager, did
19  you ever sell stock to harvest a loss and then hold
20  the proceeds from that sale in cash?
21        MR. ROB PODOLL:  Object.  Form.
22    A    I can't recall, but I probably did.
23  BY MR. STERN:
24    Q    So in the --
25    A    In 1969, we sold stock and held cash to 1974

Page 63
1  for people.
2     Q    Why did you do that?
3     A    And they all benefited many times, maybe a
4  hundred times by doing that.
5     Q    And why did they benefit?
6     A    Because in 1974 to the present time, I can't
7  tell you how many times the market is up, in the
8  thousands.  And if they invested in 1974, like we did,
9  and every one of our clients did, they made a lot of
10  money.
11    Q    So do you agree that if you sell a security
12  and hold the proceeds in cash, it's possible that
13  you'll end up missing appreciation in the stock
14  market?
15        MR. ROB PODOLL:  Object.  Form.
16    A    You really can't answer a question like
17  that.  You have to give me facts, then I can answer a
18  question.
19  BY MR. STERN:
20    Q    So as a portfolio manager assessing whether
21  to harvest a capital loss for a client, was it
22  important to understand all the facts and
23  circumstances specific to that client?
24        MR. ROB PODOLL:  Object.  Form.
25    A    At all times, you must understand your

Page 64
1  client first.
2  BY MR. STERN:
3     Q    As a portfolio manager, would it be
4  imprudent to make one decision to sell a security on
5  behalf of all your clients at the same time?
6        MR. ROB PODOLL:  Object.  Form.
7     A    A client is a separate person.  You think of
8  each client separately.
9  BY MR. STERN:
10    Q    And what type of factors specific to each
11  client, would affect your decision as of portfolio
12  manager of whether or not to sell a particular stock?
13        MR. ROB PODOLL:  Object.  Form.
14    A    God, that's such a general question.  It's
15  difficult to answer a general question without getting
16  facts.  Every client is different.
17  BY MR. STERN:
18    Q    I guess, are you not able to tell me,
19  generally speaking, what factors would affect your
20  decision of whether or not to sell a security for a
21  particular client?
22        MR. ROB PODOLL:  Object.  Form.
23    A    That is the job of the money manager, to
24  understand his client, his financial condition, what
25  are all the factors in his life.  And each client is



Page 81

1  Q   So is an IRA account an exception to your
2  rule that the portfolio manager should always take
3  short-term capital losses?
4        MR. ROB PODOLL:  Object.  Form.
5  A   It's an exception, yes, because no person in
6  their right mind would take a loss if you can't use
7  it.
8  BY MR. STERN:
9  Q   Are you aware of any types of investment
10 accounts, besides IRA accounts, where the loss cannot
11 be used to offset gains?
12       MR. ROB PODOLL:  Object.  Form.
13 A   I cannot -- well, my memory -- I can't think
14 of any right now because I just can't -- just don't
15 know, now, here today.
16 BY MR. STERN:
17 Q   Who was responsible for communicating with
18 First Western Trust on behalf of the trusts?
19 A   On behalf of the trusts, would be me.
20 Q   Okay.  Did your wife Barbara, to your
21 knowledge, ever communicate with First Western Trust
22 Bank about the trust brokerage accounts?
23 A   I don't know.
24 Q   When was the first time that you talked to
25 First Western Trust Bank about tax losses relating to

Page 82

1  the trust brokerage accounts?
2  A   Well, before they had the account, I think
3  they told me they take them or it may have been in the
4  document, I don't remember.  But, I think it was late
5  November or the first week in December.  I can't give
6  you the exact date.  When I met with them and told
7  them we had -- well, before that, taking losses, when
8  I met with Charlie Bantis and he gave me the loan, he
9  knew then that we had a potential $5 million gain.
10 And I think I talked to Andrew Godfrey and there was
11 another young man, I forget his name, that we had huge
12 losses.  I was in that office many times from May to
13 December because I deposited income checks.  So I
14 can't tell you how many times I spoke to them.
15 Q   Between May and December 2018, were you in
16 regular contact with employees of First Western Trust
17 Bank regarding the trusts brokerage accounts?
18 A   It not regarding the trust accounts, a few
19 times, but not many.
20 Q   Okay. Did you ever instruct First
21 Western --
22 A   The first -- the first time I noticed tax
23 losses was in late November or December.
24 Q   Okay.  So as of either late November 2018 or
25 early of December 2018, you knew that there were

Page 83

1  unrealized losses in the trust brokerage accounts; is
2  that correct?
3  A   Yes.
4  Q   Okay.  And at that time, did you provide
5  written instructions to First Western Trust Bank to
6  harvest those tax losses?
7  A   I told five people in the conference room
8  and the man who was on the Zoom call, I think it was a
9  Zoom call, Barrett or something --
10       (Deponent cell phone ringing.)
11 A   -- and they all looked at me and said, we
12 didn't take tax -- well, we don't know about tax loss.
13 But the man in there had blank looks and said this is
14 the strange item.  And then finally, they -- the young
15 man said, I didn't know about that, because he just
16 passed his exam and I thought they were going to take
17 tax losses.  I gave them oral instructions.  I don't
18 think you'll find a letter in the file that I wrote to
19 them.
20 Q   Okay.
21       MR. STERN:  I see it's 12:01.  I mean,
22    I could go on this topic for another five to
23    ten minutes.  Do you want to take a break
24    now, Rich, or do you want to keep going?
25       MR. ROB PODOLL:  Actually, this is Rob.

Page 84

1       MR. STERN:  Rob.
2       MR. ROB PODOLL:  Let's ask Aaron,
3    because to me this is just getting
4    interesting.  Let's see what Aaron wants to
5    do.  Aaron, would you like to go another
6    five, ten minutes on this topic or do you
7    want to take lunch?
8       THE WITNESS:  I can go four straight
9    hours.  I'm 101, I can go four straight
10   hours.
11      MR. ROB PODOLL:  Probably more than I
12   can.  Are you good for another five, ten
13   minutes on this?
14      THE WITNESS:  Sure.
15      MR. ROB PODOLL:  Okay.  Yeah, okay with
16   us if you want to keep going for another
17   five or ten.
18      MR. STERN:  Great.
19 BY MR. STERN:
20 Q   Okay.  Mr. Fleck, are you aware of any time
21 when you sent a letter, email, or writing to First
22 Western Trust Bank instructing them to take the
23 capital losses available in the trust brokerage
24 accounts in 2018?
25 A   I don't remember writing them a letter.



AARON H. FLECK  
FLECK REVOCABLE TRUST vs FIRST WESTERN
March 01, 2022  
85–88

Page 85
1  Q   Okay.  Who are the five people in the
2  meeting that you claim you told to take tax losses?
3       A   Charles Bantis; Andy Godfrey; I think his
4  name was Paul; it was a man, I believe from Denver
5  there, a trust officer or something; and a lady -- I
6  don't know what her name, maybe Elaine, I believe.
7  She was also an officer and then they had on the Zoom
8  call, this man who was supposed to be, I thought, the
9  head of their trust department, or he was their
10 manager or something.  And I do not remember his name.
11      Q   Okay.  And to the best of your recollection,
12 what specifically did you say during this meeting to
13 First Western regarding tax losses?
14      A   "You gave me a statement, I noticed you took
15 $149,000 in short-term losses.  I commend you for it,
16 that's good, I wanted you to do it.  You knew that.
17 But, you have 575,000 of additional losses.  It's
18 crazy that you had, but you had it.  You must take
19 them because I have a huge capital gain on the sale of
20 my property."
21      Q   Okay.  Did you take any notes at this
22 meeting?
23      A   No.
24      Q   Do you have any written records supporting
25 the fact that you supposedly told First Western to

Page 86
1  take additional tax losses in 2018?
2       A   I -- I don't have -- you know, I knew
3  Charlie Bantis and had done business with him for over
4  20 years.  I knew Andy Godfrey who was the best man at
5  my daughter's wedding, not best man, an usher.  I
6  trusted these people.  When I tell them to do
7  something, I thought they would do it.  I don't know
8  whether they took notes.  I don't think they did, but
9  maybe they did.  I didn't see anybody writing.  All I
10 saw was blank faces when I said, take all the losses
11 that you can.
12      Q   Okay.  Well, my question was different.  My
13 question was:  Do you have any written records
14 supporting your allegation that you told First Western
15 at a meeting to take additional tax losses for the
16 trusts?
17      A   I have answered the question the best way I
18 can.
19      Q   Okay.  Other than the in-person meeting that
20 we just discussed, was there any other time in 2018
21 when you told anyone at First Western to take
22 additional tax losses in the trust accounts?
23      A   I may have, if I came into the bank, but I
24 don't recall.  I think my next visit was in January
25 after I received the statements.

Page 87
1  Q   Okay.
2  A   But I may have been in there on deposits,
3  check deposits, but I don't recall.
4       Q   Do you have any recollection of following up
5  with anyone at First Western in December 2018 to ask
6  whether they had taken additional tax losses in the
7  trust account?
8       A   I don't recall that.
9       Q   Okay.  Do you have access to the trust
10 accounts online?
11          MR. ROB PODOLL:  Are you asking
12      presently?
13      A   Do I have -- I never -- I don't know how to
14 use those to get documents.  I have an assistant that
15 gets some for me and I don't think I ever put the
16 accounts on my computer or had anybody do it for me.
17 BY MR. STERN:
18      Q   Who was your assistant in 2018?
19      A   I'm trying to think of her name.  I have to
20 think of her name.
21      Q   Okay.  In 2018, did you ever ask your
22 assistant to go online and get the latest statement
23 for your First Western accounts?
24      A   I never showed her our accounts or asked her
25 anything about our accounts.  She wasn't really an

Page 88
1  assistant, she was a clerk.  I have an assistant now.
2       Q   How did you receive your account statements
3  for your First Western accountant in 2018?
4       A   The first one I got was in November, as I
5  recall.
6       Q   Would you get them in the mail?
7       A   I don't recall.  I think Andy handed it to
8  me -- no, I may have gotten them in the mail.  I may
9  have had statements before, I don't recall, but the
10 first one that I really looked out was in November.  I
11 was letting them manage.  You can't look at your
12 portfolios every week or every month.  I didn't care.
13 If I gave them management, I gave them management and
14 I can't expect month-to-month results.  I didn't want
15 anybody to ask me to give them month-to-month results,
16 and I trusted them.
17      Q   Okay.
18          MR. STERN:  I think this is a good time
19      to take a break.  Why don't we take a lunch
20      break.  How long would you guys like to
21      take?
22          MR. ROB PODOLL:  I've got to run some
23      errands that I've got to get done which were
24      scheduled before Rich surprised me with this
25      little ceremony.  I can be back at 1:30 or



Page 97
1   A   What's the number on the bottom?
2   Q   On the bottom it says, FLECK_001724.
3   A   I'm looking at the wrong sheet.  I need my
4   magnifying glass to read this.
5          MR. ROB PODOLL:  I was sort of thinking
6      the same way.  Can the exhibit on the screen
7      be enlarged?
8          MR. STERN:  Yes.
9          MR. ROB PODOLL:  Beautiful.  Thank you.
10  BY MR. STERN:
11  Q   Aaron, you're welcome to look at the screen.
12  I've zoomed in on the screen or you can look at your
13  hard copy, whatever you prefer.  But, do you see on
14  the top line it shows Dodge & Cox Income Fund and it
15  shows there's an unrealized loss in that security of
16  $11,456.52?
17  A   Yes.
18  Q   Okay.  Is your position that First Western
19  was required to sell Dodge & Cox Income Fund in
20  December 2018?
21  A   Well, I hope you listened to my testimony.
22  They should have, but are they required?  That's up to
23  them.  I expected that they would have.
24  Q   Okay.
25  A   And they were under instructions to sell all

Page 98
1   losses.
2   Q   Okay.
3   A   Now, is that the gain or -- I'm just looking
4   at the statement, this is a portfolio.  This was a
5   bond fund, I guess.
6   Q   Okay.  On what day should First Western have
7   sold the Dodge & Cox Income Fund security?
8   A   Their option from December 1st to December
9   31st, anytime during the month.
10  Q   Okay.  What, according to you, should First
11  Western Trust Bank have done with the proceeds from
12  selling Dodge & Cox Income Fund security?
13  A   It's up to them.  They had authority to do
14  whatever they wanted to, but I had hoped, as a client,
15  that they would have called me and said, we have so
16  much cash in the funds and we would like to buy or do
17  something with the funds.
18  Q   Okay.  So do you agree that if First Western
19  had sold Dodge & Cox Income Fund in December of 2018
20  for the Barbara Fleck trust account, it could have
21  bought a different security, held the proceeds in
22  cash, or bought back the same security 31 days later?
23  A   Well, they actually did that.
24  Q   What do you mean by that?
25  A   If you look in the January statement, they

Page 99
1   sold a bunch of securities and bought a bunch of
2   securities, without -- against my advice.
3   Q   Okay.  So my question, though, is different.
4   A   The only difference, (crosstalk, inaudible.)
5   in actuality and could have.  They did it.
6   Q   Okay.  But my question is:  Do you have a
7   position on -- okay, let me start over.  Do you agree
8   that if First Western had sold Dodge & Cox Income Fund
9   at a lost in December 2018, it could have chosen to
10  either hold the funds in cash, buy back a different
11  security, or buy back the same security 31 days later?
12  A   Yes.
13  Q   And do you agree that each of those three
14  decisions would have a different economic impact on
15  the trusts accounts?
16  A   It depends.  I can't tell you that now.
17  Q   What does it depend on?
18  A   Depends on whether they bought it back at
19  the same price, a lower price, or a higher price.
20  Q   Okay.  Did you give First Western
21  instructions --
22  A   But the one thing you failed to realize in
23  all of your questioning, they had authority to do
24  that, they had full discretion.
25  Q   Okay.  Did you ever give First Western --

Page 100
1   A   And -- and they used it several times.
2   Q   Okay.  Did you ever give First Western
3   instructions about what to do with the proceeds that
4   would be generated by harvesting tax losses in 2018?
5   A   No.
6   Q   Do you believe -- strike that.  Do you claim
7   that the defendants in this case chose not to harvest
8   tax losses for the trust account in bad faith?
9   A   I cannot answer what's in their mind.
10  Q   Okay.  Do you contend that the defendants
11  received any personal benefit by not harvesting tax
12  losses for the trusts in December 2018?
13  A   I can't answer that question without knowing
14  all the full facts of the bank.
15  Q   Okay.  Sitting here today, do you contend
16  that the bank failed to harvest tax losses in the
17  trust account intentionally?
18  A   I think it was negligence.
19  Q   Okay.  Do you contend, sitting here today,
20  that the bank acted with gross negligence when it did
21  not harvest tax losses for the trust in December 2018?
22         MR. ROB PODOLL:  Object.  Form.
23  A   Yes.
24  BY MR. STERN:
25  Q   Okay.  And tell me every reason that you

